**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DBSI INC., et al.[1] | ) | Case No. 08-12687 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | Objection Deadline: January 7, 2009 at 4:00 p.m. |

**LIMITED OBJECTION OF THE SPECIAL SERVICERS TO FIRST MONTHLY APPLICATION OF FOLEY & LARDNER LLP, SPECIAL COUNSEL FOR THE DEBTORS, FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD NOVEMBER 10, 2008 THROUGH NOVEMBER 30, 2008**

Midland Loan Services, Inc., CWCapital Asset Management LLC, J.E. Robert Company, Inc. and ORIX Capital Markets, LLC, solely in their capacity as special servicers (together, the "Special Servicers") for the trustees of the trusts that are listed on Exhibit A, by their undersigned counsel, hereby object to the First Monthly Application of Foley & Lardner LLP, Special Counsel for the Debtors, for Compensation and Reimbursement of Expenses for the Period November 10, 2008 through November 30, 2008 [DE 806] (the "Application"), stating the following for reasons:

**INTRODUCTION**

The Trusts do not object to the allowance of the fees and expenses sought in the Application. The Trusts object to the payment of any fees and expenses from the funds collected by the Debtors as "Chapter 11 Legal and Administrative Claims" through the budgets attached to the various cash collateral orders entered by the Court.

---

[1] A list of the jointly administered cases is available on the website of the Debtors' proposed noticing

# BACKGROUND

The Special Servicers administer troubled commercial mortgage backed securitized loans (the "TIC Loans") on behalf of various real estate mortgage investment conduit trusts (collectively, the "Trusts").

The TIC Loans were made to finance the purchase of commercial real property by DBSI-related entities (each, a "Sponsor"). Each Sponsor then sold undivided fractional tenant in common interests in its property to the "TIC Owners." In general, each property is now owned by a set of TIC Owners as tenants in common.

The TIC Loans are secured by first-priority liens on the non-residential real property, as well as furniture, fixtures, equipment and other assets as set forth in the TIC Loan documents (the "TIC Property"). A representative sample of a mortgage and UCC-1 filing in favor of a TIC Lender are attached hereto as Exhibits B and C, respectively.

Each property is leased to a Debtor tenant (a "Master Tenant") pursuant to a triple net lease agreement (a "Masterlease"). A representative sample of a Masterlease is attached hereto as Exhibit D. **<u>The Masterleases are subject to the Trusts' mortgages</u>**:

"21. Subordination

    21.1    Tenant agrees that this Lease shall be subject and subordinate at all times to the lien of the Permitted Mortgage. In the event that the holder of the Permitted Mortgage forecloses the Landlord's interest in the Premises or accepts a deed in lieu of foreclosure from Landlord as a result of Landlord's default, this Lease shall, at such holder's election, be terminated and Tenants shall not be deemed to, or have any right to, attorn to the holder of the Permitted Mortgage.

    \*    \*    \*

and claims agent at www.kcclle.net/dbsi.

> 23.22. Subordination.  Landlord has executed and delivered, or may hereafter from time to time execute and deliver, a Permitted Mortgage.  This Lease and Tenant's interest in this Lease shall be subordinate to the Permitted Mortgage, and to any and all advances made thereunder and to the interest theron, and to all renewals, replacements, supplements, amendments, modifications and extensions thereof unless Lender elects to make certain of Tenant's rights and interest in this Lease superior thereto; and Tenants will promptly execute and deliver such agreement or agreements as may be reasonably required by the Lender."

*See* representative language from Exhibit D, Masterlease, at paragraphs. 21 and 23.

The Masterlease agreements provide that the TIC Owners and the Debtors must obtain the TIC Lender's consent to any assignment or subletting of the premises. *See* representative language from Exhibit D, Masterlease, at paragraph 17.9.  The Masterleases may not be amended or modified to, among other things, reduce the payment obligations or shorten the lease term, without the prior written consent of the TIC Lenders.  Exhibit D, Masterlease at paragraph 23.23.  The TIC Lenders are third party beneficiaries under the Masterleases.  *See* Exhibit D, Masterlease at paragraph 23.28.

***The Debtors assigned their interests in the Masterleases and rents to the TIC Lenders as security for repayment of the TIC Loans***.  *See* representative Assignment of Leases, Rents, Income and Profits attached hereto as Exhibit E.  As further security for the TIC Loans, the Masterleases and rents have been assigned by the TIC Owners to the TIC Lenders.[2]  *Id.*  Such assignment is a present and absolute assignment, and not an assignment for security.  *See* Exhibit E, representative Assignment of Leases, Rents, Income and Profits at p. 2.

---

[2] The TIC Lenders have claims in these bankruptcy cases that are derivative of the claims of the TIC Owners, the borrowers under the TIC Loan Documents.  Any waiver or forfeiture of TIC Owners' claims diminishes the collateral and security pledged by the TIC Owners to the TIC Lenders.

The Debtors have contracted with an affiliated entity, DBSI Realty Corporation, to operate and manage the properties pursuant to an Internal Management Agreement. DBSI Realty Corporation, in turn, contracted with third party property managers to perform the actual operation and management pursuant to a Management Agreement (together, with the Internal Management Agreement, the "Management Agreements"). **_The Debtors' interests in the Management Agreements are part of the collateral for the TIC Loans._** *See* representative Assignment and Subordination of Management Agreement, attached hereto as Exhibit F. **_DBSI Realty Corporation has subordinated any interest in the management fees payable under the Management Agreements to payment of the TIC Loans and the liens of the TIC Lenders_**. *See* Exhibit F, representative Assignment and Subordination of Management Agreement at paragraphs 1, 3 and 6.

**_The TIC Lenders have the right to replace DBSI Realty Corporation and any third party manager_** in the event that a TIC Lender determines that the property is not being managed appropriately. *See* Exhibit F, representative Assignment and Subordination of Management Agreement at paragraphs 5 and 19.

While this structure initially sounds complex, the portion of the structure that relates to the proposed "sale" is simple. **_The Debtors are tenants. The Debtors' rights under the Masterleases and the Management Agreements are collateral of the TIC Lenders and subordinate to the rights of the TIC Lenders._**

### THE CHAPTER 11 CASES

These jointly administered cases began on November 10, 2008 (the "Petition Date"), when the Debtors filed voluntary petitions for relief under Chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"). As of the date of this Objection, the Debtors have yet to file their schedules or statements of financial affairs.

## DEBTORS' POSTPETITION PERFORMANCE

The Debtors have taken $27,500 from each property ($12,500 in November, and $7,500 in each of December and January) for the purpose of paying "Chapter 11 Legal and Administrative Claims." However, the Debtors have not paid debt service on all of their properties, notwithstanding (1) the directive in the Court's first cash collateral order [DE 519] that debt service be paid, (2) the requirements of 365(d)(3) that a debtor perform timely under a lease postpetition, and (3) the provisions in the Assignment and Subordination of Management Agreement, subordinating the payment of management fees to DBSI to the payment of debt service to the Trusts.

There is a finite stream of rental income generated by each property and, as stated above, the rental income is collateral of the Trusts. The Debtors' collection of $27,500 per property is an attempt to surcharge the collateral of the Trusts. The Debtors' have not applied to the Court for permission to surcharge the Trusts' collateral under Section 506(c) of the Bankruptcy Code.

This amount is material to the Trusts. The Special Servicers service approximately 55 loans involved in these cases. The attempted surcharge has taken more than $1,500,000 of collateral from the Trusts. If the Debtors are permitted to spend the money collected for "Chapter 11 Administrative Expenses and Fees," that collateral will be forever dissipated.

**FOLEY & LARDNER LLP'S FEE APPLICATION**

Foley & Lardner LLP ("Foley") has sought allowance and payment of fees in the amount of $244,763.60, 80% of what was incurred during the period of November 10, 2008 through November 30, 2008, and reimbursement of all expenses, in the amount of $4,754.86.

Foley's application divides the compensation by project category, as follows:

| Project Category | Total Billed Amount |
|---|---|
| Case Administration | $1,342.50 |
| Fee/Employment Applications | $19,778.50 |
| Tax Issues | $24,150.00 |
| TIC Issues | $119,302.50 |
| Securities Issues | $26,895.00 |
| Prepetition Financing Issues | $36,000.50 |
| Non-TIC Issues | $65,017.50 |
| Working Travel Time | $8,806.00 |
| Non-Working Travel Time | $462.00 |
| **Total** | **$305,954.50** |

None of the aforementioned categories of expenses relate to the preservation or disposition of collateral. The Trusts were not benefitted by the services and expenses set forth in the collateral.

## ARGUMENT

The Debtors' motion to use cash collateral is not brought under Section 506(c), yet it appears that relief under Section 506(c) is what the Debtors seek by including, in their budgets, line items for administrative expenses.

However, the Debtors have not made any showing that expenses have actually been incurred, or that they are reasonable, necessary, incurred in connection with the preservation or disposition of collateral, or of any benefit to any secured party. To the extent that the Debtors seek to surcharge collateral, such relief should not be granted.

The United States Court of Appeals for the Third Circuit has clearly instructed that relief under <u>Section 506(c) is the rare exception, not the rule</u>.

> "The circumstances under which a claimant may rely on § 506(c) are, as we have pointed out, sharply limited. In *C.S. Associates* we said:
>
>> "Our decisions have clarified that to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors. *Equibank*, 884 F.2d 80 at 84, 86-87; *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94-95 (3d Cir. 1986); *see also In re Glasply Marine Indus*. 971 F.2d 391, 394 (9th Cir. 1992 ("To satisfy the benefits prong [of § 506(c) the claimant] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." (internal quotation marks omitted); *In re Flagstaff Foodservice Corp*., 762 F.2d 10, 12 (2d Cir. 1985) ("To warrant [§ ] 506(c) recovery . . . [the claimant] must show that . . . funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure."). *C.S. Associates*, 29 F.3d at 906 (emphasis in the original)."

*In re Visual Industries, Inc*., 57 F.3d 321, 325-26 (3d Cir. 1995).

Providing <u>some benefit to a debtor is not enough</u>; Section 506(c) requires a "a direct benefit inuring to the secured lender for the preservation or disposition of the secured property." *Id*. at 327. Section 506(c) is not a "panacea" for the problem of keeping post-bankruptcy accounts paid. *Id*., *quoting Matter of P.C. Ltd*., 929 F.2d 203, 206 (5th Cir. 1991).

Expenses that benefit the entire estate, such as the expenses of leases and trade creditors, cannot simply be shifted to secured creditors as costs of preservation. *See In re K&L Lakeland, Inc*., 128 F.2d 203 (4th Cir. 1997) (Section 506(c) could not be used to charge secured creditor for postpetition rent); *Visual Industries*, 57 F.3d at 327 (Section 506(c) would not be used to charge secured creditor for trade debt, even though the debt was incurred to keep the debtor in business).

The direct and intended beneficiary of the services for which surcharge is sought must be the secured party, not the debtor. *See Gallivan v. Springfield Post Road Corp., et al.,* 110 F.3d 848, 852-853 (1st Cir. 1997) ("we think it sufficient to hold that the finding that the direct and intended beneficiaries of appellants' services was the debtor, and not the secured party, was supported by the evidence").

The party seeking the recovery bears the burden of demonstrating the existence and amount of any benefit. *Gallivan v. Springfield Post Road Corp., et al.,* 110 F.3d 848, 853 (1st Cir. 1997). Foley and Lardner cannot make such a showing. As reflected by the stated categories of services rendered, none of their services benefitted the Trusts or the Trusts' collateral.

A bankruptcy court must make affirmative findings of the requirements of a Section 506(c) claim before authorizing a surcharge. *K&L Lakeland*, 128 F.3d at 210.

Moreover, the legislative history and plain meaning of Section 506(c) require that, in order to surcharge under Section 506(c), the estate must have <u>actually incurred</u> the expense. *K&L Lakeland*, 128 F.3d at 210.

## CONCLUSION

As stated above, the Trusts take no position on the amount of fees and expenses that should be allowed. The Trusts object to payment of fees and expenses from the surcharge of their collateral by way of the $27,500 exacted from each property through the cash collateral orders entered by the Court.

WHEREFORE, the Special Servicers respectfully request that this Court deny the Application or, in the alternative, enter an order consistent with this objection.

Dated: Wilmington, Delaware
January 7, 2009

*/s/ Lisa Bittle Tancredi*
Lisa Bittle Tancredi
Delaware Bar No. 4657
Venable LLP
1200 North Broom Street
Wilmington, Delaware 19806
Telephone: (302) 656-3929
Facsimile: (302) 656-8503
lbtancredi@venable.com

-and-

*/s/ Gregory A. Cross*
Gregory A. Cross
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742
gacross@venable.com

Attorneys for Midland Loan Services, Inc., CWCapital Asset Management LLC, J.E. Robert Company, Inc. and ORIX Capital Markets, LLC

# CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 7th day of January, 2009, a copy of the Objection of the Special Services to First Monthly Application of Foley & Lardner LLP, Special Counsel for the Debtors, for Compensation and Reimbursement of Expenses for the Period November 10, 2008 through November 30, 2008was served upon the parties listed and by the means indicated on the attached Service List.

Dated: Wilmington, Delaware
    January 7, 2009         /s/ Lisa Bittle Tancredi