# EXHIBIT B

11/21/2006 RP2 $300.00

PREPARED/DRAFTED BY AND
RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

BEST & FLANAGAN LLP
225 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Attn: Kim JoDene Donat

Order/Escrow No.: 2710000802
Loan No.: 010-00001741

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**COMMERCIAL DEED OF TRUST, SECURITY AGREEMENT,
FIXTURE FILING FINANCING STATEMENT
AND
ASSIGNMENT OF LEASES, RENTS, INCOME AND PROFITS**

**THE PROMISSORY NOTE SECURED HEREBY PROVIDES FOR A:
[FIXED INTEREST RATE]**

THIS **COMMERCIAL DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING FINANCING STATEMENT AND ASSIGNMENT OF LEASES, RENTS, INCOME AND PROFITS** (this "**Security Instrument**") is made and given as of November 13, 2006, by DBSI COLONNADE WEST LAKE LLC, a(n) Delaware limited liability company, whose address is 1550 South Tech Lane, Meridian, Idaho 83642 ("Lessor"), and DBSI MASTER LEASECO, INC., an Idaho corporation, whose address is 1550 South Tech Lane, Meridian, Idaho 83642 ("Lessee"), (Lessor and Lessee are also referred to herein individually or collectively, as "**Borrower**" and for purposes of Article 3 hereof, collectively "**Assignor**"), to PARTNERS TITLE COMPANY, and all successors and assigns, whose address is 712 Main, Suite 2000E, Houston, Texas 77002 (herein called "**Trustee**"), for the benefit of ARTESIA MORTGAGE CAPITAL CORPORATION, a Delaware corporation, whose address is 1180 NW Maple Street, Suite 202, Issaquah, Washington 98027, and its successor and assigns (in each case, "**Lender**," and for purposes of Article 3 hereof, "**Assignee**").

HOLD/PARTNERS TITLE COMPANY/GF
2710000802

**WHEREAS**, Borrower is justly indebted to Lender in the principal sum of Seven Million Two Hundred Seventy-Two Thousand and 00/100 Dollars ($7,272,000.00), pursuant to a certain **Fixed Rate Note** of even date herewith, more particularly described below,

Lessor is the owner in fee simple of the Property (defined below).

Lessee is the tenant under that certain Master Lease Agreement dated as of the funding of the Loan herewith by and between Borrower, as landlord, and Lessee, as tenant (the "Master Lease"), which Master Lease demises to Lessee a leasehold estate in the premises as described in the Master Lease (the "Premises").

As a condition to making the Loan (defined below), Lender requires among other things Lessor execute and deliver this Security Instrument as to the fee simple title to the Property and any reversionary rights the Lessor has to the leasehold estate under the Master Lease and the building(s) and other Improvements located upon the Property and that Lessee execute and deliver this Security Instrument as to Lessee's interest in Lessee's leasehold estate in the Property and the building(s) and other improvements located upon the Property.

Lessee is executing and delivering this Security Instrument for the purpose of granting, transferring and assigning its right, title and interest in and to the Master Lease and the Property as security for repayment of the Note by the Borrower.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, including the indebtedness herein recited and the trust herein created, the receipt of which is hereby acknowledged, Borrower hereby grants a first priority security interest in, and irrevocably gives, grants, transfers, aliens, enfeoffs, conveys, confirms, warrants, assigns, mortgages, bargains, sells and pledges to Trustee, IN TRUST FOREVER, WITH ALL POWERS OF SALE AND STATUTORY RIGHTS, for the benefit and security of Lender, under and subject to the terms and conditions hereinafter set forth, the following property, rights, interests [including without limitation all of the tenancy in common interests of all of the Owners [defined in **Section 1.31** captioned "Tenant-in-Common Provisions" hereof], if any) and estates now owned, or hereafter acquired, by Borrower (collectively, the "**Property**"):

(a)     the real property described in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "**Land**"), together with additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the development, ownership or occupancy of such real property, and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(b)     any and all buildings, structures and other improvements now or hereafter erected, constructed, placed or located on the Land including, without limitation, fixtures, tenements, attachments, appliances, equipment, building systems, machinery, and other articles now or hereafter attached to or used in connection with said buildings, structures and other improvements (collectively, the "**Improvements**"), and any and all additions to, substitutions for or replacements of such Improvements and such Land and all interests, estates or other claims, both in law and in equity, which Borrower now has or may hereafter acquire in the Land or the Improvements, including, without limitation, all right, title and interest now owned or hereafter acquired by Borrower in and to any greater estate in the Land or the Improvements (including without limitation all of the tenancy in common interests of all of the Owners [defined in **Section 1.31** captioned "Tenant-in-Common Provisions" hereof], if any);

(c)     all easements, tenements, hereditaments, appurtenances, rights-of-way and rights now owned or hereafter acquired by Borrower used or useful in connection with, or located on, under or above all or any part of, the Land or as a means of access thereto, including, without limitation, all rights pursuant to any trackage agreement; all rights to the nonexclusive use of common drive entries; all oil and gas and other hydrocarbons; all minerals, crops, timber and other emblements; water, groundwater,

-2-

water rights and shares of stock evidencing the same; any and all right, title and interest of Borrower, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining the Land; and any and all sidewalks, vaults, alleys and strips and gores of land adjacent to or used in connection with the Land (collectively, the "**Appurtenances**");

(d)      all leasehold estate, right, title and interest of Borrower in and to all written and oral leases (including, without limitation, the Master Lease), subleases, subtenancies, licenses, franchises, usufructs, occupancy agreements and other agreements affecting all or any portion of the Property or the Improvements or the use or occupancy thereof, now or hereafter existing or entered into, whether before or after any proceeding is instituted by or against Borrower under 11 U.S.C. § 101 et seq., as amended (the "**Bankruptcy Code**"), including, without limitation, extensions, renewals and subleases (all of the foregoing, individually, a "**Lease**" and collectively, "**Leases**"), and all rights and claims of any kind that Borrower may have against any tenant under the Leases or in connection with the termination or rejection of the Leases in a bankruptcy or insolvency proceeding, and all right, title and interest of Borrower thereunder, including, without limitation, the Master Lease and all subleases under the Master Lease, all cash or security deposits, prepaid or advance rentals, and deposits or payments of similar nature which are hereby specifically assigned, transferred and set over to Lender; including, without limitation, all rents, royalties, issues, revenues, profits, proceeds, income and other benefits, including, without limitation, accounts receivable, of, accruing to or derived from such Leases and from the renting, leasing or bailment of Improvements and equipment, including, without limitation, any payments made by tenants under Leases in connection with the termination of any Lease and all oil, gas and other mineral rights, royalties and profits, whether paid or accruing before or after any proceeding is instituted by or against Borrower under the Bankruptcy Code (all of the foregoing, collectively, "**Rents**"), and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Secured Obligations (defined below) and all lease guaranties, letters of credit and any other supporting obligation for any of the Leases (collectively, "**Lease Guaranties**") given by any guarantor in connection with any of the Leases, and all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under Lease Guaranties;

(e)      all the estate, interest, right, title, other claim or demand, both in law and in equity, including, without limitation, claims or demands with respect to the proceeds of any any unearned premiums on insurance policies in effect with respect to the Property, which Borrower now has or may hereafter acquire in the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Property, and any and all awards made for the taking by eminent domain, or by any proceeding of purchase in lieu thereof, of the whole or any part of the Property, including, without limitation, any awards resulting from a change of grade of streets and awards for severance damages;

(f)      all goods, chattels, construction materials, furniture, furnishings, equipment, machinery, apparatus, appliances, and other items of personal property, whether tangible or intangible, of any kind, nature or description, whether now owned or hereafter acquired by Borrower, including, without limitation, improvements including, without limitation, furnaces, steam boilers, hot water boilers, oil burners, pipes, radiators, air conditioning and sprinkling systems, gas and electric fixtures, carpets, rugs, shades, awnings, screens, elevators, motors, dynamos, cabinets, and all other furnishings, tools, equipment and machinery, appliances, building supplies, materials, fittings and fixtures of every kind, which is, are or shall hereafter be located upon, attached, affixed to or used or useful, either directly or indirectly, in connection with the complete and comfortable use, occupancy and operation of the Property and Improvements, whether or not any of such personal property is now or becomes a Fixture (defined below), including, without limitation, any and all licenses, permits or franchises used or required in connection with such use, occupancy or operation, together with any and all additions, replacements or substitutions thereto, thereof or therefor, as well as the proceeds thereof or therefrom regardless of form (hereinafter sometimes together referred to as the "**Personal Property**"; such Personal Property shall include, without limitation, all Accounts, Documents, Instruments, Chattel Paper, Goods, Equipment,

General Intangibles, Fixtures and Inventory, as those terms are defined in the Uniform Commercial Code of the State where the Property is located);

(g)     all plans and specifications, contracts and subcontracts for the construction of any Improvements, density rights, bonds, permits and other development or use entitlements, licenses, guarantees, warranties, causes of action, claims, condemnation proceeds, profits, security deposits, utility deposits, governmental agency fees and deposits and refunds thereof, refunds of taxes or insurance premiums, policies, claims, and proceeds of insurance, claims and proceeds arising from condemnation, vehicles, together with all present and future attachments, accessions, replacements, additions, products and proceeds thereof;

(h)     all monies deposited by Borrower, or deposited on behalf of Borrower, with any City, County, public body or agency, irrigation, sewer or water district or company, and any other body or agency, for the installation, or to secure the installation, of any utility pertaining to the Property;

(i)     all refunds, rebates, reimbursements, reserves, deferred payments, deposits, cost savings, governmental subsidy payments, governmentally-registered credits (such as emissions reduction credits), other credits, waivers and payments, whether in cash or in kind, due from or payable by (i) any federal, state, municipal or other governmental or quasi-governmental agency, authority or district (each, a **"Governmental Agency"**) or (ii) any insurance or utility company relating to any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property;

(j)     all refunds, rebates, reimbursements, credits and payments of any kind due from or payable by any Governmental Agency for any taxes, special taxes, assessments, or similar governmental or quasi-governmental charges or levies imposed upon Borrower with respect to the Property or upon any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property;

(k)     all monies deposited by Borrower with or for the benefit of Lender pursuant to any reserve, escrow or cash collateral agreements executed by Borrower in favor of Lender;

(l)     contract rights, accounts receivable, management agreements, business records;

(m)     All substances in, on, under, or above the Land which are now, or may become in the future, intrinsically valuable (that is, valuable in themselves) and which now or may be in the future enjoyed through extraction or removal from the Property, including without limitation, oil, gas, and all other hydrocarbons, coal, lignite, carbon dioxide and all other nonhydrocarbon gases, uranium and all other radioactive substances, and gold, silver, copper, iron and all other metallic substances or ores (collectively, the "Minerals"); and

(n)     all additions, accessions, replacements, substitutions, proceeds and products of the real and personal property, tangible and intangible, described herein;

(The Property does not include any equipment, inventory, furniture, furnishings or trade fixtures owned and supplied by tenants of the Property, except to the extent of Borrower's landlord's lien (if any) therein, and except as same may become the property of Borrower as landlord under the terms of their respective Leases.)

**FOR THE PURPOSE OF SECURING:**

1.     repayment of indebtedness in the total principal amount of Seven Million Two Hundred Seventy-Two Thousand and 00/100 Dollars ($7,272,000.00) with interest, additional interest, default interest, late charges, prepayment charges and other sums and charges thereon (the **"Loan"**), evidenced

by that certain **Fixed Rate Note**, of even date herewith, and all modifications, extensions, renewals and replacements thereof or judgments thereon (collectively, the "**Note**"), executed by Borrower in favor of Lender, and with a final maturity date of **December 11, 2016**, the terms of which are hereby incorporated herein by reference as though set forth in full;

2.    the payment of any additional amounts, with interest thereon, that may be hereafter loaned by Lender to Borrower, which additional loans are evidenced by a promissory note or notes containing a recitation that this Security Instrument secures the payment of such note or notes.

3.    payment of all sums advanced by Lender, its successors and assigns, or Trustee to protect, care for or maintain the Property, or any portion thereof, with interest thereon at the Default Rate (as defined in the Note) and all sums advanced by Lender or Trustee under the terms of or for the enforcement of the Loan Documents (defined below), with interest thereon at the Default Rate (as defined in the Note);

4.    observance, performance and discharge of every obligation, covenant or agreement of Borrower contained herein or in the Note;

5.    observance, performance and discharge of every obligation, covenant and agreement of Borrower contained in any document, instrument or agreement now or hereafter executed by Borrower which recites that the obligations thereunder are secured by this Security Instrument, including, without limitation, payment of all other sums, with interest thereon, which may hereafter be loaned to Borrower, or its successors or assigns, by Lender, or its successors or assigns, when evidenced by a promissory note or notes containing a recitation that they are secured by this Security Instrument;

6.    compliance with and performance of each and every material provision of any declaration of covenants, conditions and restrictions pertaining to the Property or any portion thereof, as well as all obligations of the Lessor and Lessee under the Master Lease (as defined above); and

7.    payment and performance of all obligations of Borrower arising from any and all existing and future agreements with Lender which may afford interest rate protection to all or part of the Loan, when such agreement recites that the obligations thereunder are secured by this Security Instrument.

(The principal of and the interest on the indebtedness evidenced by the Note; all charges, fees and other sums as provided in the Loan Documents; and the principal of and interest on any other indebtedness secured by this Security Instrument and the performance of all of its obligations set forth in the Loan Documents are referred to herein, collectively, as the "**Secured Obligations**".)

PROVIDED, HOWEVER, that if the Secured Obligations shall have been paid in cash and performed in full, then, in such case the Trustee, at Lender's direction, shall, at the request and expense of Borrower, satisfy this Instrument and the estate, right, title and interest of the Trustee and Lender in the Property shall cease, and upon payment to Lender of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs if allowed by law, the Trustee and Lender shall release this Instrument and the lien, operation and effect hereof by proper instrument without recourse, covenant or warranty of any nature, express or implied.

The Note, this Security Instrument and any other document or instrument executed by Borrower in connection with the Loan shall be collectively referred to as the "**Loan Documents**." All initially capitalized terms used herein which are defined in the Note shall have the same meaning herein unless the context otherwise requires.

**TO PROTECT THE SECURITY OF THIS SECURITY INSTRUMENT, BORROWER HEREBY COVENANTS AND AGREES AS FOLLOWS:**

## ARTICLE 1.
## COVENANTS AND AGREEMENTS OF BORROWER

**1.01    Payment of Secured Obligations.**  Borrower shall pay and perform as and when due the Secured Obligations, provided, however, the parties recognize that Lessee is not a party to the Note and is not obligated thereon.

**1.02    Performance of Other Obligations; Preservation, Maintenance and Management of Property.**  Borrower shall perform, comply with and abide by each and every one of the covenants, agreements and conditions contained and set forth in the Note and this Security Instrument.  Borrower:

(a)    shall keep the Property in good condition and repair;

(b)    shall not remove, demolish or structurally alter any of the Improvements without the prior written consent of Lender; provided, however, Lender's consent shall not be required in connection with the making by Borrower of cosmetic and non-structural alterations;

(c)    shall complete promptly and in a good and workmanlike manner any Improvement which may be now or hereafter constructed on the Property and promptly restore in like manner any portion of the Improvements which may be damaged or destroyed from any cause whatsoever, and pay when due all claims for labor performed and materials furnished therefor;

(d)    shall comply with and abide by all laws, ordinances, rules, regulations and orders of governmental authorities now or hereafter affecting the Property or any part thereof or requiring any alterations or improvements to be made thereon, including without limitation, all Environmental Laws (as defined in Section 1.03 hereof), the Americans with Disabilities Act and the Architectural Barrier Act, 23 Tex. Rev. Civ. Stat. art. 9102, as amended, or any successor thereto;

(e)    shall comply with and abide by all of its obligations under any covenant, condition, restriction or agreement of record affecting the Property;

(f)    shall not commit or permit any waste or deterioration of the Property;

(g)    shall not allow changes in the use for which all or any part of the Property is intended;

(h)    shall maintain all certificates, licenses and permits necessary to keep the Property operating in conformity with the use for which all or any part of the Property is intended;

(i)    shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent;

(j)    shall insure that at all times the Land constitutes one or more separate legal lots complying with all subdivision or platting laws, ordinances, rules or regulations applicable to the Property, or other laws relating to the division or separation of real property;

(k)    shall insure that at all times the Land is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof;

(l)    shall not abandon the Property; and

(m)    shall do any and all other acts which, from the character and use of the Property, may be reasonably necessary to maintain, protect and preserve the Property and protect the security of Lender.

-6-

Subject to the terms and conditions of **Section 1.32** (captioned "Property Management") hereof, the Property shall be managed by either: (i) Borrower or a person/entity affiliated with Borrower approved by Lender for so long as Borrower or said affiliated person/entity is managing the Property in a commercially prudent and reasonable manner; or (ii) a professional property management company approved by Lender, including without limitation Manager (defined in **Section 1.32** hereof) ("Property Manager"). Management by said affiliated person/entity or professional property management company shall be pursuant to a written agreement approved in form and substance acceptable to Lender (the "**Management Agreement**"). In no event shall any manager be removed or replaced or the terms of any Management Agreement modified or amended without the prior written consent of Lender. Notwithstanding the provisions of any Management Agreement or any other agreement now or hereafter existing or entered into (together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, the "**Management Agreements**") to the contrary, Borrower shall not pay any Property Manager, nor shall any Property Manager accept, total management fees (i.e., on-site and off-site management fees or other compensation, whether monetary or nonmonetary) (collectively, "**Management Fees**") in excess of **four percent (4%)** of the effective gross income from the Property per year, (which cap shall not include any asset management fees collected by the Lessor or Lessee under the Management Agreement or Internal Management Agreement [which fees when added to the Management Fees herein described shall not be in excess of six (6%) of the effective gross income of the Property) nor shall such Management Fees be payable in advance of receipt of such income. The Management Agreements and all of the rights and interests thereunder including, without limitation, the rights to Management Fees are and at all times will be subject and subordinate to the Loan and the Loan Documents and to any renewals, extensions, modifications, assignments, replacements, or consolidations thereof, and the rights, privileges and powers of Lender hereunder and thereunder. Such subordination shall be self-operative and no further instrument shall be required to effect such subordination, but Borrower agrees to execute and deliver, and to cause any Property Manager to execute and deliver, any instrument which Lender may deem necessary or appropriate to confirm such subordination. Such subordination means, among other things, that Management Fees shall not be paid or accepted unless all current expenses attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Loan and the Loan Documents (collectively, "**Operating Expenses**"), have been paid. In the event (y) of any Event of Default (defined below) under the Loan Documents or under any Management Agreement then in effect, which default is not cured within any applicable grace or cure period, or (z) of the bankruptcy or insolvency of the manager, or Borrower, if the Property Manager is affiliated with Borrower, Lender shall have the right to immediately terminate, or to direct Borrower or Borrower's affiliate to immediately terminate, such Management Agreement and to retain, or to direct Borrower to retain, a new management agent approved by Lender. All Rents generated by or derived from the Property shall first be utilized solely for Operating Expenses, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such Operating Expenses have been fully paid and satisfied.

**1.03    Hazardous Waste.** Borrower at all times shall keep the Property and groundwater of the Property free of Hazardous Substances (defined below). Borrower shall not permit its tenants or any third party to enter the Property to use, generate, manufacture, store, release, threaten release, or dispose of Hazardous Substances in, on or about the Property; provided, however, that Borrower may permit reasonable incidental use and storage of Hazardous Substances on the Property provided that such use and storage complies with the following: (a) such use and storage shall be limited to customary supplies which are normal incidents of the ownership and management of real property which is similar to the Property ("**Permitted Uses**"); (b) no such products or supplies create any risk of harm to persons or property, including, without limitation, the Property; and (c) all such products and supplies are used and stored in strict compliance with all applicable Environmental Laws (defined below). Borrower shall give Lender prompt written notice of any claim by any person, entity, or governmental agency that a violation of Environmental Laws has occurred with respect to all or any portion of the Property, or that a release or disposal of Hazardous Substances has occurred on the Property as may be permitted pursuant to the preceding sentence), or that Hazardous Substances are present at the Property or otherwise affect the Property (except Permitted Uses). Borrower, through its professional engineers

and at its cost, shall promptly and thoroughly investigate suspected Hazardous Substances contamination of the Property and shall provide to Lender a detailed description of the investigation, and any copies of reports at Borrower's expense. Borrower shall forthwith remove, repair, clean up, and/or detoxify any Hazardous Substances from the Property, to the extent that the presence and/or maintenance of such Hazardous Substances in, on or about the Property constitutes a violation of any federal, state or local law, ordinance, order, decree or regulation now or hereafter in effect and applicable to Borrower or the Property, and whether or not Borrower was responsible for the existence of the Hazardous Substances in, on or about the Property. **"Hazardous Substances"** shall mean (i) any chemical, compound, material, mixture or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any Environmental Laws as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "acutely hazardous waste," "radioactive waste," "infectious waste," "biohazardous waste," "toxic substance," "pollutant," "toxic pollutant," and "contaminant," as well as any formulation not mentioned herein intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "EP toxicity," or "TCLP toxicity"; (ii) petroleum, natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas) and ash produced by a resource recovery facility utilizing a municipal solid waste stream, and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources; (iii) asbestos in any form; (iv) urea formaldehyde foam insulation; (v) polychlorinated biphenyls (PCBs); (vi) radon; (vii) any other chemical, material, or substance which is (because of its quantity, concentration, or physical or chemical characteristics) limited or regulated for health and safety reasons by any governmental authority, or which poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment; (viii) any "Hazardous Substance" or terms of similar import as defined in the State where Property is located or substances otherwise regulated or controlled in such State because of concerns for health, safety and/or property, and (ix) lead-based paint. **"Environmental Laws"** means any and all requirements of courts (including, without limitation, state courts whose decisions may be based on the common law of the aforementioned State) or governmental authorities relating to health, safety, the environment or to any Hazardous Substances, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (**"CERCLA"**), the Resource Conservation and Recovery Act (**"RCRA"**), the Hazardous Substances Transportation Act, the Toxic Substances Control Act, the Clean Water Act, the Endangered Species Act, the Clean Air Act, the Occupational Safety and Health Act and all similar federal, state and local environmental statutes, ordinances, and the rules, regulations, orders, decrees and guidance documents related thereto, whether any of the foregoing shall not exist or shall hereafter be enacted, decided, promulgated or published.

Borrower represents and warrants to Lender that to the best of Borrower's knowledge, except as set forth in that certain environmental site assessment delivered to Lender in connection with the Loan (the "Environmental Report"): (A) during the period of Borrower's ownership of the Property: (1) there has been no use, generation, manufacture, storage, treatment, disposal, discharge, release, or threatened release of any Hazardous Substances by any person on or around the Property except Permitted Uses; and (2) there have been no Hazardous Substances transported over or through the Property except in connection with Permitted Uses; (B) after diligent inquiry, Borrower has no knowledge of, or reason to believe that there has been: any use generation, manufacture, storage, treatment, disposal, release, or threatened release of any Hazardous Substance, hazardous waste or other waste by any prior owners or prior occupants of the Property or by any third parties onto the Property; or any actual or threatened litigation or claims of any kind by any person relating to these matters; (C) no Hazardous Substances in excess of permitted levels or reportable quantities under applicable Environmental Laws are present in or about the Property or any nearby real property that could migrate to the Property; (D) no underground storage tanks of any kind are or have ever been located in or about the Property; (E) the Property and all operations and activities at, and the use and occupancy of, the Property, comply with all applicable Environmental Laws; (F) Borrower and every person currently having an interest in or conducting operations on the Property has complied with, and is now in strict compliance with, every permit, license, and approval required by all applicable Environmental Laws for all activities and operations at, and the use and occupancy of, the Property; and (G) there are no claims related to Hazardous Substances

-8-

pending or threatened with regard to the Property or against Borrower or any indemnitor other than Borrower (individually or collectively, "**Indemnitor**") under the Environmental Indemnity (as hereinafter defined). Borrower represents and warrants that, to the best of Borrower's knowledge, any written disclosure submitted by or on behalf of Borrower to Lender concerning any release or threatened release, past or present compliance by Borrower, or any other person of any Environmental Laws applicable to the Property, and any environmental concerns relating to the Property, was true and complete when submitted and continues to be true and complete as of the date of this Security Instrument.

Borrower (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws or under any Hazardous Substances-related claim; (2) shall reimburse Lender, on demand, for all costs and expenses incurred by Lender in connection with any review, approval, consent, or inspection relating to the environmental provisions in this Security Instrument together with interest, after demand, at the highest rate permitted under applicable law; and (3) SHALL INDEMNIFY, DEFEND, AND HOLD LENDER AND TRUSTEE HARMLESS FROM AND AGAINST ALL LOSSES, COSTS, CLAIMS, DAMAGES, PENALTIES, LIABILITIES, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COSTS OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER EXPENSES (COLLECTIVELY, "EXPENSES"), INCLUDING, WITHOUT LIMITATION, ANY EXPENSES INCURRED OR ACCRUING AFTER THE FORECLOSURE OF THE LIEN OF THIS SECURITY INSTRUMENT, WHICH EITHER MAY SUFFER OR INCUR AND WHICH DIRECTLY OR INDIRECTLY ARISE OUT OF OR ARE IN ANY WAY CONNECTED WITH THE BREACH OF ANY ENVIRONMENTAL PROVISION EITHER IN THIS SECURITY INSTRUMENT OR IN ANY LOAN DOCUMENT OR AS A CONSEQUENCE OF ANY RELEASE OR THREATENED RELEASE OR THE PRESENCE, USE, GENERATION, MANUFACTURE, STORAGE, DISPOSAL, TRANSPORTATION, RELEASE, OR THREATENED RELEASE OF ANY HAZARDOUS SUBSTANCES ON OR ABOUT THE PROPERTY CAUSED OR PERMITTED BY BORROWER, ANY PRIOR OWNER OR OPERATOR OF THE PROPERTY, ANY ADJOINING LANDOWNER OR ANY OTHER PARTY, INCLUDING, WITHOUT LIMITATION, THE COST OF ANY REQUIRED OR NECESSARY MONITORING, INVESTIGATION, REPAIR, CLEANUP, REMEDY, OR DETOXIFICATION OF ANY HAZARDOUS SUBSTANCES AND THE PREPARATION OF ANY CLOSURE, REMEDIAL ACTION, OR OTHER REQUIRED PLANS, WHETHER THAT ACTION IS REQUIRED OR NECESSARY BY REASON OF ACTS OR OMISSIONS OCCURRING PRIOR TO OR FOLLOWING THE RECORDATION OF THIS SECURITY INSTRUMENT. BORROWER'S OBLIGATIONS WILL SURVIVE THE SATISFACTION, RELEASE, OR CANCELLATION OF THE LOAN, THE RELEASE AND RECONVEYANCE OR PARTIAL RELEASE AND RECONVEYANCE OF THIS SECURITY INSTRUMENT, AND THE FORECLOSURE OF THE LIEN OF THIS SECURITY INSTRUMENT OR DEED IN LIEU THEREOF. THE FOREGOING INDEMNIFICATION SHALL APPLY WITH RESPECT TO ALL CLAIMS, DEMAND, LIABILITIES, LOSSES, DAMAGES, JUDGMENTS, PENALTIES, COSTS AND EXPENSES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF LENDER OR ANY STRICT LIABILITY. Notwithstanding anything in this paragraph to the contrary, this paragraph shall not apply to matters arising out of the gross negligence or willful misconduct of Lender or the introduction and initial release of Hazardous Substances on the Property from and after the date that Lender acquires title to the Property through foreclosure or a deed in lieu of foreclosure (the "**Transfer Date**"); provided, however, Borrower shall bear the burden of proof that the introduction and initial release of such Hazardous Substances: (i) occurred subsequent to the Transfer Date, (ii) did not occur as the result of any act or omission of Borrower or its agents, and (iii) did not occur as a result of a continuing leaching, seeping, migration or release of any Hazardous Substances introduced prior to the Transfer Date in, on, under or near the Property.

To the extent permitted by applicable law, Lender or its agents, representatives, and employees may waive its lien against the Property or any portion of it, including, without limitation, the Improvements and the Personal Property, to the extent that the Property is found to be environmentally impaired and to exercise all rights and remedies of an unsecured creditor against Borrower and all of Borrower's assets and property for the recovery of any deficiency and environmental costs, including, without limitation, seeking an attachment order. Borrower will have the burden of proving that Borrower or any related party

(or an affiliate or agent of Borrower or any related party) was not in any way negligent in permitting the release or threatened release of the Hazardous Substances.

Anything contained in this Security Instrument or in the Loan Documents to the contrary notwithstanding, the Expenses will be exceptions to any nonrecourse or exculpatory provision of the Loan Documents, and Borrower will be fully and personally liable for the Expenses. That liability will not be limited to the original principal amount of the obligations secured by this Security Instrument, and Borrower's obligations will survive the foreclosure, deed in lieu of foreclosure, release, reconveyance, or any other transfer of the Property or this Security Instrument. For the purposes of any action brought under this subsection, Borrower waives the defense of laches and any applicable statute of limitations.

If Lender, in its commercially reasonable judgment, believes or has reason to believe that a release of Hazardous Substances has or is likely to occur, Lender and any other person or entity designated by Lender, including, without limitation, any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including, without limitation, conducting any environmental assessment or audit (the scope of which shall be determined by Lender) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

If recommended by the Environmental Report or any other environmental assessment or audit of the Property, Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property. Without limiting the generality of the preceding sentence, Lender may require (1) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (2) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (3) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (4) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (5) variation of the operations and maintenance program in response to the reports provided by any such consultants.

**1.04    Funds for Taxes, Insurance and Other Charges.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender, on the day monthly installments of principal and interest are payable under the Note (or on another day designated in writing by Lender) until the Note is paid in full, a sum (herein "**Impounds**") equal to one-twelfth (1/12) of: (a) all real property taxes and assessments (general and special), and all other taxes and assessments of any kind or nature whatsoever, including, without limitation, nongovernmental levies or assessments such as maintenance charges, levies or charges resulting from covenants, conditions and restrictions affecting the Property, which are assessed or imposed upon the Property or any portion of it, or become due and payable, and which create, may create or appear to create a lien upon the Property, or any part thereof, or upon any person, property, equipment or other facility used in the operation or maintenance thereof, or any tax or assessment on the Property, or any portion of it, in lieu thereof or in addition thereto, or any license fee, tax or assessment imposed on Lender and measured by or based in whole or in part upon the amount of the outstanding Secured Obligations (collectively, "**Taxes**"); (b) the yearly premium installments for fire and other hazard insurance, rent loss insurance, commercial general liability insurance and such other insurance covering the Property as Lender may require pursuant to Section 1.07 hereof (collectively, "**Insurance Premiums**"); and (c) if this Security Instrument is on a leasehold (other than the Master Lease), the yearly fixed ground rent, if any, under any ground lease affecting the Property or any portion thereof, all as reasonably estimated initially and from time to time by Lender on the basis of assessments

-10-

and bills and reasonable estimates thereof. Lender may require Borrower to pay to Lender, in advance, such other Impounds for other taxes, charges, premiums, assessments and impositions in connection with Borrower or the Property which Lender shall reasonably deem necessary to protect Lender's interests (collectively "**Other Impositions**"). (The Taxes, Insurance Premiums, Other Impositions, and other items for which Lender is authorized to collect Impounds hereunder are referred to collectively as "**Impositions**".) Unless otherwise provided by applicable law, Lender may require Impounds for Other Impositions to be paid by Borrower in a lump sum or in periodic installments, at Lender's option. Any waiver by Lender of a requirement that Borrower pays such Impounds may be revoked by Lender at any time upon notice in writing to Borrower.

Lender shall apply the Impounds to pay such Impositions so long as Borrower is not in breach of such rates, ground rent, Taxes, assessments, Insurance Premiums and Other Impositions and so long as Borrower is not in breach of any covenant or agreement in this Security Instrument. Lender shall make no charge to Borrower for holding and applying the Impounds, annually analyzing such accounts, or for verifying and compiling said assessments and bills, unless Lender pays Borrower interest, earnings or profits on the Impounds and applicable law permits Lender to make such a charge. If requested by Lender, Borrower shall cause to be furnished to Lender a tax reporting service contract covering the Property of the type, duration and with a company satisfactory to Lender. Unless applicable law requires interest, earnings or profits to be paid, Lender shall not be required to pay Borrower any interest, earnings or profits on the Impounds. Lender shall give to Borrower, without charge, an annual accounting of the Impounds, showing credits and debits to the Impounds and the purpose for which each debit to the Impounds was made. The Impounds are pledged as additional security for all sums secured by this Security Instrument.

If the Impounds held by Lender at the time of the annual accounting thereof exceed the amounts deemed necessary by Lender to provide for the payment of such Impositions, as they fall due, or exceed the amounts permitted to be held by applicable law, if no Event of Default is in effect under any of the Loan Documents, Lender shall credit such excess Impounds on the next monthly installment or installments of Impounds due. If at any time the amount of the Impounds held by Lender shall be less than is sufficient to pay such Impositions as they fall due, Borrower shall pay to Lender the amount necessary to make up the deficiency within thirty (30) days after notice from Lender to Borrower requesting payment thereof.

Upon the occurrence of any Event of Default under any of the Loan Documents or Borrower's breach of any covenant or agreement of Borrower in this Security Instrument, Lender may apply, in any amount and in any order as Lender shall determine, any Impounds held by Lender at the time of application, (i) to pay Impositions which are now or will hereafter become due, or (ii) as a credit against the sums secured by this Security Instrument. Upon payment in full of all sums secured by this Security Instrument or upon Defeasance (as defined in the Note, if so defined), Lender shall promptly refund to Borrower any Impounds held by Lender.

**1.05    Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender from Borrower under the Note or this Security Instrument shall be applied by Lender in the following order of priority: (i) to interest payable on the Note; (ii) to principal due on the Note; (iii) to interest payable on advances made pursuant to Section 1.14 hereof; (iv) to principal of advances made pursuant to Section 1.14 hereof; (v) to amounts payable to Lender by Borrower under Section 1.04 hereof; and (vi) any other sums secured by this Security Instrument in such order as Lender, at Lender's option, may determine; provided, however, that Lender may, at Lender's option, apply any sums payable pursuant to Section 1.14 hereof prior to interest on and principal of the Note, but such application shall not otherwise affect the order of priority of application specified in this Section 1.05.

**1.06    Charges; Liens.** Unless Lender shall be collecting (and Borrower shall have paid as required) Impounds pursuant to Section 1.04 above, Borrower shall pay, at Borrower's cost and expense, all Impositions attributable to the Property, the Note, this Security Instrument, or any part thereof or

interest therein by Borrower making or causing to be made payment, when due, directly to the payee thereof, or in such other manner as Lender may designate in writing. Borrower shall promptly furnish to Lender all notices of amounts due under this Section 1.06, and if Borrower shall make payment directly, Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall pay and promptly discharge, at Borrower's cost and expense, all liens, encumbrances and charges upon, and the claims of all persons supplying labor or materials to or in connection with, the Property, or any part thereof or interest therein, without regard to whether such lien, encumbrance, charge or claim is or may be senior and superior to, equal with or junior and inferior to the lien of this Security Instrument. If Borrower shall fail to pay, remove and discharge any such lien, encumbrance, charge or claim, then in addition to any other right or remedy of Lender, Lender may, but shall not be obligated to, discharge the same, either by paying the amount claimed to be due or by procuring the discharge of such lien, encumbrance, charge or claim by depositing in a court a bond or the amount claimed or otherwise giving security for such claim, or by procuring such discharge in such manner as is or may be prescribed by law. Borrower shall, immediately upon demand therefor by Lender, pay to Lender an amount equal to all costs and expenses incurred by Lender in connection with the exercise by Lender of the foregoing right to discharge any such lien, encumbrance, charge or claim, together with interest thereon from the date of such expenditure at the Default Rate.

Borrower shall give Lender prompt written notice of (a) the proposed creation of any county, municipal, quasi-governmental or other improvement or special district of any nature or (b) any action in respect to such district, which may affect the Property, including, without limitation, any proposed service plan or modification of such plan, proposed organization of such district and election in regard to such organization, the proposed issuance of bonds by such district and election in regard to such issuance and the proposed inclusion of the Property in any such district, and Borrower shall not consent to the creation of any such district or any such action in respect to such district without the prior written consent of Lender, which consent shall not be unreasonably withheld.

**1.07 Required Insurance; Delivery of Policies.** Borrower shall at all times provide, maintain and keep in force or cause to be provided, maintained and kept in force, at no expense to Trustee or Lender, policies of insurance in form and amounts, covering such casualties, risks, perils, liabilities and other hazards as provided below. All such insurance policies shall be written by a company or companies authorized and admitted to issue insurance in the State where the Property is located and having a rating of A2 or better for ratings by Moody's Investors Service, Inc., or A or better for ratings by Fitch Investors Service, L.P. or Standard & Poor's Ratings Services.

(a)     Borrower shall initially maintain, until Lender shall otherwise indicate in writing, the following insurance:

(1)     **Property Insurance.** Borrower, at its sole cost and expense, shall keep all Improvements, boilers and machinery, and all other Personal Property of Borrower now or hereafter situated on the Property insured during the term of this Security Instrument against loss or damage by fire and against loss or damage by other risks now embraced by "Special Form" or "All Risk" coverage, so called, (including without limitation, riot and civil commotion, vandalism, malicious mischief, water, fire, burglary and theft) without any exclusion for terrorism, boiler and machinery coverage (if applicable), flood and/or earthquake insurance (if applicable), wind/hail insurance, all as may be required by Lender, in amounts at all times sufficient to prevent Lender from becoming a co-insurer within the terms of the applicable policies and under applicable insurance law, providing for deductibles (not to exceed the lesser of 1% of the face amount of any such policy or **$25,000**), maintained in an amount not less than 100% of the full replacement cost of the Improvements and betterments and Personal Property (equivalent to the insurable value of the Improvements and Personal Property as determined by an appraisal acceptable to Lender), on an agreed amount basis, without deduction for depreciation and without reference to co-insurance (an insurance to value provision is not permitted in the policy).

(2)     **Liability Insurance.**  Borrower shall also provide commercial general liability insurance naming Lender as an additional insured.  Such insurance shall provide coverage for personal injury, bodily injury, death, and property damage liability, against any and all claims, including all legal liability to the extent insurable and imposed upon Lender, and all court costs, legal fees and expenses. The limits of liability for such insurance coverage shall be in an amount not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, and shall be without a deductible.

(3)     **Business Income Insurance.**  "Business income" and/or "rental income" insurance, each naming Lender as loss payee, in an amount sufficient to avoid any co insurance penalty and to provide proceeds which will cover a period of not less than twelve (12) months from the date of casualty or loss; the term "rental income" shall mean the sum of (A) the total then ascertainable Rents payable under the Leases (defined below) and (B) the total ascertainable amount of all other amounts to be received by Borrower from third parties which are the legal obligation of the tenants under such Leases, reduced to the extent such amounts would not be received because of operating expenses not incurred during a period of non occupancy of that portion of the Property then not being occupied.

(4)     **Flood Insurance.**  If the Property is now, or hereafter becomes, situated in a federally designated special flood hazard area, then Borrower shall obtain and maintain at all times thereafter, a policy of flood insurance in such amount as Lender may, from time to time require, and shall otherwise comply with the requirements of the National Flood Insurance Program.  A Life of Loan Flood Hazard Certificate shall be provided to Lender identifying the Flood Hazard Zone in which the Property is situated.

(5)     **Law and Ordinance Insurance.**  If any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, Borrower shall obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement, which shall include coverage for (A) loss of value (in an amount no less than 100% of the full replacement cost of the Improvements), (B) demolition and debris removal costs (in an amount not less than 15% of the policy limit or insured value), and (C) increased costs of construction (in an amount not less than 15% of the policy limit or insured value).

(6)     **Builder's Risk Insurance.**  At all times during which structural construction, repairs or alterations are being made with respect to the Improvements, Borrower shall also maintain (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above-mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (1) above written in a so-called builder's risk completed value form (w) on a non-reporting basis, (x) against all risks insured against pursuant to the first sentence of this paragraph, (y) including permission to occupy the Property, and (z) with an Agreed Amount endorsement waiving co-insurance provisions.

(7)     **Workers' Compensation Insurance.**  If Borrower has employees, Borrower shall also maintain workers' compensation, subject to the statutory limits of the state where the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, with respect to any work or operations on or about the Property.

(b)     The original policy or policies and renewals thereof  (or, at the sole option of Lender, duplicate originals or certified copies thereof), together with receipts evidencing payment of the premium therefor, shall be deposited with Lender, and Borrower hereby assigns to Lender the proceeds of such policy or policies as additional security for the Secured Obligations.  Not more than forty-five (45) days after closing the Loan, Borrower shall deliver to Lender the original policy or policies (or, at the sole option of Lender, duplicate originals or certified copies thereof).  Such insurance may be provided in one policy or separate policies for hazard insurance, rental or business income insurance, general liability, earthquake, environmental or flood (or other special perils) insurance.  Each such policy of insurance shall contain a non-contributing loss payable clause and a mortgagee clause in favor of and in form

acceptable to Lender for policies referred to under subsections 1.07(a)(1), (3), (4), (5), and (6), and naming Lender as an additional insured for policies referred to under subsections 1.07(a) (2) and (7), and shall provide for not less than thirty (30) days prior written notice to Lender of any intent to modify, cancel, or terminate the policy or policies or the expiration of such policies of insurance, and must include a Lender's Loss Payable endorsement, and such other endorsements as required by Lender, including a replacement cost endorsement and agreed amount endorsement. If the insurance required under this Section 1.07 or any portion thereof is maintained pursuant to a blanket policy, Borrower shall furnish to Lender a certified copy of such policy, together with an original Evidence of Insurance (Acord Form 28) indicating that Lender (and its successors and/or assigns) is an insured under such policy in regard to the Property and showing the amount of coverage apportioned to the Property which coverage shall be in an amount sufficient to satisfy the requirements hereof. Not less than thirty (30) days prior to the expiration dates of each policy required of Borrower hereunder, Borrower will deliver to Lender a renewal policy or policies marked "premium paid" or accompanied by other evidence of payment and renewal satisfactory to Lender; and in the event of foreclosure of this Security Instrument, any purchaser or purchasers of the Property shall succeed to all rights of Borrower, including, without limitation, any rights to unearned premiums, in and to all insurance policies assigned and delivered to Lender pursuant to the provisions of this Section 1.07.

(c)     Notwithstanding the foregoing, at any time while any amounts remain outstanding under the Loan, upon the written request of Lender, Borrower shall be required to maintain such insurance as may from time to time be required under Lender's then current underwriting guidelines.

**1.08     Payment of Premiums.**  If Lender shall collect and Borrower shall pay in full Impounds for premiums in accordance with the provisions of Section 1.04 above, Borrower shall be deemed to have "paid" the premiums for the purposes of this Section 1.08. In the event Borrower fails to provide, maintain, keep in force or deliver to Lender the policies of insurance required by this Security Instrument or by any Loan Document, Lender may (but shall have no obligation to) procure such insurance or single-interest insurance for such risks covering Lender's interest, and Borrower will pay all premiums thereon and reimburse Lender for all amounts paid or incurred by Lender in connection therewith promptly upon demand by Lender, and until such payment is made by Borrower, the amount of all such premiums shall be added to the principal amount of the Loan and shall bear interest at the Default Rate.

**1.09     Casualties; Insurance and Condemnation Proceeds.**  In the event of a casualty or a taking by eminent domain, the following provisions shall apply in connection with the Restoration (defined below) of the Property:

(a)     If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, or if the Property or any portion thereof is taken in any condemnation or eminent domain proceeding, Borrower shall give prompt notice of such damage or taking to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty or taking, with such alterations as may be approved by Lender (the "**Restoration**").

(b)     The term "**Net Proceeds**" for purposes of this Section 1.09 shall mean: (i) the net amount of all insurance proceeds under the policies carried pursuant to Section 1.07 hereof as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, without limitation, attorneys' fees), if any, in collecting the same, or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 1.17 hereof, after deduction of Lender's reasonable costs and expenses (including, without limitation, attorneys' fees), if any, in collecting the same, whichever the case may be.  If (i) the Net Proceeds do not exceed **$100,000** (the "**Net Proceeds Availability Threshold**"); (ii) the costs of completing the Restoration as reasonably estimated by Borrower shall be less than or equal to the Net Proceeds; (iii) no Event of Default exists under the Note, this Security Instrument or any of the other Loan Documents; (iv) the Property and the use thereof after the Restoration will be in compliance with, and permitted under, all applicable zoning laws, ordinances

-14-

rules and regulations (including, without limitation, laws relating to legal nonconforming structures or uses and all applicable Environmental Laws; (v) (A) if the Net Proceeds are insurance proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements has been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or (B) if the Net Proceeds are condemnation awards, less than 25% of the Property is taken, such Property that is taken is located along the perimeter or periphery of the Property, no portion of the Improvements is located on such Property, and such taking does not materially impair access to the Property; and (vi) Lender shall be satisfied that any operating deficits, including, without limitation, all scheduled payments of principal and interest under the Note which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, or (2) other funds of Borrower, then the Net Proceeds will be disbursed directly to Borrower for Restoration.

(c)    If the Net Proceeds are greater than the Net Proceeds Availability Threshold, such Net Proceeds shall, subject to the provisions of the Leases that are superior to the lien of this Security Instrument or with respect to which subordination and non-disturbance agreements binding upon Lender have been entered into and such subordination and non-disturbance agreements apply to the deposits of Net Proceeds, be forthwith paid to Lender to be held by Lender in a segregated account to be made available to Borrower for the Restoration in accordance with the provisions of this Subsection 1.09(c).

The Net Proceeds held by Lender pursuant to Subsection 1.09(c) hereof shall be made available to Borrower for payment or reimbursement of Borrower's expenses in connection with the Restoration, subject to the following conditions:

(1)    no Event of Default exists under the Note, this Security Instrument or any of the other Loan Documents;

(2)    Lender shall, within a reasonable period of time prior to a request for an initial disbursement, be furnished with an estimate of the cost of the Restoration accompanied by an independent architect's opinion based on due professional investigation as to such costs and appropriate plans and specifications for the Restoration, such plans and specifications and cost estimates to be subject to Lender's approval, not to be unreasonably withheld or delayed;

(3)    the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration as such costs are certified by the independent architect;

(4)    Net Proceeds are less than the outstanding principal balance of the Note;

(5)    (A) if the Net Proceeds are insurance proceeds, less than sixty percent (60%) of the total floor area of the Improvements has been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or (B) if the Net Proceeds are condemnation awards, less than 25% of the Property is taken, such Property that is taken is located along the perimeter or periphery of the Property, no portion of the Improvements is located on such Property and such taking does not materially impair access to the Property;

(6)    Lender shall be satisfied that any operating deficits, including, without limitation, all scheduled payments of principal and interest under the Note which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, or (2) other funds of Borrower;

(7)    Lender shall be satisfied, in its commercially reasonable opinion, that, upon completion of the Restoration, the gross cash flow and the net cash flow of the Property will be restored to a level sufficient to cover all carrying costs and operating expenses of the Property, including, without limitation, debt service on the Note at a coverage ratio (after deducting all required reserves as required

by Lender from net operating income) that, upon completion of the Restoration, is the greater of: (a) 1.00 to 1.00 or (b) the average debt service coverage ratio for the Property for the twenty-four (24) consecutive month period immediately preceding the event of casualty or taking by eminent domain (but not to exceed a debt service coverage ratio at least 1.25 to 1.0, which coverage ratio shall be determined by Lender on the basis of the Applicable Interest Rate (as defined in the Note);

(8)     the Restoration can reasonably be completed on or before the earliest to occur of (A) six (6) months prior to the Maturity Date (defined in the Note), (B) the earliest date required for such completion under the terms of any Major Leases (defined below) and (C) such time as may be required under applicable zoning law, ordinance rule or regulation in order to repair and restore the Property to as nearly as possible the condition it was in immediately prior to such fire or other casualty or to such taking, as applicable;

(9)     the Property and use thereof after the Restoration will be in compliance with, and permitted under, all applicable zoning laws, ordinances, rules and regulations including, without limitation, laws relating to legal nonconforming structures or uses and all applicable Environmental Laws; and

(10)     each Major Lease in effect as of the date of the occurrence of such fire or other casualty shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration.

For purposes hereof, the term **"Major Lease"** shall mean (i) the Master Lease and any Lease which (A) provides for rental income representing ten percent (10%) or more of the total rental income for the Property, (B) covers ten percent (10%) or more of the total space at the Property, in the aggregate, or (C) provides for a lease term of more than ten (10) years and (ii) any instrument guaranteeing or providing credit support for any Major Lease.

(d)     The Net Proceeds held by Lender until disbursed in accordance with the provisions of this Section 1.09 shall constitute additional security for the Secured Obligations. If Borrower is entitled to Net Proceeds pursuant to the terms hereof, the Net Proceeds (other than the Net Proceeds paid under the policy described in Section 1.07(a)(3) hereof for loss of rents or business interruption) shall be disbursed by Lender to, or as directed by, Borrower, in an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration less customary retainage from time to time during the course of the Restoration, not more frequently than once per month, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file the same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the lien of this Security Instrument. The Net Proceeds paid under the policy described in Section 1.07(a)(3) shall be disbursed by Lender to pay for debt service under the Loan, to pay other expenses incurred by Borrower in connection with the ownership and operation of the Property, and the remainder thereof, to, or as directed by, Borrower to pay for the cost of the Restoration in accordance with this Section 1.09(d). Final payment shall be made after submission to Lender of all licenses, permits, certificates of occupancy and other required approvals of governmental authorization having jurisdiction and Casualty Consultant's (defined below) certification that the Restoration has been fully completed.

(e)     Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and an independent consulting engineer selected by Lender (the **"Casualty Consultant"**), such acceptance not to be unreasonably withheld or delayed.  All costs and expenses incurred by Lender in connection with making

the Net Proceeds available for the Restoration, including, without limitation, attorneys' fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency in immediately available funds (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 1.09 shall constitute additional security for the Secured Obligations.

(g)     Unless an Event of Default exists, Borrower shall settle any insurance claims with respect to the Net Proceeds which in the aggregate are less than the Net Proceeds Availability Threshold. Lender shall have the right to participate in and reasonably approve any settlement for insurance claims with respect to the Net Proceeds which in the aggregate are greater than the Net Proceeds Availability Threshold.  If an Event of Default exists, Borrower hereby irrevocably empowers Lender, at Lender's sole election, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claims and to collect and to make receipt for any such payment.  Notwithstanding the foregoing, Lender's failure to file and prosecute any such claims shall not diminish or impair Lender's rights and remedies against Borrower under the Loan Documents.  If the Net Proceeds are received by Borrower, such Net Proceeds shall, until the completion of the related work, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof.

(h)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after (i) the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 1.09, and (ii) the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full and all required permits, licenses, certificates of occupancy and other required approvals of governmental authorities having jurisdiction have been issued, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Security Instrument or any of the other Loan Documents.

(i)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 1.09(h) hereof shall be retained and applied by Lender toward the payment of the Secured Obligations whether or not then due and payable in such order, priority and proportions as Lender shall determine, without Prepayment Charge, or, at Lender's sole election, the same shall be paid, either in whole or in part, to Borrower.  If Lender shall receive and retain Net Proceeds, the lien of this Security Instrument shall be reduced only by the amount received and retained by Lender and actually applied by Lender in reduction of the Secured Obligations.

**1.10     Assignment of Policies Upon Foreclosure.**  In the event of foreclosure of this Security Instrument or other transfer of title or assignment of the Property in extinguishment, in whole or in part, of the debt secured hereby, all right, title and interest of Borrower in and to all policies of insurance required by Section 1.07 hereof shall inure to the benefit of and pass to the successor in interest to Borrower or the purchaser or grantee of the Property.

**1.11     Indemnification; Subrogation; Waiver of Offset.**

(a)     Notwithstanding any other provisions of this Security Instrument, Lender is not undertaking any obligations, nor shall Lender have any obligations, under the Leases; or with respect to

agreements, contracts, certificates, instruments, franchises, permits, licenses and other items which are part of the Property. IF LENDER OR TRUSTEE IS MADE A PARTY TO ANY LITIGATION CONCERNING THE NOTE, THIS SECURITY INSTRUMENT, ANY OF THE LOAN DOCUMENTS, THE PROPERTY OR ANY PART THEREOF OR INTEREST THEREIN, OR THE OCCUPANCY OF THE PROPERTY BY BORROWER, THEN BORROWER SHALL INDEMNIFY, DEFEND AND HOLD LENDER AND TRUSTEE HARMLESS FROM ALL LIABILITY BY REASON OF SAID LITIGATION, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES INCURRED BY LENDER OR TRUSTEE AS A RESULT OF ANY SUCH LITIGATION, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO JUDGMENT. Lender and Trustee may employ an attorney or attorneys selected by it to protect its rights hereunder, and Borrower shall pay to Lender and Trustee attorneys' fees and costs incurred by Lender and Trustee.

(b)     Borrower waives any and all right to claim or recover against Lender, Trustee, or their respective officers, employees, agents and representatives, for loss of or damage to Borrower, the Property, Borrower's property or the property of others under Borrower's control from any cause insured against or required to be insured against by the provisions of this Security Instrument.

(c)     All sums payable by Borrower pursuant to this Security Instrument or the Note shall be paid without notice, demand, counterclaim, setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of Borrower hereunder shall in no way be released, discharged or otherwise affected (except as expressly provided herein) by reason of: (i) any damage to or destruction of or any condemnation or similar taking of the Property or any part thereof; (ii) any restriction or prevention of or interference by any third party with any use of the Property or any part thereof; (iii) any title defect or encumbrance or any eviction from the Property, the Improvements or any part thereof by title paramount or otherwise; (iv) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Lender, or any action taken with respect to this Security Instrument by any trustee or receiver of Lender, or by any court, in any such proceeding; (v) any claim which Borrower has or might have against Lender; (vi) any default or failure on the part of Lender to perform or comply with any of the terms hereof or of any other agreement with Borrower; or (vii) any other occurrence whatsoever, whether similar or dissimilar to the foregoing and whether or not Borrower shall have notice or knowledge of any of the foregoing. Except as expressly provided herein, Borrower waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any sum secured hereby and payable by Borrower.

**1.12     Utilities.** Borrower shall pay or shall cause to be paid when due all utility charges which are incurred by Borrower for the benefit of the Property and all other assessments or charges of a similar nature, whether or not such charges are or may become liens thereon.

**1.13     Actions Affecting Property.** Borrower shall promptly give Lender written notice of, and shall appear in and contest, any action or proceeding purporting to affect the Property or any portion thereof or interest therein, or the security of this Security Instrument or the rights or powers of Lender or Trustee; and shall pay all costs and expenses, including, without limitation, the cost of evidence of title and attorneys' fees, in any such action or proceeding in which Lender or Trustee may appear.

**1.14     Actions by Trustee or Lender to Preserve Property.** If Borrower fails to make any payment or to do any act as and in the manner provided in any of the Loan Documents, Lender and/or Trustee, each at its own election, without obligation so to do, without releasing Borrower from any obligation, and without notice to or demand upon Borrower, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof. In connection therewith (without limiting their general powers, whether conferred herein, in any other Loan Documents or by law), Lender and Trustee shall have and are hereby given the right, but not the obligation, (i) to enter upon and take possession of the Property; (ii) to make additions, alterations, repairs and improvements to the Property which they or either of them may consider necessary or proper to keep the Property in good

-18-

condition and repair; (iii) to appear and participate in any action or proceeding affecting or which may affect the Property or any portion thereof or interest therein, the security of this Security Instrument or the rights or powers of Lender or Trustee; (iv) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which in the judgment of either may affect or appears to affect the security of this Security Instrument or be prior or superior hereto; and (v) in exercising such powers, to pay necessary expenses, including, without limitation, attorneys' fees and costs or other necessary or desirable consultants. Borrower shall, immediately upon demand therefor by Lender and Trustee or either of them, pay to Lender and Trustee an amount equal to all respective costs and expenses incurred by such party in connection with the exercise of the foregoing rights, including, without limitation, costs of evidence of title, court costs, appraisals, surveys and receiver's, trustee's and attorneys' fees and costs and expenses, together with interest thereon from the date of such expenditure at the Default Rate.

### 1.15 Transfers; Due On Sale/Encumbrance.

(a)     **Lender Reliance**.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower or its general partners, managing partners, managing members, principals or any direct or indirect legal or beneficial owner of Borrower in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for payment and performance of the Secured Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the payment or the performance of the Secured Obligations, Lender can recover the Secured Obligations by a sale of the Property.

(b)     **Transfer Definitions**.  For purposes of this Section 1.15, an "**Affiliated Manager**" shall mean any Property Manager in which Borrower, any Guarantor (as hereinafter defined) or any Indemnitor has, directly or indirectly, any legal, beneficial or economic interest; a "**Restricted Party**" shall mean Borrower, any Guarantor, any Indemnitor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Indemnitor, any Affiliated Manager or any non-member manager; a "**Sale**" shall mean a voluntary or involuntary sale, conveyance or transfer of a legal or beneficial interest; and a "**Pledge**" shall mean a pledge of or grant of a security interest in a legal or beneficial interest; the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract, by operation of law, or otherwise. Without limiting the generality of the definition of "Borrower" as defined in and used in this Security Instrument, for the purposes of this **Section 1.15**, Borrower shall include Lessor and/or Lessee.

(c)     **No Sale/Encumbrance**.

(1)     Except as is set forth below in Section 1.15(d) with respect to Permitted Transfers (as hereinafter defined), Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively a "**Transfer**"), other than pursuant to the Master Lease and Leases of space in the Improvements to Tenants in accordance with the provisions of **Section 1.26** hereof, without the prior written consent of Lender, which consent may be withheld at Lender's sole election, regardless of whether the conditions set forth in Subsection 1.15(e) hereof have been satisfied. Without limiting the foregoing, there shall be no subordinate financing placed on any portion of the Property.

(2)     A Transfer shall include, without limitation: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) other than the Master Lease, an agreement by Borrower leasing all or a substantial part of the Property

for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation, Sale or Pledge of such corporation's stock or the creation or issuance of new stock in such corporation; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of any general partner or joint venturer, or the Sale or Pledge of the partnership interest of any limited partner, general partner or joint venturer, or the Sale or Pledge of any profits or proceeds relating to such partnership interest, or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of any managing member or non-member manager (or if no managing member or non-member manager, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest, or the creation or issuance of new membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger or consolidation or the Sale or Pledge of the legal or beneficial interests in such Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of the Property Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 1.02 hereof; (viii) without limitation to the foregoing, any Sale or Pledge by any person or entity which directly or indirectly controls Borrower of its direct or indirect controlling interest in Borrower; (ix) a Transfer of Lessee's interest under the Master Lease; and (x) any partition or filing of an action to partition the Property or the Premises which action is not dismissed within ninety (90) days of filings.

(d)     **Permitted Transfers**.

(1)     Notwithstanding the provisions of Sections 1.15(b) and (c) hereof, the following transfers shall not be deemed to be a Transfer: (i) transfers by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party; (ii) the Sale, in one or a series of transactions, of not more than forty-nine percent (49%) of the stock in a Restricted Party; (iii) the Sale, in one or a series of transactions, of not more than forty-nine percent (49%) of the limited partnership interests or non-managing membership interests, as the case may be, in a Restricted Party; (iv) inter vivos and testamentary transfers of the legal or beneficial interests (including, without limitation, stock, partnership interests and membership interests) in a Restricted Party (A) to an existing owner of a legal or beneficial interest (including, without limitation, a shareholder, limited partner, general partner, joint venturer or member) in such Restricted Party on the date hereof (an "**Existing Owner**"), (B) to a lineal descendant or spouse of an Existing Owner, (C) to a trust, the beneficiary of which is (and so long as any part of the Loan remains unpaid continues to be) an Existing Owner or a lineal descendant or spouse of an Existing Owner, or (D) to a corporation, limited or general partnership, limited liability company or other legal entity which is (and so long as any part of the Loan remains unpaid continues to be) wholly owned and controlled by an Existing Owner; and (v) pursuant to Leases for which Lender's consent is not required in accordance with the provisions of Section 1.26 (b) hereof; Notwithstanding the introductory clause of this paragraph, the transfers described in clauses (i) through (iv) inclusive of this paragraph (collectively, "**Permitted Transfers**") shall be subject to Lender's prior written consent, which consent Lender shall provide upon satisfaction of the conditions set forth in Subsection 1.15(e) hereof.

(e)     **Conditions Precedent.** Lender's consent to any Transfer/Permitted Transfer, regardless of whether Lender has consented to any previous Transfer/Permitted Transfer, is subject to satisfaction of the following conditions precedent:

(1)     Lender shall have received at least thirty (30) days prior written notice of the Transfer/Permitted Transfer, together with copies of such documents and information relating to the Transfer/Permitted Transfer as Lender may request, including, without limitation, the Sale documents (including, without limitation, purchase/sale agreement, if any), the terms and structure of the Sale and the nature and structure of the Sale (including, without limitation, debt/equity structure, if any).

(2)    the Transfer/Permitted Transfer shall not result in a change in the control of any Restricted Party or a change in the control or management of the Borrower and the Property, or, in the alternative, the person(s) or entity(ies) proposed to assume control of such Restricted Party and the person(s) or entity(ies) proposed to assume control and management of the Borrower and the Property shall be acceptable to Lender in all respects (including, without limitation, financial condition, credit history and management ability/experience and other relevant criteria, all as determined by Lender);

(3)    the Transfer/Permitted Transfer shall not release any Guarantor or Indemnitor or their respective estates from their respective obligations under the Loan Documents;

(4)    the Transfer/Permitted Transfer shall not release the Borrower from its obligations under the Note, this Security Instrument, or any other Loan Documents;

(5)    the Transfer/Permitted Transfer shall not have any adverse effect either on the Borrower's compliance with the provisions of this Security Instrument, including, without limitation, Section 1.29 (captioned "**Single Purpose Entity**") and Section 1.30 (captioned "**ERISA**") hereof, or on the Borrower's status as a continuing legal entity liable for the payment and performance of the Secured Obligations;

(6)    Borrower shall pay all of Lender's costs and expenses, including, without limitation, attorneys' fees and costs, and title insurance costs (if any).

(f)    **Additional Permitted Transfers**: Initial TIC Transfers.  In addition, notwithstanding the foregoing provisions of this **Section 1.15**, Lender shall permit TIC Transfers (defined below) subject to the satisfaction of the conditions set forth below.  Entities to which a tenancy-in-common interest ("**TIC Interest**") in the Property is transferred after the date hereof pursuant to and as permitted by **Subsections 1.15(f), (g) and (h)** are each called a "**Tenant-in-Common**" and collectively called the "**Tenants-in-Common**."  TIC Transfers shall be any sale or transfer by Primary Borrower prior to the Initial TIC Transfer Deadline (defined below) (each a "**TIC Transfer**" and, collectively, "**TIC Transfers**"), of a TIC Interest to a Tenant-in-Common; provided, however, that all of the following conditions (each a "**TIC Transfer Condition**" and, collectively with all other such conditions set forth in this **Subsection 1.15(f)**, the "**TIC Transfer Conditions**") shall be satisfied in connection with each TIC Transfer:

(i)    No Event of Default or event which with the giving of notice or passage of time would constitute an Event of Default has occurred and remains uncured;

(ii)    Borrower has delivered to Lender:

(A)    prior written notice of each TIC Transfer;

(B)    list of the names of all owners of all interests in the Property and their percentages of ownership interests, and a description of the ownership, management and control of all entities (e.g., corporations, limited partnerships, limited liability companies) that are owners of all interests in the Property, all effective after the contemplated TIC Transfer.  Because each Tenant-in-Common must satisfy the requirements of **Section 1.29** hereof, Tenants-in-Common must be entities and cannot be individuals;

(C)    organizational documents, financial statements, credit reports, tax ID numbers and such other information as Lender may reasonably require;

(D)    copies of all documents and instruments evidencing each TIC Transfer, which documents and instruments must evidence that such TIC

-21-

Transfer is a bona fide, arms-length transfer of ownership interests in the Property;

(E)     evidence of casualty and other applicable insurance; and

(iii)     Each Tenant-in-Common shall be a bankruptcy remote entity in compliance with **Section 1.29** hereof; and

(iv)     Each transferee of a TIC Interest in the Property must become and remain a tenant-in-common with Primary Borrower (defined below) and all other owners of TIC Interests in the Property, and must sign, and cause to be recorded among the land records of the jurisdiction in which the Property is located (the "Land Records") such documents and agreements as Lender or its counsel may direct, including but not limited to (i) the TIC Agreement (defined in **Section 1.31** [captioned "Tenant-in-Common Provisions"] hereof)   identical in form and substance to tenancy-in-common agreements signed by all other Tenants-in-Common or (ii), if applicable, an assignment and assumption of the existing tenancy-in-common agreement applicable to the TIC Interest in question, and approved, in any and all events, by Lender in its sole and absolute discretion (for purposes of the TIC Transfers, such assignment and assumption agreement shall be identical in form and substance to the Assignment and Assumption of Tenants-in-Common Agreement, Master Lease and Management Agreement attached hereto as Exhibit B).

(v)     Each transferee of a TIC Interest in the Property must become and remain bound under this Security Instrument and all other applicable Loan Documents, jointly and severally with Primary Borrower and all other owners of TIC Interests in the Property, and must sign, and cause to be recorded among the Land Records, such documents and agreements as Lender or its counsel may direct, including but not limited to an assumption agreement in form and substance satisfactory to Lender (the "Assumption Agreement") and shall become a Borrower and Assignor for all purposes under the Loan Documents.  Each Assumption Agreement shall be signed also by Primary Borrower (so long as it holds any interest in the Property), **Douglas L. Swenson and DBSI Housing Inc., an Idaho corporation,** and each other person designated by Lender, and shall provide, *inter alia,* that each transferee assumes joint and several liability of all of Borrower's obligations under this Security Instrument and the other Loan Documents with all other persons or entities comprising Borrower; and that each Guarantor and Indemnitor thereby ratifies and confirms its obligations under each applicable Guaranty and/or Indemnity.  For purposes of the TIC Transfers, such Assumption Agreement shall be identical in form and substance to the "Assumption and Modification Agreement" attached hereto as Exhibit C.

(vi)     No more than **thirty-five (35)** TIC Transfers shall be permitted by Lender pursuant to this **Section 1.15(f)** (i.e. so that the Property shall not, at any time, be owned by more than **thirty-five (35) Borrowers**);

(vii)     **Reserved.**

(viii)     **Reserved.**

(ix)     After each TIC Transfer occurs, Lessee shall continue (1) to be the Tenant under the Master Lease, (2) to control the day-to-day operations of the Property (not shared with any other person or entity) and (3) be 100% controlled and owned (directly or indirectly) by Douglas L. Swenson, John Meyeron and Charles Hassard;

(x)     After each TIC Transfer occurs, no owner of any interest in the Property, excluding Primary Borrower, shall own, directly or indirectly, more than forty-nine percent (49%) of the ownership interests in the Property;

(xi)  Borrower shall cause legal counsel, satisfactory to Lender and, except in regards to any Delaware entity opinions, admitted to practice in the applicable jurisdictions, to issue and deliver legal opinions, in form and substance satisfactory to Lender and its counsel, concerning each TIC Transfer, covering authorization, execution, delivery and enforceability of this Security Instrument and the other Loan Documents, each related TIC Agreement, each related Assumption Agreement and each other document and agreement evidencing each TIC Transfer, and covering such other issues as Lender may require;

(xii)  Borrower shall be responsible for all fees, charges, costs and expenses attributable to or related to any and all TIC Transfers and proposed TIC Transfers and Borrower shall pay or reimburse Lender for a processing fee payable to Lender of $1,000 and all fees and costs incurred by Lender in connection with each TIC Transfer, including, without limitation, Lender's reasonable attorneys' fees, whether or not any such TIC Transfer is approved by Lender or is consummated;

(xiii)  All TIC Transfers must be completed by **February 19, 2007** (the "Initial TIC Transfer Deadline");

(xiv)  All UCC financing statements or amendments required by Lender in connection with each TIC Transfer shall be filed in all filing offices designated by Lender;

(xv)  Lender must receive a title endorsement, reasonably acceptable to Lender, modifying Lender's title insurance policy insuring this Security Instrument (the "Title Policy") as follows:

(A)  to amend the effective date of the Title Policy to the date and time of the recordation of the Assumption Agreement,

(B)  to insure that there are no additional exceptions on Schedule B, Part I of Title Policy other than those exceptions appearing on Schedule B, Part I of the Title Policy as of the original effective date of the Title Policy and any additional exceptions that are satisfactory to Lender in its sole and absolute discretion, and

(C)  to insure that upon such TIC Transfer, the subject Tenant-in-Common is an owner of the Property as a tenant-in-common and a Borrower under this Security Instrument together with the other Tenants-in-Common owning the Property pursuant to and in accordance with the TIC Agreement and the Assumption Agreement;

(xvi)  Lender in its sole discretion shall have approved of each proposed Tenant-in-Common (and the owner(s) thereof), including its reputation, creditworthiness and financial worth and (except for those Tenants-in-Common approved prior to the Initial TIC Transfer Deadline) the Lender, in writing, shall approve or disapprove of each proposed Tenant-in-Common (and the owner(s) thereof) within twenty (20) business days following the Lender's receipt of all the items stated in **Section 1.15(f)(ii)** above;

(xvii)  No agreement, certificate or other document required to be delivered under this **Section 1.15** may be executed pursuant to a power of attorney; and

(xviii)  Upon the closing of a TIC Transfer, Borrower shall at Lender's request provide Lender with a diagram showing the structure of Borrower and each Tenant-in-Common and any constituent entity thereof owning an interest in the Property after the TIC Transfer.

(g)    **Additional Permitted Transfers; Permitted Internal Transfers.** If the TIC Transfers occur as permitted under the preceding provisions, then, notwithstanding the foregoing, the following transfers ("Permitted Internal Transfers") shall not constitute an Event of Default under this Security Instrument, provided all of the applicable conditions have been satisfied. These transfers may occur at any time (i.e., even after the Initial TIC Transfer Deadline). Notwithstanding the foregoing, the Permitted Internal Transfer rules shall not apply to Primary Borrower.

(i)    any individual owner of ownership interests (and any associated general partner, if the Tenant-in-Common is a limited partnership) in a Tenant-in-Common may transfer his or her ownership interests in such Tenant-in-Common to (A) himself or herself as a trustee by inter vivos transfer for the benefit of himself or herself or members of his or her immediate family ("immediate family members," which is defined as said individual's spouse and any direct lineal descendants of said individual); (B) the members of his or her immediate family by testamentary gifts or intestate distributions; or (C) a conservator pursuant to court order, upon the disability of such individual.

For the transfers described in this subparagraph (g)(i) to be permitted, the following conditions must be satisfied:

(A)    For transfers to trusts under (A) in this subparagraph (g)(i), no Event of Default or event which with the giving of notice or passage of time would constitute an Event of Default has occurred and remains uncured;

(B)    The requirements of **Section 1.29** hereof shall remain satisfied; and

(C)    Lender has received written notice of such transfer and a revised diagram showing the ownership interests in the Property and all Tenants-in-Common following the proposed transfer. Such notice shall be received before the transfer or as soon thereafter as Primary Borrower learns of such transfer.

(ii)    owners of ownership interests in entities that (a) own partnership interests in Tenants-in-Common or (b) are members of Tenants-in-Common (as well as any direct or indirect owners thereof) may freely transfer such ownership interests in such entities that (y) own partnership interests in Tenants-in-Common or (z) are members of Tenants-in-Common. No notice to Lender is required in connection with such a transfer; provided however if Primary Borrower has actual knowledge of the type of transfer referred to in this **Section 1.15(g)(ii),** Primary Borrower shall provide Lender with notice of such transfer within ten (10) days thereafter; further provided, upon the Lender's written request, Primary Borrower, shall provide Lender with a revised diagram showing the then current and full ownership structure of Borrower and each Tenant-in-Common, and any constituent entity thereof, owning an interest in the Property within twenty (20) days after such request by Lender;

(iii)    A Tenant-in-Common may transfer its entire TIC Interest in the Property to another Tenant-in-Common, provided that the following conditions are satisfied:

(A)    conditions for TIC Transfers set forth in **Subsection 1.15(f)** are satisfied (except that the Initial TIC Transfer Deadline shall not apply); and

(B)    Lender receives its actual costs incurred in association with the transfer and one percent (1%) of the product of the percentage of the TIC Interest in the Property proposed to be transferred, multiplied by the outstanding principal balance of the Note, which fee shall be deemed fully earned upon receipt.

(h)   **Additional Permitted Transfers**:   TIC Transfers Under Repurchase or Buy-Sell Provisions of TIC Agreement.   Further notwithstanding the foregoing, transfers of TIC Interests to Tenants-in-Common existing as of the date of the transfer as a result of the occurrence of a repurchase under **Section 8** of the TIC Agreement, shall not be an Event of Default hereunder, provided that the following conditions are satisfied:

(i)   The TIC Transfer Conditions set forth in **Subsection 1.15(f)** have been met (except that the Initial TIC Transfer Deadline shall not apply).   Notwithstanding the foregoing, the opinions described at **Subsection 1.15(f)(xii)** shall only be required as set forth therein;

(ii)   The Tenant-in-Common transferees are all existing Tenants-in-Common previously permitted under this Security Instrument and no Tenant-in-Common (excluding Primary Borrower) will own more than a 49% interest in the Property following the transfer;

(iii)   If the buy-sell transaction results from the filing of a partition action by a Tenant-in-Common, the transaction is complete within 90 days after the filing of the action.   If the buy-sell transaction results from a bankruptcy filing by a Tenant-in-Common, the transaction is complete within ninety (90) days after the filing; and

(iv)   Lender receives its actual costs incurred in association with the transfer and one percent (1%) of the product of the percentage of the TIC Interest in the Property proposed to be transferred, multiplied by the outstanding principal balance of the Note, which fee shall be deemed fully earned upon receipt.

(i)   **Lender's Rights.**   Except for the Transfers described in Sections (c) through (h) of this Section 1.15, Lender reserves the right to condition any consent required hereunder upon a modification of the terms hereof (excluding a modification of the interest rate, amortization term, maturity date, or payment schedule) and on an assumption of the Note, this Security Instrument and the other Loan Documents as so modified in connection with the proposed Transfer, payment of an assumption fee (except with respect to Permitted Transfers) of one percent (1%) of the principal balance of the Note (the **"Assumption Fee"**), payment of a $2,000.00 processing fee (the **"Processing Fee"**), payment of expenses incurred by Lender (including attorneys' fees) in connection with any proposed Transfer (the **"Transfer Expenses"**), the approval by a Rating Agency (defined below) of the proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Security Instrument including, without limitation, the covenants in Section 1.29 (captioned "Single Purpose Entity") hereof, or such other conditions and legal opinions as Lender shall determine to be in the interest of Lender.   If the holder of the Note shall be a "real estate mortgage investment conduit" or **"REMIC"** (as such terms are defined in Section 860D of the United States Internal Revenue Code, as amended, and any related United States Treasury Department regulations) (the **"REMIC Trust"**), such opinions shall include, without limitation, an opinion of counsel in form and substance satisfactory to Lender, from counsel approved by Lender, stating that the tax qualification and status of the REMIC Trust as a REMIC will not be adversely affected or impaired as a result of such modification or assumption.   The Transfer Expenses and the Processing Fee shall be payable by Borrower whether or not Lender consents to the Transfer.   Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Secured Obligations immediately due and payable upon a Transfer without Lender's consent.   Any Transfer made in contravention of this Section 1.15 shall be null and void and of no force and effect.   The provisions of this Section 1.15 shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

(j)   **Assumption and Release.**   Provided that no Event of Default shall have occurred and shall be continuing, Lender shall consent to a sale of the Property and assumption of the Loan by the purchaser (transferee) and the release of Borrower from liability under the Loan, except for any liability arising or accruing prior to the closing of said assumption, upon (1) Borrower's completion of an assumption application in such form as Lender may require from time to time, (2) Lender's review and