# EXHIBIT E

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

BEST & FLANAGAN LLP
225 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Attn: Kim JoDene Donat

Order/Escrow No.: 271000802
Loan No.: 010-00001741

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### ASSIGNMENT OF LEASES, RENTS, INCOME AND PROFITS

THIS ASSIGNMENT OF LEASES, RENTS, INCOME AND PROFITS (this "**Assignment**") is made as of November 13, 2006, by and between **DBSI COLONNADE WEST LAKE LLC**, a Delaware limited liability company, whose address is 1550 South Tech Lane, Meridian, Idaho 83642, ("Lessor"), and **DBSI MASTER LEASECO, INC.**, an Idaho corporation, whose address is 1550 South Tech Lane, Meridian, Idaho 83642, ("Lessee"), collectively as assignor hereunder (individually or collectively, "Borrower"), each having its mailing address at 1550 South Tech Lane, Meridian, Idaho 83642. This Assignment is being given to secure the payment of that certain Fixed Rate Note of even date herewith in the amount of Seven Million Two Hundred Seventy-two Thousand and 00/100 Dollars ($7,272,000.00) (the "**Note**") executed by Lessor, payable to the order of **ARTESIA MORTGAGE CAPITAL CORPORATION**, a Delaware corporation, and its successors and assigns, having its principal office at 1180 NW Maple Street, Suite 202, Issaquah, Washington 98027 (the "**Lender**").

Lessor is justly indebted to Lender in the aggregate sum of Seven Million Two Hundred Seventy-two Thousand and 00/100 Dollars ($7,272,000.00), with interest thereon as set forth in the Note, which Note is due and payable on or before **December 11, 2016** (the "**Maturity Date**"); and

Lessor is the owner in fee simple of that certain piece, parcel or tract of real property more particularly described in Exhibit A attached hereto and by this reference incorporated herein (the "**Property**"); and

HOLD/PARTNERS TITLE COMPANY/GF#

Lessee is the tenant under that certain Master Lease Agreement dated of even date with the funding of the Loan, by and between Lessor, as landlord, and Lessee, as tenant (the "Master Lease"), a memorandum of which is recorded in the official records of Harris County, Texas, after recordation of this Assignment, which Master Lease demises to Lessee a leasehold estate in the Property (defined below); and

Lender is the owner and holder of the Security Instrument (as defined in the Note) encumbering the Property, which Security Instrument secures the payment of the Note executed by Lessor; and

Lender, as a condition to making the aforesaid loan and to obtain additional security therefor, has required the execution of this Assignment by Borrower; and

Lessee is executing and delivering this Assignment for the purpose of granting, transferring and assigning its right, title and interest in and to the Master Lease and the Property as security for repayment of the Note by the Lessor; provided, however, the parties recognize that Lessee is not a party to the Note and is not obligated thereon.

NOW THEREFORE, in order to further secure the payment of the indebtedness of Borrower to Lender evidenced by the Note, which Note is secured by the Security Instrument, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower hereby irrevocably, absolutely, presently and unconditionally grants, sells, assigns, transfers, pledges and sets over to Lender:

(a)     any and all leases, contracts, subleases, licenses, franchises, concessions, occupancy agreements, rights to use or other agreements now or hereafter affecting all or any portion of the Property or the use or occupancy thereof, whether written or verbal, including without limitation the Master Lease (individually, a "Lease", collectively, the "Leases"), together with all of Borrower's right, title and interest in the Leases including all modifications, amendments, extensions and renewals of the Leases and all rights and privileges incident thereto and all demands or claims arising thereunder (including any cancellation fees or other premiums collected in connection with the Leases) or under any policies insuring against loss of rents or profits;

(b)     all rents, royalties, issues, revenues, profits, proceeds, income and other benefits, including accounts receivable, of, accruing to or derived from such Leases, or now due and which may hereafter become due under or by virtue of the Leases, including without limitation expenses paid by tenants (collectively, "Rents"); and

(c)     all security deposits, guaranties and other security now or hereafter held by Borrower as security for the performance of the obligations of the tenants under such Leases.

The foregoing assignment of Rents and Leases is intended by Borrower and Lender to create and shall be construed to create a present and absolute assignment to Lender of all of Borrower's right, title and interest in the Rents and in the Leases and shall not be deemed to create merely an assignment for security only for the payment of any indebtedness or the performance of any obligations of Borrower under any of the Loan Documents, as defined in the Security Instrument. This assignment is included within the text of the Security Instrument for convenience only, but such inclusion shall not derogate from its effectiveness as a present and absolute assignment. Nothing contained herein shall operate or be construed to obligate Lender to perform any of the terms, covenants and conditions contained in any Lease or otherwise to impose any obligation upon Lender with respect to any Lease, including without limitation, any obligation arising out of any covenant of quiet enjoyment therein contained in the event the tenant under any such Lease shall have been joined as a party defendant in any action to foreclose and the estate of such tenant shall have been thereby terminated; provided, however, Lender hereby agrees not to disturb the occupancy of any tenant under a Lease (excluding the Lessee under the Master Lease) as long as such tenant is not in default under its Lease, and is in full compliance with, its Lease.

2

Borrower and Lender further agree that, during the term of the Security Instrument, the Rents shall not constitute property of Borrower (or of any estate of Borrower) within the meaning of 11 U.S.C. §541, as may be amended from time to time.

Borrower hereby represents and warrants that: (i) Borrower has good title to the Leases and the full power and right to assign the Leases; (ii) no other persons have any title or interest in the Leases; (iii) the Leases are in full force and effect and have not been modified except as set forth in the certified occupancy statement delivered to and approved by Lender; (iv) there are no defaults under any of the Leases; (v) no other assignments of all or any portion of the Rents or the Leases exist or remain outstanding; (vi) all Rents due have been paid in full as of the date hereof except as otherwise disclosed to the Lender in writing prior to the funding of the Loan; (vii) as of the closing of the Loan and the disbursement of the Loan proceeds, none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; provided, however, that the Lessee has assigned as collateral its interest in the Leases to Lessor in connection with the Loan; (viii) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (ix) the property demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (x) there exist no offsets or defenses to the payment of any portion of the Rents; (xi) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (xii) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (xiii) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (xiv) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; (xv) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (xvi) each Lease is subordinate to the Security Instrument, either pursuant to its terms or a recordable subordination agreement; (xvii) no Lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (xviii) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (xix) no brokerage commissions or finders fees are due and payable regarding any Lease.

Borrower agrees to take such action and to execute, deliver and record such documents as may be reasonably necessary to evidence such assignment, to establish the priority thereof and to carry out the intent and purpose hereof. If requested by Lender, Borrower shall execute a specific assignment of any Lease now or hereafter affecting all or any portion of the Property and shall cause the tenant or tenants thereunder to execute, deliver and record a Subordination, Non-Disturbance and Attornment Agreement, in form and substance reasonably satisfactory to Lender.

Borrower agrees to faithfully perform and discharge all of Borrower's obligations as landlord or lessor under the Leases and to enforce all obligations undertaken by tenants thereunder. Borrower shall defend Lender in any action relating to the Leases and shall indemnify, defend and hold Lender harmless from and against any claims of tenants or third parties with respect to the Leases. Borrower shall not receive or collect any Rents in advance of the date due or waive or defer any terms of the Leases without the consent of Lender. Borrower shall not pledge, assign or encumber the Leases or any Rents or (except as is permitted by Section 1.26(b) of the Security Instrument) modify or terminate the Leases, including without limitation the Master Lease, or permit any assignment or sublease thereunder, without the consent of Lender. Borrower irrevocably appoints Lender, its true and lawful attorney-in-fact, at the option of Lender at any time and from time to time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue, in the name of Borrower or Lender, for all such Rents, and apply the same to the indebtedness secured hereby. Borrower specifically agrees that all power granted to Lender under this paragraph may be assigned by Lender to its successors and assigns.

All initially capitalized terms used herein which are defined in the Security Instrument shall have the same meaning herein unless the context otherwise requires.

3

## ARTICLE 1
## REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS OF BORROWER

1.1    **Representations, Warranties, Covenants and Agreements of Borrower.**    In furtherance of the foregoing assignment, Borrower represents, warrants, covenants and agrees as follows:

(a)    Borrower represents and warrants that Lessor is the owner in fee simple of the Property and has good title to the Leases and Rents and has good right to assign the same, and that no other person, entity, firm or corporation has any right, title or interest therein; that Borrower has not previously sold, assigned, transferred, mortgaged or pledged the Leases or Rents; and that payment of any of the same has not otherwise been anticipated, waived, released, discounted, set off or otherwise discharged or compromised.

(b)    Borrower agrees and warrants that, without the prior written consent of Lender, the terms of any Lease including the Master Lease will not be amended, altered, modified or changed in any manner whatsoever, nor will they be surrendered or canceled, nor will proceedings for dispossession or eviction of any lessee under any Lease including the Master Lease be instituted by Borrower except as allowed under Section 1.26 of the Security Instrument.

(c)    Borrower agrees and warrants that no request will be made of any lessee to pay any Rents, and no Rents will be accepted by Borrower, for more than one (1) month in advance of the date such Rents become due and payable under the terms of any and all Leases, it being agreed between Borrower and Lender that Rents shall be paid as provided in said Leases and not otherwise. The foregoing shall not prevent Borrower from charging and collecting security deposits from each tenant leasing space at the Property.

(d)    Borrower authorizes Lender, by and through its employees or agents or a duly appointed receiver, at its option, after the occurrence of an Event of Default, to enter upon the Property and to collect, in the name of Borrower, as Borrower's agent and lawful attorney (which appointment is coupled with an interest), or in Lender's own name, any Rents accrued but unpaid and/or in arrears at the date of such default, as well as the Rents thereafter accruing and becoming payable during the period of the continuance of such Event of Default or any other default. To this end, Borrower further agrees to cooperate with and facilitate, in all reasonable ways, Lender's collection of Rents and upon request by Lender, execute a written notice to each tenant, occupant or licensee directing said tenant, occupant or licensee to pay directly to Lender all Rents due and payable under the Leases; provided, however, that Lender may notify said tenant, occupant or licensee of the effectiveness of this Assignment without giving notice to Borrower or requesting Borrower to give such notice or join in such notice.

(e)    Borrower authorizes Lender, upon such entry, at its option, to take over and assume the management, operation and maintenance of the Property and to perform all acts necessary and proper and to expend such sums out of the income of the Property as in Lender's sole discretion may be reasonable or necessary in connection therewith, in the same manner and to the same extent as Borrower theretofore might do. Borrower hereby releases all claims against Lender arising out of such management, operation and maintenance, except for the gross negligence or willful misconduct of Lender.

(f)    Borrower agrees to execute, upon the request of Lender, any and all other instruments requested by Lender to effectuate this Assignment or to accomplish any other purpose deemed by Lender to be necessary or appropriate in connection with this Assignment.

(g)    Borrower agrees and acknowledges that nothing in this Assignment shall be construed to limit or restrict in any way the rights and powers granted to Lender in the Note, the Security Instrument or any of the other Loan Documents. The collection and application of the Rents as described

4

herein shall not constitute a waiver of any default or Event of Default which might at the time of application or thereafter exist under the Note, the Security Instrument or any of the other Loan Documents, and the exercise by Lender of the rights herein provided shall not prevent Lender's exercise of any rights provided under the Note, the Security Instrument or any of the other Loan Documents.

## ARTICLE 2
## ABSOLUTE ASSIGNMENT

2.1 **Grant of Revocable License to Collect Rents.** So long as an Event of Default shall not have occurred and be continuing, Lender hereby grants to Borrower a revocable license to enforce the Leases, to collect the Rents, to apply the Rents to the payment of the costs and expenses incurred in connection with the Property and to any indebtedness secured thereby. If requested by Lender, Borrower shall (a) give written notice to the tenants under the Leases of the Assignment of Rents and Leases by Borrower to Lender herein and pursuant to Section 3.01 of the Security Instrument, of the grant of the revocable license by Lender to Borrower herein and pursuant to Section 3.02 of the Security Instrument, and of the respective rights of Borrower and Lender hereunder and under Article 3 of the Security Instrument; and (b) obtain such tenants' agreements to be bound by and comply with the provisions of such assignment and grant. All Leases hereafter executed with respect to the Property shall contain a reference to the foregoing assignment and grant and shall state that the tenant executing such Lease shall be bound by and shall comply with the provisions hereof.

2.2 **Revocation of License; Lender's Rights.** Upon the occurrence of an Event of Default and at any time thereafter during the continuance thereof, subject to applicable laws, the license granted to Borrower pursuant to Section 2.1 shall automatically be revoked. Upon such revocation, Borrower shall promptly deliver to Lender all Rents then held by or for the benefit of Borrower. Lender, in addition to any other rights granted to Lender under the Security Instrument, shall have the right: (i) to notify the tenants under the Leases that Borrower's license to collect Rents has been revoked, and, with or without taking possession of the Property, to direct such tenant to thereafter make all payments of Rent and to perform all obligations under its Lease to or for the benefit of Lender or as directed by Lender; (ii) to enter upon the Property and to take over and assume the management, operation and maintenance of the Property, to enforce all Leases and collect all Rents due thereunder, to amend, modify, extend, renew and terminate any or all Leases and execute new Leases; and (iii) to perform all other acts which Lender shall determine, in its sole discretion, to be necessary or desirable to carry out the foregoing. Each tenant under any Lease shall be entitled to rely upon any notice from Lender and shall be protected with respect to any payment of Rent made pursuant to such notice, irrespective of whether a dispute exists between Borrower and Lender with respect to the existence of an Event of Default or the rights of Lender hereunder. The payment of Rent to Lender pursuant to any such notice and the performance of obligations under any Lease to or for the benefit of Lender shall not cause Lender to assume or be bound by the provisions of such Lease including but not limited to the duty to return any security deposit to the tenant under such Lease unless and to the extent such security deposit was paid to Lender by Borrower. Borrower agrees to indemnify, defend and hold Lender harmless from and against any and all losses, claims, damage or liability arising out of any claim by a tenant with respect thereto.

2.3 **Application of Rents.** All Rents received by Lender pursuant to this Assignment shall be applied by Lender, in its sole discretion, to any of the following: (i) the costs and expenses of collection, including, without limitation, reasonable attorneys' fees and receivership fees, costs and expenses; (ii) the costs and expenses incurred in connection with the management, operation and maintenance of the Property, including without limitation the payment of management fees and expenses, taxes, assessments and insurance premiums; (iii) the establishment of reasonable reserves for working capital and for anticipated or projected costs and expense, including, without limitation, capital improvements which may be necessary or desirable or required by law; (iv) the performance of landlord's obligations under the Leases; and (v) the payment of any indebtedness then owing by Borrower to Lender. In connection therewith, Borrower further agrees that all Rents received by Lender from any tenant may be allocated first, if Lender so elects, to the payment of all current obligations of such tenant

under its Lease and not to amounts which may be accrued and unpaid as of the date of revocation of Borrower's license to collect such Rents. Lender may, but shall have no obligation to, pursue any tenant for the payment of Rent which may be due under its Lease with respect to any period prior to the exercise of Lender's rights hereunder or which may become due thereafter. Borrower agrees that the collection of Rents by Lender and the application of such Rents by Lender to the costs, expenses and obligations referred to in this Section 2.3 shall not cure or waive any default or Event of Default or invalidate any act (including, but not limited to, any sale of all or any portion of the Property now or hereafter securing the Loan) done in response to or as a result of such default or Event of Default or pursuant to any notice of default or notice of sale issued pursuant to any Loan Document.

## ARTICLE 3
## GENERAL

3.1    **Limitation of Lender's Liability.**    LENDER SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION UNDER THE LEASES HEREBY ASSIGNED OR UNDER OR BY REASON OF THIS ASSIGNMENT, AND BORROWER HEREBY AGREES TO INDEMNIFY, HOLD HARMLESS AND DEFEND LENDER AGAINST ANY AND ALL LIABILITY, LOSS OR DAMAGE WHICH LENDER MIGHT INCUR UNDER THE LEASES OR UNDER OR BY REASON OF THIS ASSIGNMENT AND OF AND FROM ANY AND ALL CLAIMS AND DEMANDS WHATSOEVER WHICH MAY BE ASSERTED AGAINST LENDER BY REASON OF ANY ALLEGED OBLIGATION OR UNDERTAKING ON LENDER'S PART TO PERFORM OR DISCHARGE ANY OF THE TERMS OF SUCH LEASES.

3.2    **Tenant's Notification of Assignment.**    Upon request by Lender, at any time, Borrower will deliver a written notice to each of the tenants and lessees of the Property, which notice shall inform such tenants and lessees of this Assignment and instruct them that upon receipt of notice by them from Lender of the existence of a default by Borrower under the Note, the Security Instrument or any of the other Loan Documents, all rent due thereafter shall be paid directly to Lender.

3.3    **Satisfaction of Security Instrument; Satisfaction of Assignment.**    This Assignment shall remain in full force and effect as long as the indebtedness evidenced by the Note and secured by the Security Instrument remains unpaid in whole or in part. It is understood and agreed that a complete release or satisfaction of the aforesaid Security Instrument shall operate as a complete release or satisfaction of all of Lender's rights and interest hereunder, and that recording of a satisfaction of the Security Instrument shall operate to satisfy this Assignment. Any tenant or occupant of the Property is hereby authorized and directed upon receipt of notice to it by the Lender to pay all Rents to Lender.

3.4    **No Mortgagee in Possession.**    Nothing contained in this Assignment shall be construed as constituting Lender a "mortgagee in possession" in absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower. Further, entry upon and taking possession of the Property by a receiver shall not constitute possession by Lender.

## ARTICLE 4
## TEXAS AND OTHER PROVISIONS

4.1    **Governing Provisions.**    In the event of any conflicts or inconsistencies between the terms and conditions of this Article 4 and the remainder of this Assignment, the terms and conditions of this Article 4 shall control and be binding, but only to the extent of any such conflicts or inconsistencies.

4.2    **Revocation of License; Lender's Additional Rights.**    In furtherance of and not in limitation of any other provisions of this Assignment, including without limitation Section 2.2:

Upon an Event of Default and at any time thereafter during the continuance thereof, subject to applicable laws, and whether before or after the institution of legal proceedings to foreclose the lien of the Security Instrument or before or after sale of the Property or during any period of redemption the Lender, without regard to waste, adequacy of the security or solvency of the Borrower, may declare all indebtedness secured hereby immediately due and payable, may revoke the privilege/license granted Borrower hereunder to collect the Rents of the Property, and may, at its option, without notice in person or by agent, with or without taking possession of or entering the Property, with or without bringing any action or proceeding, or by a receiver duly appointed by a court, give, or require Borrower to give, notice to any or all tenants under any Leases authorizing and directing the tenant to pay the Rents to Lender or such receiver, as the case may be; collect all of the Rents; enforce the payment thereof and exercise all of the rights of the landlord under any Leases and all of the rights of the Lender hereunder; may enter upon, take possession of, manage and operate the Property, or any part thereof; may cancel, enforce or modify the Leases, and fix or modify the Rents, and do any acts which the Lender deems proper to protect the security hereof with or without taking possession of the Property. The entering upon and taking possession of the Property, the collection of such Rents and the application thereof as aforesaid shall not cure or waive any Event of Default or affect any notice of default or invalidate any act done pursuant to such notice nor in any way operate to prevent the Lender from pursuing any other remedy which it may now or hereafter have under the terms of the Security Instrument or the Note or any other security securing the same. The rights hereunder shall in no way be dependent upon and shall apply without regard to whether the Property is in danger of being lost, materially injured or damaged or whether the Property is adequate to discharge the indebtedness secured hereby. The rights contained herein are in addition to and shall be cumulative with the rights given in any separate instrument, assigning any Leases and Rents and shall not amend or modify the rights in any such separate agreement.

4.3    **Receiver.** If an Event of Default shall occur, the Lender shall be entitled as a matter of right without giving bond and without regard to the solvency or insolvency of the Borrower, or waste of the Property or adequacy of the security of the Property, to appointment of a receiver in accordance with applicable law, which receiver shall have all the rights, powers and remedies as provided by law or as may be contained in any court decree applying such remedy and who shall collect and apply the Rents in such order as Lender may require to all expenses for management, operation and maintenance of the Property and to the costs and expenses of the receivership, including, without limitation, reasonable attorneys' fees and the repayment of the indebtedness secured hereby. Borrower shall peaceably turn over possession of the Property to such receiver in accordance with applicable law.

4.4    **Collection of Rents.** Lender may exercise, in Lender's or Borrower's name, all rights and remedies available to Borrower with respect to the collection of Rents. The Lender is also specifically empowered to endorse the name of the Borrower, or any subsequent owner of the Property, on any checks, notes, or other instruments for the payment of money, to deposit the same in bank accounts, to give any and all acquittances or any other instrument in relation thereto in the name of the Borrower, and to institute, prosecute, settle, or compromise any summary or legal proceedings in the name of the Borrower or in the name of the Lender for the recovery of such rents, income or profits, or for the recovery of any damages done to the Property or for the abatement of any nuisance thereon, and to defend any legal proceedings brought against the Borrower arising out of the operation of the Property. The Borrower will reimburse the Lender for any charges, expenses or fees, including attorneys, fees and costs, incurred by the Lender.

4.5    **Application of Rents.** In no event will this Assignment reduce the indebtedness owing under the terms of, and evidenced by, the Note or otherwise secured by the Security Instrument and this Assignment, except only to the extent, if any, that Rents are actually received by Lender and applied as payment of the indebtedness secured hereby. Without impairment of its rights hereunder, Lender may, at its option, at any time and from time to time, release to Borrower Rents so received by Lender or any part thereof.

4.6    **Enforcement.**   Lender may enforce this Assignment without first resorting to or exhausting any security or collateral for the indebtedness.  As used in this Assignment, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

4.7    **References to Other Documents.**  The Note and Security Instrument are hereby made a part hereof as if expressly set forth herein.  Wherever the Note or Security Instrument are inconsistent with the terms hereof, the provisions which impose the greater or more stringent requirements, liability and obligations upon the Borrower shall govern and prevail.

**ARTICLE 5**
**MISCELLANEOUS**

5.1    **Remedies Cumulative.**  It is understood and agreed that the Lender's rights and remedies under this Assignment are not to be deemed to be mutually exclusive and Lender may pursue all such remedies simultaneously.

5.2    **Captions.**  The captions set forth at the beginning of the various paragraphs of this Assignment are for convenience only and shall not be used to interpret or construe the provisions of this Assignment.

5.3    **Invalidity of Certain Provisions.**  Every provision of this Assignment is intended to be severable.  In the event any term or provision hereof is declared to be illegal, invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such illegality, invalidity or unenforceability shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

5.4    **Successors and Assigns.**  The provisions of this Assignment shall inure to the benefit of Lender and its successors and assigns, and shall be binding upon Borrower, its heirs, personal representatives, successors and assigns.  The creation of rights and powers under this Assignment in favor of, or available to, Lender shall, in no way whatsoever, be construed to impose concomitant duties or obligations on Lender in favor of Borrower except as expressly set forth herein.

5.5    **Governing Law.**  This Assignment shall be governed by and construed in accordance with the laws of the State where the Property is located but not the conflict of law rules applicable in said State in cases where the parties have not expressly chosen the law of a jurisdiction to apply.

5.6    **Amendments.**  This instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought.

5.7    **Interpretation.**  In this Assignment the singular shall include the plural and the masculine shall include the feminine and neuter and vise versa, if the context so requires.

5.8    **Counterparts.**  This document may be executed and acknowledged in counterparts, all of which executed and acknowledged counterparts shall together constitute a single document.  Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this document to physically form one document, which may be recorded.

5.9    **Construction of this Assignment.**  Borrower and Lender agree that this Assignment shall be interpreted in a fair, equal and neutral manner as to each of the parties.

**[SIGNATURE PAGE(S) ATTACHED]**

Borrower hereby acknowledges and agrees that this Assignment provides for certain indemnifications by Borrower of Lender pursuant to Section 3.1.

IN WITNESS WHEREOF, the Borrower has executed this Assignment under seal as of the day and year first above written.

BORROWER AND LESSOR:

DBSI COLONNADE WEST LAKE LLC,
a Delaware limited liability company

By:    DBSI Housing Inc., an Idaho corporation
Its:     Member

By:
Name:    Jeremy Swenson
Title:     Assistant Secretary

STATE OF _Idaho_ )

COUNTY OF _Ada_ )

On _Nov 15th_, 2006, before me, _Marci Burroughs_, a Notary Public, personally appeared _Jeremy Swenson_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_Marci Burroughs_
Notary Public
Print Name: _Marci Burroughs_
My commission expires: _6/18/2011_

9

BORROWER AND LESSEE:

DBSI MASTER LEASECO, INC.,
an Idaho corporation

By: _____
Name: ~~Jeremy Swenson~~
Title: ~~Assistant Secretary~~

STATE OF _Idaho_ )

COUNTY OF _Ada_ )

On _Nov 15th_ 2006, before me, _Marci Burroughs_, a Notary Public, personally appeared _Jeremy Swenson_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_Marci Burroughs_
Notary Public
Print Name: _Marci Burroughs_
My commission expires: _6/12/2010_



THIS DOCUMENT WAS DRAFTED BY:

Kim JoDene Donat
BEST & FLANAGAN LLP
225 South Sixth Street
Suite 4000
Minneapolis, Minnesota 55402
(612) 339-7121

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

The Property is located in Harris County, Texas, and is legally described as follows:

**TRACT I:**

**Being a tract or parcel of land situated in the David Harris Survey, Abstract No. 26 and being out of and a part of reserve "E" (restricted to commercial use) in Block One (1), of Atasca Woods, Section One 91), a subdivision in Harris County, Texas, according to the Map or Plat thereof recorded at Film Code No. 438134, of the Map Records of Harris County, Texas. Said tract or parcel of land being more particularly described by metes and bounds attached hereto and made a part hereof.**

BEING a tract or parcel of land situated in the David Harris Survey, Abstract No. 26 and being out of and a part of Reserve "E", (restricted to commercial use) in Block One (1), of ATASCA WOODS, SECTION ONE (1), a subdivision in Harris county, Texas, according to the Map or Plat thereof recorded in Film Code No. 438134, of the Map Records of Harris County and described as Tract 1; Tract 2, on Access and Parking Agreement recorded under M.C.C.F. No. X726563; Tract III benefiting Tract I recorded under H.C.C.F., No. U300001, of Harris County, Texas. Said tract or parcel of land being more particularly described by metes and bounds as follows

BEGINNING at a 5/8 inch iron rod found in the Northerly right-of-way line of Aerobic Drive, for the Southeast corner of a Lot 57, Block One (1), of said Ataswoods, Section One (1);

THENCE North, along the Easterly lines of said Block One (1) of Ataswoods, Section One (1), same being the Westerly lines of said Reserve "E", a distance of 350.82 feet to a 5/8" iron rod found at the Northeast corner of Lot 62 in said Block One (1) for a Westerly corner of the herein described tract of land;

THENCE North 59 degrees 01 minutes 07 seconds East, along the Southerly lines of Lots 60-57 of said Block One (1), a distance of 227.14 feet to an Interior corner of the herein described tract of land;

THENCE North 00 degrees 15 minutes 35 seconds West, along the Easterly lines of Lots 50-57 in Block One (1) of said Ataswoods, Section, One (1), a distance of 435.62 feet, to a 5/8 iron rod found for the Northwest corner of the herein described tract of land;

THENCE 89 degrees 43 minutes 25 seconds East, departing the above referenced Easterly line of Ataswoods, Section One (1), a distance of 305.00 feet, to a 5/8" iron rod found in the Westerly right-of-way line of West Lake Houston Parkway (100' R.O.W.), for the Northeast corner of the herein described tract of land;

THENCE South 00 degrees 16 minutes 35 seconds East, along said right-of-way line, a distance of 638.63 feet to a 5/8" iron rod found for the most Easterly Southeast corner of the herein described tract of land;

THENCE South 89 degrees 43 minutes 25 seconds West, departing said right-of-way line, a distance of 54.70 feet, to a 5/8" iron rod found for corner;

THENCE South 89 degrees 43 minutes 26 seconds West, a distance of 232.24 to a 5/8" iron rod fund for corner

THENCE South 00 degrees 16 minutes 34 seconds East, a distance of 145.10 feet, to a 5/8" iron rod, found in the aforesaid Northerly right-of-way line of Aerobic Drive, for the most Southerly Southeast corner of the herein described tract of land;

THENCE South 86 degrees 39 minutes 29 seconds West, along said Northerly right-of-way line, a distance of 85.45 feet, to a 5/8" iron rod found for the point of curvature of a curve to the right having a central angle of 03 degrees 48 minutes 51 seconds, a radius of 500.00 feet and a chord bearing and distance of South 88 degrees 33 minutes 54 seconds West, 33.28 feet;

THENCE continuing along said right-of-way line and curve to the right, on arc distance of 33.28 feet, to a 5/8" iron rod found for the point of tangency;

THENCE North 89 degrees 31 minutes 40 seconds West, continuing along said right-of-way line, a distance of 127.63 feet, to the POINT OF BEGINNING and containing 6.753 Acres, 294.163 square feet of land.

**TRACT II:**

**Access and Cross Parking Agreement executed by and between Richard Flyg, Southtrust Bank and Johnny Franks, Trustee, as described by Instrument dated June 3, 2004, and filed for record under Harris County Clerk's File Number X726563.**

**TRACT III:**

**Easement Rights benefiting Tract I as shown in Declaration of Covenants, Conditions and Restrictions filed for record under Harris County Clerk's File No. U300001.**

016075/260201/473074_6

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in file number Sequence on the date and at the time stamped hereon by me; and was duly RECORDED, in the Official Public Records of Real Property of Harris County Texas on

NOV 2 1 2006

COUNTY CLERK
HARRIS COUNTY, TEXAS

2006 NOV 21
COUNTY CLERK
HARRIS COUNTY, TEXAS

FILED
2006 NOV 21 PM 3:39

**FIXED RATE NOTE**
*[Defeasance]*

**$7,272,000.00**                                                      November 13, 2006

1.       BORROWER'S PROMISE TO PAY.

         FOR VALUE RECEIVED, the undersigned, DBSI COLONNADE WEST LAKE LLC, a(n) Delaware limited liability company, having an office at 1550 South Tech Lane, Meridian, Idaho 83642 ("**Borrower**"), hereby unconditionally promises to pay to the order of ARTESIA MORTGAGE CAPITAL CORPORATION, a Delaware corporation (together with its successors and assigns, "**Lender**"), the principal sum of Seven Million Two Hundred Seventy-two Thousand and 00/100 Dollars ($7,272,000.00), in lawful money of the United States of America with interest thereon to be computed from the date of disbursement under this Note at the Applicable Interest Rate (defined below), and to be paid in installments as provided herein. Any initially capitalized terms which are not specifically defined in this Note shall have the same meanings given to them in the Security Instrument (defined below).

2.       INTEREST.

         Interest on the principal sum of this Note shall be calculated on the basis of a 360-day year and will be payable on the basis of the actual number of days elapsed. Borrower shall pay interest at the rate of Five and Eighty-two Hundredths percent (5.82%) per annum (the "**Applicable Interest Rate**"). If Borrower fails to pay any amount when due under this Note, in addition to any other rights possessed by the Lender, any accrued but unpaid interest may be added to the unpaid principal and accrue interest at the Default Rate (defined below). The first interest accrual period under this Note shall commence on and include the date that principal is advanced under this Note and shall end on and include the next tenth (10th) day of a calendar month, unless principal is advanced on the tenth (10th) day of a calendar month, in which case the first interest accrual period shall consist of only such tenth (10th) day. Each interest accrual period thereafter shall commence on the eleventh (11th) day of each calendar month during the term of this Note and shall end on and include the tenth (10th) day of the next occurring calendar month.

3.       PAYMENTS.

         (a)      **Time and Amounts of Payments.** Borrower shall pay principal and interest by making payments as follows:

                  (i)       Accrued interest only at the Applicable Interest Rate shall be due and payable (aa) on the date that principal is advanced under this Note for the period from the date of disbursement hereunder through and including the tenth (10th) day of the current calendar month (if the date of disbursement hereunder is on or after the first (1st) day of a calendar month and prior to the eleventh (11th) day of a calendar month) or the tenth (10th) day of the next succeeding calendar month (if the date of disbursement hereunder is on or after the eleventh (11th) day of the current calendar month) and (bb) on January 11, 2007, and on the eleventh (11th) day of each calendar month thereafter up to and including December 11, 2011;

                  (ii)      A constant payment in the amount of U.S. **$42,761.34** (the "**Constant Payment**"), on January 11, 2012, and on the eleventh (11th) day of each calendar month thereafter up to and including November 11, 2016; each of such payments to be applied to the

payment of interest computed at the Applicable Interest Rate, and the balance applied toward the reduction of the principal sum; and

        (iii)     A payment of the entire unpaid principal balance of this Note and all accrued and unpaid interest thereon due and payable on December 11, 2016 (the "Maturity Date").

      (b)    **Place of Payments.**  The payments referred to in Sections 3(a)(i) and (ii) above are hereinafter referred to individually as a "**Monthly Payment**", and collectively as "**Monthly Payments**". Borrower shall make its Monthly Payments and any other payments due under this Note, including, without limitation, the entire unpaid principal balance of this Note plus all accrued but unpaid interest thereon due and payable on the Maturity Date, at **Structured Products Servicing, Wachovia Wholesale Lockbox, P.O. Box 60253, Charlotte, North Carolina 28260-0253** or at a different place (including, without limitation, to Lender's Representative) if required by the Lender.  As used in this Note, the term "**Lender's Representative**" shall mean Lender or Lender's loan servicer or agent, in each case as designated by Lender from time to time.

      (c)    **Application of Payments.**  In the absence of a specific determination by Lender to the contrary, all payments paid by Borrower to Lender in connection with the obligations of Borrower under this Note and under the other Loan Documents shall be applied in the following order of priority: (i) to amounts, other than principal and interest, due to Lender pursuant to this Note or the other Loan Documents; (ii) to the portion of accrued but unpaid interest accruing at the Applicable Interest Rate on this Note; and (iii) to the unpaid principal balance of this Note.  Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower in such order of priority as Lender may deem advisable.

4.      **PREPAYMENT; DEFEASANCE.**

      (a)    Subject to the provisions of Section 4(h) below, Borrower shall not have the right or privilege to prepay all or any portion of the unpaid principal balance of this Note, except in connection with the application of Net Proceeds by Lender pursuant to Section 1.09 of the Security Instrument (which application shall not be subject to any Prepayment Charge (defined below)).

      (b)    On or after the earlier of (i) three (3) years from the due date of the first Monthly Payment or (ii) the date which is two (2) years and one (1) day after the "startup day" of any "real estate mortgage investment conduit" or "REMIC" (as such terms are defined in Sections 860G(a)(9) and 860D, respectively, of the United States Internal Revenue Code, as amended, and any related United States Treasury Department regulations) which may acquire the Loan, as the case may be (the "**Lockout Expiration Date**"), and provided that no Event of Default exists, Borrower may obtain a release (the "**Release**") of the Property from the lien of the Security Instrument and the other Loan Documents provided that the following conditions have been satisfied (a "**Defeasance**"):

        (1)    Borrower shall have provided Lender with not less than thirty (30) days and not more than sixty (60) days prior written notice (the "**Defeasance Notice**") specifying the Monthly Payment date (the "**Release Date**") on which the Defeasance Deposit (defined below) is to be paid or the Government Securities (defined below) are to be delivered, in each case in the manner hereinafter provided;

        (2)    Borrower shall have paid to Lender all interest accrued and unpaid on the principal balance of this Note to and including the Release Date;

(3)     Borrower shall have paid to Lender all other sums due and payable under this Note, the Security Instrument and the other Loan Documents to and including the Release Date, including, without limitation, any Monthly Payment which may be due and payable on the Release Date;

(4)     Borrower shall have paid to Lender's Representative a $5,000.00 non-refundable processing fee (the "**Defeasance Processing Fee**"), which must be paid at the same time the Defeasance Notice is provided to Lender;

(5)     Borrower shall have either paid to Lender's Representative the Defeasance Deposit or delivered to Lender's Representative the Government Securities, whichever Lender requires at Lender's option;

(6)     All payments by Borrower to Lender's Representative under this Section 4 shall have been made in immediately available funds, except for the Defeasance Processing Fee, which may be paid by check or draft;

(7)     The proposed Defeasance and Release shall not cause the Loan to lose its status as a "qualified mortgage" within the meaning of Sections 860D and 860G(a)(3) of the United States Internal Revenue Code, as amended, and any related United States Treasury Department regulations, including without limitation United States Treasury Department Regulation 1.860(G)-2(a);

(8)     The Successor Borrower (defined below) shall have been established and shall have been approved by Lender's Representative;

(9)     Borrower shall have delivered to Lender the following items at least fifteen (15) days prior to the Release Date:

(A)     the Defeasance Security Agreement (defined below);

(B)     a release of the Property from the lien of the Security Instrument (for execution by Lender) in form and substance appropriate for the jurisdiction in which the Property is located and satisfactory to Lender's Representative;

(C)     a certificate of Borrower, in form and substance satisfactory to Lender's Representative, certifying that all of the conditions and requirements set forth in this Section 4 have been satisfied;

(D)     a certificate, in form and substance satisfactory to Lender's Representative, from an independent certified public accountant approved by Lender's Representative, certifying that the Government Securities will generate monthly amounts and cash flow that are sufficient, without reinvestment, to timely pay all Scheduled Defeasance Payments (defined below);

(E)     the Defeasance Opinion (defined below);

(F)     written confirmation from the applicable Rating Agency(ies) to the effect that such Release and substitution of Defeasance Collateral (defined below) will not result in a downgrade, withdrawal or qualification of any rating in effect immediately prior to Defeasance for any Securities;

(G)     if Lender's Representative requires Borrower to establish the Successor Borrower pursuant to Section 4(f)(vii) below, evidence satisfactory to Lender's Representative of the establishment of Successor Borrower, including without limitation, the Successor Borrower's original organizational documents;

(H)     the Transfer and Assignment Agreement (defined below); and

(I)     such other certificates, documents or instruments as Lender's Representative may reasonably request.

(c)     Borrower shall have paid to Lender's Representative all costs and expenses (including, without limitation, Rating Agency(ies)', consultants', accountants' and attorneys' fees, costs and expenses) incurred by Lender's Representative in connection with the matters referred to in this Section 4, including, without limitation, all costs and expenses incurred in connection with the review of the proposed Defeasance Collateral, the preparation of the Defeasance Security Agreement (and any related documentation) and the establishment and maintenance of the Successor Borrower, and any administrative expenses and applicable federal income taxes associated with or incurred by the Successor Borrower.

(d)     The Defeasance Deposit (if required by Lender pursuant to Section 4(b)(5) above) shall be used by Lender's Representative to purchase the Government Securities. In connection therewith, Borrower hereby irrevocably appoints Lender's Representative as Borrower's agent and attorney-in-fact, which appointment is coupled with an interest, for the purpose of using the Defeasance Deposit to purchase or cause to be purchased the Government Securities. Borrower, pursuant to the Defeasance Security Agreement or other appropriate documents, shall authorize and direct that the payments received from the Government Securities be made directly to Lender's Representative and applied to satisfy the obligations of the Borrower under this Note, including without limitation, this Section 4. Borrower specifically agrees that all power granted to Lender under this Section 4(d) may be assigned by Lender to its successors or assigns as holder of this Note.

(e)     Upon satisfaction of all the terms and conditions of Sections 4(b) and (c) above, the Property shall be released from the lien of the Security Instrument and the other Loan Documents and the Defeasance Collateral shall constitute the sole collateral which shall secure this Note. Lender will, at Borrower's sole expense, execute and deliver any agreements reasonably requested by Borrower to release the Property from the lien of the Security Instrument and the other Loan Documents. After payment of the Defeasance Deposit or delivery of the Government Securities pursuant to Section 4(b)(5) above, notwithstanding any statement to the contrary contained in this Note or in any of the other Loan Documents, this Note cannot be prepaid in whole or in part or be the subject of any further Defeasance.

(f)     For the purposes of this Section 4, the following terms shall have the following meanings:

(i)     The term "**Defeasance Collateral**" shall mean, individually or collectively, as the case may be, the Defeasance Deposit and the Government Securities and the proceeds thereof.

(ii)     The term "**Defeasance Deposit**" shall mean an amount equal to the sum of: (1) the amount which will be sufficient to purchase the Government Securities necessary to meet the Scheduled Defeasance Payments (including, without limitation, Lender's Representative's estimate of administrative expenses and applicable federal income taxes associated with or to be incurred by the Successor Borrower during the remaining term of, and applicable to, the Loan); (2) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of this Note or otherwise required to accomplish the agreements of this Section 4; and (3) all fees, costs and expenses incurred or to be incurred by Lender in the purchase and holding of the Government Securities;

(iii)    The term "**Defeasance Opinion**" shall mean an opinion of counsel in form and substance satisfactory to Lender's Representative, from counsel approved by Lender's Representative, stating, among other things, (A) that the Defeasance Collateral has been duly and validly assigned and delivered to Lender's Representative and that Lender has a legal, valid, perfected, first priority lien on and security interest in the Defeasance Collateral, and (B) that if the holder of this Note shall at the time of the Release be a REMIC, (1) the Defeasance Collateral has been validly assigned to the REMIC trust which holds this Note (the "**REMIC Trust**"), (2) the Defeasance has been effected in accordance with the requirements of United States Treasury Department Regulation 1.860(G)-2(a)(8), as such regulation may be amended or substituted from time to time, and will not be treated as an exchange pursuant to Section 1001 of the United States Internal Revenue Code and (3) the tax qualification and status of the REMIC Trust as a REMIC will not be adversely affected or impaired as a result of the Defeasance;

(iv)    The term "**Defeasance Security Agreement**" shall mean a security agreement, in form and substance satisfactory to Lender's Representative, together with such other instruments, agreements and representations and warranties as may be required of Borrower by Lender's Representative in order to perfect upon the delivery of the Defeasance Security Agreement a first priority lien on and security interest in the Defeasance Collateral in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests, which Defeasance Security Agreement shall provide, among other things, that any excess received by Lender from the Defeasance Collateral over the amount payable by Borrower hereunder shall on the Release Date be refunded to Borrower and shall thereafter, promptly following each Monthly Payment date and the Maturity Date, be refunded to Successor Borrower;

(v)    The term "**Government Securities**" shall mean U.S. Treasury Obligations (defined below) or Non-U.S. Treasury Obligations (defined below) which (1) are duly endorsed by the holder thereof as directed by Lender's Representative or are accompanied by a valid written instrument of transfer in form and substance satisfactory to Lender's Representative (including, without limitation, such instruments, agreements and representations and warranties as may be required by Lender's Representative or by the depository holding the Government Securities or the issuer thereof, as the case may be, to effectuate book-entry transfers and pledges through the book-entry facilities of such depositary) in order to perfect upon the delivery of the Defeasance Security Agreement the first priority security interest therein in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests and (2) which provide payments which are (A) payable on or prior to, but as close as possible to, all successive Monthly Payment dates after the Release Date, and prior to but as close as possible to the Maturity Date and (B) in amounts equal to or greater than the amounts necessary to meet the scheduled payments of principal and interest due under this Note on such dates plus the Lender's Representative's estimate of administrative expenses and applicable federal income taxes associated with or to be incurred by the Successor Borrower during the term of the Loan (the "**Scheduled Defeasance Payments**");

(vi)    The term "**Non-U.S. Treasury Obligations**" shall mean non-callable, fixed-rate obligations, other than U.S. Treasury Obligations, that are "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended;

(vii)    The term "**Successor Borrower**" shall mean an entity established by either Borrower or Lender's Representative, whichever Lender requires at Lender's option, which satisfies Lender's Representative's requirements (including, without limitation single purpose entity bankruptcy remoteness criteria) and which has been approved by Lender's Representative;

(viii)    The term "**Transfer and Assignment Agreement**" shall mean an agreement in form and substance satisfactory to Lender's Representative, together with such other

instruments, agreements and representations and warranties as may be required of Borrower by Lender's Representative, pursuant to which, among other things: (A) Borrower shall transfer and assign all obligations, rights and duties under and to this Note together with the pledged Defeasance Collateral to the Successor Borrower; (B) Successor Borrower shall assume the obligations of Borrower under this Note and the Defeasance Security Agreement and Borrower shall be relieved of its obligations thereunder, except that Borrower shall be required to perform its obligations pursuant to this Section 4; and (C) Borrower shall pay $1,000 to the Successor Borrower as consideration for Successor Borrower assuming the Borrower's obligations under this Note and the Defeasance Security Agreement. Notwithstanding anything to the contrary in the Security Instrument, except as provided in this Section 4, no other transfer/assumption fee or processing fee (including, without limitation, the transfer fee and processing fee referred to in Section 1.15 of the Security Instrument) shall be payable upon a transfer of the Note in accordance with the terms and conditions of this paragraph; and

(ix)     The term "**U.S. Treasury Obligations**" shall mean direct, non-callable, fixed-rate obligations of the United States of America.

(g)     Notwithstanding the fact that prepayments are prohibited except as expressly set forth in this Section 4, if this Note is prepaid (other than a prepayment pursuant to Section 4(h) below or in connection with the application of Net Proceeds as referred to in Section 4(a) above), in full or in part, by operation of law, Borrower's default or otherwise, or following an Event of Default and acceleration of this Note, if a tender of payment of the amount necessary to satisfy the indebtedness evidenced by this Note and secured by the Security Instrument is made at any time prior to foreclosure sale, or during any redemption period after foreclosure, there shall be payable to Lender, at the same time, (i) accrued and unpaid interest on the portion of the principal balance of this Note being prepaid to and including the date of prepayment, (ii) unless prepayment is tendered on the eleventh (11th) day of a calendar month, an amount equal to the interest that would have accrued on the amount being prepaid from the date of prepayment to and including the tenth (10th) day of the current calendar month (if prepayment is tendered on or after the first (1st) day of a calendar month and prior to the eleventh (11th) day of a calendar month) or the tenth (10th) day of the next succeeding calendar month (if the prepayment is tendered after the eleventh (11th) day of a calendar month) (which amount shall constitute additional consideration for the prepayment), (iii) all other sums then due under this Note, the Security Instrument and the other Loan Documents, (iv) to the maximum extent permitted by law, a Prepayment Charge, and (v) an additional prepayment consideration equal to one percent (1%) of the outstanding principal balance of this Note.

"**Prepayment Charge**" shall mean an amount determined as of the date of any prepayment or acceleration of this Note, which will be the greater of (a) 1% of the principal amount prepaid, or (b) the amount obtained by subtracting (i) the sum of (x) the unpaid principal amount being prepaid, plus (y) the amount of interest thereon accrued to the date of such prepayment or acceleration, as the case may be, from (ii) the sum of the Current Values (defined below) of all amounts of principal and interest on this Note being prepaid or accelerated that would otherwise have become due on and after the date of such determination if this Note was not being prepaid or accelerated. The "**Current Value**" of any amount payable means such amount discounted (on a semiannual basis) to its present value on the date of determination at the Treasury Yield (defined below) per annum in accordance with the following formula:

$$\text{Current Value} = \frac{\text{Amount Payable}}{(1+d/2)^{n}}$$

where "d" is the Treasury Yield per annum expressed as a decimal and "n" is an exponent (which need not be an integer) equal to the number of semiannual periods and portions thereof (any such portion of a period to be determined by dividing the number of days in such portion of such period by the total number of days in such period, both computed on the basis of a 30-day month and a 360-day year) between the date of such determination and the due date of the amount payable. For such purpose, the due date of any amount of principal of this Note being partially prepaid means the date or dates as of which such amount is to be credited first against the Borrower's obligation to make the scheduled

payment of principal on the Maturity Date, then, to the extent of the principal being prepaid, to each preceding scheduled required installment of principal pursuant to this Note. The "**Treasury Yield**" shall be determined by reference to the most recent Federal Reserve Statistical Release H.15(519) which has become publicly available at least two (2) business days prior to the date fixed for prepayment or the acceleration date (or, if such Statistical Release is no longer published, any publicly available source of similar market data) and shall be the most recent weekly average yield on actively traded U.S. Treasury securities adjusted to a constant maturity equal to the then remaining Weighted Average Life to the Maturity (defined below) of this Note (the "**Remaining Life**"). If the Remaining Life is not equal to the constant maturity of a U.S. Treasury security for which a weekly average yield is given, the Treasury Yield shall be obtained by linear interpolation (calculated to the nearest one-twelfth (1/12) of a year) from the weekly average yields of (a) the actively traded U.S. Treasury security with the constant maturity closest to and greater than the Remaining Life of this Note, and (b) the actively traded U.S. Treasury security with the constant maturity closest to and less than the Remaining Life of this Note, except that if the Remaining Life is less than one (1) year, the weekly average yield on actively traded U.S. Treasury securities adjusted to a constant maturity of one (1) year shall be used. "**Weighted Average Life to Maturity**" means, as applied to this Note at any date, the number of years obtained by dividing (x) the then outstanding principal amount of this Note into (y) the total of the products obtained by multiplying (A) the amount of each then-remaining required principal payment including payment at the Maturity Date, in respect thereof, by (B) the number of years (calculated to the nearest one-twelfth (1/12)) which will elapse between such date and the date on which such payment is to be made.

Borrower shall pay the Prepayment Charge as provided above whether or not prepayment is voluntary or involuntary, including, without limitation, any prepayment due to the acceleration of the outstanding principal balance of this Note as a result of the occurrence of an Event of Default.

(h)     Notwithstanding anything to the contrary herein, provided no Event of Default exists and so long as no Defeasance has occurred, from and after the due date of the Constant Payment that is **three (3)** months prior to the Maturity Date, Borrower may prepay the unpaid principal balance of this Note in whole, but not in part, provided that the following conditions have been satisfied: (i) Borrower shall have provided Lender with not less than thirty (30) or more than ninety (90) days prior written notice (the "**Prepayment Notice**") specifying the Monthly Payment date on which prepayment is to be made (the "**Prepayment Date**"); (ii) Borrower shall have paid to Lender all accrued and unpaid interest on the outstanding principal balance of this Note to and including the Prepayment Date; (iii) unless prepayment is tendered on the eleventh (11th) day of a calendar month, an amount equal to the interest that would have accrued on the amount being prepaid from the date of prepayment to and including the tenth (10th) day of the current calendar month (if prepayment is tendered on or after the first (1st) day of a calendar month and prior to the eleventh (11th) day of a calendar month) or the tenth (10th) day of the next succeeding calendar month (if the prepayment is tendered after the eleventh (11th) day of a calendar month) (which amount shall constitute additional consideration for the prepayment); and (iv) Borrower shall have paid to Lender all other sums then due under this Note, the Security Instrument and the other Loan Documents.

5.     **BORROWER'S FAILURE TO PAY AS REQUIRED.**

(a)     **Late Charges for Overdue Payments.** If Lender has not received the full amount of any Monthly Payment by the date it is due, Borrower shall pay a late charge to Lender. The amount of such late charge will be four percent (4%) of such overdue payment which shall be calculated as of the date such payment was originally due. Borrower will pay such late charge promptly but only once on each late payment. Borrower and Lender agree such late charge represents the reasonable estimate of Lender and Borrower of a fair average compensation for the loss that may be sustained by Lender due to the failure of Borrower to make timely Monthly Payments and is not a penalty. Such late charge shall be paid without prejudice to the right of Lender to collect any other amounts provided to be paid upon an Event of Default, including without limitation interest at the Default Rate, or to declare a default hereunder, under the Security Instrument or under any of the other Loan Documents. Borrower recognizes (i) that its

default in making, when due, any payment under this Note or under any of the other Loan Documents, or the occurrence of any other Event of Default, will result in (x) Lender incurring additional expenses in servicing and administering the Loan, (y) loss to the Lender of the use of the overdue payment and (z) frustration to Lender in meeting its other financial and loan commitments, and (ii) that the damages caused thereby would be extremely difficult and impractical to ascertain. Borrower agrees (aa) that an amount equal to such late charge plus the accrual of interest at the Default Rate pursuant to Section 5 below is a reasonable estimate of the damage to Lender in the event of an overdue payment and (bb) that the accrual of interest at the Default Rate following any other Event of Default is a reasonable estimate of the damage to Lender in the event of such other Event of Default, regardless of whether there has been an acceleration of this Note.

(b) **Default and Acceleration; Default Rate.** If any payment required in this Note (including, without limitation, any Monthly Payment) or any other payment under any of the Loan Documents is not paid on or prior to the date when due after the expiration of any applicable notice and grace periods expressly provided in the Loan Documents, or on the happening of any other Event of Default, then the whole of the principal sum of this Note, (i) interest, default interest, Prepayment Charge, late charges and other sums, as provided in this Note, the Security Instrument or the other Loan Documents, (ii) all other monies agreed or provided to be paid by Borrower in this Note, the Security Instrument or the other Loan Documents, (iii) all sums advanced pursuant to the Security Instrument to protect and preserve the Property and the lien and the security interest created thereby, and (iv) all sums advanced and costs and expenses incurred by Lender in connection with the indebtedness evidenced by the Loan Documents or any part thereof, any renewal, extension, or change of or substitution thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender, shall without notice become immediately due and payable at the option of Lender, together with all the interest that Borrower owes on such amounts at the Default Rate. The **"Default Rate"** is equal to the Applicable Interest Rate plus four percent (4%), and shall accrue from and after the date any such payment was originally due (without taking into account any applicable notice or grace periods). This provision shall not be deemed to excuse a default hereunder or an Event of Default under the Security Instrument and shall not be deemed a waiver of any other rights Lender may have, including the right to declare the entire unpaid principal balance and accrued interest immediately due and payable.

(c) **No Waiver by Lender.**

(i) Lender shall not be deemed to have waived any of its rights or remedies under this Note unless such waiver is expressed in writing by Lender, and no delay or omission by Lender in exercising, or failure by Lender on any one or more occasions to exercise, any of Lender's rights hereunder or under the Loan Documents, or at law or in equity, including, without limitation, Lender's right, after the occurrence of any Event of Default, to declare the entire indebtedness evidenced hereby immediately due and payable, shall be construed as a novation of this Note or shall operate as a waiver or prevent the subsequent exercise of any or all such rights.

(ii) Acceptance by Lender of any portion or all of any sum payable hereunder, whether before, on or after the due date of such payment shall not be a waiver of Lender's right either to require prompt payment when due of all other sums payable hereunder or to exercise any of Lender's rights, powers and remedies hereunder or under the Loan Documents. A waiver of any right in writing on one occasion shall not be construed as a waiver of Lender's rights to insist thereafter upon strict compliance with the terms hereof without previous notice of such intention being given to Borrower, and no exercise of any right by Lender shall constitute or be deemed to constitute an election of remedies by Lender precluding the subsequent exercise by Lender of any or all of the rights, powers and remedies available to it hereunder or under the Loan Documents, or at law or in equity. Borrower hereby expressly waives the benefit of any statute or rule of law or of equity now provided, or which may hereafter be provided, which would produce a result contrary to, or in conflict with, the foregoing.

-8-

(iii)     Even if, at a time when an Event of Default has occurred, Lender does not accelerate the amounts due under this Note and the other Loan Documents and require Borrower to pay all such amounts immediately in full as described above, Lender shall still have the right to do so at a later time if such Event of Default is continuing, or upon the occurrence of another Event of Default.

(d)     **Payment of Lender's Costs and Expenses.**  If Lender has required Borrower to pay immediately in full as described above, the Lender shall have the right to be reimbursed by Borrower for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, attorneys' fees, costs and expenses.  As used in this Note, "attorneys' fees, costs and expenses" shall mean the reasonable attorneys' fees and the costs and expenses of counsel to Lender (including without limitation in-house counsel employed by Lender), which may include, without limitation, printing, duplicating, telephone, fax, air freight and other charges, and fees billed for law clerks, paralegals, librarians, expert witnesses and others not admitted to the bar but performing services under the supervision of an attorney and all such fees, costs and expenses incurred with respect to trial, appellate proceedings, arbitrations, out-of-court negotiations, workouts and settlements, and bankruptcy or insolvency proceedings (including, but not limited to, seeking relief from stay in bankruptcy proceedings), and whether or not any action or proceeding is brought or is concluded with respect to the matter for which such fees, costs and expenses were incurred.  Lender shall also be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment action or proceeding to enforce and collect the judgment.  This Section 5(d) is separate and several, shall survive the discharge of this Note, and shall survive the merger of this Note into any judgment on this Note.

6.     **NOTICES.**

All notices required or permitted hereunder shall be given and become effective as provided in the Security Instrument.

7.     **WAIVERS.**

Borrower and all others who may become liable for the payment of all or any part of the indebtedness evidenced by this Note do hereby severally waive presentment, and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except those notices for which the Loan Documents expressly provide.  No release of any security for the Note or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Security Instrument or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the indebtedness evidenced by this Note, the Security Instrument or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Security Instrument or the other Loan Documents.

8.     **SECURED NOTE.**

The obligations of Borrower under this Note are secured by that certain Commercial Deed of Trust, Security Agreement, Fixture Filing Financing Statement and Assignment of Leases, Rents, Income and Profits (the "**Security Instrument**"), of even date herewith, which contains provisions for acceleration of the entire indebtedness secured hereby upon the happening of certain events.

9.     **TRANSFER.**

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Security Instrument and

the other Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter, but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

10.    **EXCULPATION.**

Except with respect to the matters set forth in subsections (a) and (b) below, Lender's source of satisfaction of the indebtedness evidenced by this Note and all other covenants and obligations under this Note and any other of the Loan Documents shall be limited to the Property, and Lender shall not seek to procure payment out of other assets of Borrower or seek a judgment (except as hereinafter provided) for any sums which are or may be payable under this Note or any other of the Loan Documents, or claim or seek judgment for any deficiency remaining after foreclosure of the Security Instrument; provided, however, that the foregoing clause shall not prejudice the right of Lender to enforce the lien of the Security Instrument or other security given for the payment thereof or to exercise any of its remedies at law other than the entry of a personal money judgment against the Borrower.   The foregoing notwithstanding:

(a)    Borrower shall be and remain personally liable for all losses, costs, damages, or expenses incurred by Lender in the following instances:

(i)    failure to pay or cause to be paid Taxes including, without limitation, the failure by any third party to pay the taxes on any other real property that is included within the tax parcel identification number for the Property (except to the extent that Borrower has deposited funds with Lender pursuant to the Security Instrument for the purpose of paying such items) or to pay or cause to be paid charges for labor or materials, or other charges which can create liens on any portion of the Property;

(ii)    as a result of waste (except ordinary wear and tear), arson committed or instigated by Borrower, any Guarantor or any partner, member or shareholder in Borrower, or a violation of the provisions in the Security Instrument regarding removal, demolition or structural alteration of any portion of the Property;

(iii)    breach or failure to perform or comply with any of the insurance provisions of the Loan Documents;

(iv)    all court costs and reasonable attorneys' fees, costs and expenses actually incurred by Lender pursuant to the Note or any other Loan Document in enforcing the Note and Guaranty.   Notwithstanding the foregoing, Borrower shall not be liable for those legal expenses incurred:  (1) by Lender in connection with a deed in lieu of foreclosure offered by Borrower; (2) foreclosure which is not disputed/contested by Borrower; or (3) in connection with dispute(s) in which the Lender is not the prevailing party;

(v)    Borrower's breach or failure to perform or comply with Section 1.03 (captioned **"Hazardous Waste"**) of the Security Instrument, or Borrower's or any Guarantor's breach or failure to perform or comply with the provisions of the Environmental Indemnification Agreement of even date herewith executed by Borrower for the benefit of Lender;

(vi)    misapplication of or failure to deliver to Lender (in accordance with the terms of the Loan Documents) the following:  (1) any insurance or condemnation proceeds; (2) rents, issues or profits received by Borrower/Guarantor or its agent after Lender makes written demand therefor pursuant to any Loan Document; or (3) prepaid rents or tenant security deposits;

-10-

(vii)  fraud or intentional misrepresentation in connection with the Property, Loan Documents, or Loan Application, including without limitation fraud or intentional misrepresentation by any Tenant-in-Common (as defined in the Security Instrument);

(viii)  disputing, contesting or other interference by Borrower (including without limitation any Tenant-in-Common), as determined by Lender in Lender's commercially reasonable discretion, with foreclosure or the exercise of any of Lender's other rights or remedies under the Security Instrument relating to taking possession of the Property following the occurrence of an Event of Default; or

(ix)  violation of any of the provisions of Sections 1.29 and 1.30 (captioned "Single Purpose Entity" and "ERISA", respectively) of the Security Instrument, including without limitation violation of the provisions of Sections 1.29 and 1.30 of the Security Instrument by any Tenant-in-Common.

(b)  Borrower shall be and remain personally liable without exculpation or limitation of liability whatsoever for the entire amount of the indebtedness evidenced by the Note (including all principal, interest, and other charges) and all other sums due or to become due under the other Loan Documents, whether at maturity or by acceleration or otherwise, in the following instances:

(i)  violation of any of the provisions of Sections 1.15(c) and (d) of the Security Instrument (captioned, "No Sale/Encumbrance" and "Permitted Transfers", respectively), including without limitation a pledge or encumbrance, directly or indirectly, of the interest of a Tenant-in-Common (as defined in the Security Instrument) in the Property, or a pledge or encumbrance, directly or indirectly, of the ownership interests in a Tenant-in-Common;

(ii)  the Property or any part thereof becomes an asset in: (1) a voluntary bankruptcy or insolvency proceeding commenced by Borrower (including without limitation any Tenant-in-Common); or (2) an involuntary bankruptcy or insolvency proceeding in which: (A) such proceeding was commenced by any entity controlling, controlled by or under common control with Borrower (including without limitation any Tenant-in-Common) (individually or collectively, "Affiliate"), including but not limited to any creditor or claimant acting in concert with Borrower (including without limitation any Tenant-in-Common) or any Affiliate; or (B) Guarantor objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Security Instrument or any other remedial action permitted under the Note, Security Instrument or other Loan Documents, unless such motion by Lender is determined to be frivolous or made with the sole intent to harass Borrower or without factual or legal basis by a court having jurisdiction over the Property;

(iii)  amendment, modification, cancellation or termination of the TIC Agreement (as defined in the Security Instrument) in violation of Section 1.31 of the Security Instrument; violation, amendment, modification, cancellation or termination of the Master Lease (as defined in the Security Instrument) in violation of Section 1.31 of the Security Instrument; or other violation of Section 1.31 of the Security Instrument, or violation of Section 1.32 of the Security Instrument.

(iv)  partition of the Property or the filing of an action to partition the Property by Borrower (including without limitation any Tenant-in-Common) if such action is not dismissed within ninety (90) days of filing.

11.  **SAVINGS CLAUSE.**

Notwithstanding anything in this Note to the contrary, if at any time (i) interest at the Applicable Interest Rate, (ii) interest at the Default Rate, if applicable, and (iii) the Charges computed over the full term of this Note, exceed the Maximum Lawful Rate (defined below), then the rate of interest payable

hereunder, together with all Charges, shall be limited to the Maximum Lawful Rate; provided, however, that any subsequent reduction in any Applicable Interest Rate shall not cause a reduction of the rate of interest payable hereunder below the Maximum Lawful Rate until the total amount of interest earned hereunder, together with all Charges, equals the total amount of interest which would have accrued at the Applicable Interest Rate if such interest rate had at all times been in effect. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Secured Obligations (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to any of the Secured Obligations, (ii) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of this Note and/or any other portion of the Secured Obligations, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note and/or any of the other Secured Obligations, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note and/or any of the other Secured Obligations (or, if this Note and all other Secured Obligations have been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against any other Secured Obligations then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower and/or crediting such excess interest against this Note and/or other Secured Obligations then owing by Borrower to Lender. All sums contracted for, charged or received by Lender for the use, forbearance or detention of any of the Secured Obligations, including any portion of the debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note and/or other Secured Obligations (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note and/or other Secured Obligations does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note and/or the other Secured Obligations for so long as any Secured Obligations is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note and/or any of the other Secured Obligations. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration. The provisions of this paragraph shall control all existing and future agreements between the Borrower and the Lender. As used herein, "Charges" shall mean all fees and charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Lender in connection with the transactions relating to this Note and the Secured Obligations, which are treated as interest under applicable law. As used herein, "Maximum Lawful Rate" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the loan evidenced by this Note and the Loan Documents. To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the

Maximum Lawful Rate payable on the Secured Obligations, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. To the extent United States federal law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Lawful Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

12.     **JOINT AND SEVERAL OBLIGATIONS.**

If this Note is signed by more than one party, all obligations herein contained shall be deemed to be the joint and several obligations of each party executing this Note. Any married person signing this Note agrees that recourse may be had against community assets and against his or her separate property for the satisfaction of all obligations contained herein.

13.     **WAIVER OF TRIAL BY JURY.**

BORROWER AND LENDER BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE AND AGREE THAT ALTHOUGH THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS OWN CHOICE, KNOWINGLY, VOLUNTARILY, IRREVOCABLY, UNCONDITIONALLY AND FOR THE MUTUAL BENEFIT OF BOTH BORROWER AND LENDER, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE, THE OTHER LOAN DOCUMENTS OR THE INDEBTEDNESS. THIS AGREEMENT OF BORROWER IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING EVIDENCED BY THIS NOTE.

14.     **OFFSETS.**

No indebtedness evidenced by this Note shall be deemed to have been offset or to be offset or compensated by all or part of any claim, cause of action, counterclaim or cross claim, whether liquidated or unliquidated, which Borrower or any successor to Borrower now or hereafter may have or may claim to have against Lender; and, in respect to the indebtedness now or hereafter secured hereby, Borrower waives, to the fullest extent permitted by law, the benefits of any law which authorizes or permits such offsets.

15.     **MISCELLANEOUS.**

(a)     **Remedies Cumulative.**  The remedies of Lender as provided herein and in any other Loan Document, or any one or more of them, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively, or together at the sole discretion of Lender, and may be exercised as often as occasion thereof shall occur.

(b)     **Severability.**  Every provision of this Note is intended to be severable. In the event any term or provision hereof is declared by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, such illegal or invalid term or provision shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

(c)     **Headings.**  The headings and captions of various Sections of this Note are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

(d)     **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State where the Property is located but not the conflict of law rules applicable in said State in cases where the parties have not expressly chosen the law of a jurisdiction to apply.

(e)     **Amendments.** This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of any party, but only by an instrument in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

(f)     **Interpretation.** Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

(g)     **Submission and Consent to Jurisdiction.** Borrower, in consideration of making the loan evidenced by this Note, agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with this Note shall be litigated, at Lender's election, only in courts having a situs within the county and State where the Property is located, in any jurisdiction in which the Borrower (or any individual or entity comprising the Borrower) may reside or hold assets, or in any one or more of the foregoing jurisdictions and Borrower hereby consents and submits to the jurisdiction of any local, state or federal court located therein. Borrower irrevocably waives the defense of inconvenient forum to the maintenance of such action or proceeding. Borrower hereby consents to service of process by any means permitted by applicable law.

(h)     **Clerical Error.** In the event Lender at any time discovers that this Note, the Security Instrument or any other Loan Document contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to re-execute any documents that are necessary to correct any such error(s). Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error(s).

(i)     **Lost, Stolen, Destroyed or Mutilated Loan Documents.** In the event of the loss, theft or destruction of this Note, the Security Instrument, or any other Loan Document, or in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan Document and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Document, and may be treated for all purposes as the original copy of such Loan Document.

(j)     **Time is of the Essence.** TIME IS OF THE ESSENCE IN THE PERFORMANCE OF EACH PROVISION OF THIS NOTE.

(k)     **Legislation Affecting Lender's Rights.** If enactment or expiration of applicable laws has the effect of rendering any material provision of this Note or the Security Instrument unenforceable according to its terms, Lender, at its option, may require immediately payment in full of all sums evidenced by this Note and may invoke any remedies permitted under the Loan Documents.

(l)     **Disbursements.** Funds representing the proceeds of the indebtedness evidenced hereby which are disbursed by Lender by mail, wire transfer or other delivery to Borrower, to escrows or otherwise for the benefit of Borrower shall, for all purposes, be deemed outstanding hereunder and to have been received by Borrower as of the date of such mailing, wire transfer, or other delivery and until repaid, notwithstanding the fact that such funds may not at any time have been remitted by such escrows to Borrower or for Borrower's benefit.

(m)    **Exempted Transaction.**  Borrower agrees that (i) the payment obligations evidenced by this Note and the other instruments securing this Note are exempted transactions under the Truth in Lending Act 15 USC § 1601, et seq.; (ii) the proceeds of the indebtedness evidenced by this Note will not be used for the purchase of registered equity securities within the purview of Regulation "U" issued by the Board of Governors of the Federal Reserve System; and (iii) on the Maturity Date, Lender shall not have any obligation to refinance the indebtedness evidenced by this Note or to extend further credit to Borrower.

(n)    **Entire Agreement**.  THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

**[SIGNATURE PAGE(S) ATTACHED]**

**IN WITNESS WHEREOF,** Borrower has duly executed this Note under seal as of the day and year first above written.

DBSI COLONNADE WEST LAKE LLC,
a Delaware limited liability company

By:    DBSI Housing Inc., an Idaho corporation
Its:    Member

By:
Name:   Jeremy Swensor
Title:    Assistant Secretary

**Borrower Taxpayer ID/SSN: 82-0355037**

016075/260201/473157_5

-16-