# EXHIBIT F

## ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT

THIS ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT (this "Agreement") is made as of November 13, 2006, by DBSI REALTY CORPORATION, a(n) Idaho corporation, having its principal place of business at 1550 South Tech Lane, Meridian, Idaho 83642, ("Internal Agent") and among DBSI MASTER LEASECO, INC., an Idaho corporation, having its principal place of business at 1550 South Tech Lane, Meridian, Idaho 83642 ("Lessee"), by DBSI COLONNADE WEST LAKE LLC, a(n) Delaware limited liability company, having its principal place of business at 1550 South Tech Lane, Meridian, Idaho 83642 ("Lessor" and/or "Borrower"), to ARTESIA MORTGAGE CAPITAL CORPORATION, a Delaware corporation, and its successors and/or assigns, having an address at 1180 NW Maple Street, Suite 202, Issaquah, Washington 98027 ("Lender"), and is acknowledged and consented to by **Transwestern Property Company Southwest, L.P. dba Transwestern Commercial Services** having its principal place of business at the address set forth in Section 10 of this Agreement ("Property Manager").

## RECITALS:

A.      Lessor by that certain Fixed Rate Note of even date herewith given to Lender (the note together with all extensions, renewals, modifications, substitutions, replacements, restatements and amendments thereof shall collectively be referred to as the "Note") is indebted to Lender in the principal sum of Seven Million Two Hundred Seventy-two Thousand and 00/100 Dollars ($7,272,000.00) in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Note (the indebtedness evidenced by the Note, together with such interest accrued thereon, shall collectively be referred to as the "Loan"), principal and interest to be payable in accordance with the terms and conditions provided in the Note.

B.      The Loan is secured by, among other things, that certain Security Instrument (as defined in the Note), together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, dated as of the date hereof, which grants Lender a first lien on the property encumbered thereby (the "Property"). All and any of the documents other than the Note, the Security Instrument and this Agreement now or hereafter executed by Lessor and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of the Note or are otherwise executed and/or delivered in connection with the Loan, together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, are referred to as the "Other Loan Documents."

C.      Pursuant to a certain Master Lease (as defined in the Security Instrument) of even date herewith between Lessor, as landlord, and Lessee, as tenant, Lessor has leased the Property to Lessee.

D.      Pursuant to a certain property management agreement dated of even date herewith between Lessee and Internal Agent (the "Internal Management Agreement") (a true and correct copy of which Internal Management Agreement is attached hereto as Exhibit A), Lessee employed Internal Agent to rent, lease, operate and manage the Property.

E.      Pursuant to a certain property management agreement dated of even date herewith between Internal Agent and Agent (the "Management Agreement") (a true and correct copy of which Management Agreement is attached hereto as Exhibit B), Internal Agent employed Property Manager to operate and manage the Property.

F.      Lender requires as a condition to the making of the Loan that Lessee and Internal Agent as affiliates of the Lessor assign their respective interests in the Internal Management Agreement and Management Agreement as part of the collateral for the Loan and that Agent and Internal Agent subordinate their respective interests in any management fees payable under the Management Agreement and Internal Management Agreement to payment of the Loan and the lien of the Security Instrument as set forth below.

**AGREEMENT:**

For good and valuable consideration the parties hereto agree as follows:

    1.    <u>Assignment of Management Agreement</u>. As additional collateral security for the Loan, Lessee hereby conditionally transfers, sets over and assigns to Lender all of its right, title and interest in and to the Internal Management Agreement, and Internal Agent hereby conditionally transfers, sets over and assigns to Lender all of its right, title and interest in and to the Management Agreement said transfers and assignments to automatically become present, unconditional assignments, at Lender's option, in the event of a default by Lessor under the Note, the Security Instrument or any of the other Loan Documents, including but not limited to escrow agreements, and the failure of Lessor to cure such default within any applicable grace period.

    2.    <u>Termination</u>. At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Agreement and all of Lender's right, title and interest hereunder with respect to the Management Agreement and Internal Management Agreement shall terminate.

    3.    <u>Lessor, Lessee and Internal Property Manager Covenants</u>. Lessee hereby covenants with Lender that during the term of this Agreement: (a) Lessee shall not transfer the responsibility for the management of the Property from Internal Agent to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) Lessee shall not terminate or amend any of the terms or provisions of the Internal Management Agreement without the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; and (c) Lessee shall, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Lessee receives which indicates that Internal Agent is terminating the Internal Management Agreement or that Internal Agent is otherwise discontinuing its management of the Property. Internal Agent hereby covenants with Lender that during the term of this Agreement: (a) Internal Agent shall not transfer the responsibility for the management of the Property from Property Manager to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) Internal Agent shall not terminate or amend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; and (c) Internal Agent shall, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Lessee receives which indicates that Property Manager is terminating the Management Agreement or that Property Manager is otherwise discontinuing its management of the Property. Lessor hereby covenants with Lender that during the term of this Agreement Lessor shall in the manner provided for in this Agreement, give notice to Lender of any notice or information that Lessor receives which indicates that Property Manager is terminating the Management Agreement or that Property Manager is otherwise discontinuing its management of the Property.

    4.    <u>Agreement by Lessor, Lessee, Internal Property Manager and Agent</u>. Lessor, Lessee, Internal Agent and Property Manager hereby agree that (a) in the event of a default by Lessor, Lessee or Internal Agent (beyond any applicable grace period) under the Note, the Security Instrument or any of the other Loan Documents during the term of this Agreement or in the event of a default under the Management Agreement or Internal Management Agreement (beyond any applicable grace period), or (b) in the event of the bankruptcy or insolvency of the Property Manager, Internal Agent, Lessee or Lessor, if Property Manager is affiliated with Internal Agent, Lessee, or Lessor at the option of Lender exercised by written notice to Internal Agent, Lessee or Lessor (as applicable) and Property Manager: (a) all rents, security deposits, issues, proceeds and profits of the Property collected by Property Manager or Internal Agent, after payment of all costs and expenses of operating the Property (including, without limitation, operating expenses, real estate taxes, insurance premiums, repairs and maintenance and the fees and commissions payable under the Management Agreement or Internal Management Agreement [as applicable]), shall be applied in accordance with Lender's written directions to Property Manager or Internal Agent (as applicable), and (b) Lender may exercise its rights under this Agreement and may immediately terminate, or direct Internal Agent to immediately terminate, the Management Agreement, and may immediately terminate or direct the Lessee to immediately terminate, the Internal Management Agreement and may retain or direct Lessee to retain, a new

-2-

management agent approved by Lender, and require Property Manager and Internal Agent (as applicable) to transfer its responsibility for the management of the Property to such management company approved by Lender. Notwithstanding any provision of the Management Agreement, Internal Management Agreement or this Agreement to the contrary, Lessor, Lessee, Internal Agent and Property Manager agree that in no event shall the aggregate of Management Fees (defined in Section 6 below) and any other management fees (i.e., on-site and off-site management fees or other compensation, whether monetary or nonmonetary, whether payable to Property Manager, Internal Agent or some other party and whether payable pursuant to the Management Agreement, Internal Management Agreement or some other agreement) be in excess of four percent (4.0%) of the effective gross income from the Property per year, (which cap shall not include any asset management fees collected by the Lessor or Lessee under the Management Agreement or Internal Management Agreement [which fees when added to the Management Fees herein described shall not be in excess of six (6%) of the effective gross income of the Property) nor shall the Management Fees be payable in advance of receipt of such income.

5.      Lender's Right to Replace Property Manager. In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Agreement, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar to the Property, Lender shall deliver written notice thereof to Lessor, Lessee, Internal Agent and Property Manager, which notice shall specify with particularity the grounds for Lender's determination. If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Lessor, Lessee, Internal Agent or Property Manager within thirty (30) days from receipt of such notice or that Lessor, Lessee, Internal Agent or Property Manager have failed to diligently undertake correcting such conditions within such thirty (30)-day period, Lender may direct Internal Agent to terminate the Management Agreement and to replace Property Manager with a management company acceptable to Lender in Lender's sole discretion, and may further direct Lessee to terminate the Internal Management Agreement to replace Internal Agent with a management company acceptable to Lender in Lender's sole discretion.

6.      Subordination of Management Fees and Management Agreement. Lessor, Lessee, Internal Agent and Property Manager hereby agree that Property Manager shall not be entitled to receive any fee, commission or other amount payable to Property Manager under the Management Agreement including, without limitation, any amount payable upon termination of the Management Agreement (collectively, "Management Fees") and Internal Agent shall not be entitled to receive Management Fees payable to Internal Agent under the Internal Management Agreement for and during any period of time following Property Manager's receipt of notice that any amount due and owing Lender under the Note and the Security Instrument is not paid when due; provided, however, that Property Manager shall not be obligated to return or refund to Lender any Management Fees already received by Property Manager and to which Property Manager was entitled under this Agreement and further provide that Property Manager shall be able to collect any fee that is earned but unpaid prior to Property Manager's receipt of notice that any amount due and owing Lender under the Note and the Security Instrument has not been paid when due, and to which Property Manager was entitled under this Agreement. Property Manager agrees and confirms that the Management Agreement and all of its rights and interests thereunder including its rights to Management Fees and Internal Agent agrees and confirms that the Internal Management Agreement and all of its rights and interests thereunder including its rights to Management Fees are and at all times will be subject and subordinate to the Security Instrument and the Other Loan Documents and to any renewals, extensions, modifications, assignments, replacements, or consolidations thereof, and the rights, privileges and powers of Lender thereunder, in accordance with the provisions of this Agreement. Such subordination shall be self-operative and no further instrument shall be required to effect such subordination, but the Property Manager or Internal Agent (as applicable), promptly upon request of the Lender, will execute and deliver, and the Property Manager or Internal Agent (as applicable) hereby irrevocably constitutes and appoints the Lender as its attorney-in-fact (such appointment being deemed an irrevocable power coupled with an interest) to execute and deliver, any instrument which the Lender may deem necessary or appropriate in Lender's commercially reasonable discretion to confirm such subordination. Notwithstanding anything to the contrary in this Agreement or the Loan Documents, the provisions of this Agreement and the Loan Documents shall not affect any rights of Property Manager under the Management Agreement to terminate the Management Agreement

-3-

for non-payment of Management Fees. Further, during the Loan term, Internal Agent irrevocably waives any right(s) or remedy(ies) it may have at law or in equity or otherwise against the Property or the Borrower (as defined in the Security Instrument) (including any Tenant in Common [as defined in the Security Instrument]) or any tenant in common interest of any Tenant in Common.

       7.    <u>Consent and Agreement by Property Manager</u>. Property Manager hereby acknowledges and consents to this Agreement and agrees that Property Manager will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Management Agreement. In the event that the responsibility for the management of the Property is transferred from Property Manager in accordance with the provisions hereof, Property Manager shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, Property Manager hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Agreement; and (b) that it shall, in the manner provided for in this Agreement, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property. Property Manager agrees that until the Security Instrument is released or assigned (pursuant to the Security Instrument) by Lender, it will not exercise any remedies under the Management Agreement following a Borrower default thereof without first giving to Lender (a) written notice of the Borrower default, and (b) the opportunity to cure such default within the longer of (i) thirty (30) days after the expiration of the cure period provided under the Management Agreement to Borrower, or (ii) thirty (30) days from receipt of Property Manager's notice to Lender of a Borrower default. Property Manager acknowledges that Lender is not obligated to cure any Borrower default, but if Lender elects to do so, Property Manager agrees to accept a cure by Lender as that of Borrower under the Management Agreement and will not exercise any right or remedy under the Management Agreement for a Borrower default. Performance rendered by Lender on Borrower's behalf is without prejudice to Lender's rights against Borrower under the Loan Documents.

       8.    <u>Consent and Agreement by Internal Property Manager</u>. Internal Agent hereby acknowledges and consents to this Agreement and agrees that Internal Agent will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Internal Management Agreement. In the event that the responsibility for the management of the Property is transferred from Internal Agent in accordance with the provisions hereof, Internal Agent shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Internal Management Agreement is terminated. Further, Internal Agent hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Agreement; and (b) that it shall, in the manner provided for in this Agreement, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Internal Management Agreement or otherwise discontinue its management of the Property.

       9.    <u>Lender's Agreement</u>. So long as Lessor and Lessee are not in default (beyond any applicable grace period) under this Agreement, the Note, the Security Instrument or the other Loan Documents, and Internal Agent is not in default under the Internal Management Agreement, Lender agrees to permit any sums due to Lessee or Internal Agent or Property Manager under the Management Agreement and Internal Management Agreement to be paid directly to Lessee or Internal Agent or Property Manager (as applicable). Lender further agrees to use commercially reasonable efforts to advise Property Manager of any Event of Default and that no obligations of Property Manager arising solely under the terms of this Agreement shall take effect until such notice is delivered to Property Manager.

       10.    <u>Applicable Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State where the Property is located.

       11.    <u>Notices</u>. All notices required or permitted hereunder shall be given and shall become effective as provided in the Security Instrument.

All notices to Property Manager shall be addressed as follows:

**Transwestern Commercial Services**
**1900 West Loop South, Suite 1300**
**Attention:  Steve Ash**
**Facsimile No.:  (713) 291-8063**

All notices to Internal Agent shall be addressed as follows:

DBSI Realty Corporation
Attn:  Legal Dept., Operations
1550 South Tech Lane,
Meridian, Idaho 83642
Fax:  (208) 955-9834

12.     No Oral Change.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lessor, Lessee, Internal Agent or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

13.     Liability.  If Lessee, Lessor or Internal Agent consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Lessor, Lessee, Internal Agent and Lender and their respective successors and assigns forever.

14.     Inapplicable Provisions.  If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such term, covenant or condition.

15.     Headings, etc.  The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

16.     Duplicate Originals: Faxed Copies: Counterparts.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  Copies of this Agreement with faxed signature page(s) shall be binding and effective as to each party and may be used in lieu of an original of this Agreement and in lieu of original signature page(s).  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.     Number and Gender.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.     Secondary Market.  Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Agreement and the Other Loan Documents to one or more Investors (as defined in the Security Instrument) in the secondary mortgage market.  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Agreement and the Other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors.  All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19.     <u>Miscellaneous</u>.  (a)  Wherever pursuant to this Agreement (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)  Wherever pursuant to this Agreement it is provided that Lessor, Lessee or Internal Agent pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

20.     <u>Joinder of Lender</u>.   By Lessor's execution and delivery of this Agreement, and Lender's subsequent funding of the Loan, Lender joins in and shall become a party to this Agreement for the purpose of acknowledging, consenting and agreeing to the terms and provisions hereof.

**[SIGNATURE PAGE(S) ATTACHED]**

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the date and year first written above.

BORROWER:

DBSI COLONNADE WEST LAKE LLC,
a Delaware limited liability company

By:    DBSI Housing Inc., an Idaho corporation
Its:    Member

      By:
      Name:   *Jeremy Swenso*
      Title:   Assistant Secretary

LESSEE:

DBSI MASTER LEASECO, INC.,
an Idaho corporation

By:
Name:   *Jeremy Swenson*
Title:   Assistant Secretary

INTERNAL AGENT:

DBSI REALTY CORPORATION, an Idaho corporation

By:

Name:   *Jeremy Swenson*

Its:   Assistant Secretary

AGENT:

**TRANSWESTERN PROPERTY COMPANY SOUTHWEST, L.P., dba Transwestern Commercial Services, a Delaware limited partnership**

By:   _____

Name:   _____

Its:   _____

-7-

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the date and year first written above.

BORROWER:

DBSI COLONNADE WEST LAKE LLC,
a Delaware limited liability company

By:     DBSI Housing Inc., an Idaho corporation
Its:     Member

      By:     _____
      Name:     _____
      Title:     _____

LESSEE:

DBSI MASTER LEASECO, INC.,
an Idaho corporation

By:     _____
Name:     _____
Title:     _____

INTERNAL AGENT:

DBSI REALTY CORPORATION, an Idaho corporation

By:     _____

Name:     _____

Its:     _____

AGENT:

TRANSWESTERN PROPERTY COMPANY SOUTHWEST, L.P., dba Transwestern Commercial Services, a Delaware limited partnership

By:     _____

Name:     Steve Ash

Its:     Sr. V.P - Gulf Coast Region

-7-

**EXHIBIT A**

**INTERNAL MANAGEMENT AGREEMENT**

(ATTACHED)

PROPERTY MANAGEMENT AGREEMENT


FOR


COLONNADE AT WEST LAKE HOUSTON PARKWAY

18411 W. LAKE HOUSTON PARKWAY
18445 W. LAKE HOUSTON PARKWAY
18455 W. LAKE HOUSTON PARKWAY
18477 W. LAKE HOUSTON PARKWAY

HUMBLE, TX  77346


by and between


DBSI MASTER LEASECO INC.


AND


DBSI REALTY CORPORATION

# TABLE OF CONTENTS

| | Page |
|---|---|

Article 1 - Commencement ..... 1

    Section     1.1 – Commencement ..... 1

Article 2 - Manager's Responsibilities ..... 1

    Section     2.1 - Management ..... 1
                       2.2 - Employees; Independent Contractor ..... 1
                       2.3 - Compliance with Laws, Mortgages, etc. ..... 1
                       2.4 - Approved Budgets ..... 2
                       2.5 - Collection of Rents and Other Income ..... 2
                       2.6 - Competitive Bidding ..... 3
                       2.7 - Repairs ..... 3
                       2.8 - Capital Improvements ..... 4
                       2.9 - Service Contracts ..... 4
                       2.10 - Taxes, Mortgages ..... 4
                       2.11 - Leasing ..... 4
                       2.12 – Reports ..... 5

Article 3 - Insurance ..... 4

    Section     3.1 - Insurance ..... 5
                       3.2 - Additional Insurance ..... 6

Article 4 – Receivables and Payables ..... 8

    Section     4.1 - Receivables ..... 8
                       4.2 – Payables ..... 8

Article 5 - Sale of the Property ..... 8

    Section     5.1 – Cooperation with Sale Broker ..... 8

Article 6 - Cooperation ..... 9

    Section     6.1 – Cooperation with Owner ..... 9
                       6.2 – Master Lease ..... 9

Article 7 - Compensation ..... 9

    Section     7.1 – Compensation of Manager ..... 9

Article 8 - Termination ..... 9

    Section     8.1 - Termination on 30-day Notice ..... 9
                       8.2 - Authority to Execute Termination Notices ..... 9
                       8.3 - Termination Without Notice ..... 9

i

8.4 - Final Accounting          10

Article 9 - Notices          10

Section      9.1 – Notices          10

Article 10 - Miscellaneous          10

Section      10.1 - No Assignment          10

10.2 - Consents and Approvals          11

10.3 - Pronouns          11

10.4 - Amendments          11

10.5 - Headings          11

10.6 - Representations          11

10.7 - Indemnification          11

10.8 - Complete Agreement          11

Exhibits

A – Property Description
B – Competitive Bid Form
C – Salary Reimbursement

# MANAGEMENT AGREEMENT

This AGREEMENT (the "Agreement"), effective this _____ day of _____, 2006 ("Effective Date"), by and between **DBSI REALTY CORPORATION** (hereinafter called "Manager") and **DBSI MASTER LEASECO INC.** (hereinafter called "Owner") witnesseth that:

WHEREAS, pursuant to a Master Lease Agreement, DBSI Master LeaseCo Inc. is the long term tenant of certain property described in Exhibit A hereto affixed and made a part hereof, and desires to engage the Manager to manage and operate the same (the "Property").

NOW, THEREFORE, in consideration of the premises the parties agree as follows:

## ARTICLE 1. COMMENCEMENT

1.1 Commencement Date.   Manager's duties and responsibilities under this Agreement shall begin on the date hereof and shall continue for a period of one (1) year unless earlier terminated as provided in Article 8 hereof. Following the initial term, this Agreement shall continue on a month-to-month basis until terminated.

## ARTICLE 2. MANAGER'S RESPONSIBILITIES

2.1 Management.   Manager shall manage, operate, and maintain the Property in an efficient and satisfactory manner. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets.   In this capacity, Manager shall deal at arms length with all third parties and Manager shall serve Owner's interests at all times.   Manager is specifically authorized to retain the services of a third party property manager and a leasing agent to assist with the management and operation of the Property.

2.2 Employees; Independent Contractor.   Manager shall have in its employ at all times a sufficient number of capable employees or independent contractors to enable it to properly, adequately, safely and economically manage, operate, maintain, and account for the Property.   All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees or independent contractors are the responsibility of Manager.   This Agreement is not one of agency by Manager for Owner but one with Manager engaged independently in the business of managing properties on its own behalf as an independent contractor.   All employment arrangements are therefore solely its concern and Owner shall have no liability with respect thereto.

2.3 Compliance with Laws, Mortgages, etc.   Manager shall be responsible for full compliance with Federal,

State, and municipal laws, ordinances, regulations, and orders relative to the leasing, use, operation, repair, and maintenance of each Property. Manager shall promptly remedy any violation of any such law, ordinance, rule, regulation or order, which comes to its attention, provided Owner approves and funds such remedy.

Manager shall notify Owner by the end of the next business day to the end that prompt arrangements may be made to remedy the violation.

Manager shall be responsible for full compliance with all terms and conditions contained in any ground lease, master lease, space lease, mortgage, deed of trust or other security instrument affecting the Property, provided however, Manager shall not be required to make any payment or incur any liability on account thereof.

2.4 <u>Approved Budgets</u>. Manager shall prepare and submit to Owner a proposed operating budget and a proposed capital budget for the promotion, operation, repair, and maintenance of the Property for the forthcoming calendar year. Each proposed budget shall be delivered to Owner within thirty (30) days after the execution of this Agreement and each subsequent proposed budget no later than October 1 of each calendar year or such other date as specified by Owner.

Owner will consider the proposed budgets and then will consult with Manager in the ensuing period prior to the commencement of the forthcoming calendar year in order to agree on an "Approved Operating Budget" and an "Approved Capital Budget".

Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed either Approved Budget pertaining thereto either in total or in any one accounting category. All expenses must be charged to the proper account as specified in each Approved Budget and no expense may be classified or reclassified for the purpose of avoiding an excess in the annual budgeted amount of an accounting category.

Manager shall secure Owner's prior verbal approval for any expenditure greater than $3,000. During the calendar year, Manager shall promptly inform Owner of any major costs and expenses that were not foreseen during the budget preparation period and thus were not reflected in either Approved Budget.

2.5 <u>Collection of Rents and Other Income</u>. Manager shall diligently collect all rents (including percent rents, escalation billings resulting from tenant participation in expenses, taxes and common area maintenance charges) and other charges, which may become due at any time from any tenant or from others for services provided in connection

with or for the use of the Property or any portion thereof. Manager shall not delegate the collection of tenant rents to any other party without Owner's written consent. Manager shall collect and identify any income due Owner from miscellaneous services provided to tenants or the public including, but not limited to, parking income, tenant storage, and coin operated machines of all types (e.g., vending machines, pay telephones, etc.,). All monies so collected shall be handled in accordance with Section 4.1. Only Manager may terminate any lease, lock out a tenant, institute suit for rent or for use and occupancy, or enter into proceedings for recovery of possession. In connection with any collection efforts only legal counsel or a collection firm designated by Owner shall be retained. All legal expenses incurred in bringing such approved suit or proceeding shall be submitted to Owner for its approval. Manager shall not write off any income items without prior approval of Owner.

2.6 <u>Competitive Bidding</u>. All contracts for repairs, capital improvements, goods, and services exceeding $3,000.00 shall be awarded on the basis of competitive bidding, solicited in the following manner:

    (a) A minimum of three (3) written bids shall be obtained for each purchase over $3,000.00.

    (b) Each bid will be solicited in a form attached hereto as Exhibit B, or otherwise approved by Owner so that uniformity will exist in the bid quotes.

    (c) Manager shall accept the low bid. If Manager advises acceptance of other than the lowest bidder, Manager shall adequately support its recommendations to Owner.

    (d) Manager may request Owner to waive competitive bidding rules. Owner may pay for such expenses from its own resources or may authorize payment by Manager.

2.7 <u>Repairs</u>. The Manager shall attend to the making and supervision of all ordinary and extraordinary repairs, decorations, and alterations subject to the limits of the Approved Operating Budget. Excluded from this provision are expenditures to refurbish, rehabilitate, remodel, or otherwise prepare areas covered by new leases, which are to be specifically approved by Owner on a case-by-case basis.

In case of emergency Manager may make expenditures for repairs which exceed the limits in Section 2.6 without prior written approval if it is necessary to prevent damage or injury. Owner must be informed of any such expenditures before the end of the next business day.

2.8 <u>Capital Improvements</u>. The Approved Capital Budget does not constitute an authorization for Manager to expend money for projects. Capital Improvements must be approved by Owner on a case-by-case basis. With respect to

the purchase and installation of major items (cost in excess of $3,000.00) of new or replacement equipment, Manager shall recommend that Owner purchase these items when Manager believes such purchase to be necessary or desirable. Owner may arrange to purchase and install the same itself or may authorize Manager to do so subject to prescribed supervision and specification requirements and conditions. The competitive bid rules outlined in Section 2.6 will be observed.

2.9 Service Contracts. Manager may enter into any contract for cleaning, maintaining, repairing, or servicing the Property or any of the constituent parts of the Property, or for any third party property management services or leasing agent services. Manager shall state to Owner the relationship, if any, between Manager (or the person or persons in control of Manager) and the party proposed to supply such goods or services, or both. All service contracts shall: (a) be in a form acceptable to Owner (b) be in the name of Manager, unless otherwise requested by Owner; (c) be assignable; (d) include a provision for cancellation thereof upon not more than thirty (30) days written notice; (e) require that all contractors provide evidence of sufficient insurance; and (f) not be for a period longer than one (1) year.

2.10 Taxes, Mortgages. Manager shall obtain and verify bills for real estate and personal property taxes, improvement assessments and other like charges, which are or may become liens against the Property and either pay or recommend appeal as in its best judgment it may decide. Manager shall either forward such bills to Owner for payment by Owner in such time to permit Owner to avoid penalty for late payment or to permit Owner to take advantage of discounts., or Manager may pay them and seek reimbursement from Owner.

2.11 Leasing. The Manager shall make every reasonable effort to obtain and keep desirable tenants for the Property. Manager may retain a leasing agent or broker to assist Manager in leasing the Property. Manager will cooperate with any of such agents or brokers in any manner likely to aid in successfully filling any vacancy. The Manager agrees to perform whatever service may be required in connection with the negotiation of leases or renewals, extensions, modifications, or cancellations thereof.

2.12 Reports. Manager shall, during the term of this Agreement and immediately thereafter, in accordance with the provisions hereof:

(a) Maintain, at the office of Manager, a comprehensive system of office records, books and accounts relating to the operation of the Property. Owner shall have access to such office records, books and accounts, and may exercise it's rights of inspection hereunder solely during normal business hours and in such a manner so as not

to unreasonable interfere with the operations of Manager.

(b)  Deliver to Owner on or before the fifteenth (15ᵗʰ) day of each calendar month during the terms hereof, a detailed written report of all receipts and disbursements relating to the Property made during the proceeding calendar month, or any portion thereof.  Such reports shall also include information on the status of the Approved Budgets.

(c)  Deliver to Owner within sixty (60) days after the end of each fiscal year for the Property, a statement showing the results of operations for the proceeding fiscal year, or any portion thereof as well as a balance sheet of the Property dated as of the end of such fiscal year.

(d)  In the event of the termination of this Agreement, whether by normal  expiration or otherwise, deliver to Owner both a monthly report and an annual report, each covering that portion of the relevant time period which is included within the term hereof, within thirty (30) days of such termination.

## ARTICLE 3. INSURANCE

3.1 Insurance.  Owner, upon execution of this Agreement, shall notify Owner's designated insurance company of the insurable value of the Property.  Owner shall hold Manager harmless from third party bodily injury or property damage related to the Property, provided Manager:

(a)  notifies Owner within twenty-four (24) hours after Manager receives notice of any such loss, damage, or injury on a form acceptable by Owner and in a manner acceptable by Owner;

(b)  takes no action (such as admission of liability) which might bar Owner from obtaining any protection afforded by any policy Owner may hold or which might prejudice Owner in its defense to a claim based on such loss, damage or injury; and

(c)  agrees that Owner shall have the exclusive right, at its option, to conduct the defense to any claim, demand or suit within limits prescribed by the policy or policies of insurance.

Nothing herein shall be construed as indemnifying  Manager or its employees, contractors or agents against any act or omission for which insurance protection is not available; neither is the foregoing intended to affect the general requirements of this Agreement that the Property shall be managed, operated and maintained in a safe condition and in proper and careful manner.  Manager shall furnish whatever information is requested by Owner for the purpose of establishing the placement of insurance coverages and shall aid and cooperate in every reasonable way with respect to

such insurance and any loss thereunder. Owner shall include in its hazard policy covering the Property, personal property, fixtures and equipment located thereon, Manager shall include in its insurance policies which cover its furniture, furnishings or fixtures situated at the Property, if any, appropriate clauses pursuant to which the respective insurance carriers shall waive all rights of subrogation with respect to losses payable under such policies.

3.2 <u>Additional Insurance</u>. Manager will fully cooperate with and assist all property and liability insurance carriers and their authorized agents and adjusters in defending, litigating, or settling any property or liability claims, including but not limited to preparing reports and processing claims. Manager shall promptly investigate and make a full, timely, written report to Owner and Owner's designated insurance company as to all accidents or claims for damages relating to the ownership or operation and maintenance of the Property, and any damage or destruction to the Property and the estimated cost of repair thereof. All such reports shall be timely filed with the insurance company as required under the terms of the insurance policy involved. Manager will maintain during the entire term of this Agreement the following coverages in a form acceptable to Owner and adequate to protect Owner:

(i)    All insurance coverage required by law relating to its employees, including, but not limited to Workers' Compensation, Employers' Liability, and Non-Occupational Disability Insurance.

(ii)    Business Auto Liability with a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence covering all owned, non-owned and hired vehicles used in connection with the Property.

(iii)    Commercial general liability insurance with bodily injury limits of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in aggregate for third party bodily injury, property damage, and personal/advertising injury.

(iv)    Umbrella coverage of not less than Five Million Dollars ($5,000,000) per occurrence.

(v)    Professional liability insurance with limits no less than Two Million Dollars ($2,000,000) per occurrence covering errors and omissions of Manager related to all aspects of Manager's duties contained in this Agreement. If coverage is purchased on a "claims made" basis, it shall be maintained as "tail" coverage, while performing services under this Agreement and for a period of no less than two (2) years following cancellation of the Agreement, given the occurrence happened during the term of this Agreement.

(vi)    Property insurance written on an "all risk" basis covering any personal property of Manager or its employees used or present on or in the Property. Coverage shall be on a replacement cost basis and shall include a waiver of

subrogation clause against Owner.

All insurance required to be carried by Manager hereunder shall be with companies rated A– (with surplus in excess of $300,000,000.00) or better in Best's Insurance Guide, and, if appropriate accepted by U.S. Department of Housing and Urban Development, and shall be on forms and with loss payable clauses satisfactory to Owner naming Owner and any persons, firms, or corporations designated by Owner as an additional insured as its interest may appear. All such policies shall be written as primary policies in respect to Article 3, not contributing with and not in excess of coverage, which Owner may carry. No such policies shall be cancelled (or coverage reduced), except after thirty (30) days written notice to Owner. Manager shall, at least thirty (30) days prior to the expiration of such policies, furnish Owner with renewals or "binders" thereof or Owner may order such insurance and charge the cost thereof to Manager, which amount shall be payable by Manager upon demand and shall bear interest at the legal rate provided for past due obligations. Manager shall have the right to provide such insurance coverage pursuant to blanket policies obtained by Manager provided such blanket policies expressly afford coverage pursuant to the terms and conditions of this Agreement and to Owner as required by this Agreement and contains the other requirements set forth herein. The limits of such insurance shall not limit the liability of Manager. Manager shall add Owner as an additional insured under the above-procured insurance policies using an endorsement form at least as broad as the most recent edition of Additional Insured-Owner's, Lessors or Contractors Form B (CG2010). Manager also agrees to provide a waiver of subrogation against Owner with respect to (ii) through (vi) above. Certificates of Insurance articles, with respect to Article 2 of all such policies (and all renewals) shall be provided to Owner, annually. However, Owner may at any time request a certified copy of all policies. The cost of the insurance required under this paragraph shall not be an operating expense reimbursable to Manager. Owner and Manager each hereby will hold each other harmless for injury including death or disease to respective employees of either as covered by Workers' Compensation (or which would have been covered if Owner or Manager, as the case may be, was carrying the insurance required by this Agreement). Said waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained elsewhere in this Agreement. Written notice of the terms of the above mutual waivers shall be given to the insurance carriers of Owner and Manager if necessary to ensure the enforcement of said waivers on behalf of insurers who may otherwise assume the rights of Owner or Manager. If any contract requires that another party maintain any insurance coverage, Manager shall enforce such requirement under the contract and obtain insurance certificates and corresponding endorsements annually (or more

frequently as required pursuant to the applicable contract) from each such party and review the certificates for compliance with the terms of such contract. Manager will ensure that Owner and Manager are named as an Additional Insured using an endorsement form at least as broad as the most recent edition of Additional Insured-Owner's, Lessors or Contractors Form B (CG2010). Owner shall at any time have the right to audit on-site insurance certificates for contractual compliance.

## ARTICLE 4. RECEIVABLES AND PAYABLES

4.1 Receivables. All rents and other funds collected from the operation of the Property, including any and all advance rents shall be deposited into an account for Owner's benefit within one (1) day of Manager's receipt unless otherwise directed by Owner.

4.2 Payables. Manager shall pay all invoices for the Property from the receivables collected for Owner's benefit, unless otherwise directed by Owner.

## ARTICLE 5. SALE OF THE PROPERTY

5.1 Cooperation with Sale Broker. If Owner executes a listing agreement with a broker (other than the Manager) for sale of the Property, Manager shall cooperate with such broker to the end that the respective activities of Manager and broker may be carried on without friction and without interference with tenants and occupants. The Manager will permit the broker to access and show the Property during reasonable business hours provided the broker has secured the Manager's permission in advance.

## ARTICLE 6. COOPERATION

6.1 Cooperation with Owner. Should any claims, demands, suits or other legal proceedings be made or instituted by any person against Owner or title holder of the Property which arise out of any of the matters relating to this Agreement, the Manager shall give Owner all pertinent information and reasonable assistance in the defense or other disposition thereof.

6.2 Master Lease. Manger has been provided with a copy of the Master Lease Agreement that gives Owner the right to use and possess the Property, and Manager is familiar with its terms and the obligations of Owner created thereby. Manager, in carrying out its obligations under this Agreement, will abide by all of the terms and conditions of the Master Lease Agreement.

## ARTICLE 7. COMPENSATION

7.1 <u>Compensation of Manager</u>. Each month the Manager shall receive remuneration for its services in managing and leasing the Property in accordance with the terms and tenor of this Agreement. The remuneration shall be as hereinafter specified:

(a) A Management Fee based on total income, amounting to a percentage of the income actually collected and remitted, on a cash basis, during the month. Such percentage shall be a four percent (4%) property management fee and a two percent (2%) asset management fee based on total income plus salary and other reimbursement as shown on Exhibit C, attached and incorporated herein by reference. Income for the purpose of Management Fee computation will include all income except monies collected for capital items that are paid for by tenants.

(b) By the tenth (10th) day of each month, Owner shall submit to Manager an accounting of all cash received the prior month to enable Manager to calculate the prior month's Management Fee. Manager shall submit a calculation of its fee to Owner.

<u>ARTICLE 8. TERMINATION</u>

8.1 <u>Termination on 30-day Notice</u>. Either party may terminate this Agreement without cause by giving the other party a least thirty (30) days notice in writing.

8.2 <u>Authority to Execute Termination Notices</u>. Notice of termination for the purpose of Section 8.1 must be signed by persons holding a rank or position in Owner's company equal to or higher than that of the individuals who signed this Agreement on behalf of Owner.

8.3 <u>Termination Without Notice</u>. This Agreement shall immediately terminate, without notice, upon termination of Owner's Master Lease Agreement; or dissolution or termination of the corporate existence of Manager by merger, consolidation or otherwise; or cessation on Manager's part to continue to do business; or failure of Manager to properly deal with and account for trust funds; or bankruptcy of Manager. Action having for its purpose a reorganization or reconstitution of Manager shall likewise effect an immediate termination.

8.4 <u>Final Accounting</u>. Upon termination of this Agreement for any reason, Manager shall deliver to Owner the following with respect to the Property, as the case may be:

(a) Any balance or monies of Owner or tenant security deposits, or both, held by Manager with respect to such Property to be delivered immediately upon such termination.

(b) All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents which pertain to the Property to be delivered immediately upon such termination.

(c) The reports required by Section 2.12.

## ARTICLE 9. NOTICES

9.1 Notices. All notices, demands, consents and reports provided for in this Agreement shall be in writing where required by this Agreement and shall be given to Owner or Manager at the address set forth below or at such other address as they individually may specify thereafter:

**OWNER:**     DBSI COLONNADE WEST LAKE LLC
c/o DBSI REALTY CORPORATION
Attn: Legal Dept., Operations
12426 W. Explorer Drive
Boise, ID 83713
Telephone: (208) 489-2500
Facsimile: (208) 489-2501

**MANAGER:**     DBSI REALTY CORPORATION
Attn: Legal Dept., Operations
12426 W. Explorer Drive
Boise, ID 83713
Telephone: (208) 489-2500
Facsimile: (208) 489-2501

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by Post Office. Such notices, demands, consents and reports may also be delivered by hand, or by any other method or means permitted by law. For purpose of this Agreement notices will be deemed to have been "given" upon personal delivery thereof or 48 hours after having been deposited in the United States mails as provided above.

## ARTICLE 10. MISCELLANEOUS

10.1 No Assignment. This agreement and all rights hereunder, shall not be assignable by either party hereto (except as may be required by a surety company in a matter of subordination).

10.2 Consent and Approvals. Owner's consents or approvals may be given only by representatives of Owner from time-to-time designated by Owner's Principals or Officers.

10.3 Pronouns. The pronouns used in this Agreement referring to Manager shall be understood and construed

to apply whether Manager is an individual, limited liability company, co-partnership, corporation or an individual or individuals doing business under a firm or trade name.

10.4 _Amendments_. Except as otherwise herein provided, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by the parties in writing. If, however, the only change made is in Manager's commissions or fee, the new commission or fee shall become effective upon written notice thereof by Owner to Manager.

10.5 _Headings_. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

10.6 _Representations_. Manager represents and warrants that it is fully qualified and/or licensed, to the extent required by law, to manage real estate and perform all obligations assumed by Manager hereunder. Manager agrees to comply with all such laws now or hereafter in effect.

10.7 _Indemnification_. Owner shall indemnify and save Manager harmless from liability for any and all costs, expenses, attorney's fees and expenses, suits, claims and damages by reason of any act, omission, or occurrence resulting from or in any manner arising out of the performance of Manager's duties and obligations hereunder, or the exercise by Manager of any of the powers or authority herein or hereafter granted to Manager by Owner including maintenance, capital improvements, collections and disbursements, unless such liability shall have arisen by reason of the willful misconduct, dishonesty or negligence of Manager or any of Manger's employees. Manager shall indemnify and save Owner harmless from liability for any and all costs, expenses, attorney's fees and expenses, suits, claims, and damages by reason of any act, omission, or occurrence caused by, or resulting from the willful misconduct, dishonesty or negligence of Manager or any of Manager's employees.

10.8 _Complete Agreement_. This Agreement supersedes and takes the place of any and all previous management agreements entered into between the parties hereto relating to the Properties covered by this Agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement the date and year first above written.

**MANAGER:**

**DBSI REALTY CORPORATION**

By _____

    Mike Attiani
    Its authorized agent

Date  As of date of closing

**OWNER:**

**DBSI COLONNADE WEST LAKE LLC**

By _____

    Mike Attiani
    Its authorized agent

Date:  As of date of closing

# EXHIBIT A

## PROPERTY DESCRIPTION

### (6.753 Ac. 294,163 Sq. Ft.)

BEING a tract or parcel of land situated in the David Harris Survey, Abstract No. 26 and being out of and a part of Reserve "E", (restricted to commercial use) in Block One (1), of ATASCA WOODS, SECTION ONE (1), a subdivision in Harris County, Texas, according to the Map or Plat thereof recorded at Film Code No. 438134, of the Map Records of Harris County, Texas, and described as Tract 1; Tract 2, an Access and Parking Agreement recorded under H.C.C.F. No. X726563; Tract III benefiting Tract 1 recorded under H.C.C.F. No. U300001. Said tract or parcel of land being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod found in the Northerly right-of-way line of Aerobic Drive, for the Southeast corner of a Lot 67, Block One (1), of said Ataswoods, Section One (1);

THENCE North, along the Easterly lines of said Block One (1) of Ataswoods, Section One (1), same being the Westerly lines of said Reserve "E"; a distance of 350.82 feet to a 5/8" iron rod found at the Northeast corner of Lot 62 in said Block One (1) for a Westerly corner of the herein described tract of land;

THENCE North 69 degrees 01 minutes 07 seconds East, along the Southerly lines of Lots 60-57 of said Block One (1), a distance of 227.14 feet to an interior corner of the herein described tract of land;

THENCE North 00 degrees 16 minutes 35 seconds West, along the Easterly lines of Lots 50-57 in Block One (1) of said Ataswoods, Section One (1), a distance of 435.62 feet, to a 5/8" iron rod found for the Northwest corner of the herein described tract of land;

THENCE 89 degrees 43 minutes 25 seconds East, departing the above referenced Easterly line of Ataswoods, Section One (1), a distance of 305.00 feet, to a 5/8" iron rod found in the Westerly right-of-way line of West Lake Houston Parkway (100' R.O.W.), for the Northeast corner of the herein-described tract of land;

THENCE South 00 degrees 16 minutes 35 seconds East, along said right-of-way line, a distance of 638.63 feet to a 5/8" iron rod found for the most Easterly Southeast corner of the herein described tract of land;

THENCE South 89 degrees 43 minutes 25 seconds West, departing said right-of-way line, a distance of 54.70 feet, to a 5/8" iron rod found for corner;

THENCE South 69 degrees 43 minutes 26 seconds West, a distance of 232.24 to a 5/8" iron rod, found for corner;

THENCE South 00 degrees 16 minutes 34 seconds East, a distance of 145.10 feet, to a 5/8" iron rod, found in the aforesaid Northerly right-of-way line of Aerobic Drive, for the most Southerly Southeast corner of the herein described tract of land;

THENCE South 86 degrees 39 minutes 29 seconds West, along said Northerly right-of-way line, a distance of 85.45 feet, to a 5/8" iron rod found for the point of curvature of a curve to the right having a central angle of 03 degrees 48 minutes 51 seconds, a radius of 500.00 feet and a chord bearing and distance of South 88 degrees 33 minutes 54 seconds West, 33.28 feet;

THENCE continuing along said right-of-way line and curve to the right, an arc distance of 33.28 feet, to a 5/8" iron rod found for the point of tangency;

THENCE North 89 degrees 31 minutes 40 seconds West, continuing along said right-of-way line, a distance of 127.63 feet, to the POINT OF BEGINNING and containing 6.753 Acres, 294,163 square feet of land.

EXHIBIT A
*(rev 0105)*

## COMPETITIVE BID FORM

| Code | Description | Quantity | Bid Estimate | Total |
|------|-------------|----------|--------------|-------|
| | *SOFT COSTS* | | | |
| 1050 | City or County Impact Fees | | | |
| 1100 | Administration | | | |
| 1150 | Architectural Plans | | | |
| 1200 | Bid Negotiation | | | |
| 1250 | Bonding | | | |
| 1275 | Contractor Overhead | | | |
| 1300 | Engineering / Layout | | | |
| 1325 | Insurance | | | |
| 1350 | Legal Services | | | |
| 1375 | Marketing | | | |
| 1400 | Natural Gas Fees | | | |
| 1450 | Permits | | | |
| 1500 | Phase I | | | |
| 1550 | Phase II | | | |
| 1600 | Public Work Fees | | | |
| 1650 | Survey | | | |
| 1700 | Testing / Inspections | | | |
| 1750 | Title | | | |
| 1800 | Water Meter Fees | | | |
| | *TOTAL SOFT COSTS* | | | |
| | | | | |
| | *SITE WORK* | | | |
| 2050 | Clean Up | | | |
| 2100 | Clearing | | | |
| 2150 | Curb / Gutter / Sidewalks | | | |
| 2175 | Contractor Overhead | | | |
| 2200 | Decorative Site Lighting | | | |

| | | | | |
|------|---------------------------|---|---|---|
| 2250 | Demolition | | | |
| 2300 | Equipment | | | |
| 2350 | Excavation / Backfill | | | |
| 2375 | Fencing | | | |
| 2400 | Footings / Foundation | | | |
| 2450 | Grading / Paving | | | |
| 2500 | Insurance Risk - Builder | | | |
| 2550 | Landscape / Irrigation | | | |
| 2575 | Legal Services | | | |
| 2600 | Masonry / CMU | | | |
| 2650 | Parking Lot Pole Lights | | | |
| 2700 | Parking Signs / Posts | | | |
| 2725 | Pylon / Monument Sign | | | |
| 2750 | Site Storm Drainage | | | |
| 2800 | Slab Concrete | | | |
| 2850 | Striping | | | |
| 2875 | Temporary Power | | | |
| 2900 | Trash Enclosures | | | |
| 2950 | Utilities | | | |
| 2975 | Power to Site | | | |
| | *TOTAL SITE WORK* | | | |

| | SHELL CONSTRUCTION | | | |
|------|--------------------------------|---|---|---|
| 3025 | Awnings | | | |
| 3050 | Building Security Lighting | | | |
| 3075 | Canopy Lighting | | | |
| 3085 | Contractor Overhead | | | |
| 3100 | Doors / Hardware | | | |
| 3125 | Drywall | | | |
| 3150 | Electrical | | | |
| 3175 | Fire Alarm | | | |
| 3200 | Fire Sprinklers | | | |
| 3225 | Framing | | | |
| 3250 | HVAC | | | |
| 3275 | Insulation | | | |
| 3300 | Insurance Risk - Builder | | | |
| 3310 | Legal Services | | | |
| 3325 | Masonry / CMU | | | |
| 3350 | Overhead Doors | | | |
| 3375 | Plumbing | | | |
| 3400 | Roof | | | |
| 3425 | Roof Insulation | | | |
| 3450 | Roof Ladders | | | |
| 3475 | Siding / Stucco / E.I.F.S. | | | |
| 3500 | Slab Concrete | | | |
| 3525 | Storefront Glazing | | | |
| 3550 | Waterproofing / Caulking | | | |
| | *TOTAL SHELL CONSTRUCTION* | | | |
| | | | | |
| | *TENANT IMPROVEMENTS* | | | |
| 4025 | Alarms | | | |
| 4050 | Cabinets / Millwork | | | |
| 4075 | Concrete / Sawcutting | | | |
| 4085 | Contractor Overhead | | | |
| 4100 | Demolition | | | |

| | | | | |
|------|------------------------------|--|--|--|
| 4125 | Door Frames / Hardware | | | |
| 4150 | Electrical | | | |
| 4175 | Equipment | | | |
| 4200 | Floor Covering | | | |
| 4225 | Finish Carpentry | | | |
| 4250 | Fire Sprinklers | | | |
| 4275 | Framing | | | |
| 4300 | Grease Traps | | | |
| 4325 | Grid & Ceiling Tile | | | |
| 4350 | HVAC | | | |
| 4375 | Insulation | | | |
| 4385 | Legal Services | | | |
| 4400 | Lighting | | | |
| 4425 | Painting / Wallpaper | | | |
| 4450 | Phones | | | |
| 4475 | Plumbing | | | |
| 4500 | Roofing | | | |
| 4525 | Rough | | | |
| 4550 | Sheetrock | | | |
| 4575 | Trash Removal | | | |
| 4600 | Waterproofing / Caulking | | | |
| 4625 | Windows | | | |
| | *TOTAL TENANT IMPROVEMENTS* | | | |
| | | | | |
| | *TOTAL COSTS* | | | |

**EXHIBIT C**

<u>SALARY REIMBURSEMENT</u>

NOT APPLICABLE

EXHIBIT C
*(rev 0105)*

# EXHIBIT B

## MANAGEMENT AGREEMENT

### (ATTACHED)

016075/260201/473064_6

# PROPERTY MANAGEMENT AGREEMENT

## FOR

### COLONNADE WEST LAKE LLC

18411 W. Lake Houston Parkway
18445 W. Lake Houston Parkway
18455 W. Lake Houston Parkway
18477 W. Lake Houston Parkway
Humble, TX 77346

by and between

### DBSI REALTY CORPORATION

and

### TRANSWESTERN PROPERTY COMPANY SOUTHWEST LP

dba

### TRANSWESTERN COMMERCIAL SERVICES

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Article 1 - Commencement | | 1 |
| Section | 1.1 — Commencement Date | 1 |
| Article 2 - Manager's Responsibilities | | 1 |
| Section | 2.1 - Management | 1 |
| | 2.2 - Employees; Independent Contractor | 1 |
| | 2.3 - Compliance with Laws, Mortgages, etc. | 2 |
| | 2.4 - Approved Budgets | 2 |
| | 2.5 - Collection of Rents and Other Income | 3 |
| | 2.6 - Competitive Bidding | 3 |
| | 2.7 - Repairs | 4 |
| | 2.8 - Capital Improvements | 4 |
| | 2.9 - Service Contracts | 4 |
| | 2.10 - Taxes, Mortgages | 5 |
| | 2.11 - Leasing | 5 |
| | 2.12 - Reports | 5 |
| Article 3 - Insurance | | 5 |
| Section | 3.1 - Insurance | 5 |
| | 3.2 - Additional Insurance | 6 |
| Article 4 — Receivables and Payables | | 9 |
| Section | 4.1 - Receivables | 9 |
| | 4.2 — Payables | 9 |
| Article 5 - Sale of the Property | | 9 |
| Section | 5.1 — Cooperation with Sale Broker | 9 |
| Article 6 - Cooperation | | 9 |
| Section | 6.1 — Cooperation with DBSI Realty and LeaseCo | 9 |
| Article 7 - Compensation | | 9 |
| Section | 7.1 — Compensation of Manager | 9 |
| Article 8 - Termination | | 10 |
| Section | 8.1 - Termination on 30-day Notice | 10 |
| | 8.2 - Termination Without Notice | 10 |
| | 8.3 - Final Accounting | 10 |

i

Article 9 - Notices          10

      Section      9.1 – Notices      10

Article 10 - Miscellaneous      11

      Section    10.1 - No Assignment      11
                  10.2 - Consents and Approvals      11
                  10.3 - Pronouns      11
                  10.4 - Amendments      11
                  10.5 - Headings      11
                  10.6 - Representations      11
                  10.7 - Indemnification      11
                  10.8 - OFAC Representations, Warranties and Indemnification      12
                  10.9 - Hazardous Materials      13
                  10.10 - Complete Agreement      13

<u>Exhibits</u>

A – Property Description
B – Competitive Bid Form
C – Reimbursable Building Maintenance Fees and Construction Management Fee Schedule

# PROPERTY MANAGEMENT AGREEMENT

This AGREEMENT (the "Agreement"), effective this _____ day of _____, 2006 ("Effective Date"), by and between **TRANSWESTERN PROPERTY COMPANY SOUTHWEST LP dba TRANSWESTERN COMMERCIAL SERVICES** (hereinafter called "Manager") and **DBSI REALTY CORPORATION** (hereinafter "DBSI Realty") witnesseth that:

WHEREAS, DBSI Master LeaseCo LLC (hereinafter called "LeaseCo") is the long term tenant of certain real property described in Exhibit A attached hereto and made a part hereof (the "Property") under a Master Lease Agreement; and

WHEREAS, LeaseCo has retained DBSI Realty to manage the Property and has authorized DBSI Realty to obtain, supervise and oversee certain of those property management services for the Property; and

WHEREAS, Manager has agreed to provide certain property management services as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises, the parties agree as follows:

## ARTICLE 1. COMMENCEMENT

1.1 <u>Commencement Date</u>. Manager's duties and responsibilities under this Agreement shall begin on the date hereof and shall continue until terminated as provided in Article 8 hereof.

## ARTICLE 2. MANAGER'S RESPONSIBILITIES

2.1 <u>Management</u>. Manager shall manage, operate, and maintain the Property in an efficient and satisfactory manner. In this capacity, Manager shall deal at arms length with all third parties and Manager shall serve LeaseCo's interests at all times.

2.2 <u>Employees; Independent Contractor</u>. Manager shall have in its employ at all times a sufficient number of capable employees or independent contractors to enable it to properly, adequately, safely and economically manage, operate, maintain, and account for the Property. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees or independent contractors are the responsibility of Manager. This Agreement is not one of general agency by Manager for DBSI Realty but one with Manager engaged independently in the business of managing properties on its own behalf as an independent contractor. All employment arrangements are

therefore solely its concern and neither DBSI Realty nor any other persons or entities from time to time owning or leasing an interest in the Property (hereinafter collectively referred to as "Owner") shall have any liability with respect thereto.

2.3 Compliance with Laws, Mortgages, etc. Manager shall be responsible for full compliance with Federal, State, and municipal laws, ordinances, regulations, and orders relative to the leasing, use, operation, repair, and maintenance of each Property. Manager shall promptly remedy any violation of any such law, ordinance, rule, regulation or order, which comes to its attention, provided DBSI Realty approves and funds such remedy. Manager shall notify DBSI Realty by the end of the next business day to the end that prompt arrangements may be made to remedy the violation.

Manager shall be responsible for full compliance with all terms and conditions contained in any ground lease, master lease, space lease, mortgage, deed of trust or other security instrument affecting the Property, provided DBSI Realty or Owner provides copies of such instruments to Manager. Manager shall not be required to make any payment or incur any liability on account thereof.

2.4 Approved Budgets. Manager shall prepare and submit to DBSI Realty a proposed operating budget and a proposed capital budget for the promotion, operation, repair, and maintenance of the Property for the forthcoming calendar year. Each proposed budget shall be delivered to DBSI Realty within thirty (30) days after the execution of this Agreement and each subsequent proposed budget no later than October 1 of each calendar year or such other date as specified by DBSI Realty.

DBSI Realty will consider the proposed budgets and then will consult with Manager in the ensuing period prior to the commencement of the forthcoming calendar year in order to agree on an "Approved Operating Budget" and an "Approved Capital Budget".

Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed either Approved Budget pertaining thereto either in total or in any one accounting category. All expenses must be charged to the proper account as specified in each Approved Budget and no expense may be classified or reclassified for the purpose of avoiding an excess in the annual budgeted amount of an accounting category.

Manager shall secure DBSI Realty's prior verbal approval for any expenditure greater than Three Thousand and No/100 Dollars ($3,000.00). During the calendar year, Manager shall promptly inform DBSI Realty of any major costs and expenses that were not foreseen during the budget preparation period and thus were not reflected in either Approved Budget.

2.5 <u>Collection of Rents and Other Income</u>.    Only DBSI Realty shall collect rent from tenants.    Manager shall use diligent efforts to assist in the collection of miscellaneous funds which may become due at any time from any tenant, other than rent, or from others for services provided in connection with or for the use of the Property or any portion thereof. Manager shall collect and identify any income due LeaseCo from miscellaneous services provided to tenants or the public including, but not limited to, parking income, tenant storage, and coin operated machines of all types (e.g., vending machines, pay telephones, etc.). All monies so collected shall be handled in accordance with Section 4.1. Manager may not, without the prior approval of DBSI Realty, terminate any lease, lock out a tenant, institute suit for rent or for use and occupancy, or enter into proceedings for recovery of possession. In connection with any collection efforts only legal counsel or a collection firm designated by DBSI Realty shall be retained. All legal expenses incurred in bringing such approved suit or proceeding shall be submitted to DBSI Realty for its approval. Manager shall not write off any income items without prior approval of DBSI Realty.

2.6 <u>Competitive Bidding</u>. All contracts for repairs, capital improvements, goods, and services exceeding Three Thousand and No/100 Dollars ($3,000.00) shall be awarded on the basis of competitive bidding, solicited in the following manner:

(a)   A minimum of three (3) written bids shall be obtained for each purchase over Three Thousand and No/100 Dollars ($3,000.00).

(b)   Each bid will be solicited in a form attached hereto as Exhibit B, or otherwise approved by DBSI Realty so that uniformity will exist in the bid quotes.

(c)   Manager may accept, subject to DBSI Realty's written approval, the low bid. Notwithstanding the foregoing, Manager shall not sign any contracts on behalf of DBSI Realty or LeaseCo but shall forward all contracts to DBSI Realty for review, approval and execution.

(d)   If Manager advises acceptance of other than the lowest bidder, Manager shall adequately support its recommendations to DBSI Realty.

(e) DBSI Realty shall be free to accept or reject any and all bids.

(f) Manager may request DBSI Realty to waive competitive bidding rules. DBSI Realty may pay for such expenses from its own resources or may authorize payment by Manager to be paid in accordance with Section 4.2.

2.7 Repairs. Manager shall attend to the making and supervision of all ordinary and extraordinary repairs, decorations, and alterations subject to the limits of the Approved Operating Budget. Excluded from this provision are expenditures to refurbish, rehabilitate, remodel, or otherwise prepare areas covered by new leases, which are to be specifically approved by DBSI Realty on a case-by-case basis.

In case of emergency Manager may make expenditures for repairs which exceed the limits in Section 2.6 without prior written approval if it is necessary to prevent damage or injury. DBSI Realty must be informed of any such expenditure before the end of the business day following such expenditure.

2.8 Capital Improvements. The Approved Capital Budget does not constitute an authorization for Manager to expend money for projects. Capital improvements must be approved by DBSI Realty on a case-by-case basis. With respect to the purchase and installation of major items (cost in excess of $3,000.00) of new or replacement equipment, Manager shall recommend that DBSI Realty purchase these items when Manager believes such purchase to be necessary or desirable. DBSI Realty may arrange to purchase and install the same itself or may authorize Manager to do so subject to prescribed supervision and specification requirements and conditions. The competitive bid rules outlined in Section 2.6 should be observed with all such capital improvements.

2.9 Service Contracts. Manager shall not enter into any contract for cleaning, maintaining, repairing, or servicing any Property or any of the constituent parts of any Property. Instead, Manager shall submit all such contracts to DBSI Realty for review, approval and execution. Manager shall state to DBSI Realty the relationship, if any, between Manager (or the person or persons in control of Manager) and the party proposed to supply such goods or services, or both.

All service contracts shall: (a) be in a form acceptable to DBSI Realty (b) be in the name of DBSI Realty or its nominees; (c) be assignable; (d) include a provision for cancellation thereof by DBSI Realty or its nominee or Manager upon not more than thirty (30) days written notice; (e) require that all contractors provide evidence of sufficient insurance; and (f) not be for a period longer than one (1) year.

2.10 Taxes, Mortgages. Manager shall, if so requested, obtain and verify bills for real estate and personal property taxes, improvement assessments and other like charges, which are or may become liens against each Property and recommend payment or appeal as in its best judgment it may decide. Manager shall forward such bills to DBSI Realty for payment in such time to permit DBSI Realty to avoid penalty for late payment or to permit DBSI Realty to take advantage of discounts.

2.11 Leasing. DBSI Realty anticipates entering into a separate agreement with a leasing agent or broker for the specific purpose of securing tenants for the Property. Any such agreement notwithstanding, only DBSI Realty shall be authorized to collect rents from tenants. Manager will cooperate with any of such agents or brokers in any manner likely to aid in successfully filling any vacancy. Manager agrees to perform whatever service may be required in connection with the negotiation of leases or renewals, extensions, modifications, or cancellations thereof.

2.12 Reports. Manager agrees that it shall, during the term of this Agreement and immediately thereafter, in accordance with the provisions hereof:

(a) Maintain, at the office of Manager, a comprehensive system of office records (other than accounting) relating to the operation of the Property. DBSI Realty shall have access to such office records and may exercise its rights of inspection hereunder solely during normal business hours and in such a manner so as not to unreasonably interfere with the operations of Manager.

(b) Provide a monthly itemization report to DBSI Realty of any receipts or disbursements related to the operation of the Property that Manager may administer or handle other than those accounting records which are the responsibility of DBSI Realty, and, in the event of termination of this Agreement, provide to DBSI Realty a full accounting of any such records within thirty (30) days of such termination.

## ARTICLE 3. INSURANCE

3.1 Insurance. DBSI Realty, upon execution of this Agreement, shall notify LeaseCo's designated insurance company of the full replacement cost as the insurable value of the Property, which shall be insured on "All Risk" terms, including coverage of Boiler and Machinery perils and for Operation of Building Codes, as appropriate, with waivers of subrogation in favor of Manager. DBSI Realty and LeaseCo shall also maintain, throughout the term of this Agreement Commercial General Liability insurance with bodily injury limits of not less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) in aggregate for third party

bodily injury, property damage, personal/advertising injury and contractual liability arising out of the Property and its management, and Umbrella coverage of not less than Five Million and No/100 Dollars ($5,000,000.00) per occurrence, on which Manager shall be designated as an insured, either under the policy by definition or by endorsement. DBSI Realty shall hold Manager harmless from third party bodily injury or property damage related to the Property, provided Manager:

    (a) notifies DBSI Realty within twenty-four (24) hours after Manager receives notice of any such loss, damage, or injury on a form acceptable by DBSI Realty and in a manner acceptable by DBSI Realty;

    (b) takes no action (such as admission of liability) which might bar DBSI Realty or LeaseCo from obtaining any protection afforded by any policy DBSI Realty or LeaseCo may hold or which might prejudice DBSI Realty or LeaseCo in its defense to a claim based on such loss, damage or injury; and

    (c) agrees that DBSI Realty or LeaseCo shall have the exclusive right, at its option, to conduct the defense to any claim, demand or suit within limits prescribed by the policy or policies of insurance.

Nothing herein shall be construed as indemnifying Manager or its employees, contractors or agents against any negligent act or omission for which standard commercial general liability insurance protection would not be available; neither is the foregoing intended to affect the general requirements of this Agreement that the Property shall be managed, operated and maintained in a safe condition and in proper and careful manner. Manager shall furnish whatever information is requested by DBSI Realty for the purpose of establishing the placement of insurance coverages and shall aid and cooperate in every reasonable way with respect to such insurance and any loss thereunder. DBSI Realty or LeaseCo shall include in its hazard policy covering the Property personal property, fixtures and equipment located thereon. Manager shall include in its insurance policies which cover its furniture, furnishings or fixtures situated at the Property, if any, appropriate clauses pursuant to which the respective insurance carriers shall waive all rights of subrogation with respect to losses payable under such policies.

3.2 <u>Additional Insurance</u>. Manager will fully cooperate with and assist all property and liability insurance carriers and their authorized agents and adjusters in defending, litigating, or settling any property or liability claims, including but not limited to preparing reports and providing reasonable assistance in processing claims. Manager shall promptly investigate and make a full, timely, written report to DBSI Realty, LeaseCo and LeaseCo's designated insurance company as to all accidents or claims for damages relating to the ownership or operation and maintenance of

the Property, and any damage or destruction to the Property and the estimated cost of repair thereof. All such reports shall be timely filed with the insurance company as required under the terms of the insurance policy involved. Manager will maintain during the entire term of this Agreement the following coverages in a form acceptable to DBSI Realty and adequate to protect DBSI Realty and LeaseCo:

(i)  All insurance coverage required by law relating to its employees, including, but not limited to Workers' Compensation, Employers' Liability with limits no less than One Million and No/100 Dollars ($1,000,000.00), and Non-Occupational Disability Insurance.

(ii)  Business Auto Liability with a combined single limit of not less than One Million and No/100 Dollars ($1,000,000.00) per occurrence covering all owned, non-owned and hired vehicles used in connection with the Property.

(iii)  Commercial general liability insurance with bodily injury limits of not less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) in aggregate for third party bodily injury, property damage, personal/advertising injury and contractual liability coverage.

(iv)  Employee Fidelity Insurance in the amount of One Million and No/100 Dollars ($1,000,000.00) for the joint protection of Manager, DBSI Realty and LeaseCo to indemnify each from any loss, theft or embezzlement of LeaseCo's property or funds caused by any officers, employees or agents of Manager.

(v)  Umbrella coverage of not less than Ten Million and No/100 Dollars ($10,000,000.00) per occurrence.

(vi)  Professional liability insurance with limits no less than Two Million and No/100 Dollars ($2,000,000.00) per occurrence covering errors and omissions of Manager related to all aspects of Manager's duties contained in this Agreement. If coverage is purchased on a "claims made" basis, it shall be maintained as "tail" coverage, while performing services under this Agreement and for a period of no less than two (2) years following cancellation of the Agreement, given the occurrence happened during the term of this Agreement.

(vii)  Property insurance written on an "all risk" basis covering any personal property of Manager or its employees used or present on or in the Property. Coverage shall be on a replacement cost basis and shall include a waiver of subrogation clause in favor of DBSI Realty and LeaseCo. All insurance required to be carried by Manager hereunder shall be with companies rated A– (with surplus in excess of $300,000,000.00) or better in Best's Insurance Guide, and, if appropriate accepted by U.S. Department of Housing and Urban Development. Manager's property insurance shall be on forms and with loss payable clauses satisfactory to DBSI Realty naming DBSI Realty and

LeaseCo as loss payees as their interests may appear. Except in instances of any act, omission or occurrence that is beyond the scope of duties and responsibilities of Manager under this Agreement, all DBSI Realty policies shall be written as primary policies in respect to Article 3, not contributing with and not in excess of coverage, which Manager may carry. Except in instances of any act, omission or occurrence that is beyond the scope of duties and responsibilities of Manager under this Agreement, Manager's liability insurance shall be excess and shall not be called upon to contribute to any claim covered by DBSI Realty's liability insurance. In instances of any act, omission or occurrence that is beyond the scope of duties and responsibilities of Manager under this Agreement, Manager's insurance policies shall be primary, not contributing with and not in excess of coverage which DBSI Realty may carry.

No policies shall be cancelled (or coverage reduced), except after thirty (30) days written notice to DBSI Realty and Manager. Manager shall, prior to the expiration of such policies, furnish DBSI Realty with renewals or "binders" thereof or DBSI Realty may, after written notice to Manager, order such insurance and charge the cost thereof to Manager, which amount shall be payable by Manager upon demand and shall bear interest at the legal rate provided for past due obligations. Manager shall have the right to provide such insurance coverage pursuant to blanket policies obtained by Manager provided such blanket policies expressly afford coverage pursuant to the terms and conditions of this Agreement and to DBSI Realty and LeaseCo as required by this Agreement and contains the other requirements set forth herein. The limits of such insurance shall not limit the liability of Manager. Each party hereto agrees to provide a waiver of subrogation in favor of the other with respect to any property insurance and/or Workers' Compensation and/or Employer's Liability coverages maintained by them. Certificates of Insurance shall be provided by each party to the other, annually. The cost of the insurance required under this paragraph shall not be an operating expense reimbursable to Manager. DBSI Realty, LeaseCo, and Manager all hereby will hold each other harmless for injury including death or disease to respective employees of either as covered by Workers' Compensation (or which would have been covered if DBSI Realty or LeaseCo or Manager, as the case may be, was carrying the insurance required by this Agreement). Said waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained elsewhere in this Agreement. Written notice of the terms of the above mutual waivers shall be given to the insurance carriers of DBSI Realty, LeaseCo and Manager if necessary to ensure the enforcement of said waivers by insurers who may otherwise assume the rights of DBSI Realty or LeaseCo or Manager. If any tenant, vendor, service, construction or similar contract requires that another party maintain any insurance coverage, Manager shall enforce such requirement under the

contract and obtain insurance certificates and corresponding endorsements annually (or more frequently as required pursuant to the applicable contract) from each such party and review the certificates for compliance with the terms of such contract, which shall be required to name DBSI Realty, LeaseCo and Manager as additional insureds. DBSI Realty or LeaseCo shall at any time have the right to audit on-site insurance certificates for contractual compliance.

## ARTICLE 4. RECEIVABLES AND PAYABLES

4.1 Receivables. All funds collected from the operation of the Property shall be sent to DBSI Realty within one (1) day of Manager's receipt.

4.2 Payables. Manager shall forward all property invoices to DBSI Realty on an expedited basis to ensure ample time to process and pay without incurring late fees, which shall in no event be less than one time every seven (7) days via overnight delivery.

## ARTICLE 5. SALE OF THE PROPERTY

5.1 Cooperation with Sale Broker. If DBSI Realty executes a listing agreement with a broker (other than the Manager) for sale of the Property, Manager shall cooperate with such broker to the end that the respective activities of Manager and broker may be carried on without friction and without interference with tenants and occupants. Manager will permit the broker to access and show the Property during reasonable business hours provided the broker has secured Manager's permission in advance.

## ARTICLE 6. COOPERATION

6.1 Cooperation with DBSI Realty and LeaseCo. Should any claims, demands, suits or other legal proceedings be made or instituted by any person against DBSI Realty, LeaseCo or title holder of the Property which arise out of any of the matters relating to this Agreement, Manager shall give DBSI Realty and LeaseCo all pertinent information and reasonable assistance in the defense or other disposition thereof.

## ARTICLE 7. COMPENSATION

7.1 Compensation of Manager. Each month Manager shall receive remuneration for its services in managing the Property in accordance with the terms and tenor of this Agreement. The remuneration shall be a flat monthly fee of One Thousand Seven Hundred Two and 38/100 Dollars ($1,702.38) which amount shall include Property-related salary reimbursements, if any. DBSI Realty shall reimburse Manager for building maintenance fees in accordance with Exhibit C attached hereto.

DBSI Realty may, at its option, request that Manager perform construction management services related to the Property and, if Manager is so engaged, DBSI shall pay Manager for construction management services according to the fee schedule set forth on Exhibit C attached hereto. On a project-by-project basis, Manager shall obtain written approval from DBSI Realty prior to performing any construction management tasks.

## ARTICLE 8. TERMINATION

8.1 <u>Termination on 30-day Notice</u>. Either party may terminate this Agreement without cause by giving the other party at least thirty (30) days' notice in writing.

8.2 <u>Termination Without Notice</u>. This Agreement shall immediately terminate, without notice, upon dissolution or termination of the corporate existence of Manager by merger, consolidation or otherwise; or cessation on Manager's part to continue to do business; or failure of Manager to properly deal with and account for trust funds; or bankruptcy of Manager. Action having for its purpose a reorganization or reconstitution of Manager shall likewise effect an immediate termination.

8.3 <u>Final Accounting</u>. Upon termination of this Agreement for any reason, Manager shall deliver to DBSI Realty the following with respect to the Property, as the case may be:

(a) All money that belongs to LeaseCo that is held by Manager with respect to such Property to be delivered immediately upon such termination.

(b) All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents which pertain to the Property to be delivered immediately upon such termination.

(c) The reports required by Section 2.12.

## ARTICLE 9. NOTICES

9.1 <u>Notices</u>. All notices, demands, consents and reports provided for in this Agreement shall be in writing where required by this Agreement and shall be given to DBSI Realty or Manager at the address set forth below or at such other address as they individually may specify thereafter:

DBSI REALTY:    DBSI Realty Corporation
Attn: Legal Department, Operations
12426 West Explorer Drive
Boise, ID 83713
Telephone: (208) 489-2500
Facsimile: (208) 489-2501

<pre>
MANAGER:          Transwestern Property Company Southwest, L.P.
                  dba Transwestern Commercial Services
                  Attn: Steve Ash
                  1900 West Loop South, Suite 1300
                  Houston, TX 77027
                  Telephone: (713) 270-3365
                  Facsimile: (713) 270-6285
</pre>

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by Post Office. Such notices, demands, consents and reports may also be delivered by hand, or by any other method or means permitted by law. For purposes of this Agreement notices will be deemed to have been "given" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided above.

## ARTICLE 10. MISCELLANEOUS

10.1 <u>No Assignment</u>. This Agreement and all rights hereunder, shall not be assignable by either party hereto (except as may be required by a surety company in a matter of subordination).

10.2 <u>Consents and Approvals</u>. LeaseCo's consents or approvals may be given by DBSI Realty from time-to-time as provided for herein.

10.3 <u>Pronouns</u>. The pronouns used in this Agreement referring to Manager shall be understood and construed to apply whether Manager is an individual, partnership, limited liability company, corporation or an individual or individuals doing business under a firm or trade name.

10.4 <u>Amendments</u>. Except as otherwise herein provided, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by the parties in writing.

10.5 <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

10.6 <u>Representations</u>. Manager represents and warrants that it is fully qualified and/or licensed, to the extent required by law, to manage real estate and perform all obligations assumed by Manager hereunder. Manager agrees to comply with all such laws now or hereafter in effect.

10.7 <u>Indemnification</u>. To the extent not covered by the primary and excess liability insurance provided by DBSI Realty or LeaseCo, DBSI Realty shall indemnify and save Manager harmless from liability for any and all costs,

expenses, attorney's fees and expenses, suits, claims and damages by reason of any act, omission, or occurrence resulting from or in any manner arising out of the performance of Manager's duties and obligations hereunder, or the exercise by Manager of any of the powers or authority herein or hereafter granted to Manager by DBSI Realty including maintenance, capital improvements, collections and disbursements, unless such liability shall have arisen and then to the extent attributable to (i) the willful misconduct, dishonesty or negligence of Manager or any of Manager's employees or (ii) by reason of any act, omission or occurrence that is beyond the scope of duties and responsibilities of Manager under this Agreement. To the extent not covered by the primary and excess liability insurance provided by DBSI Realty or LeaseCo, Manager shall indemnify and save DBSI Realty, LeaseCo, and any other persons or entities from time to time owning or leasing an interest in the Property, harmless from liability for any and all costs, expenses, attorney's fees and expenses, suits, claims, and damages to the extent such liabilities or costs are attributable to any act, omission, or occurrence caused by, or resulting from (i) the willful misconduct, dishonesty or negligence of Manager or any of Manager's employees or (ii) by reason of any act, omission or occurrence that is beyond the scope of duties and responsibilities of Manager under this Agreement.

    10.8 <u>OFAC Representations, Warranties, and Indemnification.</u>

    (a) <u>Representations and Warranties</u>. DBSI Realty, LeaseCo and Manager each represents and warrants that (i) it is not, and none of its partners, members, managers, employees, officers, directors, representatives or agents is, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or under any other law, rule, order, or regulation that is enforced or administered by OFAC (such persons and entities each being a "Prohibited Person"); (ii) it is not acting directly or indirectly, for or on behalf of any Prohibited Person; (iii) it is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any Prohibited Person; and (iv) it will not contract with or otherwise engage in any dealings or transactions or be otherwise associated with any Prohibited Person.

(b) <u>Indemnification</u>. DBSI Realty, LeaseCo, and Manager each hereby agrees to defend, indemnify, and hold harmless each other from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing representations and warranties contained in this Section 10.8.

10.9  <u>Hazardous Materials</u>.  If either DBSI Realty or Manager becomes aware of any asbestos, PCB's, underground storage tanks or hazardous materials in the Property (collectively "Hazards"), DBSI Realty or Manager shall promptly advise one another and shall cooperate with one another in determining any regulatory or other action that may be required to address or confirm the presence of such identified Hazards. Manager shall not be responsible for resolution of any claims related to DBSI Realty's noncompliance with any laws, including laws regarding Hazards in connection with the Property.

10.10  <u>Complete Agreement</u>.  This Agreement supersedes and takes the place of any and all previous management agreements entered into between the parties hereto relating to the Property covered by this Agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement the date and year first above written.

**MANAGER:**

**TRANSWESTERN PROPERTY COMPANY**
**SOUTHWEST LP dba**
**TRANSWESTERN COMMERCIAL SERVICES**

By_____

Name_____

Its_____

**DBSI REALTY CORPORATION**

B_____
Mike Attiani
Its authorized agent

**EXHIBIT A**

<u>PROPERTY DESCRIPTION</u>

## DESCRIPTION OF LAND
### (6.753 Ac. 294,163 Sq. Ft.)

BEING a tract or parcel of land situated in the David Harris Survey, Abstract No. 26 and being out of and a part of Reserve "E", (restricted to commercial use) in Block One (1), of ATASCA WOODS, SECTION ONE (1), a subdivision in Harris County, Texas, according to the Map or Plat thereof recorded at Film Code No. 438134, of the Map Records of Harris County, Texas, and described as Tract 1; Tract 2, an Access and Parking Agreement recorded under H.C.C.F. No. X726563; Tract III benefiting Tract 1 recorded under H.C.C.F. No. U300001. Said tract or parcel of land being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod found in the Northerly right-of-way line of Aerobic Drive, for the Southeast corner of a Lot 67, Block One (1), of said Ataswoods, Section One (1);

THENCE North, along the Easterly lines of said Block One (1) of Ataswoods, Section One (1), same being the Westerly lines of said Reserve "E", a distance of 350.82 feet to a 5/8" iron rod found at the Northeast corner of Lot 62 in said Block One (1) for a Westerly corner of the herein described tract of land;

THENCE North 69 degrees 01 minutes 07 seconds East, along the Southerly lines of Lots 60-57 of said Block One (1), a distance of 227.14 feet to an interior corner of the herein described tract of land;

THENCE North 00 degrees 16 minutes 35 seconds West, along the Easterly lines of Lots 50-57 in Block One (1) of said Ataswoods, Section One (1), a distance of 435.62 feet, to a 5/8" iron rod found for the Northwest corner of the herein described tract of land;

THENCE 89 degrees 43 minutes 25 seconds East, departing the above referenced Easterly line of Ataswoods, Section One (1), a distance of 305.00 feet, to a 5/8" iron rod found in the Westerly right-of-way line of West Lake Houston Parkway (100' R.O.W.), for the Northeast corner of the herein described tract of land;

THENCE South 00 degrees 16 minutes 35 seconds East, along said right-of-way line, a distance of 638.63 feet to a 5/8" iron rod found for the most Easterly Southeast corner of the herein described tract of land;

THENCE South 89 degrees 43 minutes 25 seconds West, departing said right-of-way line, a distance of 54.70 feet, to a 5/8" iron rod found for corner;

THENCE South 69 degrees 43 minutes 26 seconds West, a distance of 232.24 to a 5/8" iron rod, found for corner;

THENCE South 00 degrees 16 minutes 34 seconds East, a distance of 145.10 feet, to a 5/8" iron rod, found in the aforesaid Northerly right-of-way line of Aerobic Drive, for the most Southerly Southeast corner of the herein described tract of land;

THENCE South 86 degrees 39 minutes 29 seconds West, along said Northerly right-

of-way line, a distance of 85.45 feet, to a 5/8" iron rod found for the point of curvature of a curve to the right having a central angle of 03 degrees 48 minutes 51 seconds, a radius of 500.00 feet and a chord bearing and distance of South 88 degrees 33 minutes 54 seconds West, 33.28 feet;

THENCE continuing along said right-of-way line and curve to the right, an arc distance of 33.28 feet, to a 5/8" iron rod found for the point of tangency;

THENCE North 89 degrees 31 minutes 40 seconds West, continuing along said right-of-way line, a distance of 127.63 feet, to the POINT OF BEGINNING and containing 6.753 Acres, 294,163 square feet of land.

# EXHIBIT B

## COMPETITIVE BID FORM

| Code | Description | Quantity | Bid Estimate | Total |
|------|-------------|----------|--------------|-------|
| | *SOFT COSTS* | | | |
| 1050 | City or County Impact Fees | | | |
| 1100 | Administration | | | |
| 1150 | Architectural Plans | | | |
| 1200 | Bid Negotiation | | | |
| 1250 | Bonding | | | |
| 1275 | Contractor Overhead | | | |
| 1300 | Engineering / Layout | | | |
| 1325 | Insurance | | | |
| 1350 | Legal Services | | | |
| 1375 | Marketing | | | |
| 1400 | Natural Gas Fees | | | |
| 1450 | Permits | | | |
| 1500 | Phase I | | | |
| 1550 | Phase II | | | |
| 1600 | Public Work Fees | | | |
| 1650 | Survey | | | |
| 1700 | Testing / Inspections | | | |
| 1750 | Title | | | |
| 1800 | Water Meter Fees | | | |
| | *TOTAL SOFT COSTS* | | | |
| | | | | |
| | *SITE WORK* | | | |
| 2050 | Clean Up | | | |
| 2100 | Clearing | | | |
| 2150 | Curb / Gutter / Sidewalks | | | |
| 2175 | Contractor Overhead | | | |
| 2200 | Decorative Site Lighting | | | |
| 2250 | Demolition | | | |
| 2300 | Equipment | | | |
| 2350 | Excavation / Backfill | | | |

| | | | | |
|---|---|---|---|---|
| 2375 | Fencing | | | |
| 2400 | Footings / Foundation | | | |
| 2450 | Grading / Paving | | | |
| 2500 | Insurance Risk – Builder | | | |
| 2550 | Landscape / Irrigation | | | |
| 2575 | Legal Services | | | |
| 2600 | Masonry / CMU | | | |
| 2650 | Parking Lot Pole Lights | | | |
| 2700 | Parking Signs / Posts | | | |
| 2725 | Pylon / Monument Sign | | | |
| 2750 | Site Storm Drainage | | | |
| 2800 | Slab Concrete | | | |
| 2850 | Striping | | | |
| 2875 | Temporary Power | | | |
| 2900 | Trash Enclosures | | | |
| 2950 | Utilities | | | |
| 2975 | Power to Site | | | |
| | **TOTAL SITE WORK** | | | |

| | | | | |
|---|---|---|---|---|
| | **SHELL CONSTRUCTION** | | | |
| 3025 | Awnings | | | |
| 3050 | Building Security Lighting | | | |
| 3075 | Canopy Lighting | | | |
| 3085 | Contractor Overhead | | | |
| 3100 | Doors / Hardware | | | |
| 3125 | Drywall | | | |
| 3150 | Electrical | | | |
| 3175 | Fire Alarm | | | |
| 3200 | Fire Sprinklers | | | |
| 3225 | Framing | | | |
| 3250 | HVAC | | | |
| 3275 | Insulation | | | |
| 3300 | Insurance Risk – Builder | | | |
| 3310 | Legal Services | | | |

EXHIBIT B - 2
(rev 0506)

| | | | | |
|------|-------------------------------|---|---|---|
| 3325 | Masonry / CMU | | | |
| 3350 | Overhead Doors | | | |
| 3375 | Plumbing | | | |
| 3400 | Roof | | | |
| 3425 | Roof Insulation | | | |
| 3450 | Roof Ladders | | | |
| 3475 | Siding / Stucco / E.I.F.S. | | | |
| 3500 | Slab Concrete | | | |
| 3525 | Storefront Glazing | | | |
| 3550 | Waterproofing / Caulking | | | |
| | *TOTAL SHELL CONSTRUCTION* | | | |
| | | | | |
| | *TENANT IMPROVEMENTS* | | | |
| 4025 | Alarms | | | |
| 4050 | Cabinets / Millwork | | | |
| 4075 | Concrete / Sawcutting | | | |
| 4085 | Contractor Overhead | | | |
| 4100 | Demolition | | | |
| 4125 | Door Frames / Hardware | | | |
| 4150 | Electrical | | | |
| 4175 | Equipment | | | |
| 4200 | Floor Covering | | | |
| 4225 | Finish Carpentry | | | |
| 4250 | Fire Sprinklers | | | |
| 4275 | Framing | | | |
| 4300 | Grease Traps | | | |
| 4325 | Grid & Ceiling Tile | | | |
| 4350 | HVAC | | | |
| 4375 | Insulation | | | |
| 4385 | Legal Services | | | |
| 4400 | Lighting | | | |
| 4425 | Painting / Wallpaper | | | |
| 4450 | Phones | | | |
| 4475 | Plumbing | | | |
| 4500 | Roofing | | | |

| | | | | |
|---|---|---|---|---|
| 4525 | Rough | | | |
| 4550 | Sheetrock | | | |
| 4575 | Trash Removal | | | |
| 4600 | Waterproofing / Caulking | | | |
| 4625 | Windows | | | |
| | *TOTAL TENANT IMPROVEMENTS* | | | |
| | | | | |
| | *TOTAL COSTS* | | | |

# EXHIBIT C

## REIMBURSABLE BUILDING MAINTENANCE FEES

## AND CONSTRUCTION MANAGEMENT FEE SCHEDULE

Reimbursable Building Maintenance Fees:

DBSI Realty shall reimburse Manager for fees related to building maintenance personnel in the amount of Thirty Five and No/100 Dollars ($35.00) per hour. Such fees related to building maintenance personnel shall not exceed the amount specified for this service in the Approved Budgets without the prior written approval of DBSI Realty.

Construction Management Fee Schedule

DBSI Realty shall pay to Manager the construction management ("CM") fees on the following graduated scale:

| Total Project Cost of Projects | Applicable Fee |
|---|---|
| (a) up to $10,000 | no fee |
| (b) $10,001 up to $100,000 | 5% |
| (c) $100,001 up to $200,000 | 4% |
| (d) $200,001 up to $350,000 | 3% |
| (e) greater than $350,000 | fee to be negotiated |

Manager shall be paid at the end of construction after providing the following items to DBSI Realty: (1) final unconditional lien waivers from the general contractor and all major subcontractors; (2) construction drawings, including architectural, structural, and MEP's; (3) copies of building permit(s) and inspection documents; (4) if applicable, a Certificate of Occupancy; and (5) a signed Certificate of Substantial Completion.

These fees apply to all or any portion of the project cost on a graduated basis, i.e., on a project costing a total of $150,000, the CM fee will be calculated as follows:

$10,000 – No Fee
$90,000 – 5% fee = $4,500.00
$50,000 – 4% fee = $2,000.00

$150,000 Total Fee = $6,500.00

EXHIBIT C
*(rev 0905)*