UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

JUDGE PETER J. WALSH

824 MARKET STREET
WILMINGTON, DE 19801
(302) 252-2925

March 26, 2009

Richard L. Schepacarter
Assistant U.S. Trustee
Office of the U.S. Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

**Re: DBSI, Inc., et al.**
    **Case No. 08-12687**

Dear Mr. Schepacarter:

This letter addresses two issues that I would like to see the United States Trustee address.

Debtors acknowledge that "[t]hese chapter 11 cases are unique and complex in many respects." (Doc. # 2495, p. 2.) With respect to DBSI's and its related entities' real estate interests, the business falls into two separate groups: (1) the TIC properties with a DBSI entity acting as the seller of the property and another DBSI entity being the master lessee ("TIC Debtors"); and (2) the DBSI entities not involved in the TIC operations but engaged in owning and operating real estate projects ("Non-TIC Entities"). The Debtors have acknowledged this in noting that "the Debtors and the Committee have separated the Debtors as being related to the

TIC Assets and the Non-TIC Assets . . . ."  (Id. at p. 3.) According to the Debtors, the Non-TIC Entities includes "certain Debtors and Non-Debtor Affiliates [who] are owners and developers of approximately 79 parcels of real property, which range in size and character from a single lot improved by one building to hundreds of acres of unimproved land." (Id. at pp. 5-6.)  Funds to purchase and develop these properties were raised in part from investors ("Noteholders").  According to the Debtors, these Noteholders hold general unsecured claims against DBSI Notes Affiliates and DBSI Notes Affiliates.  (Id. at p. 8.)

Among disputes between the TIC Debtors and the TIC owners, there is a sharp conflict between the TIC Debtors and the TIC owners as to whether certain "accountable reserves" constitute funds dedicated to specified uses and for which the appropriate DBSI entity is accountable to the TIC owners.  The position of the TIC owners is reflected in hundreds of letters that I have received from TIC owners complaining about the TIC Debtors' treatment of the "accountable reserves."  In contrast, the TIC Debtors' position is that the "accountable reserves" is a liability on the balance sheet of the DBSI master lessee and any assets that reflect that liability were paid to the selling DBSI entity and are freely available to that DBSI entity without restriction as to disposition.  In short, the TIC Debtors take the position that the "accountable reserves" represent merely general unsecured claims by

the TIC owners.  The Debtors' position on these reserves is set forth in detail in the March 12, 2009 letter from Foley & Lardner to me.  (Doc. # 2498.)  In their letters to me, many of the TIC owners attach excerpts from DBSI communications and documents in support of the position that the "accountable reserves" constitute some type of escrow or trust funds to which they are now entitled to as result of the termination of the master leases.[1]

You will recall from the March 13, 2008 hearing on the motion by the State of Idaho Department of Finance (the "State") to appoint an examiner that the State introduced as exhibits voluminous documents furnished to the TIC owners and constituting agreements and positions of the TIC Debtors.  To illustrate the points made by the TIC owners, I bring to your attention the following portions of the State's Exhibits:

> Accountable reserves for tenant improvements, leasing commissions and Capital Expenses will be repaid to the Purchasers to the extent not used in the operation of the Property.

---

[1] I must confess that I am somewhat confused about Foley & Lardner's explanation as set forth in their March 12, 2009 letter.  In paragraph number 4 of the letter Foley & Lardner states that "DBSI entered the Master Lessee's obligation to return the accountable reserve as a liability on the balance sheet of such Master Lessee."  Then in paragraph 10 of the letter Foley & Lardner states that "the portion of the property purchase price allocated to the accountable reserve was never deposited with the Master Lessee.  The cash was received by the DBSI seller of the property as part of the purchase price and used for general corporate purposes.  It was never intended for operation of the specific property.  A liability to return the reserve at the end of the Master Lease term was recorded on the Master Lessee's balance sheet." Query: Why does one return a reserve liability that the returnee already paid for in cash at the beginning of the venture?

(Ex. 26, p. 34.)

> Any initial reserves (including accountable reserves which are returned to the TIC investors if not used) could be considered "boot" and become taxable.

(Ex. 27, p. 42.)

> Accountable Reserves: All $750,000 of reserves should be made accountable meaning that the reserves will be returned to the TIC investors to the extent they are not used in the operation of the property.

(Ex. 27, p. 46.)

Where a DBSI seller of the TIC property has "accountable reserves" funds, did it have the right to transfer those funds to a Non-TIC Entities? The Debtors, through Foley & Lardner, say yes; the Committee, based on its silence, I assume agrees with Foley & Lardner. However, many TIC owners have asserted the right to those funds, not as general unsecured claimants, but as owners of those funds. If the TIC owners are correct, it would appear that they could pursue remedies (such as fraudulent conveyance, constructive trust, resulting trust or other theories) against any Non-TIC Entities that may have received "accountable reserves" funds. Thus, there appears to be a conflict of interests between the TIC owners and the unsecured creditors (including Noteholders) of the Non-TIC Entities.

Given this apparent conflict, I question whether the present creditors committee can represent both groups. You may recall that at the March 13, 2009 hearing I commented that the

5

composition of the Committee may be unbalanced. Accordingly, I ask you to consider, either on your own or at the behest of a party in interest, seeking an order to dissolve the existing creditors committee and to create two separate committees, one representing claimants other than TIC owners and the other representing the TIC owners.

On a related matter, information has come to my attention as to whether Foley & Lardner should be acting as special counsel to the Debtors on "accountable reserves" issue.

On December 1, 2008, the Debtors filed an application seeking to retain Foley & Lardner as special corporate and litigation counsel. (Doc. # 362.) Neither the motion nor the affidavit attached thereto makes any reference to the nature and extent of Foley & Lardner's prepetition work for the Debtors. Indeed, the declaration attached to the motion states:

> Based on the Conflicts Investigation search conducted by Foley of the entities listed on Exhibit 1 attached hereto, to the best of my knowledge, neither I, Foley, nor any partner, counsel or associate thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, or any other parties-in-interest, or their respective attorneys and accountants, and the United States Trustee or any person employed in the Office of the United States Trustee, except as listed in <u>Exhibit 2</u> attached hereto.

(Declaration ¶ 10.) Neither Exhibit 1 nor Exhibit 2 identifies the Debtors.

6

In examining the State's Exhibit 26, I discovered that Foley & Lardner rendered a tax opinion for certain tax issues set forth in the Private Placement Memorandum of DBSI North Stafford ("PPM"). The focus of that opinion is to justify the IRC Section 1031 application for non-recognition of income on an exchange of like kind property. While the opinion does not endorse or "bless" the proposed transaction reflected in the PPM, the opinion does state, in bold letters: "This opinion was written to support the promotion or marketing of the transactions contemplated by and described in the memorandum." (Ex. 26, p. G-2.)

Given my view that there appears to be a conflict between the TIC owners and the interest of the Noteholders (and other general unsecured claimants) in the Non-TIC Entities, I am concerned that, given Foley & Lardner's role in the prepetition promotion of one or more of the TIC ventures, its role in now representing the estates may be compromised. I believe it would be appropriate for the United States Trustee's Office to examine this issue with Foley & Lardner.

                                  Very truly yours,

                                  Peter J. Walsh

PJW:ipm

cc:  Michael R. Nestor
     Donald J. Detweiler
     Stephen I. Burr