**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DBSI, INC., et al., | ) |
| | ) Case No. 08-12687 (PJW) |
| | ) |
| Debtors. | ) Jointly Administered |

## MEMORANDUM OPINION

James L. Patton, Jr.
Michael R. Nestor
Joseph M. Barry
Robert F. Poppiti, Jr.
Young Conaway Stargatt &
Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Counsel to Debtors and
Debtors in Possession

Tobey M. Daluz
Ballard Spahr Andrews &
Ingersoll, LLP
919 N. Market Street
12th Floor
Wilmington, DE 19801

Martin P. Pelster
Croker, Huck, Kasher,
DeWitt, Anderson &
Gonderinger, L.L.C.
2120 South 72nd Street
Suite 1200
Omaha, NE 68124

Counsel to TD Ameritrade
Service Company and TD
Ameritrade Holding
Corporation

Neil B. Glassman
Charlene D. Davis
Jamie L. Edmonson
Bayard, P.A.
222 Delaware Ave., Suite 900
Wilmington, DE 19801

James Waggoner
Timothy M. Dozois
Nicholas Kampars
Davis Wright Tremaine
1300 S.W. 5th Ave., Suite 2300
Portland, Oregon 97201

Counsel to ACI Omaha TIC
Owners

Dated: May 28, 2009

**WALSH, J.**  ꞏꞏꞏꞏꞏꞏ

      This opinion is with respect to the motion of DBSI Housing, Inc. ("DBSI Housing") to assume and assign the lease of the commercial office building located at 330 S. 108th Avenue in Omaha, Nebraska, commonly referred to as the "ACI Building." (Doc. # 1135.)  The lessee of the ACI Building, TD Ameritrade Services Company ("TD Ameritrade"), objects to the assumption and assignment.  (Doc. # 1187 and 1607.)  For the reasons set forth below, I will deny the motion to assume and assign.

      DBSI Housing's motion to assume and assign was filed as part of a combined motion of numerous Debtor entities to assume and assign a large number of unexpired non-residential real property leases.  (Doc. # 1135.)  This opinion relates only to DBSI Housing's motion contained therein.

**BACKGROUND**

      The ACI Building is owned by a group of tenant-in-common owners ("TIC Owners").  On August 25, 2004, DBSI Housing leased the ACI Building from the TIC Owners ("Master Lease").  On April 2, 2008, DBSI Housing, as Landlord, entered in a sub-lease for the ACI Building with TD Ameritrade, as Tenant, and TD Ameritrade Holding Corporation, as guarantor ("Lease").  (5/13/09 Hearing, ex. TDA-1.) The Lease contains the following pertinent provisions:

      (1) Section 5.2 provides that "[t]he Term of this Lease, and Tenant's obligation to pay Rent, shall commence on later of (i)

January 1, 2009, or (ii) four (4) months after Landlord's delivery of the Premises to Tenant." (Id. at p. 6.)

(2) Section 5.4.2 provides for an early occupancy period commencing on the later of September 1, 2008 or the date the premises are delivered by the Landlord to the Tenant for the purpose of effecting improvements TD Ameritrade intended to make to the premises ("Early Occupancy Period"). (Id. at p. 7.)

(3) Section 5.4.1 provides for a rent abatement period of three months beginning upon the commencement of the term of the Lease ("Rent Abatement Period"), but requires TD Ameritrade to be responsible for payment of all other monetary obligations under the Lease, which includes charges for common area maintenance, taxes, and insurance. (Id.)

(4) Section 26.3 provides that the Landlord is liable to the Tenant for any damages sustained by the Tenant as a result of the Landlord's failure to perform its obligations under the Lease. (Id. at p. 23.)

(5) Exhibit F of the Lease requires the Landlord to pay an amount not to exceed $1,939,743.75 for certain leasehold improvements ("Leasehold Improvement Allowance"). (Id. at pp. 40-41.)

On November 1, 2008, possession of the ACI Building was delivered to TD Ameritrade. (Doc. # 2497, p. 2, ¶ 5.) But for the intervening bankruptcy case initiated by DBSI Housing, the Early

4

Occupancy Period would have expired and the term of the Lease would have commenced on March 1, 2009, and the Rent Abatement Period would have expired on June 1, 2009. Accordingly, TD Ameritrade would have received seven months of occupancy with no rent obligation. As testified to by TD Ameritrade's witnesses at the evidentiary hearing on May 13, 2009, upon receiving possession of the ACI Building, TD Ameritrade intended to make $9 million in improvements that would require demolition of the entire interior of the ACI Building. TD Ameritrade had intended to begin demolition in November 2008. (Doc. # 2501, pp. 6-7; 5/13/09 Hearing.) Indeed, prior to DBSI Housing filing for bankruptcy, TD Ameritrade had incurred about $500,000 in design, engineering, and contractor fees related to its plan to make improvements. (5/13/09 Hearing, ex. TDA-7 and TDA-8.)

On November 10, 2008, DBSI Housing, together with the numerous other related Debtor entities (collectively, "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. Two days later, DBSI Housing moved to reject the Master Lease and Lease of the ACI Building. That motion was a part of a motion by DBSI Housing and related Debtors to reject a large number of unexpired non-residential real property leases and subleases, all of which were identified as unprofitable and detrimental to Debtors' overall business strategy and goals. (Doc. # 31.) The motion was revised

in subsequent pleadings, but rejection of the ACI Building Master Lease and Lease continued as a possibility.  Relying on the motion and its common law duty to mitigate damages under the Lease, TD Ameritrade immediately ceased demolition and construction activities on the ACI Building.  (Doc. # 2501, pp. 6-7.)

On December 18, 2008, Debtors proposed a procedure for selling Debtors' interests in various leases, including the Master Lease and Lease relating to the ACI Building.  Specifically, as to the ACI Building, DBSI Housing proposed that the Master Lease be assumed and assigned to the TIC Owners.  Through this assumption and assignment, the TIC Owners would assume the Lease as well, thereby becoming the Landlord under the Lease.  Pursuant to the Sales Procedure Order this Court entered on January 7, 2009 (Doc. # 1050), DBSI Housing served on TD Ameritrade a notice of possible assumption and assignment of the ACI Building Lease; this notice included a proposed cure amount of $1,939,743.75, the Leasehold Improvement Allowance.  (Doc. # 1135.)  On February 13, 2009, the TIC Owners delivered an Assumption and Assignment of Sublease Agreement with the assignee consisting of the TIC Owners.  As DBSI Housing proposed, under this agreement, the TIC Owners will assume DBSI Housing's rights and duties under the Master Lease and Lease. (5/13/09 Hearing, ex. TDA-25.)

On March 18, 2009, the Court conducted its first hearing on DBSI Housing's motion to assume and assign the Lease.  Based on

the evidence offered at that hearing, the Court denied the motion. (Doc. # 2893.)  On April 3, 2009, the TIC Owners filed a motion for reconsideration.  (Doc. # 3228.)  On April 29, 2009, the Court granted the motion for reconsideration and set May 13, 2009 as a date for conducting an evidentiary hearing.  Following that hearing, on May 21, 2009, the parties filed supplemental briefs.

If the Court approves DBSI Housing's motion for assumption and assignment, the TIC Owners propose to assume the ACI Building Lease and then assign the management of the ACI Building to a newly created entity to be funded and controlled by two distinct entities of Barclay Associates, LLC ("Barclay Associates").  (<u>Id.</u> at ex. TDA-100-109.)

As testified to by TD Ameritrade's witnesses at the May 13, 2009 evidentiary hearing, TD Ameritrade intended the ACI Building to be part of its new corporate campus, which it expected to contain five buildings, four of which required or will require substantial improvements or completely new construction. (5/13/09 Hearing, ex. TDA-2.)  TD Ameritrade had intended to renovate and build its campus in a specific order, with the ACI Building constituting Phase 2 of its plan.  (<u>Id.</u>)  As it could not proceed with the demolition and reconstruction of the ACI Building on schedule because of DBSI Housing's express indication that it intended to reject the Lease, TD Ameritrade adjusted its campus renovation and construction plan, and re-allocated its internal

resources pursuant to its revised plan.  If the Lease is assumed and assigned, based on its revised plan, TD Ameritrade would be able to begin its previously planned demolition as of January 2010, and its employees would be able to assume occupancy of the renovated ACI Building in June 2010.  (5/13/09 Hearing; Doc. # 3618, pp. 13-14.)

Pursuant to its revised plan, a portion of the employees originally intended to be housed in the ACI Building will be relocated indefinitely to a facility in Forth Worth, Texas.  The total cost expected to be incurred by TD Ameritrade to move and accommodate these 110 employees to Fort Worth is $496,800.  These expenses include providing the relocated employees with furniture, computer equipment, and telecommunications equipment, among other things.  (5/13/09 Hearing; Doc. # 3618, p. 19.)

Similarly, pursuant to its revised plan, TD Ameritrade temporarily moved thirty other employees it originally intended to move to the ACI Building to a different location.  In moving these employees, TD Ameritrade was able to forego renewing or extending a lease on the portion of a building that housed these thirty employees.  These employees will need to be moved a second time to the ACI Building in June 2010 if the Lease is assumed and assigned.  TD Ameritrade estimates the additional expense of moving these thirty employees twice instead of once to be $800 per employee, or $24,000 in total.  (5/13/09 Hearing; Doc. # 3618, p. 18.)

Further, TD Ameritrade was required to renew its lease on a portion of a building ("Meyers Building") that currently houses some of the employees it had intended to move to the ACI Building. If TD Ameritrade had started demolition on schedule in November 2008, its prior lease on the Meyers Building would have expired in July 2009, shortly after it planned to finish relocating its employees in the Meyers Building to the ACI Building.  (5/13/09 Hearing; Doc. # 3618, pp. 17-18.)  The monthly rent on its renewed two-year lease is $17,911.12.   (5/13/09 Hearing, ex. TDA-3, § 3.02.)

Additionally, TD Ameritrade will need to "reprogram" the ACI Building according to its revised needs because its plan for the ACI Building has changed significantly as a result of the delay caused by DBSI Housing's decision to reject the Lease.   TD Ameritrade will incur $88,700 in "reprogramming" costs. (5/13/09 Hearing, ex. TDA-18; Doc. # 3618, p. 18.)

On January 20, 2009, TD Ameritrade filed an objection to the assumption and assignment of the ACI Building Lease. (Doc. # 1187.)   On February 9, 2009, TD Ameritrade filed a revised objection to the assumption and assignment.  (Doc. # 1607.)   TD Ameritrade asserts that it has incurred or will incur significant damages as a result of DBSI Housing's failure to perform its obligations under the Lease and TD Ameritrade's inability to utilize the ACI Building as anticipated.

In addition to the expenses outlined above, TD Ameritrade has paid, in the form of a credit to its initial deposit of $71,671 with DBSI Housing, for common area maintenance ("CAM") charges in the amount of $16,250 per month for three months, and for utilities for the ACI Building from November 2008 through May 2009 in the amount of $20,172.47. Also, TD Ameritrade asserts that it is entitled to the benefit of the Early Occupancy Period and Rent Abatement Period. Thus, pursuant to the Lease and based on when it would have taken possession of and begun demolition on the ACI Building, TD Ameritrade calculates that if it is able to begin demolition in January 2010, it should be reimbursed for, or not required to pay rent through July 2010. Similarly, TD Ameritrade asserts that it should be reimbursed for, or not required to pay CAM charges through April 2010. (5/13/08 Hearing; Doc. # 3618, pp. 15-16.) TD Ameritrade asserts that, in accordance with 11 U.S.C. §§ 365(b) and (f), the Lease may only be assumed and assigned if TD Ameritrade is reimbursed for these pecuniary losses.

To cover the cure amount and reimburse TD Ameritrade for the pecuniary losses, the TIC Owners have located financing through an entity of Barclay Associates, which has agreed to provide funding of up to $6.5 million in the form of a loan. This loan carries a 13% per annum interest rate, with interest payable monthly. (5/13/08 Hearing, ex. TDA-100-109.) Barclay Associates, through a different, distinct entity, will assume management of the

ACI Building.  In addition to the loan, this entity of Barclay Associates will have access to $560,000 in "silo" cash.  (Doc. # 3615, p. 18.)   Thus, Barclay Associates will have access to $7,060,000 in total.  From this amount, it also will have to pay $3,473,254.31 to pay off a mortgage loan held by a senior lender,[1] $22,745.92 in interest on the balance of the mortgage,[2] and approximately $245,000 in real estate taxes, transactional expenses, and property expenses.[3]  After paying the balance and interest on the mortgage loan, other expenses, and the agreed upon cure amount, it will have $1,379,256.02 ($7,060,000 minus $5,680,743.98) to reimburse any pecuniary losses the Court finds TD Ameritrade is owed, as well as to provide adequate assurance, as required pursuant to 11 U.S.C. §§ 365(b) and (f), that it will be able to fund other potential future expenses.

---

[1] This amount is calculated pursuant to the figures included in the May 12, 2009 letter to Barclay Associates from Capmark Finance, Inc., the special servicer of the mortgage loan.  (5/13/09 Hearing, ex. ACI-105.)

[2] Pursuant to the May 12, 2009 letter to Barclay Associates from Capmark Finance, beginning May 13, 2009, interest will be added to the mortgage balance at $1,421.62 per diem until the calculated payoff is received.  (5/13/09 Hearing, ex. ACI-105.)  This amount is 16 days (May 13 - May 29) of interest at $1,421.62 per diem.

[3] Though not included in the initial submissions as to the expenses associated with the assumption and assignment of the ACI Building Lease (see, e.g., 5/13/09 Hearing, ex. ACI-106), this amount is included in the TIC Owners' supplemental submission in support of DBSI Housing's motion to assume and assign, and is identified as an expense that the entity to which the Lease is assigned will need to pay.  (Doc. # 3615, p. 18.)

At the conclusion of the May 13, 2009 evidentiary hearing, the Court asked the parties to submit supplemental briefs as to TD Ameritrade's pecuniary losses and as to adequate assurance of future performance. (Doc. # 3615 and 3618.) In addition to its supplemental brief in support of DBSI Housing's motion to assume and assign, the TIC Owners submitted a declaration with exhibits attached that were not presented as evidence during the hearing. (Doc. # 3616.) A party is not allowed to present additional evidence after an evidentiary hearing is completed. Significantly, TD Ameritrade was not provided an opportunity to cross-examine the declarant, nor was TD Ameritrade provided an opportunity to object to the evidentiary basis of the email attached as an exhibit. Accordingly, these documents, and the arguments based upon them, will not be considered by the Court.

## DISCUSSION

Pursuant to 11 U.S.C. § 365(b)(1), if there has been a default under an unexpired lease of a debtor and the debtor wants to assume and assign the lease, the debtor must: (A) cure the default, or provide adequate assurance that it will promptly cure the default; (B) compensate, or provide adequate assurance the it will promptly compensate, the non-debtor party to the lease for any actual pecuniary loss resulting from the debtor's default; and (C) provide adequate assurance of future performance under the lease. The purpose of § 365(b)(1) is "to restore the 'debtor-creditor

relationship . . . to pre-default conditions,' bringing the [loan] back into compliance with its terms." In re U.S. Wireless Data, Inc., 547 F.3d 484, 489 (2d Cir. 2008) (quoting In re Taddeo, 685 F.2d 24, 26-27 (2d Cir. 1982) and citing 3 Collier on Bankruptcy § 365.05[3], 365-54 (15th ed. rev. 2008)).

TD Ameritrade has been unable to utilize the ACI Building as anticipated by both parties to the Lease at the time it was executed.  DBSI Housing filed a motion to reject the Lease two days after filing the bankruptcy petition.  (Doc. # 31, ex. B, p. 6.) TD Ameritrade intended to make $9 million of tenant improvements to the ACI Building, for which it would have been reimbursed for only $1,939,743.75 pursuant to the Tenant Improvement Allowance. Moreover, TD Ameritrade had not begun demolition on the ACI Building; this demolition would have resulted in the complete gutting of the interior of the ACI Building.  Under these circumstances, it would have been foolhardy on the part of TD Ameritrade to continue with the tenant improvements or to otherwise believe that all its rights under the Lease would be preserved and be enforceable.  Thus, I conclude that TD Ameritrade was entitled to stop tenant improvements and wait for DBSI Housing's bankruptcy case to unfold.

Further, I also conclude that TD Ameritrade was entitled to adjust its campus renovation and construction plans to prioritize the renovation of other buildings.  TD Ameritrade's

witnesses testified sufficiently to establish the reasonableness of re-allocating its internal and external resources, both personnel and financial, to the other buildings such that returning to the demolition and renovation of the ACI Building cannot begin until January 2010.  Just as TD Ameritrade was not required to continue its demolitions plans when DBSI Housing filed for bankruptcy and indicated that the ACI Building Lease would be rejected, neither was TD Ameritrade required to proceed according to construction timetables that no longer efficiently utilized its internal and external resources.

Accordingly, TD Ameritrade must be compensated and provided with the adequate assurance pursuant to § 365(b)(1).  DBSI Housing and TD Ameritrade disagree as to the actual pecuniary loses under § 365(b)(1)(B), and whether, pursuant to the funding, the TIC Owners and Barclay Associates can provide TD Ameritrade adequate assurance of future performance under § 365(b)(1)(C).

Pecuniary Losses

Under § 365(b)(1)(B), a non-debtor party to a lease is entitled to any element of actual pecuniary loss resulting from the debtor's default that it is able to prove, that is authorized by the parties' agreement, and that is reasonable.  See, e.g., In re Joshua Slocum, Ltd., 103 B.R. 601, 605 (Bankr. E.D. Pa. 1989).  Pursuant to § 26.3 of the Lease, TD Ameritrade is entitled to recover any damages sustained as a result of DBSI Housing's

default.    (5/13/09 Hearing, ex. TDA-1, p. 23.)    As noted, the
purpose of § 365(b)(1) is to restore parties to the position they
would have been in had a debtor not defaulted.    I find that in
order to restore TD Ameritrade to the position it would have been
in had DBSI Housing not filed for bankruptcy and indicated that the
Lease would be rejected, TD Ameritrade must be reimbursed the
following expenses, for each of which TD Ameritrade has met its
burden of proof.

### 1. Fort Worth "Restacking" Expense

With respect to the $496,800 expense for "restacking" the
Fort Worth building to accommodate the employees that otherwise
would have been moved to the ACI Building as scheduled, TD
Ameritrade's witnesses amply testified as to the expenses
associated with reconfiguring the Fort Worth building.    Based on
the testimony, I find that $5,000 per employee in furniture,
computer, telecommunications, and other expenses is reasonable.
Further, TD Ameritrade's witness confirmed that this expenditure
was caused solely by the delay in going forward with the occupancy
of the ACI Building.    Accordingly, in order to restore TD
Ameritrade to the position it would have been in had DBSI Housing
not defaulted under the Lease, TD Ameritrade must be reimbursed the
$496,800 in Fort Worth "restacking" expenses.

### 2. Expense To Temporarily Relocate 30 Employees

With respect to the $24,000 expense to temporarily relocate thirty employees to a different location in lieu of renewing or extending a lease on a portion of a building, TD Ameritrade's witnesses similarly amply testified as to the expenses associated with the temporary move. Based on the testimony, I find that the $800 per employee in relocation expenses is reasonable, especially in light of the fact that it saved additional rent expenses. Further, TD Ameritrade's witness confirmed that this expenditure was caused solely by the delay in going forward with the occupancy of the ACI Building. Accordingly, in order to restore TD Ameritrade to the position it would have been in had DBSI Housing not defaulted under the Lease, TD Ameritrade must be reimbursed the $24,000 in expenses to temporarily relocate thirty of its employees.

### 3. Meyers Building Lease

With respect to TD Ameritrade's decision to renew the lease on a portion of the Meyers Building for two years, I find that TD Ameritrade's witnesses amply testified to the reasonableness of renewing that portion of the lease. The employees housed in the portion of the Meyers Building on which the lease was extended were sufficiently specialized -- requiring expensive technology and other interfaces -- for it to be more expensive for TD Ameritrade to attempt to locate them elsewhere temporarily.

The Meyers Building lease was scheduled to expire July 2009. Pursuant to the two-year lease extension, the lease now will expire July 2011. I find that TD Ameritrade should be reimbursed for the months TD Ameritrade's employees will not occupy the Meyers Building, but for which TD Ameritrade will need to pay rent pursuant to the lease renewal.

As testified to by TD Ameritrade's witnesses, TD Ameritrade will be able to move its employees to the ACI Building in June 2010. Thus, TD Ameritrade will need to pay rent on the Meyers Building for a full year (12 months) even though its employees will not be utilizing the Meyers Building. The rent on the Meyers Building is $17,911.12 per month; a full year of rent is $214,933.44. Obviously, this expenditure was caused solely by the delay in going forward with the occupancy of the ACI Building. Accordingly, in order to restore TD Ameritrade to the position it would have been in had DBSI Housing not defaulted under the Lease, TD Ameritrade must be reimbursed the $214,933.44 in Meyers Building rent payments.

### 4. ACI Building "Reprogramming" Expenses

With respect to the $88,700 expense to "reprogram" the ACI Building, I find that TD Ameritrade's witnesses amply testified to the necessity of the expense. When DBSI Housing filed for bankruptcy and indicated that the ACI Building Lease would be rejected, TD Ameritrade was entitled to stop its demolition plans

and adjust its campus renovation plans. In so doing, TD Ameritrade's plans for the ACI Building necessarily changed. This change required the ACI Building to be "reprogrammed." As confirmed by TD Ameritrade's witnesses, this expenditure was caused solely by the delay in going forward with the occupancy of the ACI Building. Accordingly, in order to restore TD Ameritrade to the position it would have been in had DBSI Housing not defaulted under the Lease, TD Ameritrade must be reimbursed the $88,700 in ACI Building "reprogramming" expenses.

### 5. CAM and Utilities Charges

With respect to the $48,750 in CAM charges that were deducted from TD Ameritrade's deposit with DBSI Housing and the $20,172.47 that TD Ameritrade paid for utilities while TD Ameritrade did not occupy the ACI Building, I find that TD Ameritrade's witnesses established the reasonableness of the reimbursement of these two expenses. As I have found, TD Ameritrade was entitled to forego assuming occupancy of the ACI Building on schedule and to readjust its schedule such that it will not assume occupancy of the building until January 2010. TD Ameritrade should not be required to pay for CAM and utilities charges in a building it was not able to occupy solely because of DBSI Housing's decision to reject the Lease. Accordingly, in order to restore TD Ameritrade to the position it would have been in had

DBSI Housing not defaulted under the Lease, TD Ameritrade must be reimbursed the $68,922.47 in CAM and utilities charges.

### 6.  Total Pecuniary Loss

Thus, in total, I find that TD Ameritrade is entitled to be reimbursed for pecuniary losses pursuant to § 365(b)(1)(B) as follows:

| | |
|---|---:|
| Fort Worth "Restacking" | 496,800.00 |
| 30 Employees Relocation | 24,000.00 |
| Meyers Building Lease | 214,933.44 |
| ACI Building "Reprogramming" | 88,700.00 |
| CAM and Utilities Charges | 68,922.47 |
| Total Pecuniary Losses | 893,355.91 |

### 7. Early Occupancy and Rent Abatement Period

With respect to the Early Occupancy Period and Rent Abatement Period, I find that TD Ameritrade is entitled to what it bargained for when the Lease was executed on April 2, 2008. Pursuant to the Early Occupancy Period, the Lease was to commence on the later of (1) January 1, 2009 or (2) four months after TD Ameritrade was delivered possession.  (5/13/09 Hearing, ex. TDA-1, p. 7.)  Possession was delivered on November 1, 2008; thus, the Lease commenced on March 1, 2009, four months after TD Ameritrade assumed occupancy.  In addition, pursuant to the Rent Abatement Period, TD Ameritrade was entitled to an additional three months of occupancy during which it did not pay rent.  (Id.)  Hence, the rent was scheduled to start on June 1, 2009, seven months after TD Ameritrade assumed occupancy.  But for DBSI Housing's decision to

reject the Lease, upon assuming occupancy of the ACI Building, TD Ameritrade would have not paid CAM charges or other expenses required by the terms of the Lease for four months, and would not have paid rent for seven months.

TD Ameritrade is entitled to this same benefit if it assumes occupancy of the ACI Building in January 2010. Accordingly, I find that TD Ameritrade is not required to pay CAM charges and other expenses required by the terms of the Lease until May 2010, four months after TD Ameritrade assumes occupancy of the ACI Building. Similarly, I find that TD Ameritrade is not required to pay rent until August 2010, seven months after TD Ameritrade assumes occupancy of the ACI Building.

<u>Adequate Assurance</u>

Once TD Ameritrade is reimbursed the $893,355.91 in pecuniary losses, the Barclay Associates' entity that will be managing the ACI Building will have $485,900.11 of the $6.5 million loan  in excess funds, as demonstrated in the following table.

| **Sources** | |
| --- | --- |
| Funds From Barclay Loan | $  6,500,000.00 |
| "Silo" Funds | 560,000.00 |
| Total Sources | 7,060,000.00 |

| **Uses** | |
| --- | --- |
| Balance of Senior Mortgage | 3,473,254.31 |
| Interest on Senior Mortgage | 22,745.92 |
| Leasehold Improvement Allowance | 1,939,743.75 |
| Taxes and Expenses | 245,000.00 |
| Pecuniary Losses | 893,355.91 |
| Total Uses | 6,574,099.89 |

**Excess Funds Available**                    $    485,900.11

       The Bankruptcy Code does not provide a definition of adequate assurance.  See In re Fleming Cos., 499 F.3d 300, 305 (3d Cir. 2007); Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001).  Based on legislative history, courts have turned to the Uniform Commercial Code for guidance as to the meaning of adequate assurance.  See Cinicola, 248 F.3d at 120 n.10; Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985).  The Uniform Commercial Code considers the adequacy of assurance to be based on commercial reasonableness; as such, courts have held that the term "adequate assurance" was intended to be given a practical, pragmatic construction.  See, e.g., Cinicola, 248 F.3d at 120 n.10; Richmond Leasing, 762 F.2d 1309-10; In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("The phrase 'adequate assurance of future performance,' . . . is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.").

       Generally, adequate assurance is considered to be something less than an absolute guarantee.  See, e.g., In re PRK Enters., Inc., 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999).  The particular facts and circumstances of each case are evaluated and taken into consideration to determine what constitutes adequate assurance.  See id. at 602; In re Carlisle, 103 B.R. at 538 ("Although no single solution will satisfy every case, the required

assurance will fall considerably short of an absolute guarantee of performance."). Accordingly, the facts and circumstances of the assumption and assignment of the ACI Building Lease must be evaluated to determine whether TD Ameritrade has been provided with adequate assurance of future performance as required by § 365(b)(1).

Based on the pecuniary losses and rent abatement that TD Ameritrade is owed, I find that adequate assurance of future performance has not been proven. As noted, once the Barclay Associates' entity that will be managing the ACI Building pays the balance and interest on the mortgage, the Leasehold Improvement Allowance, taxes and other expenses, and the $893,355.91 in pecuniary losses, it will have $485,900.11 to fund future expenses. In light of the fourteen month period during which TD Ameritrade would not be required to pay rent, this amount is insufficient to cover even the interest expense, payable monthly, on the $6 million of the $6.5 million loan which will need to be drawn. The interest rate on the loan is 13% per annum, which amounts to $780,000 a year, or $65,000 a month, in interest on $6 million. With interest of $65,000 a month, the new landlord will run out of funds within eight months, long before it will receive rent from TD Ameritrade.

Thus, under this scenario, there is no assurance of future performance by the landlord.

## CONCLUSION

For the reasons stated above, DBSI Housing's motion to assume and assign is denied.