**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DBSI, INC., et al., | ) |
| | ) Case No. 08-12687 (PJW) |
| | ) |
| Debtors. | ) Jointly Administered |

**MEMORANDUM OPINION**

Neal J. Levitsky
L. Jason Cornell
Seth A. Niederman
Fox Rothschild, LLP
919 N. Market Street
Suite 1300
Wilmington, DE 19801

Attorneys for The Plaza
at Ridgmar Trust

Donald J. Detweiler
Sandra G. M. Selzer
Dennis A. Meloro
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801

Michael H. Goldstein
Nathan A. Schultz
Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400 East
Santa Monica, CA 90404

Attorneys for Official Committee
of Unsecured Creditors

James L. Patton, Jr.
Michael R. Nestor
Joseph M. Barry
Robert J. Poppiti, Jr.
Young Conaway Stargatt &
Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

Attorneys for the Debtors
and Debtors in Possession

Dated: July 7, 2009

2

**WALSH, J**

This opinion is with respect to the motion brought by The Plaza at Ridgmar Trust ("Ridgmar Trust") seeking rejection of its lease, compelling allowance and immediate payment of administrative claims, or, in the alternative, seeking relief from the automatic stay. (Doc. # 1532.) For the reasons discussed below, the Court denies relief from the automatic stay, denies a portion of the administrative claims, and requests that the parties provide additional information as to the remaining administrative claims.

## BACKGROUND

Ridgmar Trust constitutes certain tenant-in-common owners ("TIC Owners") who entered into a master lease agreement ("Lease") with DBSI Housing, Inc. ("DBSI Housing") as to non-residential real property located at 6660 West Freeway 30 and 2400 Lands End Boulevard in Fort Worth, Texas ("Property"). Pursuant to the Lease, DBSI Housing collects rent from the commercial subtenants of the Property, pays various operating expenses of the Property, and holds funds in escrow to pay real estate taxes. As Lessee, DBSI Housing collects a management fee for these services, and pays rent to the TIC Owners, as Lessors.

Of pertinence, § 23 of the Lease provides:

> Upon the occurrence of any event of default set forth in this Lease, Lessor shall have the option, in its sole discretion, to pursue any one or more of the following remedies without any notice or demand to the Lessee: (a) Terminate this Lease, in which event Lessee

> shall  immediately  surrender  the  Leased
> Premises to Lessor . . . .

(Doc. # 3437, ex. A, p. 13.)  "Event of default" includes the
Lessee failing "to pay within 5 days of when due any installment of
Rent or any other payment . . . ."  (Id. at p. 13, § 22(a).)
Section 33 of the Lease states: "[a]ny notice or document required
or permitted to be delivered by this Lease shall be deemed to be
delivered (whether or not actually received) when deposit[ed] in
the United States mail, postage prepaid, certified mail, return
receipt requested, addressed to the parties at the respective
addresses" listed in the Lease.  (Id. at p. 16.)  The agreement
executed by the TIC Owners provides, in pertinent part, that all
decisions regarding the Property, except those explicitly outlined,
"may be approved by the Tenants In Common who own more than fifty
percent (50) of the [Property]."  (Id. at ex. E, p. 3, § 5.1.)

Pursuant  to  a  letter  mailed  in  accordance  with  the
requirements of the Lease, on November 3, 2008, Ridgmar Trust
terminated the Lease due to DBSI Housing's non-payment of the
monthly rent obligation for more than five days.  (Id. at ex. B.)
That letter specified that the termination was agreed to by TIC
Owners owning 64% of the Property.  (Id.)

On  November  10,  2008,  DBSI  Housing,  together  with
numerous related entities (collectively "Debtors"), filed voluntary
petitions for relief under Chapter 11 of the Bankruptcy Code, 11
U.S.C. §§ 101 et seq.  On November 18, 2008, Debtors sent a letter

to Ridgmar Trust stating that Debtors did not believe the Lease was validly terminated.  (Doc. # 3437, ex. D.)

On November 12, 14, and 18, 2008, Debtors filed their First, Second, and Third Rejection Motions (collectively "Rejection Motions").  (Doc. # 31, 63, and 88.)  These Rejection Motions sought to reject certain non-residential real property leases, including the Lease, which Debtors continued to treat as not validly terminated.  On February 4, 2009, the Court entered an order granting authority for Debtors to reject certain unexpired leases of non-residential real property, including the Lease. (Doc. # 1678.)  Pursuant to that order, the Lease was rejected effective January 30, 2009.

Shortly after filing its petition, Debtors sought an order from this Court to use cash collateral.  The Court entered a series of orders ("Cash Collateral Orders") authorizing Debtors to use cash collateral to continue to manage certain properties pursuant to existing master leases, such as the Lease.  (Doc. # 519, 677, 993, and 1005.)  The Cash Collateral Orders provided that Debtors were authorized to pay, to the extent of available cash, and in order of the following priority, as applicable to Ridgmar Trust:  ordinary course disbursements, chapter 11 legal and administrative expenses, taxes, asset management fees, and tenant property improvements.  (Doc. # 3437, pp. 18-19.)  Additionally, the owners of each property were required to pay to Debtors an

apportionment fee of $7,500 to cover the cost of the administration of Debtors' chapter 11 case. (Id. at p. 18.) DBSI Housing claims that the Property generated insufficient funds to fully cover this apportionment fee as well as other fees prescribed by the Cash Collateral Orders. Likewise, the Property generated insufficient funds to pay the rent called for by the Lease. (Id. at p. 17, n.8.)

On January 29, 2009, Ridgmar Trust filed the instant motion requesting: (1) that DBSI Housing be compelled to reject the Lease, (2) that DBSI Housing immediately be compelled to pay a requested administrative claim, or (3) in the alternate, that Ridgmar Trust be granted relief from the automatic stay. (Doc. # 1532.) As DBSI Housing subsequently rejected the Lease, the first request of the motion is moot. Since filing the motion, Ridgmar Trust has updated its administrative claim to request $258,743.79. The number consists of: (1) unpaid rent for November and December 2008 in a total amount of $49,286; (2) unpaid common area maintenance ("CAM") for November and December 2008 in a total amount of $26,372; (3) a five percent late charge on unpaid rent of $3,696.45; (4) a security deposit in the amount of $19,389.34; and (5) accountable reserves in the amount of $160,000. (Doc. # 3437, pp. 12-13.)

The merits of Ridgmar Trust's motion were argued before the Court on April 15, 2009. At the end of the hearing, the Court

requested that the parties fully brief the motion.  Ridgmar Trust
contends that 11 U.S.C. §§ 365(d)(3) and 503(b)(1) permit the Court
to order that the requested administrative claim be paid
immediately by DBSI Housing.  In the alternate, Ridgmar Trust
contends the Court should lift the automatic stay pursuant to 11
U.S.C. § 362(d)(1) so that Ridgmar Trust may pursue its right under
federal or state law.  (Doc. # 1532.)

In response, DBSI Housing argues that Ridgmar Trust
waived any § 365(d)(3) rights to payment of post-petition rent when
it and other TIC owners supported the Cash Collateral Orders.  DBSI
Housing further argues that the remainder of Ridgmar Trust's
administrative claim does not meet § 503(b)(1)'s requirements that
the expenses arise out of post-petition transactions and benefit
DBSI Housing's estate.  Even if some or all of the expenses are
found to constitute administrative claims, DBSI Housing argues that
immediate payment should not be allowed as it will upset the
priority scheme.  Finally, DBSI Housing asserts that Ridgmar Trust
has not met its burden as to relief from the automatic stay.  (Doc.
# 3437.)

**DISCUSSION**

Applicability of Section 365(d)(3)

Section 365(d)(3) provides in relevant part: "The trustee
shall timely perform all the obligations of the debtor, except
those specified in section 365(b)(2), arising from and after the

order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." Evident in this plain language, the section does not apply to expired or terminated leases; terminated leases cannot be assumed or rejected. See Collier on Bankruptcy ¶ 365.02[2] (15th ed. Rev. 2008) ("Section 365 applies only if the contract or lease is in existence at the commencement of the case. If the contract or lease has expired by its own terms or has been terminated under applicable law before the commencement of the bankruptcy case, there is nothing left for the trustee to assume or assign.").

Ridgmar Trust maintains that it validly terminated the Lease on November 3, 2008, seven days before DBSI Housing filed its bankruptcy petition; indeed, Ridgmar Trust previously has stated this position in five filings with this Court. (Doc. # 3437, p. 28; Doc. # 3648, p. 9.) To terminate the Lease, Ridgmar Trust was required to send a notice by certified mail, postage prepaid and return receipt requested, to DBSI Housing at the address listed in the Lease, which it did. (Doc. # 3437, ex. A, p. 16, § 33.) As soon as the letter was placed in the mail, the termination became effective. (Id.) Further, the requisite percentage of TIC Owners were in agreement as to the termination. (Id. at ex. B.) DBSI Housing has presented no evidence and made no arguments that the Lease was not terminated beyond the fact that Debtors sent a letter

8

to Ridgmar Trust contending that the Lease was not properly terminated. (Doc. # 3437, ex. D.)  That letter fails to state a reason why Debtors believed the Lease was not terminated. Accordingly, I find that the Lease was terminated prior to DBSI Housing filing its bankruptcy petition.  Thus, § 365(b)(3) does not apply to Ridgmar Trust's claimed administrative expenses.

        Even if § 365(d)(3) did apply, that section does not prescribe a penalty for its violation.  See In re Mr. Gatti's, Inc., 164 B.R. 929, 931 (Bankr. W.D. Tex. 1994) ("While [§ 365(d)(3)] expressly requires a debtor-tenant to timely perform all obligations accruing under the lease after commencement of the case, it fails to set out the landlord's remedies in the event of a default."); Collier on Bankruptcy ¶ 365.04[g] (15th ed. Rev. 2008).  Some courts automatically allow an administrative claim as the penalty for violating § 365(d)(3).  See, e.g., In re Schnitz, 293 B.R. 7, 10 (Bankr. W.D. Mo. 2003) ("To hold otherwise would be to give the debtor an incentive . . . to not comply with the prompt payment mandate of § 365(d)(3) if there is a chance the lease will be rejected and is at an above-market rental rate or if the debtor has not fully occupied the premises."); In re Worths Stores Corp., 135 B.R. 112, 114 (Bankr. E.D. Mo. 1991) ("The majority of courts appear to hold that § 365(d)(3) gives a lessor an administrative expense for lease obligations arising after the date of filing but before the earlier of the expiration of 60 days from filing or the

actual date of assumption or rejection of the lease."); In re Wingspread Corp., 116 B.R. 915, 926 (Bankr. S.D.N.Y. 1990) (holding that "irrespective of whether the payments required under the lease meet the usual requirements for administrative status, reasonableness and benefit to the estate, they are unconditionally due . . .").  In contrast, other courts specifically have stated that an administrative claim is not automatically allowed and have prescribed different penalties.  See, e.g., In re Southwest Aircraft Servs., Inc., 831 F.2d 848, 854 (9th Cir. 1987) cert denied, 487 U.S. 1206 (1988) ("Congress intended the bankruptcy courts to have the discretion to consider all of the particular facts and circumstances involved in each bankruptcy case and to decide whether the consequence of a violation of subsection (d)(3) should be forfeiture of the unassumed lease, some other penalty, or no penalty at all."); In re Mr. Gatti's, 164 B.R. at 946 ("This court however believes that Congress chose not to spell out the consequences of default under Section 365(d)(3), not because it believed that courts would somehow discern its intent to automatically allow an administrative or superpriority claim, but because it felt that the landlord's interest was now adequately protected by other provisions in the Code."); In re Telesphere Commun'cs., Inc., 148 B.R. 525, 531-32 (Bankr. N.D. Ill. 1992) (relying on § 105(a) to order payment of postpetition rent rather than relying on § 365(d)(3)).

        I agree with those courts that do not automatically allow
an administrative claim as the penalty for violation of §
365(d)(3).  Further, as outlined in detail by the court in In re
Mr. Gatti's, I believe that a correct reading of § 365(d)(3),
taking other Code provisions into consideration, is that the Code
provides alternative remedy provisions such that § 365(d)(3) should
not be read to provide for an administrative claim as a potential
penalty.  Rather, as I have stated in court on numerous occasions,
I now explicitly confirm that an appropriate remedy for a violation
of § 365(d)(3) is to cause the lease to be rejected in a timely
fashioned manner.  Of course, that remedy is mooted by the fact
that DBSI Housing has already rejected the Lease.

        Also as to § 365(d)(3), Debtors quote certain comments
from a January 7, 2009 hearing that they interpret as my view that
the Cash Collateral Orders waived the rights of TIC owners, such as
Ridgmar Trust, under § 365(d)(3).  This interpretation of my
remarks is incorrect.  The TIC owners temporarily may have
compromised their rights under § 365(d)(3) when they agreed to the
Cash Collateral Orders that did not provide for compliance with §
365(d)(3) such that the their leases were not rejected
automatically; however, at some point, Debtors could be required to
remedy that noncompliance.

Section 503(b)(1) Administrative Expenses

Though the Lease was terminated prior to DBSI Housing filing its bankruptcy petition, DBSI Housing continued to operate the Property as if the Lease remained in effect, including collecting rent from the commercial subtenants of the Property and paying operating expenses, thereby acting on the behalf of Ridgmar Trust's TIC Owners.

Courts generally apply a two-part test to determine whether a movant is entitled to the payment of administrative expenses: "(1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction." In re Waste Sys. Int'l, Inc., 280 B.R. 824, 826 (Bankr. D. Del. 2002) (citing In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 532-33 (3d Cir. 1999)). I find that the Cash Collateral Orders, which contain budgets as to each of the covered properties, including the Property, by which the Court specifically authorized DBSI Housing to utilize money as to Ridgmar Trust, and by which Ridgmar Trust consented to such use, constitutes a post-petition transaction necessary to establish the applicability of § 503(b)(1). (See also Doc. # 3293, ex. C (providing a detailed budget as to the Property covering a post-petition time period submitted by Ridgmar Trust).)

Pursuant to § 503(b)(1)(A), "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . .

including . . . the actual, necessary costs and expenses of preserving the estate." When seeking allowance of an administrative expense under § 503(b)(1), the movant bears the burden of establishing that its claim is an actual, necessary expense of preserving the debtor's estate. See, e.g., In re Goody's Family Clothing, Inc., 392 B.R. 604, 613-14 (Bankr. D. Del. 2008). See also In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("[P]riority claims are narrowly construed."); In re Enron, 279 B.R. 695, 704 (Bankr. S.D.N.Y. 2008) (noting that courts narrowly construe the terms "actual" and "necessary" in order to limit "administrative expense claims thereby preserving the estate to benefit all creditors"). If the movant fails to meet its burden of proof, the expense is a general unsecured claim. In re Continental Airlines, Inc., 146 B.R. 520, 526-27 (Bankr. D. Del. 1992).

Ridgmar Trust's claim breaks down into five categories: (1) rent, (2) CAM charges, (3) additional rent, (4) deposits, and (5) reserves. As to the additional rent, deposits, and reserves, these expenses did not arise out of a post-petition transaction. The deposits represent funds collected by DBSI Housing from commercial subtenants at the Property prior to their assuming occupancy, and, thus, clearly arise out of a pre-petition transaction. Similarly, the reserves were placed with DBSI Housing pre-petition. Further, the additional rent amount is a penalty for

DBSI Housing's failure to pay rent that accrued pre-petition; thus this amount too arose out of a pre-petition transaction.  All these claims are pre-petition claims under § 502(g).

As to the rent and CAM charges, these expenses occurred post-petition, in November and December 2008.  Obviously, the amount of rent and CAM charges that the TIC Owners did not receive for November and December 2008 resulted in an adverse financial impact on the TIC Owners.  However, that fact is not the equivalent of a benefit to DBSI Housing's estate.  It is unclear how these expenses may have benefitted DBSI Housing's estate.  Indeed, DBSI Housing claims that the continued management of the Property was detrimental to the estate: according to Debtors, the Property was too cash poor to pay the $7,500 apportionment fee and other fees outlined in the Cash Collateral Orders, creating an overall loss to DBSI Housing's estate of nearly $20,000.  (Doc. # 3437, p. 34.)  If insufficient funds were available for Debtors to pay the rent and CAM charges, DBSI Housing's estate necessarily did not benefit from the continued management of the Property, and, thus, the expenses do not meet the benefit requirement of § 503(b)(1).  For instance, if DBSI Housing merely paid expenses otherwise chargeable to the Property's TIC Owners, those expenditures benefitted the TIC Owners who would have been required to pay the expenses, and did not benefit DBSI Housing's estate.  If DBSI Housing is correct that the Property had insufficient funds, the only benefit to DBSI Housing's

estate -- and the only allowable administrative claim -- likely is the $7,500 apportionment fee, to the extent that the Property had funds to pay that fee.

Based on the current record, I cannot rule as to whether these expenses benefitted the estate. Accordingly, I am requesting that Ridgmar Trust and DBSI Housing submit an agreed statement of facts that outlines exactly what money was paid into the Property and what money was paid out as to the Property from the date of DBSI Housing's petition to January 30, 2009, detailing the amount and date of each payment, the payee, and to what obligation the payment related. If Ridgmar Trust and DBSI Housing cannot agree to a statement of facts, this information should be presented at an evidentiary hearing. After the statement of facts is submitted or a hearing is held, I will rule as to the allowable § 503(b)(1) administrative claim, if any, and the timing of payment of any allowed claim.

Lift of Automatic Stay

The purpose of the automatic stay provided by § 362 is three-fold: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." Borman v. Raymark Indus., Inc., 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting St. Croix

<u>Condominium Owners v. St. Croix Hotel</u>, 682 F.2d 446, 448 (3d Cir. 1982)).  Section 362(d)(1) permits the court to grant relief from the automatic stay "for cause."  The movant bears the initial burden to produce evidence that cause exists to grant relief from the automatic stay; if the movant meets its burden, then the burden shifts to opposing party.  <u>See, e.g.</u>, <u>In re Rexene Prods. Co.</u>, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

The term "cause" as used in § 362(d)(1) is undefined; courts have ruled that whether there is cause to lift the automatic stay  must be determined on a case-by-case basis.  <u>Id.</u> at 576. This Court has developed a three-part balancing test to evaluate whether cause exists in a specific case: "Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; [w]hether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and [t]he probability of the creditor prevailing on the merits."  <u>In re SCO Group, Inc.</u>, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (citing <u>In re Rexene Prods.</u>, 141 B.R. at 576)).  Courts also place emphasis on whether lifting the automatic stay will impeded the orderly administration of the debtor's estate.  <u>See, e.g.</u>, <u>In re Sonnax Indus., Inc.</u>, 907 F.2d 1280, 1285 (2d Cir. 1990) (quoting legislative history of the Bankruptcy Code for the rule that "[t]he lack of adequate protection of an interest in property is one cause for relief [from

the automatic stay] . . . . Other causes might include the lack of any connection with or interference with the pending bankruptcy case"); <u>Rich v. Maryland Nat'l Bank</u>, 42 B.R. 350, 354-55 (D. Md. 1984) (citing the same legislative history).

Granting Ridgmar Trust relief from the stay would cause significant prejudice to DBSI Housing's estate as it continues to resolve numerous outstanding disputes.  Indeed, it is unclear if and to what extent DBSI Housing is administratively solvent; if the automatic stay is lifted, Ridgmar Trust may recover a greater percentage of its claims than similarly-situated creditors. Moreover, by lifting the stay, I may encourage a race to the courthouse by parties seeking similar orders, which will cause undue hardship and expense to the estate.  In contrast, Ridgmar Trust will suffer little prejudice if I do not lift the stay: they simply will have to wait a few extra months to recover an amount most likely well under $100,000.  This hardship obviously does not outweigh the hardship likely to be suffered by DBSI Housing's estate if the stay is lifted.  Accordingly, Ridgmar Trust's request for relief from the stay is denied.

## CONCLUSION

For the reasons stated above, the Court denies Ridgmar Trust's motion seeking relief from the automatic stay, the Court denies the portion of administrative claims outlined above, and the Court requests the parties to provide additional information as to

the remaining administrative claims either in the form of an agreed statement of facts or at an evidentiary hearing.