UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                          )      Chapter 11
                                )
DBSI, INC., et al.              )      Case No. 08-12687 (PJW)
                                )
        Debtors.                )      Jointly Administered
                                )
                                )

## MEMORANDUM OPINION

William R. Firth, III
Gibbons P.C.
1000 N. West Street, Ste. 1200
Wilmington, DE 19801-1058

Geraldine E. Ponto
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310

Counsel to Trustee,
James R. Zazzali

L. Jason Cornell
Fox Rothschild, LLP
Citizens Bank Center
919 N. Market St., Suite 1300
Wilmington, DE 19899-2323

Terry C. Copple
Alex P. McLaughlin
Davison, Copple, Copple &
Copple, LLP
Chase Capitol Plaza,Suite 600
199 N. Capitol Boulevard
P.O. Box 1583
Boise, ID 83701

Counsel to Bank of the Cascades

Donald J. Detweiler
Sandra G.M. Selzer
Dennis A. Meloro
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801

Michael H. Goldstein
Nathan A. Schultz
Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400 East
Santa Monica, CA 90404

Counsel to the Official
Committee of Unsecured
Creditors

Dated: May 12, 2010

**WALSH, J.** ⟨signature⟩

This opinion is with respect to four motions brought by Bank of the Cascades (the "Bank"), as Indenture Trustee for the holders of bonds issued by DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, and DBSI 2001C Funding Corporation (together, the "Funding Corporations"). Three of the motions seek entry of orders, pursuant to 11 U.S.C. § 362, lifting the automatic stay to allow the Bank to foreclose on its alleged collateral and exercise state law remedies (the "Lift Stay Motions"). (Doc. ## 3562, 3564, and 3567.) The remaining motion seeks a declaratory judgment that the Bank's actions with respect to seizure of funds in certain accounts do not violate the automatic stay (the "Declaratory Judgment Motion"). (Doc. # 4371.) For the reasons discussed below, I will deny the Lift Stay Motions and the Declaratory Judgment Motion.

**BACKGROUND**

In 2001, Farmers & Merchant State Bank ("F&M"), as Indenture Trustee, entered into a separate indenture agreement (collectively, the "Indentures") with each of the Funding Corporations. (Doc. # 4566, p. 3.) The Indentures contemplated that the Funding Corporations would issue bonds totaling $25,000,000 (the "Bonds"). (Doc. # 4566, p. 3.)

The Indentures also contemplated that the funds raised through the Bonds' sales would be loaned (the "Bond Loans") by the

3

Funding Corporations to DBSI Realty Corporation ("DBSI Realty").
Pursuant to the virtually identical terms of each Indenture, F&M
was to create several separate trust accounts for the benefit of
the bondholders to capture various amounts as they became due under
the Indentures and the Bond Loans.  (Doc. # 4371, ¶ 10.)  One such
account was the Bond Proceeds/Loan Repayment Account where F&M was
to deposit the proceeds from the sale of the Bonds and repayment of
the Bond Loans.  (Doc. # 4371, ¶ 10.)

　　　In 2001, UCC-1 financing statements related to the
Indentures (the "Indenture Financing Statements") were filed with
the Idaho Secretary of State.  (Doc. # 4371, ¶ 10.)  The Indenture
Financing Statements listed each Funding Corporation as the debtor
and F&M as the secured party. (Doc. # 4371, ¶ 10.)  The collateral
description in the Indenture Financing Statements included all of
the relevant Funding Corporation's interest in:

> (i) loans made to certain named DBSI
> partnerships or subsidiary partnerships that
> are 100% equitably owned and controlled by the
> named partnerships;
>
> (ii) all collateral pledged by the named
> partnerships (or subsidiaries) for said loans;
>
> (iii) all monies and securities held by F&M
> (later, the Bank) in any account created under
> the applicable Indenture;
>
> (iv) all property transferred, mortgaged,
> pledged or assigned as security for payment or
> performance of certain named DBSI partnerships
> (or subsidiaries) under said loans or loan
> collateral agreements; and

                    (v) all income, revenue, issues, proceeds,
                    revisions, substitutions, replacements, profits
                    and proceeds of and from the foregoing.

(Doc. # 4566, ex. B.)

        Investors ultimately purchased a total of $23,521,000 of
the available Bonds and, on December 31, 2004, the Bond Loans were
made.  (Doc. # 4371, ¶ 5-6.)  In connection with the Bond Loans, the
Funding Corporations and DBSI Realty executed certain Term Loan
Agreements and Fixed Interest Rate Promissory Notes, all dated
December 31, 2004.  (Doc. # 4566, p. 5.)  As consideration for the
Bond Loans, DBSI Realty executed security agreements (the "Master
Lease Security Agreements") that purported to grant each Funding
Corporation a security interest in DBSI Realty's interest as lessee
in certain master leases (the "Master Leases").  (Doc. # 4566, p.
5.)  As described below, it appears that DBSI Realty was not a party
to any of the Master Leases listed in the Master Lease Security
Agreements.  The Bond Loans were guaranteed by DBSI Housing, Inc.
(later, DBSI, Inc. by virtue of a name change) ("DBSI Housing").
(Doc. # 4371, ¶ 7.)

        The Master Lease Security Agreements were assigned to F&M
(the "Assignments") on the same day that they were executed.  (Doc.
# 4371, ¶ 8.)  Following a merger in 2006, the Bank succeeded to
F&M's rights under the Assignments, as well as F&M's rights and
duties as trustee under the Indentures.  (Doc. # 4566, p. 6.)

The Bank has not alleged that UCC-1 financing statements for either the Master Lease Security Agreements or the Assignments were filed with any state agency. The Indenture Financing Statements, however, were amended in 2005 (the "Amended Financing Statements"). (Doc. # 4566, p. 6.) The Amended Financing Statements changed the name of the debtor from the individual Funding Corporations to "DBSI Group of Companies" and expanded the collateral description to include:

> (i)  loans made to DBSI Realty and evidenced by a promissory note from DBSI Realty to DBSI Group of Companies;
>
> (ii) all collateral pledged by DBSI Realty for said loans;
>
> (iii) all monies and securities held by F&M (later, the Bank) under the Indenture and all interest, profits, proceeds or other income derived therefrom;
>
> (iv) all property transferred, mortgaged, pledged or assigned as security for payment or performance of DBSI Realty under said loans or loan collateral agreements; and
>
> (v) all income, revenue, issues, proceeds, revisions, substitutions, replacements, profits and proceeds of and from the foregoing.

(Doc. # 4566, ex.B.)

The Master Leases

Prior to the execution of the Indentures and continuing thereafter, various DBSI-affiliated companies, as lessors, entered into Master Leases with other DBSI-affiliated companies, as lessees.

(Doc. # 5078, ex. E-1 - E-10.)  DBSI Housing was often the lessee under the Master Leases, although in several instances other DBSI-affiliated companies were named as lessee.  (Doc. # 5078, ex. E-1 - E-10.)  DBSI Realty was not a party to the relevant Master Leases.  (Doc. # 5078, ex. E-1 - E-10.)  Nonetheless, by the Master Lease Security Agreements described above, DBSI Realty purported to convey security interests in various Master Leases to the Funding Corporations as collateral for the Bond Loans.  (Doc. # 4566, p. 3.)

The Master Leases required the lessees to record memoranda of the Master Leases (the "Master Lease Memoranda") in the real property records where the leased premises were located.  (Doc. # 5078, ex. E-1, ¶ 34.)  The recorded Master Lease Memoranda before the Court refer to specific Master Leases and provide the names of the lessors and lessees, but do not refer to F&M, the Bank, the Assignments, or security interests extrinsic to the Master Leases. (Doc. #5078, ex. E-1 - E-10.)

With the exception of base rent, each Master Lease contains substantially identical language, including provisions related to assignment and the lessor's lien rights.  (Doc. #5078, ex. E-1 - E-10.)  The Master Leases provide that the lessee (generally DBSI Housing) granted the lessor (a DBSI-affiliated company) a lien on all of the lessee's property on the leased premises and all sums collected from the lessee's sublessees.

(Doc. # 5078, ex. E-1, ¶ 19.)  The Master Leases do not, however, create or describe liens or security interests between parties other than the lessor and lessee.

The Debtors' Bankruptcy Filing and Post-Petition Events

On November 10, 2008 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

On November 12, 2008, the Bank issued notices of default to the Funding Corporations and DBSI Inc. (as successor to DBSI Housing) due to the Funding Corporations' failure to remit quarterly interest payments for October 2008.  (Doc. #4566, p. 6.)

On November 14, 2008, the Bank assumed control of the Bond Proceeds/Loan Repayment Accounts and applied the funds in such accounts to amounts the Bank alleged the Debtors owed it.  (Doc. # 4371, ¶ 11.)

On November 21, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").  (Doc. # 138.)  On September 11, 2009, this Court entered an Order appointing James R. Zazzali as Chapter 11 trustee (the "Trustee") for the Debtors' estates.  (Doc. # 4375.)

On May 15, 2009, the Bank filed the Lift Stay Motions seeking relief from the automatic stay to foreclose on its alleged

8

collateral and to exercise state law remedies.  (Doc. ## 3562, 3564, and 3567.)

On September 10, 2009, the Bank filed the Declaratory Judgment Motion seeking an order from this Court holding that the Bank had not violated the automatic stay by exercising control over the funds in the Bond Proceeds/Loan Repayment Account.  (Doc. # 4371.)

By the Lift Stay Motions, the Bank represented to this Court that it holds security interests in certain collateral, including the Funding Corporations' alleged interests in the Master Leases.  (Doc. # 3567, ¶ 10.)  The Bank further represented that such security interests are perfected by virtue of the filed Indenture Financing Statements.  (Doc. # 3567, ¶ 10.)  The Bank argues that relief from stay is necessary and appropriate because the Debtors have not made any payments under the Indenture since the Petition Date and allegedly have no equity in the collateral.  (Doc. # 3567, ¶¶ 21-30.)

By the Declaratory Judgment Motion, the Bank asserts that the funds in the Bond Proceeds/Loan Repayment Account were not property of the Debtors' estates and therefore the Bank could not have violated the automatic stay by draining the accounts after the Petition Date.  (Doc. # 4371, ¶¶ 22, 29.)

The Trustee and Committee object to the Lift Stay Motions and the Declaratory Judgment Motion. (Doc. ## 4436, 4445.)  They

argue that the Declaratory Judgment Motion is procedurally defective because declaratory relief relating to recovery of money or property must be requested through an adversary proceeding. (Doc. # 4436, ¶ 15; Doc. # 4445, ¶ 3.) They also allege that the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") compel such a result and that an adversary proceeding is the most efficient forum to determine the validity and extent of the Bank's security interest. (Doc. # 4436, ¶ 15; Doc. # 4445, ¶ 3.)

The Trustee also objects to the Lift Stay Motions and asserts that the Bank has failed to show that it has a perfected security interest in any collateral and what value should be assigned to that collateral. (Doc. # 4436, ¶¶ 21-22.) In addition, the Trustee asserts that the Master Lease Security Agreements are illusory because DBSI Realty is not a party to the Master Leases it purported to convey security interests in. (Doc. # 4436, ¶ 16.) Finally, the Committee contends that the Debtors have an interest in the funds inappropriately seized by the Bank from the Bond Proceeds/Loan Repayment Account. (Doc. # 4445, ¶ 3.)

The Court heard initial arguments on the Stay Relief Motions and the Declaratory Judgment Motion on September 30, 2009 and requested further briefing from the parties on the question of whether the Bank had a perfected security interest in the Master Leases. Thereafter, the Bank submitted a brief in further support of its motions (the "Supplemental Brief"). (Doc. # 4566.)

In the Supplemental Brief, the Bank argues that, due to the Debtors' corporate structure, DBSI Realty had authority to grant security interests in the Master Leases, despite the fact that it was not a party to the Master Leases. (Doc. # 4566, p. 2.) The Bank further alleges that the Indenture Financing Statements and Amended Financing Statements were sufficient to put the world on notice of its security interest in the Master Leases. (Doc. # 4566, pp. 16-19.)

Contemporaneously with the filing of its Supplemental Brief, the Bank filed a motion pursuant to Bankruptcy Rule 2004 (the "2004 Motion") requesting authority to subpoena certain of the Debtors' key employees for deposition. (Doc. # 4564.) The Court granted the relief requested in the 2004 Motion (Doc. # 4617) over objections from the Committee and the Trustee. (Doc. ## 4598, 4599.) The Committee's objection to the 2004 Motion (the "Omnibus Objection") also responds to the Supplemental Brief and requests that the Court deny the Lift Stay Motions as being moot. (Doc. # 4598.)

By the Omnibus Objection, the Committee argues, <u>inter alia</u>, that the Lift Stay Motions and the Supplemental Brief are premised on an erroneous application of Chapter 9 of Title 28 of the Idaho Code (the "Idaho Commercial Code") to the perfection of security interests in real property. The Committee contends that the Idaho Commercial Code specifically does not apply to the

"creation or transfer of an interest in or lien on real property, including a lease or rents thereunder . . . ."  Idaho Code Ann. § 28-9-109(d)(11).  (Doc. # 4598, p. 8.)

The Committee further argues that Chapter 8 of Title 55 of the Idaho Code governs the recording of transfers of interests in real property, such as the Master Leases.  Idaho Code Ann. § 55-808 (2009).  (Doc. # 4598, p. 9.)  That statutory provision, argues the Committee, requires recording of real property interests in the county where the real property is located.  (Doc. # 4598.)  Finally, the Committee requests that the Lift Stay Motions be denied as moot because the Debtors have sold, rejected, or assumed and assigned all of the Master Leases at issue and therefore the Debtors' estates no longer have an interest in the Master Leases.  (Doc. # 4598, pp. 10-11.)

Following the Court's review of the Omnibus Objection, the Court requested that the Bank respond in writing to the Committee's argument regarding the non-applicability of the Idaho Commercial Code to perfection of the Bank's alleged security interests in the Master Leases.  (Doc. # 4971.)

The Bank filed the requested response, asserting therein that at least nine of the Master Leases were recorded at the county level and therefore the Bank had a perfected security interest. (Doc. # 5078, p. 2.)  Thereafter, the Committee filed a limited response (the "Limited Response") pointing out that although the

Bank's pleadings may show that certain of the Master Leases were recorded at the county level, the Bank failed to allege that any interests of the Bank are reflected in filed documents.  (Doc. # 5145, pp. 2-3.)  The Committee argues that "because the Bank never recorded its purported interest in the Masterleases at the county level, the Bank cannot have a perfected interest in the Masterleases to serve as the basis for the [Lift] Stay Motions."  (Doc. # 5145, p. 3.)

The Bank then filed a reply to the Limited Response, therein arguing that (1) its security interests in the Master Leases are perfected by the recordation of the Master Leases despite the complete absence of any reference to the Bank, F&M, or the Assignments in the recorded documents; and (2) it has statutory liens pursuant to section 545(2) of the Bankruptcy Code.  (Doc. # 5158, pp. 2-5.)  The Court finds these arguments misleading and legally unfounded.

## JURISDICTION

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.  The predicate for the relief are 11 U.S.C. §§ 362(d) and Bankruptcy Rules 3001(d), 7001(1) and (9), and 7003.

## DISCUSSION

The Bank Has Not Shown That It Has A Valid Perfected Lien.

        The Bank seeks relief from the automatic stay pursuant to
section 362(d)(2) of the Bankruptcy Code for cause.  To establish
cause, the Bank must show that the "balance of hardships from not
obtaining relief tips significantly in [its] favor."  Atl. Marine
Inc. v. Am. Classic Voyages, Co. (In re Am. Classic Voyages, Co.),
289 B.R. 222, 225 (D. Del. 2003) (quoting In re FRG, 115 B.R. 72, 74
(E.D. Pa. 1990).  Prior to undertaking a hardship balancing
analysis, the Court must determine whether the Bank has made a prima
facie showing that it is entitled to the relief it seeks.  In re RNI
Wind Down Corp., 348 B.R. 286, 299 (Bankr. D. Del. 2006) (quoting In
re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994))
(finding that a prima facie case requires a movant to show "a
factual and legal right to the relief it seeks.").

        Here, the Bank has requested relief from the automatic
stay to foreclose on the Master Leases, which it has asserted are
its collateral.  As its prima facie case, the Bank must show that it
has a perfected security interest in the Master Leases that entitles
it to foreclose on the Master Leases if the stay is lifted.

        State law provides the basis for the Court's determination
as to whether a party has a perfected interest, which often requires
analysis of Uniform Commercial Code provisions.  Article 9 of the
Uniform Commercial Code, however, explicitly does not apply to the
"creation or transfer of an interest in or lien on real property,

including a lease or rents thereunder." U.C.C. § 9-109(d)(11). <u>See also In the Matter of Bristol Assocs., Inc.</u>, 505 F.2d 1056, 1060 (3d Cir. 1974) (finding that, under Pennsylvania law, the use of a lease as collateral for a loan was "exclude[d] from the filing and perfection provisions of Article 9 . . .").

It is widely held that security interests in leases must be recorded in the real property records of the county where the applicable real property is located. <u>See The Bus. Bank v. White, et al. (In re Timothy Dean Rest. & Bar)</u>, 342 B.R. 1, 29 (Bankr. D.C. 2006) (finding that "[b]ecause Article 9 does not apply to the creation of a security interest in real property, the Bank could only perfect its interest in the Lease by using District of Columbia law pertaining to real property."); <u>Weitzner v. Goldman (In re Kavolchyck)</u>, 154 B.R. 793, 802 (Bankr. S.D. Fla. 1993) (collecting cases and stating that, "security interests in leaseholds are excluded from coverage under the Florida UCC."); <u>In re Le Sueur's Fiesta Store, Inc.</u>, 40 B.R. 160, 162 (Bankr. D. Ariz. 1984) (finding that under Arizona law, a security interest in a lease must be recorded in the county real property records to be effective against third parties); 4 White & Summers, <u>Uniform Commercial Code</u> § 30-8 (6th ed. 2009) (stating that, "[o]ne wishing to take a security interest in [a lessee's interest in a leasehold] should use a mortgage and comply with real estate recording laws.").

The Bank has not alleged that its interests in the Master
Leases were recorded in the applicable real property records.
Instead, the Bank argues that "[t]he name of the debtor was located
on the [recorded] Memorandum of Leases" and therefore, "all third
parties inquiring into the Master Leases and, more specifically,
looking into whether a prior security interest existed thereon, at
least had constructive and/or reasonable notice of a prior security
interest." (Doc. # 5158, p. 4.)   This observation may be correct
to the extent that the Master Leases themselves created security
interests, but is not relevant to third party security interests
created by wholly separate documents.

At bottom, the Bank argues that because the Master Lease
Memoranda were recorded, under a "quantum of notice" theory, third
parties had constructive notice of any and all liens on the Master
Leases, regardless of whether the liens were described in the filed
memoranda. (Doc. # 5158, p. 3.)   This argument is not supported by
the cases cited by the Bank.

For example, the Bank cites Pinkus v. Union Trust Co., 111
B.R. 25, 26 (Bankr. D. Conn. 1990), where a Chapter 7 trustee sought
to avoid a mortgage that was silent as to the identity of the
mortgagee.  Applying Connecticut law, the court found that a valid
mortgage must disclose, "at a minimum, the nature and the amount of
the encumbrance . . . ."   Id. at 27.   The court noted the
purpose of the minimum disclosure requirement is to "prevent parties

that are not privy to the transaction from being defrauded or misled." Id. The court then found that the mortgage at issue did not contain potentially misleading omissions or misstatements because it was "apparent from the face of the instrument that it [wa]s a mortgage . . . ." Id. at 28.

The court in Dart and Bogue Co., Inc. v. Slosberg, 522 A.2d 763, 769-70 (Conn. 1987) also opined on the "reasonable notice" standard for recordation of mortgages under Connecticut law. The mortgagor in Dart and Bogue Co. asserted that its mortgage was invalid because the mortgage failed to state the maximum term. Id. at 765. The court found the omission did not invalidate the mortgage, stating that reasonable notice only requires "notice of the nature and amount of the obligation, so that subsequent lien creditors are not misled." Id. at 770-71.

Like the Pinkus case, Citifinancial Services, Inc. v. Haburjak (In re Haberjak), 309 B.R. 170, 173 (Bankr. W.D. Pa. 2004) related to a discrepancy in the specificity of parties' names in a mortgage. There, a mortgagor argued that his mortgage was ineffective under Pennsylvania law because the mortgage incorrectly omitted "Jr." from his name in the granting clause. Id. The Haburjak Court found this argument unpersuasive and held that, as recorded, the mortgage was valid and provided constructive notice. Id. at 178.

Finally, the court in Moon v. GMAC Mortgage Corp. (In re Burche), 249 B.R. 518, 520 (Bankr. W.D. Mo. 2000) was determining the enforceability of a lien created by a deed of trust, under Missouri law, when the deed failed to name a trustee due to a scrivner's error.

These cases are plainly distinguishable from the present facts and do not compel the relief requested by the Bank.  Here, the only recorded documents provide notice of leases, not mortgages or other security interests.  This is not an instance, such as in Pinkus, Haburjak, or In re Burche, where the recorded documents simply lack specific reference to a secured party (which they do). In contrast, the recorded documents here lack any reference to the security interest itself.

Dart & Bogue Co. is also inapplicable because the issue there was the absence of one provision in a properly filed document that otherwise clearly conveyed a real property interest.  522 A.2d at 770-71.  Again, the recorded documents here give notice of leases, not third party security interests, and do not mention the Bank, much less clearly convey any interest to the Bank.  It is untenable to presume that a third party reviewing the Master Lease Memoranda would have any reason to believe that any security interests in the Master Leases existed, outside of those interests of the two parties to each of the Master Leases.  The Bank has

failed to show that it holds a perfected security interest in the

Master Leases under applicable law.

<u>The Bank Has Not Shown That It Has A Statutory Lien.</u>

        The Bank's assertion that is has a valid statutory lien

similarly fails.  The Bank alleges that it holds a statutory lien by

virtue of its "properly perfected security interest in the Master

Leases."  (Doc. # 5158, p. 4.)   The Bankruptcy Code defines a

statutory lien as:

> [a] lien arising solely by force of a statute on
> specific circumstances or conditions, or lien of
> distress for rent, whether or not statutory, but
> does not include security interest or judicial
> lien, whether or not such interest or lien is
> provided by or is dependent on a statute and
> whether or not such interest or lien is made
> fully effective by statute.

11 U.S.C. § 101(53).   The plain language of the Bankruptcy Code

provides that security interests are not statutory liens.   <u>Id.</u>

<u>Collier</u> elaborates on this as follows:

> A statutory lien is one that is created by
> statute, arises automatically and is not based
> on an agreement to give a lien or on judicial
> action.   Mechanics',   materialmen's,
> warehousemen's and tax liens are examples of
> statutory liens.  Consensual liens and judicial
> liens are not affected by section 545.

5 <u>Collier on Bankruptcy</u> ¶ 545.01 (Alan N. Resnick & Henry J. Sommer

eds., 16th ed.).

        The Bank cites several cases for the unremarkable, but

inapplicable, principle that a statutory lien properly perfected

pre-petition may not be avoided by a trustee in bankruptcy pursuant to Bankruptcy Code section 545(2).  (Doc. # 5158, p. 4-5.)  The cases cited by the Bank are factually distinguishable and unhelpful to the Bank's assertion of a statutory lien.

For example, in <u>Souers v. Nev. Ready Mix</u>, 163 B.R. 246, 347 (Bankr. S.D. Iowa 1994), the court was reviewing a mechanic's lien on a debtor's homestead property that arose on account of certain materials used to improve the property.  In <u>Rafool v. Associated Anesthesiologists, S.C., et al.</u>, 2002 WL 750835, *1 (Bankr. C.D. Ill. 2002), the court was reviewing a statutory lien arising under the Illinois Hospital Lien Act.  Finally, in <u>Spicer v. IRS (In re Motion Mktg.)</u>, 403 B.R. 403, 405 (Bankr. N.D. Tex. 2009), the court was reviewing a federal tax lien.  Unlike the lienholders in <u>Souers</u>, <u>Rafool</u> and <u>In re Motion Mktg.</u>, the Bank has not cited an applicable statute to provide a basis for its alleged statutory lien.  Accordingly, the Bank has failed to show that it has a valid statutory lien.

The Bank has failed to make a <u>prima facie</u> showing of a perfected security interest or a valid statutory lien in the Master Leases and the Lift Stay Motions will be denied.

<u>The Declaratory Judgment Motion is Procedurally Defective.</u>

Bankruptcy Rule 7001 provides that certain proceedings are adversary proceedings.  Fed. R. Bankr. P. 7001.  Specifically, Bankruptcy Rule 7001 provides that "a proceeding to recover money or

property" and "a proceeding to obtain a declaratory judgment relating to any of the foregoing . . . ." are adversary proceedings. Fed. R. Bank. P. 7001 (1), (9). By the Declaratory Judgment Motion, the Bank requests a declaratory judgment relating to its entitlement to the funds in the Bond Proceeds/Loan Repayment Accounts. Such relief falls clearly within the types of proceedings specified by Bankruptcy Rule 7001 to be adversary proceedings. The Bank has failed to properly commence an adversary proceeding by filing a complaint as required by Bankruptcy Rule 7003. Accordingly, the Declaratory Judgment Motion will be denied as procedurally improper.

### CONCLUSION

For the reasons set forth above, the Bank's motions for entry of orders lifting the automatic stay and entry of a declaratory judgment are denied.