## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DBSI INC., ET AL.,[1] | ) | Case No. 08-12687 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

RE: Docket No. 5699, 5923

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION

**GIBBONS P.C.**

William R. Firth, III (Bar No. 4356)
1000 N. West Street, Suite 1200
Wilmington, DE 19801-1058
T (302) 295-4875
F (302) 295-4876
E-mail: wfirth@gibbonslaw.com

- and -

Karen A. Giannelli
Brian J. McMahon
E. Evans Wohlforth, Jr.
Natasha M. Songonuga (Bar No. 5391)
One Gateway Center
Newark, NJ 07102-5310
E-mail: kgiannelli@gibbonslaw.com

*Attorneys for James R. Zazzali, Chapter 11 Trustee*

---

[1] The last four digits of DBSI Inc.'s federal tax identification number are 5037. The mailing address for DBSI Inc. is 12426 West Explorer Drive, Suite 220, Boise, Idaho 83713. Due to the large number of Debtors in these jointly administered cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers and their addresses is not provided herein. A complete list of such information may be obtained by counsel for the Chapter 11 Trustee at rfitzgerald@gibbonslaw.com.

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT AND CONCLUSION OF LAW .................................................................. 2

    A.    Jurisdiction and Venue ................................................................................ 3

    B.    Judicial Notice ........................................................................................... 3

    C.    Relevant Procedural Background ................................................................ 3

    D.    Filing of Joint Chapter 11 Plan and Adequacy of Disclosure Statement .............. 5

    E.    The Plan Solicitations Process .................................................................... 6

    F.    Adequacy Of Notice .................................................................................. 7

    G.    Balloting Results with Respect to the Plan ................................................. 8

    H.    The Private Actions Trust Election ............................................................ 9

    I.    Modifications to the Schedules to the Disclosure Statement ........................ 9

    J.    Findings With Respect To Substantive Consolidation ................................ 9

        (i)    Substantive Consolidation of the Plan Debtors is warranted ....... 12

        (ii)    Substantive Consolidation of the Consolidated Non-Debtors is warranted ................................................................ 16

        (iii)    Substantive Consolidation of the DBSI Consolidated Debtors on the one hand, and the Note/Fund Consolidated Debtors on the other hand, *nunc pro tunc* to November 10, 2008 is warranted ...................................................................... 20

    K.    Compliance with Section 1129(a) of the Bankruptcy Code ......................... 21

    Section 1129(a)(1) — Compliance of the Plan with All Applicable Provisions of the Bankruptcy Code ................................................................ 21

        (i)    Sections 1122: Classification and Treatment of Claims and Interests ................................................................................... 21

        (ii)    Section 1123(a): Mandatory Contents of a Plan ....................... 22

            (A)    Section 1123(a)(1): Designation of Classes of Claims and Interests ......................................................... 22

            (B)    Section 1123(a)(2): Specification of Impairment ............ 22

            (C)    Section 1123(a)(3): Specification of Treatment of Impaired Classes ................................................................ 22

            (D)    Section 1123(a)(4): Equal Treatment of Each Claim or Interest Within a Particular Class ................................. 23

            (E)    Section 1123(a)(5): Adequate Means for the Plan's Implementation ............................................................... 23

(F)    Section 1123(a)(6): Prohibition of the Issuance of Non-voting Equity Securities ........................................... 24

(G)    Section 1123(a)(7): Selection of Trustees in a Manner Consistent with the Interests of Creditors and Public Policy ............................................................. 24

(H)    Section 1123(a)(8): Payments from Post-petition Earning of Individual Debtors .......................................... 25

(iii)    Section 1123(b): Discretionary Plan Provisions .......................... 25

(A)    Section 1123(b)(1): Impairment/Unimpairment of Claims and Interests .......................................................... 25

(B)    Section 1123(b)(2): Assumption/Rejection of Executory Contracts and Leases ...................................... 26

(C)    Section 1123(b)(3): Retention, Enforcement and Settlement of Claims and Causes of Action .................... 26

(D)    Section 1123(b)(4): Sale of Property of the Estate .......... 30

(E)    Section 1123(b)(5): Modification of Creditor Rights ...... 30

Section 1129(a)(2): Compliance with the Provisions of the Bankruptcy Code .................................................................................................... 30

Section 1129(a)(3): Proposal of the Plan is in Good Faith ................................. 30

Section 1129(a)(4): Approval of Certain Payments as Reasonable .................... 31

Section 1129(a)(5): Disclosure of Identity and Affiliation of the Proposed Trustee and the Litigation Trustee is Consistent with the Interests of Creditors and Holders of Interests and with Public Policy ................................. 32

Section 1129(a)(6): Approval of Rate Changes .................................................. 32

Section 1129(a)(7): Best Interests of Creditors .................................................. 32

Section 1129(a)(8): Acceptance of the Plan By Impaired Classes ..................... 33

Section 1129(a)(9): Treatment of Priority Claims .............................................. 34

Section 1129(a)(10): Acceptance By At Least One Impaired Class .................... 34

Section 1129(a)(11): Feasibility of the Plan ...................................................... 35

Section 1129(a)(12): Payment of Bankruptcy Fees ............................................ 35

Non-Applicability of Sections 1129(a)(13) through 1129(a)(16) ........................ 35

L.    Compliance With Section 1129(b) "Cramdown" Requirements ........................ 36

M.    The Principal Purpose of the Plan is not Tax Avoidance (Section 1129(d)) ....... 37

Page

N. The Global Claims Settlement and Claims Protocols ........................................... 38

O. Assumption Of The Designated Insurance Policies ............................................. 45

P. The DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust ......... 46

Q. The DBSI Estate Litigation Trust and the Private Actions Trust ........................ 47

R. Satisfaction of Conditions to Confirmation .......................................................... 48

S. Objections to the Plan ............................................................................................ 48

DECREES ............................................................................................................................. 50

James R. Zazzali, as chapter 11 trustee ("Chapter 11 Trustee") for the estates of DBSI Inc. ("DBSI") and certain affiliated chapter 11 debtors (collectively, the "Debtors") in jointly-administered cases and the Official Committee of Unsecured Creditors ("Creditors' Committee" and together with the Chapter 11 Trustee, "Plan Proponents"), having filed with the Court under chapter 11, title 11 United States Code (the "Bankruptcy Code") a Second Amended Joint Chapter 11 Plan of Liquidation dated August 17, 2010 (the "Plan")[2]; and this Court having entered an order on August 18, 2010 [Docket No. 5705] (the "Disclosure Statement Order") which, among other things, approved the related Disclosure Statement (the "Master Disclosure Statement") [Docket Nos. 5700 and 5701] and the two proposed short forms of combined disclosure statements and plan summaries, which served as the investor solicitation documents and were tailored to the two distinct types of investors who are creditors of the Debtors [Docket Nos. 5702 and 5703] (the "Investor Disclosure Statements", and together with the Master Disclosure Statement, the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing");[3] and due notice of the Confirmation Hearing having been given to all known Holders of Claims against and Interests in the Plan Debtors, the Consolidated Non-Debtors and the Non-Plan Debtors and other parties in interests in accordance with Disclosure Statement Order; and the solicitation of acceptances or rejections from Holders of Claims against or Interests in the Plan Debtors having been made in the manner required under the Disclosure Statement Order and by applicable law; and upon the filed (i) Certification of P. Joseph Morrow IV With Respect To The Tabulation of Votes on the Second Amended Joint

---

[2] Unless expressly noted otherwise, all capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

[3] The Confirmation Hearing was originally scheduled for October 5, 2010 but thereafter adjourned to October 26, 2010.

Chapter 11 Plan of Liquidation (the "Voting Report") [Docket No. 5851]; (ii) Certification of Timothy L. Donovan with respect to the solicitation of votes on the Plan [Docket No. 5854]; (iii) Declaration of Conrad Myers in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation Of DBSI, Inc. and its Related Debtors and Non-Debtor Affiliates ("Myers Decl."), and (iv) Declaration of Kevin Gannon; and the Ballots having been filed with Kurtzman Carson Consultants, LLC ("KCC" or "Balloting Agent"); and seventeen (17) written responses regarding the Plan having been filed by parties-in-interest; and after reviewing the memorandum of law and declarations submitted in support of confirmation of the Plan, after hearing the arguments of counsel and individuals appearing *pro se*, if any, and considering the evidence admitted at the Confirmation Hearing; and upon the entire record properly before the Court, including the record made at the Confirmation Hearing, the Court makes the following findings of fact and conclusions of law in support of this Order confirming the Plan, approving the Global Claims Settlement, the Claims protocols and the releases and injunctions as set forth in the Plan, and setting November 10, 2008 as the effective date for the substantive consolidation of the DBSI Consolidated Debtors as well as the Note/Fund Consolidated Debtors, as described in more detail below.

## FINDINGS OF FACT AND CONCLUSION OF LAW

These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") 7052 and 9014. To the extent that any provision designated herein as a finding of fact is more properly characterized as a conclusion of law, it is adopted as such. To the extent that any provision designated herein as a conclusion of law is more properly characterized as a finding of fact, it is adopted as such.

## A. Jurisdiction and Venue

1. The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Confirmation of the Plan constitutes a core proceeding pursuant to Section 157 (b)(2)(L) of the Bankruptcy Code, over which this Court has jurisdiction to enter a final order.

2. Venue of the Chapter 11 Cases is proper in this District pursuant to 28 U.S.C. § 1408.

3. The Debtors were and are qualified to be debtors under Section 109(a) of the Bankruptcy Code, and each of the Plan Proponents is a proper proponent of the Plan under Section 1121(c) of the Bankruptcy Code.

4. Each of the conditions precedent to confirmation of the Plan has been satisfied in accordance with Section A of Article X of the Plan.

## B. Judicial Notice

5. The Court takes judicial notice of the docket of the Chapter 11 Cases and all related adversary proceedings maintained by the Clerk of the Court, and all pleadings and other documents filed, all orders entered, and evidence and arguments made, proffered or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

## C. Relevant Procedural Background

6. Beginning on November 6, 2008 (the "Petition Date"), and on various dates thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By Order dated November 12, 2008, and subsequent orders, the Court authorized the joint administration of the Debtors' chapter 11 cases for procedural purposes only.

7. On November 21, 2008, the United States Trustee for Region Three ("U.S. Trustee") appointed the Creditors' Committee.

8.     By Order dated November 12, 2008, KCC was retained as notice, claims and balloting agent to the Debtors [Docket No. 36] ("KCC Retention Order"). To satisfy the requirements under Section 1102(b)(3) of the Bankruptcy Code, the scope of KCC's services, as approved by the KCC Retention Order, was expanded by Order dated January 7, 2009 [Docket No. 1073]. Pursuant to that Order, KCC established a website that provides information to the Debtors' general unsecured creditors. The Plan and Disclosure Statement are accessible on that website.

9.     On April 3, 2009, the U.S. Trustee filed the notice of the appointment of Joshua R. Hochberg, Esq. as examiner (the "Examiner"), which this Court approved by Order dated April 14, 2009.

10.     The First Report of the Examiner dated on or about August 3, 2009 ("Examiner's First Report") [Docket No. 4159], found that, as of that date, the Debtors had operated their businesses as one enterprise and funded their operations and obligations from commingled funds without regard to the sources or intended purposes of such funds. The Examiner's First Report resulted in the U.S. Trustee filing a Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee [Docket No. 4169].

11.     Counsel for the Debtors, the Creditors' Committee and the U.S. Trustee stipulated to the appointment of a Chapter 11 Trustee by the Certification of Counsel With Respect to Order Approving Stipulation Regarding Appointment of a chapter 11 trustee filed on August 3, 2009 [Docket No. 4236], following which, on August 31, 2009, the U.S. Trustee appointed the Chapter 11 Trustee. By Order dated September 11, 2009, the Court approved the appointment of the Chapter 11 Trustee [Docket No. 4375].

12.     The Examiner completed his investigation and filed a Final Report on October 19,

2009 (the Examiner's First Report and Final Report are collectively referred to as the

"Examiner's Reports") [Docket No. 4544].

**D.     Filing of Joint Chapter 11 Plan and Adequacy of Disclosure Statement**

13.     On June 24, 2010, the Plan Proponents filed an initial Joint Chapter 11 Plan of

Liquidation, and the Chapter 11 Trustee filed a Certification of Counsel attaching a preliminary

disclosure statement [Docket Nos. 5565 and 5567], which were later amended on July 16, 2010

by a First Amended Joint Chapter 11 Plan of Liquidation and related Disclosure Statement

[Docket Nos. 5606 and 5607], respectively.  On July 19, 2010, the Creditors' Committee filed

the initial proposed forms of the Investor Disclosure Statements [Docket Nos. 5611 and 5613].

14.     On July 30, 2010, the Chapter 11 Trustee filed the Motion for an Order

(A) Approving Form and Manner of Notice of Hearing on, and Adequacy of, Disclosure

Statement and Approving Plan Summaries; (B) Establishing Procedures for Solicitation and

Tabulation of Voting on Proposed Joint Chapter 11 Plan, Approving Ballot Form and

Establishing Voting Deadline to Accept or Reject Plan; (C) Approving Private Actions Trust

Election Form and Establishing Deadline to Make the Private Actions Trust Election;

(D) Scheduling Hearing on Confirmation of Proposed Joint Chapter 11 Plan and (E) Granting

Certain Related Relief ("Motion to Approve Adequacy of the Disclosure Statement and

Solicitation Procedures") [Docket No. 5645].  A hearing to determine the adequacy of the

Disclosure Statement had been previously scheduled by the Court for August 16, 2010

("Adequacy Hearing").

15.     As a result of the Adequacy Hearing, certain revisions were noted on the record to

be made to the Proposed Second Amended Plan, the Proposed Disclosure Statement, the

Schedules to the Disclosure Statements and the proposed Order granting the Motion to Approve

Adequacy of the Disclosure Statement and Solicitation Procedures. On August 17, 2010, after making the revisions noted above, the Plan Proponents filed the Plan, the Master Disclosure Statement and the Investor Disclosure Statements.

16.     On August 18, 2010, the Court entered the Disclosure Statement Order. The Disclosure Statement Order, *inter alia*, fixed September 23, 2010 as the last date for the filing and service of objections to the Plan (the "Plan Objection Deadline") and scheduled the Confirmation Hearing. The Disclosure Statement Order and the Confirmation Hearing Notice provided that objections to confirmation of the Plan must (a) be in writing, (b) state with particularity the legal and factual bases for the objections, including reference to specific provisions of the Plan to which objection is made, (c) provide proposed language changes/additions to resolve the objection(s), and (d) be filed and served upon certain named parties so as to be received no later than the Plan Objection Deadline. The Disclosure Statement Order and the Confirmation Hearing Notice explicitly provided that objections not timely filed and served as required shall not be considered and shall be deemed overruled.[4]

E.     **The Plan Solicitations Process**

17.     The (i) Master Disclosure Statement; (ii) Investor Disclosure Statements; (iii) Plan; (iv) Disclosure Statement Order (a) fixing the record date for purposes of voting on the Plan, (b) approving the notice and objection procedures in respect of confirmation of the Plan and setting the date for the Confirmation Hearing, (c) approving the solicitation packages and procedures for distribution thereof, and (d) approving the form of ballot and establishing procedures for voting on the Plan, including the Voting Deadline; (v) Ballot; (vi) Private Actions

---

[4] Objecting parties Walt E. Mott and John D. Foster ("Mott" and "Foster") obtained an order of this Court extending their deadline to object to the Plan to September 27, 2010 [Docket No. 5818]. Mott and Foster filed a preliminary objection and reservation of rights on September 28, 2010. [Docket No. 5827]. Mott and Foster have agreed to withdraw any objection to confirmation of the Plan based upon certain clarifications set forth herein.

Trust Election; and (vii) notice of the Confirmation Hearing (collectively, the "Solicitation Packages"), as applicable, were mailed to all creditors, equity security holders and other parties in interest as provided by Bankruptcy Rules 3017(c) and (d) and in accordance with the Disclosure Statement Order. The Court finds that mailing of the Solicitation Packages, as evidenced by the affidavit of service filed on September 2, 2010, by P. Joseph Morrow, IV of KCC [Docket No. 5737] and the supplemental affidavits of service filed by Reyanna Burbank, Stephanie Delgado and Greg Barlage of KCC [Docket Nos. 5746, 5766, 5793, 5833-5836 and 5856], with respect to the mailing of the Solicitation Packages in respect of the Plan and in accordance with the Disclosure Statement Order (collectively, the "KCC Affidavit") was proper, timely, and constituted sufficient notice of the Confirmation Hearing, the Voting Deadline, the Plan Objection Deadline and all other matters to be noticed pursuant to the Disclosure Statement Order and no further notice is required.

18. The Court finds that in accordance with Bankruptcy Code Section 1125(e), the Plan Proponents, and their designees, agents, representatives, attorneys, accountants and advisors acted in good faith in soliciting acceptances or rejections of the Plan and in compliance with all applicable provisions of the Bankruptcy Code.

**F.     Adequacy Of Notice**

19. Notice of, among other things, the Chapter 11 Cases, the Claims Bar Date, the hearing on the adequacy of the Disclosure Statement, the Plan, and the Confirmation Hearing was reasonable, adequate and sufficient under the circumstances and provided creditors and parties in interest adequate notice of the relevant proceedings held herein and an opportunity to appear and be heard, as required by the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, as applicable, and applicable law. The solicitation of votes on the Plan complied with the solicitation procedures in the Disclosure Statement Order, was

appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

**G.      Balloting Results with Respect to the Plan**

20.      On October 5, 2010, KCC filed Voting Report confirming that the Plan Proponents solicited and tabulated votes in accordance with the Disclosure Statement Order.[5]

21.      Pursuant to the Voting Report, Ballots were received from or on behalf of 3,868 Holders of Classes 1C-(a), 1C-(b), 2C-(a), 2C-(b), 3C-(a), 3C-(b), 4C-(b), 4C-(c), 5C-(a), 5C-(b), 5C-(c), 6C-(a), 6C-(b), 6C-(c), 7C-(a), 7C-(b), 8C-(b), 8C-(c), 9C-(a), 9C-(b), 10C-(a), 10C-(b), 11C-(b), 12C-(a) and 12C-(b) Claims (Note/Fund Consolidated Debtors' votes).  Of these Ballots, 95% (3,677 total) were cast in favor of the Plan.  Ballots were also received from 2,946 Holders of Classes 13B-(b), 13C-(a), 13C-(b), 13C-(c), 13C-(d), 14C, 15C, 16C, 17C, 18C, 19C, 20B-(b), 20C, 21C, 22C, 23C, and 24C Claims (DBSI Consolidated Debtors' votes).  Of these Ballots, 95% (2,796 total) were cast in favor of the Plan.  No ballots were cast on behalf of Classes 4C-(a) (General Unsecured Claims against DBSI 2008 DOF) and 8C-(a) (General Unsecured Claims against DBSI STDF) (the "Abstained Classes").

22.      Based on the votes cast in favor of the Plan by claimants in Classes 1C-(a), 1C-(b), 2C-(a), 2C-(b), 3C-(a), 3C-(b), 4C-(b), 4C-(c), 5C-(a), 5C-(b), 5C-(c), 6C-(a), 6C-(b), 6C-(c), 7C-(a), 7C-(b), 8C-(b), 8C-(c), 9C-(a), 9C-(b), 10C-(a), 10C-(b), 11C-(b), 12C-(a), 2C-(b), 13B-(b), 13C-(a), 13C-(b), 13C-(c), 13C-(d), 14C, 15C, 16C, 17C, 18C, 19C, 20B-(b), 20C, 21C, 22C, 23C, and 24C (the "Impaired Accepting Classes"), the Plan satisfies the requirements of Sections 1126(c) and 1129(a) of the Bankruptcy Code with respect to each of the Impaired Accepting Classes insofar as it has been accepted by Creditors in each of the Impaired Accepting

---

[5] The Chapter 11 Trustee also filed the Certification of Timothy L. Donovan of Myers & Co. with respect to the solicitation of votes on the Plan [Docket No. 5854].

8

Classes that hold at least two-thirds in amount and more than one-half in number of the allowed Claims contained therein.  [*See* Voting Report].

## H.     The Private Actions Trust Election

23.     As of the Voting Deadline, approximately 2,189 investors affirmatively made the Private Actions Trust Election.  The Plan Proponents have become aware of certain misunderstandings that may have caused certain investors not to respond regarding the Private Actions Trust Election.  In addition, 182 investors submitted a Private Actions Trust Election after the September 23, 2010 deadline.  In order to give investors a full and fair opportunity to participate in the Private Actions Trust, the Plan Proponents have proposed to (i) extend the deadline to make the Private Actions Trust Election through and including November 30, 2010, and (ii) serve a notice, substantially in the form attached hereto as Exhibit A, on those investors who have not yet responded regarding the Private Actions Trust Election (the "Supplemental Private Action Trust Notice").

## I.     Modifications to the Schedules to the Disclosure Statement

24.     On October 20, 2010, the Plan Proponents filed modifications to Schedules 3, 4, 5 and 6 to the Disclosure Statement, which, as applicable, corrected certain mathematical errors and removed certain entities from Schedules 5 and 6 (the "Schedule Modifications").  The Schedule Modifications do not materially change the treatment of the Claims of any Creditors. *See* Myers Decl. ¶ 25.

## J.     Findings With Respect To Substantive Consolidation

25.     Prior to the Petition Date, the DBSI enterprise was separated into three main spheres of activity:

(a)     the syndication and sale to investors of TIC interests in real estate ("TIC Investment").  Offering documentation reflects that the marketability of those interests rested on

(i) their qualification under Internal Revenue Code § 1031 as a tax-minimization device for sheltering capital gains in commercial real estate, and (ii) guarantees given by DBSI of a steady return on investment;

(b) the purchase of real estate at various stages of development for ultimate sale to the TIC Investors; and

(c) investment in the Technology Companies.

26. Underlying these various business activities were a number of fund-raising entities. These issued debt instruments such notes and bonds, or offered participation shares in limited liability companies through private placement offerings to qualified investors (collectively the "Note/Bond/Fund Entities"). Investors in the Note/Bond/Fund Entities provided capital for the other three areas of the DBSI enterprise (the "Note/Bond/Fund Investments").

27. DBSI ran its businesses and entities as a unified enterprise under common ownership and control. A small group of insiders employed that control to raise cash, commingle it, and then distribute it as needs presented, without regard for source or restrictions on use. The practice of running DBSI as a unified enterprise caused investors to rely upon the purported financial strength and competence of the unified enterprise in deciding to invest in various DBSI projects. The Chapter 11 Trustee's factual investigation revealed transactions of fantastic and tortured complexity. These inter-entity transactions cannot practically be unraveled. Based upon the proofs submitted by the Plan Proponents, the Court finds that it is impossible to truly trace and separate cash obtained from the Note/Bond/Fund Entities and cash obtained from TIC Investments, just as it is impossible to separate cash used to pay Note/Bond/Fund Entities' obligations from cash used to pay TIC Investment obligations. Moreover, a great many transfers of cash and properties between DBSI entities were either

constructively or actually fraudulent or otherwise gave rise to claims between the DBSI entities. Any attempt to trace all the different transfers and litigate the competing rights and claims among the DBSI entities would involve years of contentious litigation and, ultimately, administratively bankrupt most if not all of the Debtors' estates.

28.  On January 19, 2010, based on the Examiner's Reports and after months of factual investigation regarding the issues of commingling of funds and the potential for substantive consolidation of the Debtors, the Chapter 11 Trustee filed a motion seeking to substantively consolidate all of the Plan Debtors' Estates as one estate (the "Sub Con Motion").

29.  Approximately 35 creditors, including investors in the Note/Bond/Fund Entities (the "Note/Bond/Fund Investors") filed objections to the Sub Con Motion.  In particular, several Note/Bond/Fund Investor groups objected to the Sub Con Motion contending that grounds do not exist to substantively consolidate the Note/Bond/Fund Entities.  By the end of May 2010, extensive discovery was underway regarding the Sub Con Motion, and in June 2010, the litigation schedule for the Sub Con Motion was extended through December 20, 2010.  *See* Docket No. 5527.  On June 10, 2010, in contemplation of the Plan being filed and in an effort to reduce the costs relating to discovery under the Sub Con Motion, the Creditors' Committee filed a motion to stay discovery in connection with the Sub Con Motion (the "Committee's Stay Motion") [Docket No. 5521].  By Order entered on July 12, 2010, the Court granted the Committee's Stay Motion, inter alia, staying all discovery in connection with the Sub Con Motion effective as of June 28, 2010 and continuing through and including October 5, 2010.

30.  The Plan was proposed as an alternative to litigating the Sub Con Motion and to balance fair and equitable treatment of all investors and creditors with the practical realities of administering the inter-twined DBSI corporate structure, assets and claims in an efficient

manner. The Plan accomplishes this goal by providing for substantive consolidation of the

Debtors into two separate groups - the DBSI Consolidated Debtors, which includes certain Non-

Debtor Affiliates and the Note/Fund Consolidated Debtors, rather than substantive consolidation

of all Debtors as sought in the Sub Con Motion.

(i) <strong><em>Substantive Consolidation of the Plan Debtors is warranted</em></strong>

31. Among the factors supporting the substantive consolidation of the DBSI

Consolidated Debtors' Estates (including the substantive consolidation of the non-debtor

affiliates) and the Note/Fund Consolidated Debtors' Estates, as applicable, are the following:

- Under *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005), what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) pre-petition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

- Here, the funds of the DBSI enterprise are commingled and inter-entity claims and obligations are a hopeless tangle. The ledgers maintained by the various DBSI entities reflect transactions of staggering complexity. Yet, those ledgers do not provide a reliable guide, because the actual movement of funds was frequently quite different than what was recorded. Assets and liabilities were moved between the DBSI enterprise without regard for arms-length exchanges of value. Entities loaned money based upon collateral of dubious value. Funds were commingled and paid out without regard to source. Important transactions were insufficiently documented. The funding available to unsecured creditors is limited and any attempt to unravel these estates would quickly exhaust it.

- Accountable Reserves, proceeds from the sale of notes and bonds to the Note/Bond/Fund Investors and other revenues were pooled and disbursed based upon the needs of the Debtors at the moment, making it logically impossible to trace it now.

- Important corporate formalities were frequently ignored.

- DBSI clearly operated as the alter ego of its Insiders (as such term is defined under Section 101(31) of the Bankruptcy Code). They operated the entities as a single economic enterprise. All of the entities were housed in the central DBSI offices, and their boards, officers and/or general partners were mostly the same Insiders. In addition to the commingling of funds and the use of shared offices, most of the entities shared the same "DBSI" acronym in their names and DBSI

12

management frequently changed the names of various entities (sometimes switching the same name from one entity to another).

- The resolution of Intercompany Claims is a critical component of the advantages to be realized through substantive consolidation and absent confirmation of the Plan, the potential costs to each of the Plan Debtors' Estates for the professionals conducting diligence on, much less pursuing, the unwinding of these Intercompany Claims would be enormous.

- With respect to the Note/Fund Consolidated Debtors, no reasonable investor could have relied on anything but the guarantee of the single parent or the organization's ability to successfully complete real estate development projects. Offering materials plainly stated that the single parent controlled all of the entities involved and that the transactions involving the note proceeds would not be at arms length. In general, the private placement memoranda (the "PPM") or offering statements issued by each of these Entities called out the fact that property valuations would be subjective, not subject to independent appraisal, and might not represent true market value. Loan-to-value ratios were well above normal rates, and the return was higher than any operating profit the real estate could be expected to generate. None of the Note/Fund Consolidated Debtors had any capital at all, except for what they were raising in the offerings. In sum, all investors must necessarily have relied upon the creditworthiness of the DBSI enterprise as a whole when purchasing debt instruments issued by any of the Note/Fund Consolidated Debtors. *See generally* Gannon Decl. (citing Private Placement Memoranda).

- With respect to the TIC Investors, DBSI guaranteed the TIC rent payments to TIC Investors and made such payments even where the TIC property generated no cash flow. Prior to the Petition Date, TIC rent payments were being paid to TIC Investors, with a total book expense of $8,663,050 per month (as of January 2008) and an actual monthly cash outlay of $7,945,000, which also were being fed by the stream of funds coming from new TIC Investors through their Accountable Reserves.

- Each investor Class (including the Note/Bond/Fund Investors and the TIC Investors) has voted to accept the Plan (evidencing consent to the proposed substantive consolidation) and no investor has filed an objection to the Plan based on the substantive consolidation proposed in the Plan. The only objections to substantive consolidation were filed by current or former insiders, and these objections have been resolved.

32. The bifurcated substantive consolidation structure embodied in the Plan

represents a mid-point between the two opposite extremes of (1) completely substantively

consolidating all of the remaining DBSI assets into one pool to satisfy all investors/creditors on a

pro rata basis, and (2) attempting to keep assets that can be attributable to each of the DBSI entities separate and using the assets of a particular entity only to satisfy claims against that entity. In contrast to these two extreme alternatives, the Plan provides a more balanced structure in that:

- The TIC Investments and the Note/Bond/Fund Investments were structured in significantly different ways-- TIC Investors received fee title to real property, whereas Note/Bond/Fund Investors received only a payment obligation from a DBSI entity (who may have held debt or equity interests in other DBSI real estate owning entities);

- Due in large part to the difference in these investment structures, the implication and impact of the Chapter 11 Cases was significantly different for TIC Investors and Note/Bond/Fund Investors-- the TIC Investment business was wound down in a matter of months without the need for a chapter 11 plan, whereas a resolution of the Note/Bond/Fund Investments requires a much more involved process for realizing value and distributing it to investors;

- Despite the structural differences and the resultantly divergent impacts of the Chapter 11 Cases on TIC Investors and Note/Bond/Fund Investors, the Examiner's report and diligence conducted by the Chapter 11 Trustee and the Creditors' Committee have revealed that cash arising from both types of investments was extensively commingled among the Plan Debtors and Non-Debtor Affiliates, and properties were routinely bounced back and forth between TIC Investment and Note/Bond/Fund Investment structures, often in conjunction with gross manipulations of value by DBSI management;

- Complete substantive consolidation would require extensive litigation of the Sub Con Motion (with approximately 35 parties having filed objections) that would not conclude before the end of 2010 at significant cost to the Debtors' estates and to the parties prosecuting objections; and

- Absent any substantive consolidation (i.e. if all of the Debtors' estates were to remain separate), it does not appear practically possible to unwind the various interconnections, commingling of cash, property transfers, and related Intercompany Claims -- most (or all) value for distribution to investors and other creditors could be consumed with the investigation and litigation of these issues without producing any benefit to investors/creditors.

33. The authority to order substantive consolidation of several debtors' estates is derived from Sections 105 and 1123(a)(5) of the Bankruptcy Code. Section 105 of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105 (a); *see also In re Stone & Webster*, 286 B.R. 532, 539 (Bankr. D. Del. 2002) ("[U]nder the Bankruptcy Code, the power to substantively consolidate is arguably derived from the bankruptcy court's general equitable powers as provided in Bankruptcy Code Section 105(a)"). In addition, Section 1123(a)(5)(c) of the Bankruptcy Code states that a chapter 11 plan may provide for the consolidation or merger of a debtor with one or more persons. 11 U.S.C. §1123 (a)(5)(c).

34.     In view of the limited funding available to unsecured creditors and the expense involved in unraveling the Plan Debtors' Estates, the recovery by Creditors of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors will, at best, be maximized, and at worst, be largely unaffected by consolidating the assets of each of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, in accordance with the Plan. No creditor or group of creditors will be deprived of their rights if substantive consolidation is allowed.

35.     The substantive consolidation proposed in the Plan is the most equitable and effective way to generate and distribute the remaining value in the Plan Debtors' Estates:

(a)     to the TIC Investors because the TIC Investors claims for, among other things, lease rejection damages and Accountable Reserves are primarily against the DBSI Consolidated Debtors and the TIC Investors, as opposed to the Note/Bond/Fund Investors, have already received value from the Debtors' Estates in the form of the assumption and assignment or the rejection and return of their leased properties; and

(b)     to Note/Bond/Fund Investors because:

- All Note/Bond/Fund Investors have suffered as a result of the same disregard for investment guidelines, inflated property valuations, and cash commingling perpetrated by DBSI's former management;

- As opposed to the TIC Investment structure, the various Note/Bond/Fund Investment structures were fundamentally similar in that (i) they were real estate focused, (ii) Note/Bond/Fund Investors generally received unsecured payment promises obligations from the funding entity, and (iii) the investments were premised on the strength of the DBSI enterprise as a whole (as opposed to specifically identified property portfolios);

- Differences in whether a particular Note/Bond/Fund Investment prohibited third party debt, required secured lending or was restricted to real estate investments do not consistently correlate with the relative values of the real estate project portfolios allocated by DBSI's former management to the various Note/Bond/Fund Investment groups as of the Petition Date; and

- Instead, similar investment structures have divergent portfolio quality, and diligence by the Chapter 11 Trustee and the Creditors' Committee has revealed that DBSI's former management routinely moved real estate projects from one Note/Bond/Fund Investment portfolio to another.

36.     The substantive consolidation of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, as described in Article VI of the Plan, will promote a more equitable distribution of the assets of the Plan Debtors' Estates and is warranted and appropriate under applicable Third Circuit precedent and Section 105 of the Bankruptcy Code.

###     (ii)     *Substantive Consolidation of the Consolidated Non-Debtors is warranted*

37.     A bankruptcy court has authority to extend a debtor's bankruptcy case over a non-debtor under appropriate circumstances. *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 218 (1941); *In re Plymouth Dyeing Co.*, 323 F.2d 134, 137-38 (3d Cir. 1963), *cert. dismissed*, 375 U.S. 998 (1964) (corporate bankruptcy case extended over another corporation that functioned together as a single economic unit). Consolidation of non-debtors with debtor entities is appropriate where doing so would be in "furtherance of the equitable goals of

substantive consolidation." *In re Bonham*, 229 F.3d 750, 765 (9th Cir. 2000). In particular, non-debtor consolidation is warranted where "the non-debtor is a subsidiary or alter ego of the debtor." *In re Logistics Info. Sys., Inc.*, 432 B.R. 1, 11 (D. Mass. 2010); *see also Plymouth Dyeing* 323 F.2d at 137-38 (corporate bankruptcy case extended over another corporation that functioned together as a single economic unit); *In re United Stairs Corp.*, 176 B.R. 359, 370 (Bankr. D.N.J. 1995) ("Where the non-debtor entities are alter-egos of the debtor," the right to "consolidation [is] independent from the right to force those entities into bankruptcy pursuant to 11 U.S.C. § 303.").

38.     Here, in light of the case law providing for substantive consolidation of the non-debtors and the relevant facts of the Chapter 11 Cases, the Court finds that the Consolidated Non-Debtors were merely the alter ego of DBSI and substantive consolidation of the these Entities, including DBSI Redemption Reserve ("DRR") and DBSI Investments L.P., with DBSI is warranted and in the best interest of Creditors for the following reasons:

- The Consolidated Non-Debtors operated as part of the unitary DBSI enterprise.

- As noted above, each investor Class (including the Note/Bond/Fund Investors and the TIC Investors) voted to accept the Plan (evidencing their consent to the proposed substantive consolidation) and no parties except Insiders Douglas Swenson, Charles Hassard, John Mayeron, Thomas Var Reeve, Walt E. Mott and John D. Foster filed an objection to the Plan based on the substantive consolidation of the Consolidated Non-Debtors proposed in the Plan. The objections of these current and former insiders have been resolved.

  - With respect to DRR, that entity was used as a mechanism for recording inter-company loans to various DBSI entities. To the extent that cash was moved among the DBSI entities, the books indicate that it moved through DRR. Often, however, the funds did not actually pass through DRR's bank accounts, but there would be journal entries on DRR's books documenting the transfers as if they had.

  - DRR had no significant assets (other than book-entry impaired inter-company loans receivable), nor did it have third-party creditors, an independent business or investment operations. Little to no cash was

maintained in DRR. If funds were deposited into DRR, they were immediately transferred to another account.

- As of December 31, 2008, the books and records state that DRR owed DBSI, Inc. $196,689,254. The books and records also state that DRR has large receivables due from the non-debtor entities DBSI Investments and Stellar in the amount of $101,144,847 and $127,869,385, respectively. DRR generated little to no income as a result of any business activity and, carried on its balance sheet from 2004 through 2008 a growing value of impaired loans to its affiliates, which by 2008 had reached in excess of $240 million. Neither of the two affiliates to which the great bulk of these loans were made, DBSI Investments and Stellar, had the means to repay. DBSI Investments and Stellar themselves were hopelessly insolvent and could not repay even a small portion of those loans.

- With respect to DBSI Investments, DBSI Inc. is the Class B General Partner of DBSI Investments and, as such, was authorized to manage virtually all of the business affairs of DBSI Investments.

    - DBSI Investments is a holding company that holds a direct interest in Stellar and Western Technologies. DBSI Investments also acts as a general partner or co-general partner with DBSI for certain other limited partnerships that own or owned real estate projects.

    - DBSI Investments' books and records demonstrate that it has never had any sales, and no costs of good sold, no revenues and no expenses. DBSI Investments had no assets other than an indirect interest in the Technology Companies. All of its creditors were related parties or Insiders. It had no creditors, no employees and no operations other than to be a holding company.

    - DBSI Investments has five purported creditors: former insiders Mott and Foster and three affiliated DBSI entities (DRR, DBSI REFC, and Strategic Finishing, a former affiliate company). The largest creditor is DRR. By the end of 2008, DBSI Investments owed DRR $101,144,847, including accrued interest, as a result, in larger measure of funds funneled via DBSI to DRR and then from DRR to DBSI Investments and then from DBSI Investments to Insiders and the Technology Companies. There does not appear to be any corresponding benefit or offset for these monies advanced to DBSI Investments by DRR. Similarly, by the end of 2008, DBSI Investments owed DBSI REFC $6,536,679, without regard to accrued interest.

    - DBSI Investments was insolvent and could not repay even a small portion of the loans made to it by DRR. The Balance Sheet of DBSI Investments reflects the growing losses of its interests in other entities (principally Stellar and the other TICs) which grew to approximately $104 million by

2008 and little or no other assets. On the liability side of the balance sheet there is in excess of $100 million of debt to its affiliates such that the cumulative negative capital of DBSI Investments exceeds $200 million by 2008.

- With respect to Stellar, that entity holds ownership interests in and was a conduit for providing capital and financing to certain technology related entities (the "Technology Companies"). Stellar had no revenue-generating business operations, and no assets other than interests in the Technology Companies, and the only third-party creditor as of the present time is Paul Judge, its former President, who claims unpaid compensation of $52,000.

  - All of Stellar's equity interests in the Technology Companies were pledged to secure inter-entity loans. The pledgees, Stellar's creditors, were all affiliated entities, however, and the money those affiliates loaned to Stellar all originated from commingled pools of funds received from DBSI investors. Neither DBSI Investments nor Stellar ever had the means to repay these "loans" and the value of the interests they ostensibly held were a fraction of the inter-entity obligations they had accrued.

  - Stellar's income statements for the period 2004 through 2008 reflect the fact that Stellar was consistently losing between $5 million and $20 million per year depending on the year. Stellar's balance sheet reflects that its net owners' equity was consistently negative and grew from more than negative $68.5 million in 2004 to more than negative $149 million in 2008. Stellar was insolvent at all relevant times.

- With respect to commingling of funds between the Consolidated Non-Debtors and DBSI, DBSI-related entities made loans totaling $208,333,387 to the Technology Companies, including Western Technologies. Typically, as cash was needed to fund these companies, DRR transferred cash to DBSI Investments, which transferred it to Stellar. However, the funds did not originate at DRR. The funds were always transferred from whatever DBSI- related account had sufficient funds, into DRR, who transferred the funds to DBSI Investments and then onto the Technology Companies. In large part, the funds came from Accountable Reserves. In some instances, the funds were transferred directly from DRR to the Technology Companies, although the transactions are booked by Stellar as loans from Stellar to the Technology Companies. Stellar's borrowings are largely undocumented and a significant amount of Stellar's debt remains undocumented.

  - the commingling of funds between the Consolidated Non-Debtors and DBSI is further evidenced by the fact that debt was reclassified as investment and loans were reassigned between entities freely.

(iii) ***Substantive Consolidation of the DBSI Consolidated Debtors on the one hand, and the Note/Fund Consolidated Debtors on the other hand, nunc pro tunc to November 10, 2008 is warranted***

39.    Included within a bankruptcy court's equitable powers is the discretion to order *nunc pro tunc* substantive consolidation. *In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 141 (D. Me. 1991); *see also Owens Corning*, 419 F.3d at 208-09 n.13 (recognizing that courts have allowed *nunc pro tunc* substantive consolidation). The standard for *nunc pro tunc* substantive consolidation varies by court. Some courts follow an *Augie/Restivo* approach that finds that *nunc pro tunc* flows from the concept of substantive consolidation itself. *See Bonham*, 229 F.3d 750; *In re Baker & Getty Financial Services, Inc.*, 974 F.2d 712 (6th Cir. 1992). Thus, if the estates were commingled as of the petition dates and/or if they were treated as a unitary enterprise to the extent pre-petition creditors perceived them as such, then the estates were effectively operating as one as of the date the first petition and the consolidation order should logically reflect that fact as *nunc pro tunc*. Other courts use a balancing test in allowing *nunc pro tunc* consolidation only when "the use of *nunc pro tunc* yields benefits greater than the harm it inflicts." *See In re Auto-Train Corp.*, 810 F.2d 270, 277 (D.C. Cir. 1987).

40.    Although the Third Circuit has not directly addressed the standard for *nunc pro tunc* substantive consolidation, it bears noting that the Third Circuit essentially follows the *Augie/Restivo* approach, just like the *Bonham* and *Baker & Getty* courts. *See Owens Corning*, 419 F.3d at 210 ("if presented with a choice of analytical avenues, we favor essentially that of *Augie/Restivo*"); *Bonham*, 229 F.3d at 771 ("Our abecedarian prerequisite to ordering substantive consolidation is that the two factors set forth in *Augie/Restivo* must be satisfied."); *Baker & Getty*, 974 F.2d at 720-21 (rejecting *Auto-Train* and applying test that considers whether the debtors are "hopelessly intertwined" or whether "creditors consider the two debtors to be one").

41.     Here, fixing the effectiveness of the Plan's substantive consolidation of the DBSI

Consolidated Debtors (including the Consolidated Non-Debtors) on the one hand, and the

Note/Fund Consolidated Debtors on the other hand, *nunc pro tunc* to November 10, 2008 is

proper under either of the foregoing formulations for the foregoing reasons:

- The great majority of the Plan Debtors were placed into bankruptcy on or around November 10, 2008, and as determined above, their funds were commingled with the Consolidated Non-Debtors. Indeed, the sole reason for DRR's existence was to commingle funds. Because substantive consolidation is warranted under either prong of *Owens Corning* and because this was true as of the date that DBSI filed its petition, substantive consolidation is properly ordered as to all of the Estates, as set forth in the Plan, *nunc pro tunc to* November 10, 2008.

- With respect to a balancing of the equities, the Plan has been accepted by every Class of investor creditors, thus, those with arguably the most at stake in substantive consolidation, the TIC Investors and the Note/Bond/Fund Investors are satisfied with the compromise struck in the Plan. No non-insider creditor has filed an objection to the Plan based on the *nunc pro tunc* substantive consolidation proposed in the Plan.

## K.     Compliance with Section 1129(a) of the Bankruptcy Code

Section 1129(a)(1) — Compliance of the Plan with All Applicable
Provisions of the Bankruptcy Code

42.     The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by Section 1129(a)(1) of the Bankruptcy Code, including Sections 1122 and 1123 of the

Bankruptcy Code.

(i)     *Sections 1122:  Classification and Treatment of Claims and Interests.*

43.     In accordance with Section 1122(a) of the Bankruptcy Code, Article II of the Plan

provides for the separate classification of Claims and Interests with respect to each Plan Debtor

based upon differences in the legal nature, priority, or factual nature of such Claims and

Interests.  Each Plan Debtor has been assigned a number from 1 through 24, inclusive, for the

purposes of classifying and treating Claims against and Interests in such Plan Debtor for

balloting purposes.  The Claims against and Interests in each Plan Debtor, in turn, have been

assigned to separate lettered Classes based on the type of Claim or Interest involved. Each

Claim or Interest in each particular Class is substantially similar to the other Claims or Interests

in such Class. Thus, the Plan satisfies the requirement of Section 1122(a) of the Bankruptcy

Code. Additionally, because the Plan does not designate a separate class of unsecured claims for

administrative convenience purposes, Section 1122(b) is inapplicable here.

(ii)     <em>Section 1123(a): Mandatory Contents of a Plan</em>

(A)     <em>Section 1123(a)(1): Designation of Classes of Claims and Interests</em>

44.     In accordance with Section 1123(a)(1) of the Bankruptcy Code, Article II of the

Plan designates Classes of Claims and Interests, other than Administrative Claims and Priority

Tax Claims.[6] Thus, the Plan satisfies Section 1123(a)(1) of the Bankruptcy Code.

(B)     <em>Section 1123(a)(2): Specification of Impairment</em>

45.     In compliance with Section 1123(a)(2) of the Bankruptcy Code, Article IV of the

Plan specifies that Priority Tax Claims (Classes 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, 9a, 10A, 11A,

12A, 13A, 14A, 15A, 16A, 17A, 18A, 19A, 20A, 21A, 22A, 23A, and 24A) and Miscellaneous

Secured Claims (Classes 1B, 2B, 3B, 4B, 5B, 6B, 7B, 8B, 9B, 10B, 11B, 12B, 13B-(a), 14B,

15B, 16B, 17B, 18B, 19B, 20B-(a), 21B, 22B, 23B, and 24B) are not Impaired in that the legal,

equitable or contractual rights of Holders of Claims in these Classes are not altered under the

Plan. Therefore, the Plan satisfies Section 1123(a)(2) of the Bankruptcy Code.

(C)     <em>Section 1123(a)(3): Specification of Treatment of Impaired Classes</em>

46.     Article IV of the Plan identifies each Class of Claims and each Class of Interests

that is Impaired under the Plan. Additionally, Article IV of the Plan properly identifies and

---

[6] Pursuant to Section 1123(a)(1) of the Bankruptcy Code, classes of Administrative Claims and Priority Tax Claims are not required to be classified.

describes the treatment of each Class of Claims or Interests that is Impaired under the Plan. Thus, the Plan satisfies Section 1123(a)(3) of the Bankruptcy Code.

### (D) *Section 1123(a)(4): Equal Treatment of Each Claim or Interest Within a Particular Class*

47.     In accordance with Section 1123(a)(4) of the Bankruptcy Code, under Article IV of the Plan, all Claims and Interests within each particular Class will receive the same treatment unless, in the case of Classes of Claims, the holder of a particular Claim agrees to less favorable treatment of its Claim.

### (E) *Section 1123(a)(5): Adequate Means for the Plan's Implementation*

48.     Articles V and VI and various other provisions of the Plan set forth the means for implementation of the Plan as required by Section 1123(a)(5) of the Bankruptcy Code. Collectively, the following provisions of the Plan adequately provide for implementation of the Plan:

- Section B of Article VI of the Plan contemplates the substantive consolidation of the Entities constituting the DBSI Consolidated Debtors (including the Consolidated Non-Debtors) and the Entities constituting the Note/Fund Consolidated Debtors;

- Sections M and N of Article VI provide for the establishment and administration of the DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust for the purpose of liquidating the Plan Debtors' remaining Assets and distributing the proceeds, if any, as prescribed under the Plan;

- Sections J, K and L of Article VI of the Plan set forth the provisions of the Administrative TIC Rent/Expense Claims Protocol, the TIC Claims Protocol and the Note/Fund Claims Protocol, respectively.

- Sections M and N of Article VI of the Plan also provide for the creation, funding and administration of the DBSI Estate Litigation Trust and the Private Actions Trust;

- Section C of Article VI of the Plan authorizes the Chapter 11 Trustee, following confirmation of the Plan and prior to the Effective Date, to execute such

documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan;

- Section M(g)(ii) of Article VI of the Plan and Section D of Article XI of the Plan provide for the transfer and assignment, on the Effective Date, of each Plan Debtor's and Consolidated Non-Debtor's respective Assets to the applicable Trust free and clear of all Liens, Claims, Interests, charges and other encumbrances;

- Section G of Article VI of the Plan vests control of the Plan Debtors and the Non-Debtor Affiliates in the applicable Trustee to allow for all corporate action to effectuate the Plan and to wind-down those Entities; and

- Article V of the Plan provides for the settlement of certain Intercompany Claims and DBSI Note/Fund Claims and Note/Fund DBSI Claims.

Thus, the Plan complies with Section 1123(a)(5) of the Bankruptcy Code.

      (F)    *Section 1123(a)(6): Prohibition of the Issuance of Non-voting Equity Securities*

49.     Section 1123(a)(6) of the Bankruptcy Code is not applicable because the Plan Proponents do not propose to issue any equity securities under the Plan and the Plan is a liquidating plan.

      (G)    *Section 1123(a)(7): Selection of Trustees in a Manner Consistent with the Interests of Creditors and Public Policy*

50.     Section B.16 of Article XII of the Plan identifies Conrad Myers as the proposed Trustee for the DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust and James R. Zazzali as the proposed Litigation Trustee for the DBSI Estate Litigation Trust and the Private Actions Trust. Section M of Article VI of the Plan sets forth the procedures for appointment of the Trustee and the Litigation Trustee. In addition, pursuant to Section G of Article VI of the Plan, after the Effective Date, the Trustee and the Litigation Trustee, as applicable, shall be authorize to wind-down the affairs of the Non-Debtor Affiliates in which one or more of the DBSI Consolidated Debtors or the Note/Fund Consolidated Debtors holds a majority interest. The Trustee and the Litigation Trustee have ample experience and were chosen by the Plan

Proponents. The post-Effective Date activities of the Trustee and the Litigation Trustee will be monitored by the Trust Oversight Committee appointed pursuant to Section N of Article VI of the Plan.

51.     In addition, pursuant to Sections M.1(c) and M.2(c) of Article VI of the Plan, the Plan Proponents filed the final Trust Agreement and Litigation Trust Agreement, as amended, with the Court as part of the Supplemental Plan Documents, which Trust Agreement identifies Conrad Myers as the Trustee for the Trust and which Litigation Trust Agreement identifies James R. Zazzali as the Litigation Trustee. In light of the foregoing, the Plan satisfies the requirements set forth in Section 1123(a)(7) of the Bankruptcy Code.

> (H)     *Section 1123(a)(8): Payments from Post-petition Earning of Individual Debtors*

52.     Section 1123(a)(8) of the Bankruptcy Code is not applicable to the Chapter 11 Cases because the Debtors are not individuals.

> (iii)     *Section 1123(b): Discretionary Plan Provisions*

53.     The Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code. As set forth below, such discretionary provisions comply with Section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code. Thus, Section 1123(b) of the Bankruptcy Code is satisfied.

> (A)     *Section 1123(b)(1): Impairment/Unimpairment of Claims and Interests*

54.     Article IV of the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving others Unimpaired, as permitted by Section 1123(b)(1). As such, the Plan is consistent with Section 1123(b)(1) of the Bankruptcy Code.

(B)    *Section 1123(b)(2): Assumption/Rejection of Executory Contracts and Leases*

55.    Sections A and E of Article IX of the Plan provides, *inter alia*, that except for any executory contract and/or unexpired lease (i) that was previously assumed or rejected by an Order of the Court or otherwise pursuant to Section 365 of the Bankruptcy Code, (ii) that is subject to a pending motion to assume or reject before the Court, or (iii) that is an insurance policy under which any DBSI Consolidated Debtor or Note/Fund Consolidated Debtor is a party or a beneficiary, each executory contract entered into by any of the Plan Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date, except as otherwise provided in the Plan.  Section B of Article IX of the Plan provides further that the obligations of the Plan Debtors to indemnify any Person or Entity having served as one of their officers and directors, or currently serving as one of their employees, by reason of such Person's or Entity's service in such capacity, to the extent provided in the Plan Debtors' corporate governance documents or under any of the Plan Debtors' directors and officers insurance policies, or by a written agreement with the Plan Debtors or by the applicable states' corporation law, each as applicable, shall be deemed and treated as executory contracts that are rejected by the Plan Debtors pursuant to the Plan and Section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, the Plan is consistent with Section 1123(b)(2) of the Bankruptcy Code.

(C)    *Section 1123(b)(3): Retention, Enforcement and Settlement of Claims and Causes of Action*

56.    <u>The Global Claims Settlement</u>:  Consistent with Section 1123(b)(3) of the Bankruptcy Code, Article V of the Plan contains a settlement and compromise pursuant to Rule 9019 of all Claims and controversies amongst the DBSI Consolidated Debtors and the Note/Fund

Consolidated Debtors, their Estates, Creditors, and other parties in interest, as well as Intercompany Claims against the Plan Debtors and their Non-Debtor Affiliates. As discussed more fully below, the provisions relating to the Global Claims Settlement are appropriate and are in the best interests of the Plan Debtors, their Estates and the Holders of Claims and Interests.

57. <u>Releases by the Plan Debtors</u>: The releases of Claims and Causes of Actions held by the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors against each other and against TIC Investors and Holders of Note Claims, Bond Claims, Preferred Interest Claims, Non-Preferred Interest Claims or Sharing Unit Interest Claims (excluding claims against insiders) under the Global Claims Settlement represent a valid exercise of the Plan Proponents' business judgment. Moreover, the releases being granted by and between the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors are an integral part of the Plan. Eliminating the releases would be prejudicial to the Creditors as the Estates will be open to expensive litigation regarding the Claims to be released. In addition, TIC Investors and Holders of Note Claims, Bond Claims, Preferred Interest Claims, Non-Preferred Interest Claims or Sharing Unit Interest Claims have consented to the release provisions by voting in favor of the Plan.

58. <u>Injunctions</u>: The injunction provision set forth in Section E of Article XI of the Plan is necessary to preserve and enforce the provisions of the Plan and is narrowly tailored to achieve that purpose.

59. <u>Exculpation Provision</u>: The exculpation provisions set forth in Section G of Article XI of the Plan are designed to promote the finality of the Plan and prevent collateral attacks on the Plan. The exculpation provisions are appropriately tailored to protect the

Exculpated Parties from inappropriate litigation and do not provide for an impermissible third-party release or relieve any party from gross negligence or willful misconduct.

60. Each of the injunction, release and exculpation provisions set forth in the Plan: (i) is an essential means of implementing the Plan pursuant to Sections 1123(b)(3) and (b)(6) of the Bankruptcy Code; (ii) is an integral element of the transactions incorporated into the Plan; (iii) confers material benefit on, and is in the best interests of, the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, their Estates, and their Creditors; (iv) is important to the overall objectives of the Plan to orderly liquidate and distribute the remaining assets of the Plan Debtors and to maximize the distribution to their Creditors; and (v) is consistent with Sections 1123, 1129 and other applicable provisions of the Bankruptcy Code. The record of the Confirmation Hearing and the circumstances surrounding the Chapter 11 Cases support the injunction, release and exculpation provisions contained in the Plan.

61. Therefore, pursuant to Section 1123(b)(3) of the Bankruptcy Code the injunction, release and exculpation provisions set forth in the Plan, including Articles V and VI of the Plan, are integral parts of the Plan and are fair, equitable, reasonable and in the best interests of the Plan Debtors, their Estates and the Holders of Claims and Interests.

62. Retention of Claims and Causes of Action: As authorized by Section 1123(b)(3) of the Bankruptcy Code, Section R of Article VI of the Plan provides for the retention of all Estate Causes of Action (including all Causes of Action held by all Consolidated Non-Debtors) not expressly released or settled under the Plan, including, but not limited to, any and all Estate Causes of Action (including all Causes of Action held by all Consolidated Non-Debtors), including without limitation preferential and fraudulent transfers and other Avoidance Actions held by the Note/Fund Consolidated Debtors, the DBSI Consolidated Debtors, and the

Consolidated Non-Debtors, including, without limitation, DBSI Investments, DBSI Redemption, Stellar and the Non-Debtor Affiliates described in Schedule 1 to the Disclosure Statement. For avoidance of doubt, notwithstanding that the Plan provides for the substantive consolidation of the DBSI Consolidated Debtors (including the Consolidated Non-Debtors) and the substantive consolidation of the Note/Fund Consolidated Debtors *nunc pro tunc* to November 10, 2008 and the subordination of Intercompany Claims: (i) the rights of each DBSI Consolidated Debtor (including each Consolidated Non-Debtor) to prosecute any Cause of Action that could have been brought by such DBSI Consolidated Debtor (including each such Consolidated Non-Debtor) at any time, including but not limited to Avoidance Actions, are reserved and preserved for prosecution by the DBSI Estate Litigation Trustee; and (ii) the rights of each Note/Fund Consolidated Debtor to prosecute any Cause of Action that could have been brought by such Note/Fund Consolidated Debtor at any time, including but not limited to Avoidance Actions, are reserved and preserved for prosecution by the DBSI Estate Litigation Trustee. In accordance with Article VI of the Plan, all Estate Causes of Action (which includes all Causes of Action held by the Consolidated Non-Debtors) are vested in, and may be prosecuted by, the DBSI Estate Litigation Trustee.

63.     Pursuant to the Plan, including but not limited to, Articles V and VI, on the Effective Date, all Causes of Action held by any Consolidated Non-Debtor shall be transferred to and vest in the DBSI Estate Litigation Trust and all references to Estate Causes of Action under the Plan and the DBSI Estate Litigation Trust Agreement shall be deemed to include Causes of Action previously held by all Consolidated Non-Debtors; and the DBSI Estate Litigation Trustee shall be fully empowered to prosecute all such Causes of Action pursuant to the DBSI Estate Litigation Trust Agreement.

(D)    *Section 1123(b)(4): Sale of Property of the Estate*

64.    The Plan provides for the orderly liquidation of all of the Assets of the DBSI

Consolidated Debtors and the Note/Fund Consolidated Debtors and sets forth a process to

distribute the proceeds thereof to Holders of Allowed Claims through the establishment of the

DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust, as applicable.

(E)    *Section 1123(b)(5): Modification of Creditor Rights*

65.    Article IV of the Plan modifies or leaves unaffected, as the case may be, the rights

of Holders of each class of Claims and Interests.

Section 1129(a)(2): Compliance with the Provisions of the Bankruptcy Code

66.    The Plan Proponents have complied with all applicable provisions of the

Bankruptcy Code, as required by Section 1129(a)(2) of the Bankruptcy Code, including Sections

1125 and 1126.  As noted above, in the Disclosure Statement Order, the Court approved the

adequacy of the Disclosure Statement and the Solicitation Procedures.

Section 1129(a)(3):  Proposal of the Plan is in Good Faith

67.    The Plan Proponents have proposed the Plan in good faith and not by any means

forbidden by law in accordance with Section 1129(a)(3).  In determining that the Plan has been

proposed in good faith, the Court has examined the totality of the circumstances surrounding the

filing of the Chapter 11 Cases and the formulation of the Plan.  The Plan Proponents' good faith

is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement, the

record of the Plan Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

68.    The Court finds that adequate disclosures of the current financial condition of the

Plan Debtors, the Consolidated Non-Debtors and their Non-Debtor Affiliates, and of the terms of

the proposed orderly liquidation of the Estates (through, *inter alia*, substantive consolidation and

the Global Claims Settlement), were made during the course of the Chapter 11 Cases and the

solicitation of acceptances of the Plan, and in connection with the Confirmation Hearing. Moreover, the Plan itself, and the process leading to its formulation, including the Plan Proponents' arm's-length and painstaking discussions between themselves and with various creditor constituencies, provides independent evidence of the Plan Proponents' good faith in proposing the Plan. Further, the terms and conditions of the Plan are consistent with the objectives and policy of the Bankruptcy Code and serve to maximize value of the Estates' Assets for the benefit of Holders of Allowed Claims as provided for in the Plan.

69. Additionally, the Court previously determined in the Disclosure Statement Order that the Disclosure Statement contained adequate information, and the Plan Proponents provided Holders of Claims and Interests with the approved disclosure materials during the period between entry of the Disclosure Statement Order and the commencement of the Confirmation Hearing. The procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with Sections 1125 and 1126 of the Bankruptcy Code and the Disclosure Statement Order. The Plan Proponents and the other Exculpated Parties, as applicable, have acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code.

Section 1129(a)(4): Approval of Certain Payments as Reasonable

70. In accordance with the requirements of Section 1129(a)(4), all payments by the Plan Debtors' Estates for costs and services in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, to representatives, consultants, professionals and others, the approval of which is required under the Bankruptcy Code, either have previously been reviewed by the Fee Examiner appointed in these Chapter 11 Cases or have been approved by the Court or remain subject to final review for reasonableness by the Court under Section 330 of the Bankruptcy Code, and were adequately disclosed in the Plan and the

Disclosure Statement, including the Schedules and exhibits thereto, or have been disclosed prior to or at the Confirmation Hearing.

**Section 1129(a)(5): Disclosure of Identity and Affiliation of the Proposed Trustee and the Litigation Trustee is Consistent with the Interests of Creditors and Holders of Interests and with Public Policy**

71.     The Plan Proponents have duly and properly disclosed the identity and affiliations of the individuals proposed to serve after confirmation of the Plan as the Trustee and the Litigation Trustee.  Mr. Myers and Mr. Zazzali are experienced professionals, with valuable and extensive knowledge of the facts and circumstances pertinent to the Trust and the Litigation Trust, as applicable, and thus well qualified to serve as Trustee and Litigation Trustee, respectively.  The appointment of the proposed Trustee and Litigation Trustee is consistent with the interests of the Holders of Claims and Interests and with public policy.

**Section 1129(a)(6): Approval of Rate Changes**

72.     The requirements of Section 1129(a)(6) are not applicable to the Plan.

**Section 1129(a)(7):  Best Interests of Creditors**

73.     In accordance with Section 1129(a)(7), each holder of a Claim or Interest in an Impaired Class has either (a) accepted the Plan or, (b) as demonstrated by the chapter 7 liquidation analyses attached as Exhibit D to the Disclosure Statement, as amended, (the "Liquidation Analysis"), and the testimony of Mr. Myers, will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Plan Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

74.     The methodology used by the Plan Proponents in estimating the liquidation value of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as set forth in the Liquidation Analysis, is reasonable.  The Liquidation Analysis conclusively establishes that each

Holder of a Claim or Interest that did not accept the Plan, will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. Further, no Holder of a Claim or Interest objected to confirmation of the Plan on the basis that it was not receiving or retaining under the Plan as much as it would receive in a chapter 7 liquidation.

Section 1129(a)(8):  Acceptance of the Plan By Impaired Classes

75.     As indicated in the Plan, Classes 1A, 1B, 2A, 2B, 3A, 3B, 4A, 4B, 5A, 5B, 6A, 6B, 7A, 7B, 8A, 8B, 9A, 9B, 10A, 10B, 11A, 11B, 12A, 12B, 13A, 13B-(a), 14A, 14B, 15A, 15B, 16A, 16B, 17A, 17B, 18A, 18B, 19A, 19B, 20A, 20B, 21A, 21B, 22A, 22B, 23A, 23B, 24A, and 24B consist of Unimpaired Claims and thus, as previously determined in the Disclosure Statement Order and as a matter of law, are deemed to have accepted the Plan under the Bankruptcy Code. As to these Classes, Section 112(a)(8)(B) of the Bankruptcy Code applies and is satisfied.

76.     Classes 1C-(a), 1C-(b), 2C-(a), 2C-(b), 3C-(a), 3C-(b), 4C-(a), 4C-(b), 4C-(c), 5C-(a), 5C-(b), 5C-(c), 6C-(a), 6C-(b), 6C-(c), 7C-(a), 7C-(b), 8C-(a), 8C-(b), 8C-(c), 9C-(a), 9C-(b), 10C-(a), 10C-(b), 11C-(a), 11C-(b), 12C-(a), 12C-(b), 13B-(b), 13C-(a), 13C-(b), 13C-(c), 13C-(d), 14C, 15C, 16C, 17C, 18C, 19C, 20B-(b), 20C, 21C, 22C, 23C, and 24C (the "Impaired Voting Classes") consist of all Impaired Claims that were entitled to vote on the Plan. As set forth in the Voting Report, of the Impaired Voting Classes, Creditors in the Impaired Accepting Classes have accepted Plan. Creditors who voted to accept the Plan hold no less than 71% in amount and 86% in number of the Allowed Claims in the Impaired Accepting Classes. The

aggregate rate of acceptance for all Impaired Accepting Classes was 96.24% in amount and 95% in number. As to these Classes, Section 1129(a)(8)(A) applies and is satisfied.

77.     No ballots were returned with respect to Classes 4C-(a) and 8C-(a). Pursuant to the Disclosure Statement Order, such Classes are deemed to accept the Plan. In addition, no member of such Classes objected to the Plan and the Plan is confirmable with respect to each such Class because, as set forth below, the Plan satisfies the cramdown requirements of Section 1129(b) of the Bankruptcy Code.

78.     Classes 1D, 1E, 2D, 2E, 3D, 3E, 4D, 4E, 5D, 5E, 6D-(a), 6D-(b), 6E, 7D, 7E, 8D-(a), and 8D-(b), 8E, 9D, 9E, 10D, 10E, 11D, 11E, 12D, 12E, 13D, 13E, 14D, 14E, 15D, 15E, 16D, 16E, 17D, 17E, 18D, 18E, 19D, 19E, 20D, 20E, 21D, 21E, 22D, 22E, 23D, 23E, 24D, and 24E (the "Deemed Rejecting Classes") consist of Impaired Claims that were not entitled to vote on the Plan but are deemed to have rejected the Plan as a matter of law. As to each of these Classes, the Plan is confirmable however, because as set forth below, the Plan satisfies the cramdown requirements of Section 1129(b) of the Bankruptcy Code.

Section 1129(a)(9):  Treatment of Priority Claims

79.     The treatment of Administrative Claims and Priority Claims as set forth in Articles III and IV of the Plan, as modified by the Professional Fee Deferral (defined below), is in accordance with the requirements of Section 1129(a)(9) of the Bankruptcy Code. For the reasons noted below, the objections raised to the Administrative TIC Rent/Expense Claims Protocol are without merit and are overruled.

Section 1129(a)(10):  Acceptance By At Least One Impaired Class

80.     As set forth in the Voting Report, the Impaired Accepting Classes have voted to accept to the Plan. As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by an

Insider. The Plan, therefore, satisfies the requirements of Section 1129(a)(10) of the Bankruptcy Code.

Section 1129(a)(11): Feasibility of the Plan

81. The Plan is a plan of orderly liquidation. However, based upon the evidence proffered or adduced at the Confirmation Hearing, including the Myers Decl., the Plan Distribution Projections are reasonable and achievable. Further, the Trustee will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date, including the funding of the S/A/P Reserve, the Operating Expense Reserves for the Trust, the DBSI Estate Litigation Trust and the Private Actions Trust. *See* Myers Decl., at ¶ 36q.

Section 1129(a)(12): Payment of Bankruptcy Fees

82. Pursuant to Article III of the Plan, all fees payable pursuant to Section 1930(a) of title 28 of the United States Code, as determined by the Court, have been paid or shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first, thus satisfying the requirements of Section 1129(a)(12) of the Bankruptcy Code.

Non-Applicability of Sections 1129(a)(13) through 1129(a)(16)

83. The Plan Debtors do not have any obligation to pay retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, or owe any domestic support obligations, are not individuals, and are not nonprofit corporations. Therefore, Sections 1129(a)(13), 1129(a)(14), 1129(a)(l 5), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

## L.    Compliance With Section 1129(b) "Cramdown" Requirements

84.    Section 1129(b) of the Bankruptcy Code contains the so-called "cram-down" provisions and provides that, if all applicable requirements of Section 1129(a) are met other than Section 1129(a)(8), the Court shall confirm a plan so long as it does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan. *See* 11 U.S.C. § 1129(b)(1); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).  Section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to (i) the Deemed Rejecting Classes, which are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and (ii) Classes 4C-(a) and 8C-(a) because these Classes did not cast any ballots with respect to the Plan.  However, under Section 1129(b) of the Bankruptcy Code, the Plan may be confirmed without compliance with Section 1129(a)(8) of the Bankruptcy Code with respect to such Classes because the Plan (i) does not discriminate unfairly against these Classes, and (ii) is fair and equitable with respect to these Classes within the meaning of Section 1129(b) of the Bankruptcy Code.

85.    In determining whether a plan unfairly discriminates against a dissenting class, courts within the Third Circuit apply a "rebuttable presumption" test, under which a rebuttable presumption of unfair discrimination arises when there is:

> a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Armstrong World*, 348 B.R. at 121 (citing *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)); *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000) (adopting rebuttable presumption test).  Here, there is no unfair discrimination

against Classes 4C-(a) and 8C-(a) and the Deemed Rejecting Classes. As noted above and reflected in the Voting Report, per the solicitation procedures approved by the Court in the Disclosure Statement Order, the Holders of Claims in Classes 4C-(a) and 8C-(a) are deemed to have accepted the Second Amended Plan. Moreover, under the Plan, Holders of Claims in Classes 4C-(a) and 8C-(a) will receive treatment identical to that received by other Unsecured Classes against the Note/Fund Consolidated Debtors - a projected 18.5% distribution. Additionally, under the Plan Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected Plan, insofar as the Holders of such Claims or Interests will not retain or receive any property on account thereof, consistent with their relative priority under applicable law.

86.     Likewise, the Plan is fair and equitable as to each Holder of Claims and Interests in Classes 4C-(a) and 8C-(a) and the Deemed Rejecting Classes as the Plan provides for no distribution on account of any Claim or Interest that is junior to the Claims or Interests classified under such Classes and no Creditors in Classes senior to such Classes are receiving more than 100% of the Allowed amount of their respective Claims.

87.     The Court therefore, finds that the Plan satisfies the requirements of Sections 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code with respect to Classes 4C-(a) and 8C-(a) and the Deemed Rejecting Classes.

**M.      The Principal Purpose of the Plan is not Tax Avoidance (Section 1129(d))**

88.     No party in interest, including, without limitation, any governmental unit or taxing authority, has requested that the Court deny confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 and the primary purpose of the Plan is not such

avoidance. Accordingly, the Plan satisfies the requirements of Section 1129(d) of the
Bankruptcy Code.

89. The evidence and testimony at the Confirmation Hearing establishes that any and
all other applicable requirements of Sections 1123 and 1129 are satisfied by the Plan Proponents
and the Plan. Thus, the Plan Proponents have met their burden to introduce evidence that
supports confirmation of the Plan. There remains no issue of law or fact, nor any objection,
which would preclude confirmation of the Plan.

**N.     The Global Claims Settlement and Claims Protocols**

90. Critical to the implementation of the Plan and conditions to the occurrence of the
Effective Date is the approval by the Court of the Global Claims Settlement, the Administrative
TIC Rent/Expense Claims Protocol, the TIC Claims Protocol, the Note/Fund Claims Protocol
and the Cost Allocation and Professional Fees Protocol (collectively, the "Protocols"). The
Global Claims Settlement and the Protocols provide for fair and efficient mechanisms for
resolving Claims, the absence of which would increase the costs of the Chapter 11 Cases, delay
the administration of the Chapter 11 Cases, and dilute recoveries to Holders of Allowed Claims
and Interests that are provided for in the Plan. The Global Claims Settlement and the Protocols
are therefore in the best interests of the Plan Debtors, their Estates, all Holders of Claims and
Interests and comport with public policy.

(a)     The Global Claims Settlement

91. Article V of the Plan contains the Global Claims Settlement. The Global Claims
Settlement constitutes a settlement and resolution of the Sub Con Motion. Pursuant to Section
1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a) and in consideration of the
substantive consolidation, treatment of Claims, distributions and other benefits provided under

the Plan, the Global Claims Settlement constitutes a good faith compromise and settlement of all the Claims and controversies resolved by such agreement.

92.     Settlements are "a normal part of the process of reorganization." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("A plan may include a provision that settles or adjusts any claim belonging to the debtor or the estate") (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968)); *see also Coram Healthcare*, 315 B.R. at 329 (citing *Myers v. Martin*, 91 F.3d 389, 393 (3d Cir. 1996) and noting that "compromises are favored in bankruptcy").

93.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. P. 9019(a).  This standard also applies when the settlement is incorporated into a chapter 11 plan.  *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) (citing "the standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9019"); *Coram Healthcare*, 315 B.R. at 334 (holding that the "standards for approval of a settlement under Section 1123 are generally the same as those under Rule 9019.").  To approve a compromise and settlement under Rule 9019(a), the court does not have to be convinced that the settlement is the best possible compromise.  *Coram*, 315 B.R. at 329.  Rather, the court must only determine that the compromise or settlement is fair and equitable and falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness.  *Id.* at 330; *see also In re Integrated Health Services, Inc.*, 2001 Bankr. LEXIS 100, at *7 (Bankr. D. Del. Jan. 3, 2001) ("The responsibility of the bankruptcy judge . . . is not to decide the numerous questions of

law and fact raised . . . but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness.").

94.     The evidence and arguments made, proffered or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases, demonstrate that: (i) the Chapter 11 Trustee exercised his sound business judgment in formulating the Global Claims Settlement, which was the result of good faith and arms' length discussions between the Chapter 11 Trustee and the Creditors' Committee, which also included other parties in interest from time to time; (ii) the Global Claims Settlement is fair and equitable, reasonable and in the best interests of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, their Estates and Creditors, and (iii) clearly falls well above the lowest range of reasonableness.

95.     Approval of the Global Claims Settlement is essential to the orderly liquidation of the Plan Debtors as a means of resolving the Intercompany Claims, the Note/Fund DBSI Claims and the DBSI Note/Fund Claims.

96.     Furthermore, the resolution of the Intercompany Claims as provided for in the Global Claims Settlement is a critical component of the advantages to be realized through the Plan. Absent the approval of the Global Claims Settlement, the potential costs to each of the Plan Debtors' Estates for pursuing the unwinding of these Intercompany Claims undoubtedly would be enormous. Moreover, it is likely that the end result of any further due diligence and litigation pursued on behalf of each Plan Debtor's Estate regarding Intercompany Claims would be the same conclusion upon which the Plan's substantive consolidation is based-- the Debtors' financial affairs are so entangled that separating them is a futile and cost-prohibitive endeavor.

97.     The Global Claims Settlement eliminates the need to litigate the Intercompany Claims and avoids the very real prospects that the attendant cost and delay would render the Plan

Debtors' Estates administratively insolvent. The Global Claims Settlement is a negotiated resolution of numerous Claims and controversies that recognizes the strengths and equities of the various Intercompany Claims, while saving the very substantial litigation costs, risks and delays associated with litigated resolutions of these Intercompany Claims. These savings are reflected in the proposed Plan distributions rather than consumed in expensive and likely fruitless litigation.

98. Accordingly, the implementation of the Global Claims Settlement is a critical Plan mechanism for resolving the Intercompany Claims for the benefit of all Impaired Classes of Claims.

(b) The Protocols

99. Several thousand claims totaling billions of dollars were filed in the Chapter 11 Cases. The vast majority in number of these claims were filed by the TIC Investors and Note/Bond/Fund Investors. In order to avoid the enormous expense of reconciling each of the almost ten thousand (10,000) investor claims, which reflect vastly different assertions of value, the Plan implements these protocols for the liquidation and allowance of the different kinds of investor claims. In addition, the Plan includes a protocol for the allowance of Chapter 11 administrative costs among the two groups of substantively consolidated Debtors created under the Plan. Specifically, Article VI of the Plan contains the following four protocols, the approvals of which are critical and essential to the implementation of the Plan:

- The Administrative TIC Rent/Expense Claims Protocol;

- The TIC Claims Protocol;

- The Note/Fund Claims Protocol; and

- The Cost Allocation and Professional Fees Protocol.

100. Two Protocols are applicable to TIC Investors: (i) the Administrative TIC Rent/Expense Claims Protocol, which applies the dictates of Section 503(b) and prior orders of the Court to determine the allowability of Administrative TIC Rent Claims and/or Administrative TIC Expense Claims; and (ii) the TIC Claims Protocol, which provides *pro rata* treatment for all pre-petition TIC Investor Claims, arising from their pre-petition masterleases or asset management agreements with the Debtors, and determine the allowable amounts of such Claims according to the nature of the Claims that the Holders preserved (or waived) in the Chapter 11 Cases.

101. The Note/Fund Claims Protocol governs the allowability of Note/Bond/Fund Investors Claims, including Note Claims, Bond Claims, Preferred Interest Claims, Non-Preferred Interest Claims and Sharing Unit Interest Claims, taking into account the nature and priority of those Claims under the instruments under which they were created.

102. The Cost Allocation and Professional Fees Protocol allocates certain administrative costs and all professional fees of the Chapter 11 Cases from inception through the Effective Date, allocating those administrative costs to each of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors in proportion to their respective levels of required administrative activities and resulting costs for the period prior to June 2009, and thereafter, on the basis of the estimated realizable liquidation values of their respective Assets.

103. Based on the testimony either given or proffered and the other evidence introduced at the Confirmation Hearing and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, the Court finds that the Protocols are (i) fair and equitable and in the best interests of the Plan Debtors, their Estates, Creditors and other parties in interest; (ii) necessary to facilitate the

efficient administration of the Chapter 11 Cases and to avoid unnecessary delay and costs which would dilute the recovery to Creditors; and (iii) essential to the implementation of the Plan and the orderly liquidation of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors.

(c)    <u>The Objections to the Administrative TIC Rent/Expense Claims Protocol</u>

104.    Further, the Court finds that the Administrative TIC Rent/Expense Claims Protocol set forth in Section I.2 of Article VI of the Plan is consistent with Third Circuit case law. *See In re DBSI, Inc.*, 407 B.R. 159, 165 (Bankr. D. Del. 2009). Limiting the Administrative TIC Rent Claims to the excess cash flow after payments of (i) property operating costs, (ii) debt service, (iii) Chapter 11 expenses, (iv) Taxes, (v) asset management fees, and (vi) tenant improvement costs in the priority set forth in the three separate orders in November 2008, December 2008 and January 2009 (collectively, the "Cash Collateral Orders") authorizing and approving the use of cash collateral with respect to the TIC Property Assets [Docket Nos. 294, 519 and 1005], complies with the mandates of the Cash Collateral Orders and is in accordance with Section 503(b) of the Bankruptcy Code. Section 503(b) of the Bankruptcy Code limits the Administrative TIC Rent Claims to the amount of the benefit received by DBSI's Estate subsequent to the Petition Date. DBSI's Estate, unlike a debtor-occupant or beneficial user of real property, gained no benefit from use or enjoyment of the respective properties other than the excess cash flow, if any, accruing from its "sandwich" tenancy during the post-petition period. Therefore, the benefit to DBSI's Estate can, in respect to each Administrative TIC Rent Claim or Administrative TIC Expense Claim, be measured in discreet financial terms -- that being the amount by which each respective TIC property's cash balance increased after the Petition Date, after giving effect to the payments made from each such TIC property's cash

43

under the Cash Collateral Orders. This is what is implemented pursuant to the Administrative TIC Rent/Expense Claims Protocol set forth in Section J.2 of Article VI of the Plan.

105.    Based on the foregoing, the objection (the "TIC Investor Objection") filed by the tenant-in-common owners of the properties identified as 48 Perimeter, Holly Hills, Arbors at Mallard Creek, and Dacular Medical Center, joined by the tenant-in-common owners of the properties known as Regents Park, Valley View and Solitude (collectively, the "Objecting TIC Investors") is overruled in all respects. The Objecting TIC Investors object to confirmation of the Plan on the basis that the Plan does not pay in full their claims for post-petition rent under their respective master lease agreements with the Debtors. However, as noted above, the Plan complies with the mandates of the Bankruptcy Code and the Cash Collateral Orders entered by this Court by providing for the full payment of Allowed Administrative TIC Rent Claims under the Administrative TIC Rent/Expense Claims Protocol. The Debtors did not occupy the real property leased by the Objecting TIC Investors and the Objecting TIC Investors have failed to proffer any evidence that the Debtors' continued management of these respective properties provided a direct and substantial benefit to the Estates.

106.    Further, the Objecting TIC Investors' contention that Section 365(d)(3) automatically elevates their claims for post-petition rent to administrative expense status is also unavailing. This Court has expressly held in this case that (i) Section 365(d)(3) does not provide a specific remedy for noncompliance with its requirements, and (ii) the penalty for violation of Section 365(d)(3) is not an automatic administrative claim. *See* 407 B.R. at 164. The Objecting TIC Investors have not provided any basis for Administrative Claims for the full amount of their post-petition rent. As such, their claims for post-petition rent need not be paid in full at

confirmation and their objection to confirmation is overruled and the Protocols are approved in their entirety as set forth in Article VI of the Plan.

(d)     The Professional Fee Deferral

107.    The Plan Proponents have proposed and all affected Professionals have agreed, to a deferral in payment (and waiver of a reserve) of approximately seven percent (7%) (the "Professional Fee Deferral") of their total fees for services rendered in the Chapter 11 Cases through the Effective Date.

**O.     Assumption Of The Designated Insurance Policies**

108.    In accordance with Section E of Article IX of the Plan, to the extent that any or all of the DBSI Consolidated Debtors' and the Note/Funds Consolidated Debtors' insurance policies, and any agreements, documents or instruments relating thereto are considered to be executory contracts, including, but not limited to, certain insurance policies listed in the Supplemental Plan Exhibit - Designated Insurance Polices filed with the Court, as amended [Docket Nos. 5820 and 5884] (collectively, the "Designated Insurance Policies"), they are deemed assumed and assigned to the Trust, effective as of the Effective Date, and, unless otherwise determined pursuant to agreement of the parties or a Final Order of the Court prior to the Effective Date, no payments are required to cure any defaults under such Designated Insurance Policies existing as of the Confirmation Date. Entry of this Order constitutes approval of such assumptions and assignment pursuant to Section 365(a) of the Bankruptcy Code and a finding by the Court that assumption of the Designated Insurance Policies is in the best interest of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, their respective Estates, and all parties in interest in the Chapter 11 Cases, *provided, however*, that nothing contained in this paragraph or the Plan shall constitute or be deemed a waiver of any Cause of Action the DBSI Consolidated Debtors or the Note/Fund Consolidated Debtors may

hold against any Entity, including, without limitation, the insurer, under any insurance policies to which a DBSI Consolidated Debtor or a Note/Funds Consolidated Debtor is a party or a beneficiary. For the avoidance of doubt, all rights under any Designated Insurance Policy that is not considered to be an Executory Contract, and all rights under any other insurance policies under which any DBSI Consolidated Debtor or Note/Fund Consolidated Debtor may be a beneficiary (including the rights to make, amend, prosecute, and benefit from claims) shall be preserved and shall vest in the applicable Trust pursuant to Article VI of the Plan and Section 1123(a)(5)(B) of the Bankruptcy Code.

**P.**     **The DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust**

    (a)     <u>Creation of the Trust</u>

    109.     On the Effective Date, the DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust shall be created in accordance with Section M.1 of Article VI of the Plan and the applicable Trust Agreement. The DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust are authorized and empowered to receive the applicable Trust Assets pursuant to Section M.1 of Article VI of the Plan. The transfer of the applicable Trust Assets to the DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust on the Effective Date in accordance with the Plan and the Trust Agreement is reasonable and necessary and made in accordance with applicable state law and applicable provisions of the Bankruptcy Code, including Sections 363(b) and 1123(b)(3) of the Bankruptcy Code.

    (b)     <u>The Trust Agreement</u>

    110.     The DBSI Liquidating Trust Agreement and the DBSI Real Estate Liquidating Trust Agreement are essential elements of the Plan and entry into the applicable Trust Agreement is in the best interests of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, their Estates and their Creditors. The Plan Proponents have exercised

reasonable business judgment in determining to enter into the Trust Agreement on the terms set forth in the applicable Trust Agreement. The Plan Proponents have provided sufficient and adequate notice of the Trust Agreement, including any material modifications to the Trust Agreement, to all parties in interest. The Trust Agreement shall, upon execution, be valid binding, and enforceable and shall not be in conflict with any federal or state law.

(c)     Transfer of Trust Assets.

111.    The Chapter 11 Trustee's transfer of the Trust Assets to the applicable Trust on the Effective Date in accordance with the Plan and the Trust Agreement is reasonable and necessary and made in accordance with applicable state law and applicable provisions of the Bankruptcy Code, including Bankruptcy Code Sections 363(b) and 1123(b)(3).

**Q.     The DBSI Estate Litigation Trust and the Private Actions Trust**

(a)     Creation of the Litigation Trust

112.    On the Effective Date, the DBSI Estate Litigation Trust and the Private Actions Trust shall be created in accordance with Section M.2 of Article VI of the Plan and the applicable Litigation Trust Agreement. The DBSI Estate Litigation Trust and the Private Actions Trust are authorized and empowered to receive the applicable Litigation Trust Assets pursuant to Section M.2 of Article VI of the Plan. The transfer of the applicable Litigation Trust Assets to the DBSI Estate Litigation Trust and the Private Actions Trust on the Effective Date in accordance with the Plan and the Litigation Trust Agreement is reasonable and necessary and made in accordance with applicable state law and applicable provisions of the Bankruptcy Code, including Sections 363(b) and 1123(b)(3) of the Bankruptcy Code.

(b)     The Litigation Trust Agreement

113.    The DBSI Estate Litigation Trust Agreement and the Private Actions Trust Agreement are essential elements of the Plan and entry into the applicable Litigation Trust

Agreement is in the best interests of the DBSI Consolidated Debtors and the Note/Fund

Consolidated Debtors, their Estates and their Creditors. The Plan Proponents have exercised

reasonable business judgment in determining to enter into the Litigation Trust Agreement on the

terms set forth in the applicable Litigation Trust Agreement. The Plan Proponents have provided

sufficient and adequate notice of the Litigation Trust Agreement, including any material

modifications to the Litigation Trust Agreement, to all parties in interest. The Litigation Trust

Agreement shall, upon execution, be valid binding, and enforceable and shall not be in conflict

with any federal or state law.

(c)    Transfer of the Litigation Trust Assets.

114.    The Chapter 11 Trustee's transfer of the Litigation Trust Assets to the applicable

Litigation Trust on the Effective Date in accordance with the Plan and the Litigation Trust

Agreement is reasonable and necessary and made in accordance with applicable state law and

applicable provisions of the Bankruptcy Code, including Bankruptcy Code Sections 363(b) and

1123(b)(3).

**R.    Satisfaction of Conditions to Confirmation.**

115.    Section A of Article X of the Plan contains conditions precedent to Confirmation

that must be satisfied or duly waived pursuant to Section C of Article X of the Plan. The

conditions precedent set forth in Section A of Article X of the Plan have been satisfied.

**S.    Objections to the Plan**

116.    Seventeen responses/objections to confirmation of the Plan were filed with the

Court. *See* Docket Nos, 5749, 5796, 5798 - 5806, 5808 - 5812 and 5827 - 5828.

117.    The objections filed by (i) the Lewisville Independent School District, (ii) Denton

& Williamson Counties, Texas, (iii) the Dallas County, Round Rock ISD, Richardson, Tarrant

County, Bexar County, Coppell, Coppel ISD & Harris County, Texas, (iv) Pacific Western Bank,

48

(v) the Chapter 7 Trustee, (vi) the Great Oaks Water Co., (vii) Douglas Swenson, Charles Hassard, John Mayeron and Thomas Var Reeve, and (viii) Walt E. Mott and John D. Foster have been resolved by the addition of language to this Order, which is set forth in paragraph 8 below. The reservations of rights filed by DBSI 2005 Secured Notes Creditors and DBSI 2006 Secured Notes Creditors, 2007 LIDF Notes Investors' Committee and 2008 DOF Notes Investors' Committee and DBSI 2008 Notes Purchasers Investors' Committee have been addressed through corrections to the Disclosure Statement Schedules and language inserted in this Confirmation Order at paragraph 8 below. Similarly, the objection filed by Western Electronics LLC has been resolved by addition of language to the Confirmation Order, which is set forth in paragraph 9.C(ii) below. The objection filed by the State of Idaho Department of Environmental Quality ("IDEQ") has been withdrawn, the IDEQ having been advised and having confirmed to its satisfaction that record ownership of the Broadway Plaza property, which is the subject of said objection, is not in the name of any of the Plan Debtors. Conditioned upon the removal of DBSI Chambers and Hess Units LLC from Schedule 5 to the Disclosure Statement, the objection filed by Sharon K. Jones, Treasurer of Douglas County, Colorado has been withdrawn.

118. The objections filed by 48 Perimeter, Arbors at Mallard Creek, Dacular Medical Center and Holly Hill TIC Investors, Regents, Solitude and Valley View TIC Investors and Midfirst Bank are without merit and are overruled in all respects for the reasons set forth on the record at the Confirmation Hearing.

**[Intentionally left blank]**

**DECREES**

Based upon the foregoing Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.    Confirmation.  The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code. All other requirements for confirmation of the Plan have been satisfied.  Accordingly, the Plan, as amended, is hereby CONFIRMED pursuant to Section 1129 of the Bankruptcy Code.  The terms of the Plan are incorporated by reference into, and are an integral part of this Order.  A copy of the Plan is attached hereto as Exhibit B.

2.    Best Interest of Creditors.  The Liquidation Analysis filed as Exhibit D to the Disclosure Statement together with evidence proffered at the Confirmation Hearing (i) are persuasive, credible and accurate as of the dates such evidence was prepared, presented, or proffered, (ii) have not been controverted by other persuasive evidence or have not been challenged, (iii) are based upon reasonable and sound assumptions, (iv) provide a reasonable estimate of the chapter 7 liquidation values of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors upon a hypothetical chapter 7 liquidation and (v) establish that each Holder of a Claim in an Impaired Class that has not accepted the Plan will receive or retain under the Plan, as of the Effective Date, property of a value that is not less than the amount that such Holder would receive on account of such Claim if the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, were hypothetically liquidated under chapter 7 of the Bankruptcy Code.

3.    Objections.  All parties in interest have had a full and fair opportunity to litigate all issues raised, or that might have been raised, including, without limitation, any objections that could have been raised to any exhibits and/or Schedules to the Plan and Disclosure Statement or

related thereto, and any and all comments thereto have been considered by the Court. All objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons stated on the record of the Confirmation Hearing. Any Objection that has been withdrawn is deemed withdrawn with prejudice.

4.     Plan and Confirmation Order Binding. Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as expressly provided in the Plan or this Order, the Plan and its provisions are binding upon and inure to the benefit of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, any Person or Entity acquiring or receiving property under the Plan, and any holder of a Claim against or Interest in any of the DBSI Consolidated Debtors or the Note/Fund Consolidated Debtors, whether the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has filed, or is deemed to have filed, a proof of Claim or Interest, or has accepted or rejected the Plan.

5.     Supplemental Private Actions Trust Notice/Deadline Extension. The deadline to make the Private Actions Trust Election is hereby extended through and including November 30, 2010. The form of the Supplemental Private Action Trust Notice attached hereto as Exhibit A is approved and KCC is authorized to serve such Supplemental Private Actions Trust Notice on investors who have not yet responded regarding the Private Actions Trust Election.

6.     Plan Classification Controlling. The classifications of Claims and Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.

7.    Clarification of Specific Plan Provisions:

A.    M&I Disputed Secured Claim. For the avoidance of doubt, the Court retains jurisdiction to determine the M&I Action and nothing in this Order or the Plan shall affect the rights, claims and/or defenses asserted by the parties in said proceeding until such rights, claims and/or defenses are determined by further order of the Court. Further, notwithstanding anything to the contrary in Section F of Article VIII of the Plan or otherwise, any distribution payable to M&I pursuant to the Plan shall not subject to reduction, including on account of payments by a party that is not a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, except in accordance with (i) agreement of the parties, or (ii) pursuant to the Plan procedures regarding objections to disputed claims, which contemplate an objection, opportunity for response by the claimant and adjudication by the Court, if necessary. To the extent any of the Setoff Funds are determined to be property of the any of the Converted Affiliates' estates, then the Plan treatment of M&I Disputed Secured Claim does not apply to such Setoff Funds.

B.    Pacific Western Bank. Nothing in the Plan, the Trust Agreement, or this Order shall affect the rights or claims of Pacific Western Bank against South Cavanaugh LLC, including, without limitation, rights under the stay relief Order entered by the Court on March 4, 2009, the Operating Agreement of South Cavanaugh dated June 8, 2008, if any, and applicable non-bankruptcy law, and all such rights are expressly reserved.

C.    Great Oaks Water Co. For avoidance of doubt, nothing in the Plan or in this Confirmation Order seeks authority to (i) sell that certain property known as Cavanaugh V in Ada County, Idaho ("Cavanaugh V") free and clear of (a) that certain ground lease between DBSI Tanana Valley, LLC ("Tanana Valley") as lessor and Great Oaks Water Co. ("GOW") as lessee for ninety-nine (99) years, a true and correct copy of which appears at Docket No. 1570

(the "Ground Lease"), and/or (b) the option within the Ground Lease whereby GOW may

purchase the fee title to Cavanaugh V for $1.00 from Tanana Valley (the "GOW Option"), or

(ii) reject the Ground Lease and/or the GOW Option. Any future seller of Cavanaugh V that is

related to the Debtors, including but not limited to the Trust, shall provide written notice of any

future sale of Cavanaugh V to GOW to be received as soon as is reasonably practicable, but in

no event less than one month prior to a proposed closing, addressed as follows: Great Oaks

Water Co., c/o Timothy S. Guster, General Counsel, Legal and Regulatory Affairs, Great Oaks

Water Co., PO Box 23490, San Jose, CA 95153 (the "Required Notice"). Any sale of

Cavanaugh V purporting to be free and clear of the Ground Lease and/or GOW Option made

without having first provided the Required Notice shall each be void *ab initio* and without legal

effect. The same clarifications set forth in this paragraph have been requested by certain

similarly situated lessees of properties known as DBSI Cavanaugh LLC and DBSI Cavanaugh II,

III and IV (the "Additional Cavanaugh Properties"). The Plan Proponents agree that the same

clarifications shall apply to the lessees of the Additional Cavanaugh Properties provided that

they supply to the Plan Proponents and/or file with the Court no later than November 8, 2010

their respective leases and such other information as necessary for the required notices to be

given to such lessees.

        D.    <u>Texas Taxing Authorities</u>. In resolution of the objections filed by

Lewisville Independent School District [Docket No. 5749], County of Denton and County of

Williamson [Docket No. 5800], and the Local Texas Tax Authorities [Docket No. 5811]

(hereinafter collectively, the "Texas Taxing Authorities"), the Plan Proponents acknowledge that

none of the Plan Debtors are the owners of real property within the taxing jurisdictions of the

Texas Taxing Authorities; nothing in the Plan or this Order shall be deemed to prohibit or impair

the ability of the Texas Taxing Authorities to pursue their tax collection remedies against any Non-Debtor entities or any Non-Plan Debtors owning property within their respective taxing jurisdictions, provided, however, that to the extent that the cases of any Non-Plan Debtors are not dismissed upon the Effective Date, the Texas Taxing Authorities will remain subject to the provisions of the automatic stay with respect to such Non-Plan Debtors remaining in Chapter 11; and nothing in the Plan or this Order shall be deemed to prohibit or impair the ability of the Texas Taxing Authorities from including in their state law collection actions any Plan Debtors having either a secured, unsecured or other economic interest in or against the Non-Debtors or Non-Plan Debtors owning real properties within their respective tax jurisdictions, provided, however, that the relief sought by the Texas Taxing Authorities against any such Plan Debtors shall be limited to *in rem* relief against the subject real properties within their respective tax jurisdictions.

E.  <u>Converted Affiliates</u>.  In resolution of the objection filed by George L. Miller, Chapter 7 Trustee for the Converted Affiliates, notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Converted Affiliates shall be deemed to have waived and released all Claims, including Intercompany Claims, against the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, and the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors shall be deemed to have waived and released any and all claims against the Converted Affiliates, including, without limitation, any and all distribution or dividend, or right to distribution or dividend payable by the Converted Affiliates.

F.  <u>Limited Insider Claims</u>.  The Plan provides for the *nunc pro tunc* substantive consolidation of the Consolidated Non-Debtors effective November 10, 2008.  The Plan also anticipates that causes of action may be pending or initiated or pursued against certain

former insiders in litigation, arbitration, or otherwise, including, without limitation, Consolidated Non-Debtor Avoidance Actions, Estate Causes of Action, Non-Estate Causes of Action, the Spann Action, and Other Class Actions. Any such causes of action pursued against Douglas Swenson, Charles Hassard, John Mayeron, Thomas Var Reeve, Walt E. Mott and John D. Foster ("Limited Insider Claims") shall be subject to the following limitations:

- Notwithstanding anything in the Plan or any other pleading or other document filed in the Debtors' bankruptcy cases to the contrary, and notwithstanding any position taken by a party in the Debtors' bankruptcy cases, the preclusive effect (under the doctrines of collateral estoppel, res judicata, or otherwise) of the Court's decision regarding substantive consolidation of the Consolidated Non-Debtors as set forth in the Confirmation Order shall be limited, solely as to the defendants of the Limited Insider Claims, to the specific relief granted in the Confirmation Order—e.g., *nunc pro tunc* substantive consolidation of the Consolidated Non-Debtors; provided, however, that for avoidance of doubt, (i) the Court's decision regarding substantive consolidation of the Consolidated Non-Debtors shall not have any other preclusive effect with respect to the Limited Insider Claims, (ii) the preclusive effect of the Confirmation Order shall not be subject to any limitation in connection with affirmative claims that may be asserted by Messrs. Swenson, Hassard, Mayeron, Reeve, Mott or Foster; and (iii) the non-objection of Messrs. Swenson, Hassard, Mayeron, Reeve, Mott or Foster to substantive consolidation of the Consolidated Non-Debtors shall not be deemed an admission or concession of any factual or legal issue in connection with the Limited Insider Claims.

G.    Claim Amounts for Certain Note/Bond/Fund Investors. Any discrepancies or disputes regarding the allowed claim amounts set forth in Schedule 4 to the Disclosure Statement for 2005 Notes and 2006 Notes Claimants, 2007 LIDF and 2008 DOF Claimants, and/or 2008 Notes Claimants that are identified in a writing provided to the Plan Proponents by counsel for such claimants on or before the Confirmation Date (the "Identified Claim Amount Issues") shall be resolved either (i) by agreement of the parties, or (ii) by the Court consistent with the Note/Fund Claims Protocol; provided that, for avoidance of doubt, the absence of a formal objection having been filed regarding any Identified Claim Amount Issues shall not preclude or affect the resolution thereof.

H.    Technology Companies Transferred Properties.  For purposes of the definition of "Technology Companies Transferred Properties" contained in Section B.1.209 of Article I of the Plan, the phrase "Secured or Unsecured Claims" is clarified to read "secured or unsecured claims".  For further clarification, Technology Companies Transferred Properties shall include any debt owed to any Plan Debtor or any Consolidated Non-Debtor by iTerra Communications LLC and/or certain other technology-related non-debtor companies, including Western Electronics, Wavetronix LLC, GigOptix Inc., and Bio-Reaction Industries LLC (each, a "Technology Company"), and any equity interest in any Technology Company owned by any Plan Debtor or any Consolidated Non-Debtor; and (ii) notwithstanding Section B.2(c) of Article VI of the Plan, such debt and equity interests shall not be included in the DBSI Estate Litigation Trust Assets for any purpose.

8.    Implementation of the Plan: Entry of this Order shall constitute approval of the Global Claims Settlement, the Administrative TIC Rent/Expense Claims Protocol, the TIC Claims Protocol, the Note/Fund Claims Protocol and the Cost Allocation and Professional Fees Protocol as well as all other transactions set forth in Articles V and VI of the Plan. Notwithstanding Section J.3. of the Plan, the Cost Allocation and Professional Fees Protocol shall govern the allocation and payment of costs of the Chapter 11 Cases incurred and projected from the Petition Date to the Effective Date.  The Chapter 11 Trustee, the Trustee and the Litigation Trustee are authorized to take all actions necessary or appropriate to implement the provisions of the Plan, subject to the terms of this Confirmation Order.

A.    Substantive Consolidation.  Substantive consolidation of the DBSI Consolidated Debtors, including, without limitation, DBSI Investments and DBSI Redemption, is hereby granted and ordered *nunc pro tunc* to November 10, 2008.  Substantive consolidation

of the Note/Fund Consolidated Debtors is hereby granted and ordered *nunc pro tunc* to November 10, 2008. As a consequence of substantive consolidation on the Effective Date: (i) all of the property and interests in property of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, and their respective Estates, shall be deemed pooled for all purposes under the Plan; (ii) all of the Claims between and among the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors shall be subordinated and remain in effect with respect to Avoidance Actions against non-Debtor third parties; and (iii) any fees due under 28 U.S.C. §1930 following the Effective Date shall be calculated based on two consolidated entities. Because each Potential Defendant listed on Schedule 10 to the Disclosure Statement received notice of the *nunc pro tunc* substantive consolidation ordered herein, each such Potential Defendant is hereby barred and enjoined from contesting or collaterally attacking the *nunc pro tunc* substantive consolidation ordered herein in this or any future proceedings. The Holder of a Claim against the DBSI Consolidated Debtors shall be entitled to only one satisfaction on account of such Claim, and any duplicative Claims (including a Claim on account of the same transaction against other DBSI Consolidated Debtor) shall be disallowed. The Holder of a Claim against the Note/Fund Consolidated Debtors shall be entitled to only one satisfaction on account of such Claim, and any duplicative Claims (including a Claim on account of the same transaction against other Note/Fund Consolidated Debtor) shall be disallowed.

B.      Kastera LLC. For purposes of Section B.1(b) of Article VI of the Plan, the term "Kastera Subsidiary Interests" is clarified to read "Kastera Transferred Properties and DBSI Pristine Meadows LLC, a DBSI Owned Real Estate SPE". It is further clarified that Kastera does not have an ownership interest in DBSI Pristine Meadows LLC ("Pristine

Meadows"). Rather, Pristine Meadows, together with Kastera Development, own all of the interests in Kastera Pavilion Commons.

        C.      <u>Corporate Action; Effectuating Documents; Further Transactions</u>.  On the Effective Date, (i) the matters under this Plan involving or requiring corporate action of the Chapter 11 Trustee on behalf of the Plan Debtors, their subsidiaries or any Entity that is or becomes a Trust Asset, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to this Plan, shall be deemed to have been authorized and to have occurred and effective in all respects as provided in the Plan and shall be taken without any further action by the Court or the Chapter 11 Trustee on behalf of the Plan Debtors or their Affiliates or any Entity that is or becomes a Trust Asset; and (ii) the Chapter 11 Trustee, the Trustee and the Litigation Trustee, as applicable, are authorized to adopt such resolutions, make such amendments, execute, deliver, file or record such instruments or other agreements or documents and take such actions as may be reasonably necessary or appropriate consistent with the language of the Plan to effectuate, implement and further evidence the terms and conditions of the Plan.

        D.      <u>Entity Governance</u>.  From and after the Effective Date, the DBSI Liquidating Trustee as to the DBSI Consolidated Debtors, and the DBSI Real Estate Liquidating Trustee as to the Note/Fund Consolidated Debtors, shall have the sole authority: (i) to manage and wind-down the affairs of such Entities; (ii) to exercise all authority of such Entities to manage and wind-down the affairs of the Non-Debtor Affiliates and all other Entities the ownership interests of which are included within the applicable Trust; (iii) to abandon any asset or interest transferred to the Trust which is determined in such Trustee's discretion to be burdensome or of inconsequential value; and (iv) to implement the provisions of the Plan,

notwithstanding the provisions of any Entity governance document or agreement to the contrary; provided however, that:

(i) *Wavetronix LLC.* Notwithstanding any provision of the Plan or this Order to the contrary: (a) nothing in the Plan nor in this Order shall (i) affect the rights of the Debtors' Estates, the Trust, the Trustee, the Chapter 11 Trustee, the Creditors' Committee, the Trust Oversight Committee nor Wavetronix LLC ("Wavetronix"), or any successor to any of the foregoing, with respect to dissociation and recharacterization, including any affirmative claims, counterclaims and defenses, and all such rights are expressly reserved, (ii) alter the Wavetronix Operating Agreement or Idaho state law or any other applicable law with respect to the interests in Wavetronix or claims against Wavetronix, if any, held or to be held by the Chapter 11 Trustee, if prior to the Effective Date, or the Trustee (or his successor(s) in interest), if after the Effective Date, or with respect to the interests in Wavetronix held by any of its members or claims against Stellar or the Chapter 11 Trustee, if any, held by such members, (iii) cause the Wavetronix Operating Agreement or any other Wavetronix organizational document to be disregarded or otherwise affect the enforceability thereof under applicable law, including the provisions contained in Sections B.2, C and D of Article VI of the Plan, and (iv) effectuate any consolidation of Wavetronix into the DBSI Consolidated Debtors and Wavetronix and its members shall retain any offset rights they may possess under applicable law; (b) the DBSI Estate Liquidating Trust, as transferee of Stellar's claims and/or interests against Wavetronix, shall take such claims and/or interests only to the extent of Stellar's claims and/or interests prior to confirmation of the Plan and, in the case of claims and interest under the Wavetronix Operating Agreement, subject to the terms and conditions of such Operating Agreement, and, subject in all events, to whatever claims, objections or legal arguments Wavetronix, its members,

officers, directors, option holders and employees may have; and (c) nothing in the Plan or Confirmation Order shall or shall be deemed to give the DBSI Liquidating Trust any greater rights, claims, interests or defenses in Wavetronix by virtue of any transfers from Stellar to the DBSI Liquidating Trustee than those held by Stellar or the Chapter 11 Trustee prior to confirmation of Plan.

(ii) *Western Technology.* The provisions of Section B.2(d) of Article VI of the Plan shall be deemed omitted and there shall be substituted the following: "The Chapter 11 Trustee's execution and delivery, on behalf of Western Tech, of the Fourth Amended and Restated Operating Agreement of Western Electronics LLC ("Western Electronics") dated as of the Effective Date of the Plan (the "Amended Western Electronics Agreement"), by and among the parties thereto, in settlement of the limited objection to the Plan filed by Western Electronics, is ratified and affirmed and the Chapter 11 Trustee shall cause the transfer to the DBSI Liquidating Trust Western Tech's Assets (except Estate Causes of Action, which shall be transferred to the DBSI Estate Litigation Trust), including, without limitation, its Interest in Western Electronics, and the DBSI Liquidating Trustee shall be authorized to exercise all of the authority accorded to it under the Amended Western Electronics Agreement." Notwithstanding any provision of the Plan or this Order to the contrary: (i) Western Electronics is not and shall not be deemed a Consolidated Non-Debtor for purposes of the Plan or this Order or for any other purpose, and, notwithstanding that Western Electronics is a non-debtor affiliate of Western Tech, the provisions of the Plan and this Order that apply to Non-Debtor Affiliates shall not apply to Western Electronics; (ii) neither the Plan nor this Order shall be deemed to vest in any party any rights or powers with respect to Western Electronics not otherwise provided for in the Amended Western Electronics Agreement or under applicable law; and (iii) the allowance and treatment of

any Claim of Western Electronics shall be pursuant to Article IV of the Plan, and the Court shall retain jurisdiction with respect to any such Claim of Western Electronics, except that any such Allowed Claim shall not be subordinated under Section A.2 of Article V of the Plan or any other provision thereof absent further order of the Court, and Western Electronics and its members shall retain any offset rights they may possess under applicable law, including, without limitation, the rights reserved in Section E of Article XI of the Plan.

E. *Wind-Down; Abandonment; Dismissal of Non-Plan Debtors*. The Trustee is authorized to take all actions necessary to effectuate the wind-down or other disposition of all Non-Debtor Affiliates in which one or more of the DBSI Consolidated Debtors or the Note/Fund Consolidated Debtors holds a majority interest and to transfer the net proceeds from such disposition to the applicable Trust for distribution in accordance with the Plan. The definition of Non-Plan Debtors in Section B.1.152 of Article I of the Plan shall be deemed omitted and there shall be substituted the following: "***Non-Plan Debtors*** means, collectively, One-Executive Tower LLC, DBSI Copperfield Timbercreek LeaseCo LLC, DBSI Shoppes at Trammel LLC, DBSI Alma/121 Office Commons LLC, DBSI Cottonwood Plaza Development LLC, DBSI Draper Technology 21 LLC, DBSI Escala LLC, DBSI Telecom Office LLC, Belton Town Center Acquisition LLC, DBSI Broadway Plaza LeaseCo LLC, DBSI Flowood Plaza LLC, DBSI Lexington LLC, DBSI Meridian 184 LLC, DBSI One Hernando Center North LLC, South Cavanaugh LLC, DBSI 121/Alma Land L.P., DBSI 121/Alma LLC, FOR 1031 Broadway Plaza LLC, Florissant Market Place Acquisition LLC, FOR 1031 Brookhollow One LLC, DBSI Brookhollow One LLC, DBSI Lone Peak Parkway LLC, DBSI Lansdowne I LP, DBSI Surprise Farms LLC, Kastera Snake River 94 LLC, DBSI E-470 East LLC, and DBSI Colony West Development LLC." On the Effective Date, the Clerk of the Court shall dismiss the Chapter 11

Cases of One-Executive Tower LLC [Case No. 08-12666], DBSI Copperfield Timbercreek LeaseCo LLC [Case No. 08-12816], DBSI Shoppes at Trammel LLC [Case No. 08-12823], DBSI Alma/121 Office Commons LLC [Case No. 08-12826], DBSI Cottonwood Plaza Development LLC [Case No. 08-12827], DBSI Draper Technology 21 LLC [Case No. 08-12828], DBSI Escala LLC [Case No. 08-12829], DBSI Telecom Office LLC [Case No. 08-12831], Belton Town Center Acquisition LLC [Case No. 09-10034], DBSI Broadway Plaza LeaseCo LLC [Case No. 09-10035], DBSI Flowood Plaza LLC [Case No. 09-10038], DBSI Lexington LLC [Case No. 09-10040], DBSI Meridian 184 LLC [Case No. 09-10041], DBSI One Hernando Center North LLC [Case No. 09-10042], South Cavanaugh LLC [Case No. 09-10044], DBSI 121/Alma Land L.P. [Case No. 09-10045], DBSI 121/Alma LLC [Case No. 09-10046], FOR 1031 Broadway Plaza LLC [Case No. 09-10080], Florissant Market Place Acquisition LLC [Case No. 09-10081], FOR 1031 Brookhollow One LLC [Case No. 09-10262], DBSI Brookhollow One LLC [Case No. 09-10263], DBSI Lone Peak Parkway LLC [Case No. 09-10264], DBSI Lansdowne I LP [Case No. 09-10276], DBSI Surprise Farms LLC [Case No. 09-10409], Kastera Snake River 94 LLC [Case No. 09-10987], DBSI E-470 East LLC [Case No. 09-12117], and DBSI Colony West Development LLC [Case No. 10-10768], unless any such Entity is listed on a Notice of Non-Dismissal to be filed by the Chapter 11 Trustee on or before the Effective Date.

F.     Closing of Chapter 11 Cases of DBSI Consolidated Debtors and Note/Fund Consolidated Debtors. Upon the filing of a notice of the Effective Date by the Chapter 11 Trustee: (i) the Clerk of the Court is authorized to close the Chapter 11 Cases of all DBSI Consolidated Debtors and Note/Fund Consolidated Debtors with the exception DBSI, Inc. [Case No. 08-12687] and DBSI 2008 Notes Corporation [Case No. 08- 12699], both of which

Chapter 11 Cases shall continue to be jointly administered under Case No. 08-12687 (PJW); and (ii) all post-Effective Date filings shall be filed in Case No. 08-12687 (PJW). For the avoidance of doubt, closure of the aforementioned Chapter 11 Cases shall in no manner waive, eliminate, modify, release, affect or alter the Causes of Action retained and preserved under the Plan and paragraph 8(H) below of this Order.

        G.    <u>Nullification of Anti-Assignment or Other Transfer Provisions</u>. The Plan contemplates (i) the transfer to the DBSI Real Estate Liquidating Trust of Interests of and in the Note/Fund Consolidated Debtors in various Entities as identified more fully in the definition of DBSI Real Estate Liquidating Trust Assets, and (ii) the transfer to the DBSI Liquidating Trust of Interests of and in the DBSI Consolidated Debtors in various Entities as identified more fully in the definition of DBSI Liquidating Trust Assets, and to the extent that any agreement, document, charter document (including, without limitation, any operating agreement, shareholders' agreement, by-laws, or partnership agreement), statute, rule or other restriction (collectively, a "Restriction") prohibits, limits, or impairs, in any respect, such transfer by the Note/Fund Consolidated Debtors or the DBSI Consolidated Debtors, as applicable, such Restriction shall be unenforceable solely for purposes of allowing the transfer of the DBSI Real Estate Liquidating Trust Assets to the DBSI Real Estate Liquidating Trust and the DBSI Liquidating Trust Assets to the DBSI Liquidating Trust, as applicable.

        H.    <u>Retention of Causes of Action /Preservation of Rights</u>. It is in the best interests of the Holders of Claims and Interests that all Estate Causes of Action that are not expressly released under the Plan be retained and preserved by the DBSI Estate Litigation Trustee and the Trustee, as applicable, pursuant to Section R of Article VI of the Plan. Specifically:

(i)       Pursuant to Section R of Article VI of the Plan and in accordance with Section 1123(b) of the Bankruptcy Code, any and all Estate Causes of Action, including preferential and fraudulent transfers and other Avoidance Actions of the Note/Fund Consolidated Debtors and the DBSI Consolidated Debtors (including, without limitation, Consolidated Non-Debtors DBSI Investments, DBSI Redemption, Stellar and the Non-Debtor Affiliates described in Schedule 1 to the Disclosure Statement) shall remain Assets of the Estates, shall be part of the Assets of the DBSI Estate Litigation Trust and shall vest in the DBSI Estate Litigation Trust with the DBSI Estate Litigation Trustee being the representative of the Estates with respect to such Causes of Action, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Estate Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Court, and neither the Chapter 11 Trustee, the Plan Debtors nor their Estates waive, release, relinquish, forfeit, or abandon (nor shall they be estopped or otherwise precluded or impaired from asserting) any Estate Causes of Action that constitutes property of the Plan Debtors or their Estates: (i) whether or not such Estate Cause of Action has been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Court, (ii) whether or not such state Estate Cause of Action is currently known to the Chapter 11 Trustee, and (iii) whether or not a defendant in any litigation relating to such Estate Cause of Action Filed a Proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan.

(ii)      Notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify,

analyze or refer to any Estate Cause of Action, or potential Estate Cause of Action, in the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release or alter the Chapter 11 Trustee's, the Estates', or the DBSI Estate Litigation Trustee's right to commence, prosecute, defend against, settle, and realize upon any Estate Cause of Action that the Plan Debtors and their Estates have or may have as of the Confirmation Date.

(iii)    Solely for the avoidance of doubt, except as expressly provided in the Plan, the DBSI Estate Litigation Trustee, shall, after the Effective Date, retain the rights of each Consolidated Non-Debtor, to prosecute any Cause of Action that could have been brought by such Consolidated Non-Debtor at any time, including Avoidance Actions.

(iv)    For the further avoidance of doubt and in addition to the preservation of Avoidance Actions described above, notwithstanding the substantive consolidation ordered herein, all Avoidance Actions of the Note/Fund Consolidated Debtors and DBSI Consolidated Debtors (which includes the Consolidated Non-Debtors) that are based upon transfers made to any insider or third-party where the transferor was not directly liable (constructively fraudulent transfers) are hereby expressly preserved.

(v)    For the further avoidance of doubt, notwithstanding anything herein to the contrary, neither the Global Claims Settlement nor any other release provided for herein or in the Plan shall release or waive any Causes of Action, including Avoidance Actions, that the Note/Fund Consolidated Debtors and the DBSI Consolidated Debtors may hold against any insider as that term is defined in Section 101(31) of the Bankruptcy Code and/or other applicable law.

(vi)    For the further avoidance of doubt, Section B(ii) of Article V of the Plan is subject to Section B(i) of Article V of the Plan in that the treatment of Intercompany Claims between the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors are provided for in Section B(i) of Article V of the Plan and not affected by Section B(ii) of Article V of the Plan.

9.    <u>Effectuating Documents; Further Transactions</u>. The Chapter 11 Trustee is authorized to enter into any and all documentation necessary to effectuate the terms of the Plan, as amended.

10.    Approval of the Trust Agreement; Appointment of the Trustee
and Vesting of Trust Assets:

A.    The DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust is an essential element of the Plan and entry into the Trust Agreement is in the best interests of the Plan Debtors, their Estates and Creditors. Therefore, the DBSI Liquidating Trust Agreement and the DBSI Real Estate Liquidating Trust Agreement (together with all schedules, exhibits, appendices, and other attachments thereto and as supplemented, amended and modified) are approved, and the Chapter 11 Trustee and the Trustee, respectively, are authorized to take all actions contemplated under the applicable Trust Agreement. The Trust Agreement shall, upon execution, be valid, binding and enforceable in accordance with their terms.

B.    As of the Effective Date, the appointment of Conrad Myers as Trustee under the DBSI Liquidating Trust and the DBSI Real Estate Liquidating Trust is approved. From and after the Effective Date, except as expressly provided in the Plan, the Trustee shall be deemed a representative of the applicable Estates in accordance with Section 1123 of the Bankruptcy Code and shall have, and be entitled to exercise, all rights and powers provided to

the Estates under the Bankruptcy Code, including Section 1107 thereof, in addition to all powers, authority, rights and responsibilities granted in the applicable Trust Agreement.

C.  Except as otherwise set forth in the Plan or this Confirmation Order, on the Effective Date, the DBSI Real Estate Liquidating Trust Assets shall vest in, and constitute assets of, the DBSI Real Estate Liquidating Trust free and clear of all Liens, Claims, Interests and encumbrances asserted against any of the Note/Fund Consolidated Debtors and/or DBSI Consolidated Debtors, except as otherwise provided in the Plan, and each applicable Note/Fund Consolidated Debtor shall be deemed for all purposes to have transferred legal and equitable title to all DBSI Real Estate Liquidating Trust Assets of its Estate to the DBSI Real Estate Liquidating Trust for the benefit of the Holders of DBSI Real Estate Liquidating Trust Beneficial Interests.  Except as otherwise set forth in the Plan or this Confirmation Order, on the Effective Date, the DBSI Liquidating Trust Assets shall vest in, and constitute assets of, the DBSI Liquidating Trust free and clear of all Liens, Claims, Interests and encumbrances asserted against any of the DBSI Consolidated Debtors and/or Note/Fund Consolidated Debtors, except as otherwise provided in the Plan, and each applicable DBSI Consolidated Debtor shall be deemed for all purposes to have transferred legal and equitable title to all DBSI Liquidating Trust Assets of its Estate to the DBSI Liquidating Trust the benefit of the Holders of DBSI Liquidating Trust Beneficial Interests.

11.  Approval of the Litigation Trust Agreement; Appointment of Litigation Trustee and Vesting of Litigation Trust Assets:

A.  The provisions relating to the DBSI Estate Litigation Trust and the Private Actions Trust contained in the Plan and in the applicable Litigation Trust Agreement are approved in all aspects, and the Chapter 11 Trustee and the Litigation Trustee, respectively, are authorized to take all actions contemplated under the applicable Litigation Trust Agreement.

The Litigation Trust Agreement shall, upon execution, be valid, binding and enforceable in accordance with their terms.

B.       As of the Effective Date, the appointment of James R. Zazzali, Esq. as the Litigation Trustee under the DBSI Estate Litigation Trust and the Private Actions Trust is approved. From and after the Effective Date, except as expressly provided in the Plan, the Litigation Trustee in his role as the DBSI Estate Litigation Trustee shall be deemed a representative of the applicable Estates in accordance with Section 1123 of the Bankruptcy Code and shall have, and be entitled to exercise, all rights and powers provided to the Estates under the Bankruptcy Code, including, without limitation, the powers of a trustee under Sections 704, 1106 and 1108 thereof and Rule 2004 of the Bankruptcy Rules, in addition to all powers, authority, rights and responsibilities specified in the Plan and the DBSI Estate Litigation Trust Agreement.

C.       Except as otherwise set forth in the Plan or this Confirmation Order, on the Effective Date, all Estate Causes of Action and Objection Rights involving an adversary proceeding that is pending on the Effective Date and that relates to a common set of facts or legal issues also implicated by an Estate Cause of Action shall vest in, and constitute assets of, the DBSI Estate Litigation Trust, and the Note/Fund Consolidated Debtors and the DBSI Consolidated Debtors shall be deemed for all purposes to have transferred legal and equitable title to all DBSI Estate Litigation Trust Assets of their Estates to the DBSI Estate Litigation Trust for the benefit of the Holders of DBSI Estate Litigation Trust Beneficial Interests.

12.     <u>No Suit Against Trustee and Litigation Trustee</u>. Absent the permission of the Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than this Court against the Trustee or the Litigation Trustee in their official

capacity, with respect to their status, duties, powers, acts, or omissions as Trustee or Litigation Trustee, as applicable.

13.     Exemption From Certain Transfer Taxes.  Pursuant to, and to the extent provided in, Section 1146(a) of the Bankruptcy Code, any transfers from the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, or any other entity pursuant to the Plan shall not be taxed under any law imposing a stamp tax or similar tax.

14.     Distributions.  The provisions in Article VII of the Plan governing Distributions and related matters hereby are approved and found to be fair and reasonable.  Except as otherwise agreed in writing and approved by the Court, the treatment and Distribution set forth in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any Liens) that each entity holding a Claim or an Interest may have in or against the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, the Estates, the Trust, the Trustee, the Litigation Trustee or their respective property.  This treatment supersedes and replaces any agreements or rights those entities may have in or against the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, the Estates, the Trust, the Trustee, the Litigation Trustee or their respective property.

15.     Cancellation of Interests.  On the Effective Date, all Interests in the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, shall be cancelled, annulled, and extinguished, and shall be of no further force or effect, without any further action by any party.

16.     No Post-petition Interest on Claims.  Unless otherwise specifically provided for in the Plan and except as set forth in Article IV of the Plan, this Confirmation Order, or a post-petition agreement in writing between the Chapter 11 Trustee and a Holder of a Claim and approved by an Order of this Court, post-petition interest shall not accrue or be paid on any

Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, this Confirmation Order or Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

17. <u>Consolidated Non-Debtors Bar Date</u>. Creditors holding claims against the Consolidated Non-Debtors must file proofs of claim with the Trustee, and serve same upon the Trust Oversight Committee, by the deadline set forth in the notice of entry of the Confirmation Order, which shall provide no less than thirty (30) days' notice of such claims deadline and no less ninety (90) days for the DBSI Liquidating Trustee to file objections to such claims (the "Consolidated Non-Debtors' Objection Deadline"). The Consolidated Non-Debtors' Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the DBSI Liquidating Trustee upon the filing of a notice of the extended Consolidated Non-Debtors' Objection Deadline with the Court. Any claim not timely filed shall be forever barred from assertion against, and shall receive no distribution from, the DBSI Consolidated Debtors or any of their assets.

18. <u>Administrative Claims Bar Date and Related Matters</u>:

A. <u>General Administrative Claims Bar Date</u>. Except for Administrative TIC Rent Claims and Administrative Claims covered by the Cost Allocation and Professional Fees Protocol, requests for payment of Administrative Claims (including Administrative TIC Expense Claims) must be filed and served on counsel for the Trustee, counsel for the Creditors' Committee and the U.S. Trustee no later than (a) thirty (30) days after a notice of the Effective Date is filed with the Court and served, or (b) such later date, if any, as the Court shall order

upon application made prior to the end of such 30-day period. Holders of Administrative Claims that are required to file a request for payment of such Claims and that do not file such requests by the applicable bar date shall be forever barred from asserting such Claims against the Plan Debtors, the Estates, the Trust or any of their property. Notwithstanding the foregoing, any bar dates established during the course of the Chapter 11 Cases shall remain in full force and effect. Any objections to allowance of Administrative Claims (other than Administrative TIC Rent Claims and Administrative Claims covered by the Cost Allocation and Professional Fees Protocol) that are timely filed must be filed by any parties in interest no later than ninety (90) days after the Administrative Claim Bar Date (the "Administrative Claim Objection Deadline"). The Administrative Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the Trustee upon the filing of a notice of the extended Administrative Claim Objection Deadline with the Court. Thereafter, the Administrative Claim Objection Deadline may be further extended by an Order of the Court upon application by the Trustee, which Order may be granted without notice to any Creditors.

B. <u>Professional Compensation and Reimbursement Claims</u>. All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, inter alia, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Cases) shall file and serve on counsel for the Chapter 11 Trustee, counsel for the Trustee, counsel for the Creditors' Committee, the Fee Examiner, and the U.S. Trustee, an application for final allowance of compensation and reimbursement of expenses incurred from the Petition Date to the Effective Date ("Final Fee Applications"), no later than (a) forty-five (45) days after the

Effective Date, or (b) such later date as the Court shall order upon application made prior to the end of such 45-day period. Notwithstanding the foregoing, the provisions of prior Orders of the Court governing the allowance and payment of interim fee applications shall remain in effect until the hearing on Final Fee Applications provided, however, that Professionals or any other Person seeking approval of a substantial contribution claim shall be subject to the Professional Fee Deferral. The Fee Examiner's review of the Final Fee Applications shall be limited to the quarterly periods (or parts thereof) not previously reviewed by the Fee Examiner. The Final Fee Applications must be filed and served on counsel for the Chapter 11 Trustee, counsel for the Trustee, counsel for the Creditors' Committee, counsel for the Fee Examiner, the U.S. Trustee, and the Professionals or other Persons to whose application the objections are addressed on or before (a) thirty (30) days after the Professional or other Person files such Final Fee Application or (b) such later date as the Court shall order upon application made prior to the end of such 30-day period, or upon agreement between the Trustee, and the affected Professional or other Person. The costs of a Trust, including without limitation, the fees and expenses of the Trustee and any professionals retained by the Trustee, shall be borne entirely by the applicable Trust and may be paid without further application or order of the Court.

19. <u>Discharge of the Chapter 11 Trustee and Counsel</u>. The appointment of the Chapter 11 Trustee shall terminate on the Effective Date in accordance with Section E of Article VI of the Plan.

20. <u>Dissolution of the Creditors' Committee</u>. The appointment of the Creditors' Committee shall terminate on the Effective Date in accordance with Section F of Article VI of the Plan.

21. Injunction; Release; Exculpation. The injunctions, releases and exculpation provisions set forth in the Plan, including, but not limited to, the injunction set forth in Section E of Article XI, the exculpation provision set forth in Section G of Article XI and the general releases set forth in Section H of Article XI of the Plan are approved as fair, equitable, reasonable and in the best interests of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, their Estates and all Creditors and are warranted based on applicable law.

A. Plan Injunction. On the Effective Date, except as otherwise expressly provided in the Plan, this Order or the documents executed pursuant to the Plan:

(i) All Persons who have been, are or may be Holders of Claims against or Interests in a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor is hereby enjoined from taking any of the following actions against or affecting a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, its Estate, the DBSI Liquidating Trust, the DBSI Real Estate Liquidating Trust, the DBSI Liquidating Trustee, the DBSI Real Estate Liquidating Trustee, or the respective Assets of the foregoing, including the applicable Trust Assets, with respect to such Claims or Interests:

(1) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, its Estate, the DBSI Liquidating Trust, the DBSI Real Estate Liquidating Trust, the DBSI Liquidating Trustee, the DBSI Real Estate Liquidating Trustee, or the respective Assets of the foregoing, including the applicable Trust Assets, provided that, with respect to any suit, action or other proceeding pursued by the DBSI Liquidating Trust or the DBSI Real Estate Liquidating Trust, as applicable, nothing in the Plan or this Order shall limit asserting or pursuing in such suit, action or other proceeding (a) all arguments in or objections or defenses to such suit, action or other proceedings and (b) all claims and counterclaims that relate in any way to the facts, circumstances, transactions or occurrences that are the subject of such suit, action or other proceeding (each referred to as a "Related Claim"), to the extent such Related Claims have not been released, or are otherwise prohibited, by the Plan, and *provided further* that, notwithstanding anything in the Plan or this Order to the contrary, any Claims that are Related Claims asserted by any adverse party in any suit, action or other proceeding, pursued by the applicable Trust (Y) may be, to the extent permitted by applicable law, asserted defensively in such suit, action or other proceeding, including, without limitation, for purposes of setoff, recoupment, reduction of damages or otherwise, without limitation hereunder; and (Z) may be, to the extent permitted by applicable law, liquidated in such suit, action or other proceeding and Allowed, subject to receiving the treatment provided to such Claims under the Plan and subject to the rights of the applicable Trustee to contest such assertions, arguments, objections, defenses and/or claims on any grounds;

(2) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, its Estate, the DBSI Liquidating Trust or the DBSI Real Estate Liquidating Trust, as applicable, the Trustee, or the respective Assets or property of the foregoing, including the Trust Assets;

(3) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, its Estate, the DBSI Liquidating Trust or the DBSI Real Estate Liquidating Trust, as applicable, the Trustee, or the respective Assets or property of the foregoing, including the Trust Assets, other than as contemplated by the Plan;

(4) except as provided in the Plan or this Order, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligations due a DBSI Consolidated Debtor or a Note/Fund Consolidated Debtor, its Estate, the DBSI Liquidating Trust or the DBSI Real Estate Liquidating Trust, as applicable, the Trustee, or the respective Assets or property of the foregoing, including the Trust Assets, other than as contemplated by the Plan or this Order; and

(5) proceeding in any manner whatsoever that does not conform to or comply with the provisions of the Plan, this Order or the settlements set forth in the Plan.

(ii) All Persons that have held, currently hold, or may hold Claims against or Interests in the DBSI Consolidated Debtors and Note/Fund Consolidated Debtors or the Estates that arose prior to the Effective Date (including but not limited to states and other governmental units, and any state official, employee, or other entity acting in an individual or official capacity on behalf of any state or other governmental units) are permanently enjoined from, on account of such Claims or Interests: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of the Plan or this Order. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

B.     Continuation of Existing Injunctions and Stays. Unless otherwise

provided in the Plan or this Order, all injunctions or stays provided for in the Chapter 11 Cases

under Sections 105 or 362 of the Bankruptcy Code, the Plan, by prior Orders of this Court, or

otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Trust.

22. _Record_. The record of the Confirmation Hearing is closed. The findings of fact and conclusions of law of this Court set forth herein and at the Confirmation Hearing shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and the oral findings of fact and conclusions of law reached by the Court at the Court at the Confirmation Hearing are incorporated herein by reference and are made part of this Confirmation Order in accordance with Bankruptcy Rule 7052(a).

23. _Retention of Jurisdiction_. This Court shall retain jurisdiction in accordance with the terms of Article XII of the Plan, the other provisions of this Order, and Section 1142 of the Bankruptcy Code. Until this Chapter 11 Case is closed, any party in interest may commence a proceeding in this Court in respect of any matter as to which jurisdiction has been retained.

24. _Conflicts Between Confirmation Order and Plan_. The failure to specifically include any particular provision of the Plan in this Order will not diminish the effectiveness of such provision, it being the intent of this Court that the Plan is confirmed in its entirety and the Plan Documents are incorporated herein by this reference. The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that if there is determined to be any inconsistency between any Plan provision and any provision of this Order that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this Order shall govern and any provision of this Order shall be deemed a modification of the Plan and shall control and take precedence. Except as set forth directly above, the provisions of the Plan and this Order are integrated with each other and are non-severable and mutually dependent.

25. <u>Notice of Confirmation Order, Effective Date and Related Matters</u>. The Plan Proponents shall not be required to serve notice of the entry of this Confirmation Order. Within ten (10) days of the occurrence of the Effective Date, the Plan Proponents shall file with this Court and serve on all known Holders of Claims and Interests a written notice identifying, inter alia, the Effective Date and Administrative Claims Bar Date and the Bar Date for damages under executory contracts rejected under the Plan. No further notices (other than notice of the Effective Date) shall be required to be sent to any entities or Persons.

26. <u>No Just Cause for Delay</u>. The Court determines that there is no just cause for delay, and this Confirmation Order shall not be stayed and shall take effect immediately upon entry, notwithstanding anything to the contrary in Bankruptcy Rules 3020(e) or 7062(a).

**THIS ORDER IS HEREBY DECLARED TO BE IN RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY RECORDING OFFICER FOR FILING AND RECORDING PURPOSES WITHOUT FURTHER OR ADDITIONAL ORDERS, CERTIFICATIONS OR OTHER SUPPORTING DOCUMENTS.**

Dated: Wilmington, Delaware
October 2 6 2010

_____
The Honorable Peter J. Walsh
United States Bankruptcy Judge