## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DBSI, INC., *et al.*, | Case No. 08-12687 (PJW) |
| Debtors. | Jointly Administered |

**Hearing Date: January 18, 2011, at 3:00 p.m.**
**Objection Deadline: January 3, 2011, by 4:00 p.m.**

### MOTION OF CERTAIN NOTES INVESTOR CREDITORS FOR ORDER PURSUANT TO 11 U.S.C. § 503(B)(3)(D) AND § 503(B)(4) ALLOWING AN ADMINISTRATIVE EXPENSE CLAIM FOR PROFESSIONAL FEES AND EXPENSES INCURRED IN SUCH CREDITORS' SUBSTANTIAL CONTRIBUTION TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN

The creditors identified in Exhibits A through E (collectively, the "Creditors"), by and through their undersigned counsel, respectfully request entry of an order pursuant to Bankruptcy Code § 503(b)(3)(D) and § 503(b)(4) allowing and awarding to the Creditors an administrative expense claim in the amount of $800,000.00 on account of the fees and expenses incurred in these Chapter 11 cases on the grounds that their efforts substantially contributed to confirmation of the Joint Plan and a successful resolution of these Chapter 11 cases. In support of this Motion, the Creditors respectfully state as follows:

### BACKGROUND

1.      DBSI, Inc. ("DBSI") commenced a voluntary petition under Chapter 11 in the case above captioned on November 10, 2008 together with approximately 145 affiliates. DBSI affiliates that filed petitions included each of the entities from which the Creditors purchased promissory notes.

2.     The cases of DBSI and its affiliates which have filed (including the 2007 LIDF, the 2008 DOF, the 2008 Notes Corp, the 2006 Notes Corp and the 2005 Notes Corp [as defined below]) are jointly administered pursuant to orders of the Court.

3.     The Creditors listed on the attached Exhibit A (the "2007 Participants") bought promissory notes from the DBSI 2007 Land Improvement & Development Fund LLC (the "2007 LIDF"). Many other creditors purchased promissory notes from the 2007 LIDF and are similarly situated with the 2007 Participants.

4.     The Creditors listed on the attached Exhibit B (the "2008 DOF Participants") bought promissory notes from the DBSI 2008 Development Opportunity Fund LLC (the "2008 DOF"). Many other creditors purchased promissory notes from the 2008 DOF and are similarly situated with the 2008 DOF Participants.

5.     The Creditors listed on the attached Exhibit C (the "2008 Notes Participants") bought promissory notes from the DBSI 2008 Notes Corporation (the "2008 Notes Corp"). Many other creditors purchased promissory notes from the 2008 Notes Corp and are similarly situated with the 2008 Notes Participants.

6.     The Creditors listed on the attached Exhibit D (the "2006 Notes Participants") bought promissory notes from the DBSI 2006 Secured Notes Corporation (the "2006 Notes Corp"). Many other creditors purchased promissory notes from the 2006 Notes Corp and are similarly situated with the 2006 Notes Participants.

7.     The Creditors listed on the attached Exhibit E (the "2005 Notes Participants") bought promissory notes from the DBSI 2005 Secured Notes Corporation (the "2005 Notes Corp"). Many other creditors purchased promissory notes from the 2005 Notes Corp and are similarly situated with the 2005 Notes Participants.

2

8.      The Creditors' efforts in these cases were focused on preventing the substantive consolidation of all Debtors and obtaining a successful confirmation of a plan.  Beginning in the Spring of 2009 with the Creditors' objection to the Debtors' Disclosure Statement (as defined below) and continuing through Creditors' objection to the Chapter 11 Trustee's Motion for Substantive Consolidation in the Spring of 2010, and Creditors negotiation and support of the Trustee's plan, the Creditors actively sought to prevent substantive consolidation of all debtors while getting an acceptable plan confirmed.

9.      In light of the Creditors' opposition to substantive consolidation, a Second Amended Joint Chapter 11 Plan of Liquidation (the "Approved Plan") and related disclosure statement (the "Disclosure Statement") were filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors (the "Committee") in the Summer of 2010.  This Approved Plan was touted as a "compromise" between the position of the Chapter 11 Trustee and his Motion for Substantive Consolidation, and the position of the Creditors, who opposed consolidation.  The Approved Plan was confirmed by the Court on October 26, 2010 [Docket No. 5924].

10.     The Approved Plan does not provide for substantive consolidation of all of the Debtors into one pool of assets and liabilities.  Instead, it provides for substantive consolidation of the Debtors in two separate groups.  One group includes the Note/Fund Consolidated Debtors (as defined in the Approved Plan) and the other group includes the DBSI Consolidated Debtors (as defined in the Approved Plan).  This form of consolidation resulted from the recognition by the Chapter 11 Trustee and the Committee that the Note/Bond/Fund Investors (as defined in the Approved Plan) and the TIC Investors (as defined in the Approved Plan) should not be treated the same and that the assets made available to pay claims of the Note/Bond/Fund Investors and

3

the TIC Investors should not come from the same pool. As a result of the Creditors' efforts, all persons holding claims against the Note/Fund Consolidated Debtors will receive a much higher return than they would have received had the Chapter 11 Trustee's Motion to Substantively Consolidate these cases been granted.

**CREDITORS' SUBSTANTIAL CONTRIBUTIONS**

11.    The Creditors submit that their efforts in these cases materially and substantially improved the treatment of Note/Bond/Fund Investors in the Joint Plan from that which had been proposed initially by the Debtors and later by the Chapter 11 Trustee. The efforts and the improvements which paved the way for a successful resolution of these cases are explained below.

**(a) Objections to Debtors Disclosure Statement and Plan.**

12.    The Creditors were actively involved throughout the Debtors' jointly administered bankruptcy cases since April 2009. When the Debtors filed their initial Disclosure Statement [Docket No. 3477] (the "Debtors' Disclosure Statement") and related Joint Plan of Liquidation [Docket No. 3476] (the "Debtors' Plan") on May 8, 2009, the Creditors led the effort in opposition to a proposed plan that was unconfirmable and not fair and respectable to creditors' interests generally, and to an inadequate disclosure of information needed to evaluate a plan. In particular, the Creditors identified, *inter alia*, missing information and false statements made pertaining to the liquidation analysis, a lack of disclosure regarding the Debtors' interests in non-debtor affiliates of the Debtors and a lack of disclosure regarding transactions of the Debtors with insiders. The Creditors were the first parties to object to the Debtors' Disclosure Statement [Docket No. 3661], asserting that Debtors failed to make numerous required disclosures. A number of parties that submitted objections to the Debtor's Disclosure Statement thereafter

4

copied significant portions of the Creditors' objection word-for-word. Even the Committee adopted many of the Creditors objections. The Debtors' Disclosure Statement was not approved by the Court.

**(b) Motions to Terminate Debtor's Exclusivity and to Appoint a Trustee.**

13.    Following the Creditors' successful objection to the adequacy of the Debtors' Disclosure Statement, the Committee filed a motion [Docket No. 3711] which sought to terminate the Debtors' exclusive rights to file a plan or, alternatively, to appoint a Trustee. The Creditors filed a response [Docket No. 3764] supporting the termination of the Debtors' exclusivity period and the Committee's motion for the Court to appoint a trustee. The response requested that the appointment of the trustee be in addition to, not as alternative remedy to, termination of the Debtors' exclusivity period.

14.    Shortly thereafter, and on the filing of the Examiner's Report, the United States Trustee moved for appointment of a trustee, an action with the Creditors also supported, and a Chapter 11 Trustee was, in fact, appointed for the Debtors.

**(c) Administrative Cost Allocation Protocols.**

15.    Early in this consolidated case, the focus of the Debtors and the Committee was on resolving lease issues and issues involving almost entirely the TIC entities. In March 2009, and before the active participation of the Creditors in this case, the Debtors sought (by Motion filed as Docket No. 2495) and the Court approved (by Order filed as Docket No. 3139) a preliminary administrative cost allocation protocol, roughly allocating administrative costs incurred through March 2009 and estimated administrative costs through the end of May 2009, between TIC entities, and Note/Bond/Fund entities. This cost allocation motion and order later became an issue because of the substantial change in direction of these consolidated cases from

5

that estimated in March 2009 and the substantial resultant variances in costs and time spent on TIC issues versus Note/Bond/Fund entity issues. Additionally, the protocol had ambiguities regarding which Debtors and costs should be attributed to the TIC group on the protocol and which Debtors and costs should be allocated to the Note/Bond/Fund Debtors. Issues also arose regarding the use of funds in accounts of one debtor to pay administrative expenses allocated or attributable to other Debtors, which raised issues of inter-debtor borrowing and also effectively implicated issues like substantive consolidation of the Debtors.

16.     The Creditors consequently submitted objections relating to the allocation and payment of administrative expenses among the Debtors and requested orders clarifying which Debtor's assets were used to pay administrative expenses, how such costs were allocated and how loans to pay costs were tracked and documented (see Docket No. 4274, 4973 and 4986). The principal objectives of Creditors in these objections were to: (1) clarify how costs incurred in the consolidated case would be allocated to the separate individual Debtors; and (2) to the extent the Note/Bond/Fund Debtors were paying more of the costs than could be properly allocated to such Note/Bond/Fund Debtors, to properly account for the excess and documented as appropriate loans. A secondary objective was to lay the groundwork for opposing the Chapter 11 Trustee's attempt to consolidate all of the Debtors' cases.

17.     These objections led to the Chapter 11 Trustee moving for Court approval of a specific allocation formula for the costs incurred in 2009. The Creditors objected and, among other things, the Court agreed that it would only enter a provisional, temporary order allocating costs incurred in 2009. The responses and objections raised by the Creditors to this motion highlighted issues, which the Chapter 11 Trustee and the Committee later addressed in the Approved Plan. The Trustee and Committee, recognizing errors in the original allocation

6

estimates made in March 2009, proposed modifications to the cost allocation protocol which were approved as part of the Approved Plan. Those modifications, among other things, correctly increased the share of costs borne by TIC Investor creditors under the Approved Plan to reflect the greater time spent on TIC issues.

**(d) Objection to Substantive Consolidation of All Debtors.**

18.     The Creditors recognized that the TIC Investors and the Note/Bond/Fund Investors invested in significantly different types of investments and were not similarly situated. Additionally, although there was substantial comingling of the funds of DBSI, Inc. and many of the TIC entities, the cash and transactions of the Note/Bond/Fund entities were much more segregated. The Creditors also understood early-on that substantive consolidation of all Debtors was likely to be asserted at some point during the proceedings and were committed to opposing substantive consolidation from the beginning.

19.     The Creditors submitted a request to the U.S. Trustee to convene a creditors meeting in order to elect separate trustees and subsequently filed a motion seeking to compel the U.S. Trustee to convene such a meeting [Docket Nos. 4379, 4383, 4384, 4458, 4460, 4466, 4468 and 4918]. The Creditors viewed separate trustees as a path to avoiding substantive consolidation. The requests were never ruled on by the Court, but they laid part of the ground work for defending against substantive consolidation.

20.     Creditors who purchased Notes issued by 2006 Notes Corp also filed objections when the Debtors, and later the Chapter 11 Trustee, sought to sell real estate assets [Docket Nos. 4279, 5451 and 5544]. These objections illuminated the conflicts of interest facing the Chapter 11 Trustee and the Committee, among other issues. As a result, the sales proceeds were reserved for Debtor 2006 Notes Corp rather than commingled with other Debtors' funds.

7

21.     When the Chapter 11 Trustee did file a motion to substantively consolidate the assets and liabilities of all of the Debtors, the Creditors objected [Docket Nos. 5241, 5243, 5244] and further sought appropriate relief by motion to obtain proper and reasonable discovery from the proponents of substantive consolidation [see Docket Nos. 5448, 5539, 5542 and 5543]. While the Approved Plan does provide for consolidation, it is limited and appropriately keeps TIC Investors and Note/Bond/Fund Investors claims separate.   Creditors submit their efforts at opposing unlimited and unconditional consolidation paved the way for better treatment of Note/Bond/Fund Investor creditors and the way to a successful resolution of these Chapter 11 cases.

**(e) Rule 2019 Statements.**

22.     In order to represent the Creditors, counsel for the Creditors and various ad hoc committees established by the Creditors prepared and filed verified statements pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure [Docket Nos. 3688, 4431, 4434, 5138, 5139, 5225, 5263, 5403 and 5404].   These statements, although administrative in nature, were necessary for the Creditors to be participants in the Debtors bankruptcy cases and achieve the beneficial results the Creditors obtained.  The creation of the committees referred to in the 2019 Statements facilitated efficient and greater participation by creditors of the Note/Bond/Fund entities.  Use of the committees streamlined the process for communication and negotiation with the Chapter 11 Trustee and the Committee, resulting in a successful resolution of the cases.

**(f) Negotiating and Facilitating Approval of Chapter 11 Trustee and Committee's Plan.**

23.     Finally, the Creditors filed motions [Docket No. 5667, 5669 and 5809] which, while including limited objections, ultimately supported the Disclosure Statement and Approved Plan.  The objections to the Debtors' Disclosure Statement and to the Disclosure Statement

8

Schedules helped identify deficiencies and clarify various provisions in the Approved Plan and provided additional information to all creditors. The deficiencies identified were corrected and clarified in the Approved Plan. The additional disclosures that were made in response to the Creditors' objections aided creditors in understanding the Approved Plan and helped obtain plan approval.

24.    In particular, Disclosure Statement Schedules 3, 4, 5, 6, 7 and 12 and portions of the Approved Plan pertaining to the treatment of the M&I Bank claims and the description of the funding of the S/A/P Claims Reserve, were corrected and clarified.

25.    The corrections to Schedules 5, 6 and 7 consist of identified corrections to the listing of entities on the applicable Schedules and the addition of entities (which had been omitted and should have been included) to the listing of entities on the applicable Schedules.

26.    The corrections to Schedules 3, 4 and 12 consist of identified corrections to the listing of claim amounts on the applicable Schedules and the addition of claims (which had been omitted and should have been included) to the listing of claims on the applicable Schedules.

27.    These corrections were accomplished through the cooperative efforts of the attorneys for the Creditors, working closely with the attorneys for the Trustee and the attorneys for the Committee, including extensive written and telephone discussions of corrections and clarifications, and the process and methodology for completing the clarifications and corrections. These Schedules are important and critical to the Approved Plan.

28.    Also, after the Disclosure Statement and Schedules were published, the undersigned counsel communicated with Creditors, explaining various provisions of the extremely complex plan and disclosure statements, the process which led to the plan's proposal, and the clarifications and corrections mentioned above (which the Creditors asserted needed to

SL1 1039942v1/000000.00000

be made and were made in the Approved Plan and revised Schedules). As a result, the Creditors were among those parties who voted in favor of the Approved Plan, and the Creditors therefore provided a large segment of support for the Approved Plan.

**(g) Fee Breakdown.**

29.    The legal fees incurred by the Creditors are summarized by category in <u>Exhibit F</u> attached hereto. The total amount of fees incurred is $1,512,034.50. However, pursuant to agreement with the Chapter 11 Trustee and the Committee as stated above, the Creditors are only seeking payment in the amount of $800,000.00 for their substantial contribution. The Chapter 11 Trustee and the Committee, recognizing the substantial contribution of the Creditors, have agreed that they will not object to allowance of an administrative claim for this amount.

30.    Since the efforts of the Creditors benefited the estates of the Note/Fund Consolidated Debtors, the Creditors acknowledge and agree that it is appropriate for the payment of their fees to be allocated to the DBSI Real Estate Liquidating Trust and/or the S/A/P Reserve as funded by the DBSI Real Estate Liquidating Trust, as these are the trusts which have been established for the Note/Fund Consolidated Debtors. In addition, the Creditors acknowledge and agree that the timing for payment of the Creditors' fees will appropriately be at the discretion of the DBSI Real Estate Liquidating Trustee, provided that payment shall be made before or concurrently with the first distribution to beneficiaries of the DBSI Real Estate Liquidating Trust.

31.    The Creditors are requesting that their $800,000.00 administrative expense claim be disbursed to Nelson & Minert, PLLC. Any payment received will be applied first to pay any unpaid legal expenses incurred by the Creditors and the balance will be allocated pro rata among all Creditors, based upon their contributions made to pay costs and expenses during the

10

bankruptcy. Thus, the amount to be received by each Creditor will be calculated based upon the amount that such Creditor contributed in comparison to the total amount that was contributed by all Creditors. Nelson & Minert will be in charge of disbursing to the Creditors, subject to review by committees which have been previously established among the Creditors. Nelson Minert collected all contributions from the Creditors throughout the bankruptcy proceedings, has contracts with the committees which have been established by the Creditors, and has the information necessary to calculate the Creditors' distributions. Nelson Minert will distribute amounts out to Creditors net of any unpaid legal fees and Nelson Minert's administrative costs of making the payments. The committees which have been established by the Creditors will monitor Nelson Minert's distribution process.

## BASIS FOR MOTION

32.    Bankruptcy Code § 503(b) provides, in pertinent part:

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
***
(3)  the actual, necessary expenses, other than compensation and reimbursements specified in paragraph (4) of this subsection, incurred by –
***
(D)  a creditor ... or a committee representing creditors ... in making a substantial contribution in a case under chapter ... 11 of this title;
***
(4)  reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph ... (D) ... of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

Accordingly, Bankruptcy Code § 503(b) authorizes this Court to award as an administrative expense the "reasonable compensation for professional services rendered by an attorney" of "a creditor ... in making a substantial contribution" to the Debtors' case.

11

33.    Courts have agreed that the test for whether a substantial contribution pursuant to § 503(b)(3)(D) has been made is whether the applicant's contribution to the bankruptcy case resulted in an "actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Fin. (In re Mechem Fin.)*, 27 F.3d 937, 944 (3d Cir. 1994) (*quoting In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988). *See also In re Washington Lane Assocs.*, 79 B.R. 241, 244 (Bankr. E.D. Pa. 1987); *In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993) (substantial contribution provided if applicant's efforts produced "tangible benefits to the bankruptcy estate and to other unsecured creditors").

34.    To determine whether a substantial contribution has been made, courts consider the following factors:  (1) whether the services were rendered solely to benefit the client or to benefit all parties in the case; (2) whether the services provided direct, significant and demonstrable benefit to the estate; and (3) whether the services were duplicative of services rendered by attorneys for a committee or for the debtor. *See Buckhead Am. Corp.*, 161 B.R. at 15.

35.    The Creditors' efforts produced actual and demonstrable benefit to the estates of the Note/Fund Consolidated Debtors and the creditors of the Note/Fund Consolidated Debtors. The efforts prevented substantive consolidation of all of the Debtors' assets and liabilities and thus avoided a significant diminution in assets available to Note/Bond/Fund Investors by preventing sharing those assets with the TIC Investors.  Exhibit C to the Disclosure Statement provides "Plan Distribution Projections".  The Plan Distribution Projection for the creditors of the Note/Fund Consolidated Debtors is 18.5% (see page 2 of Exhibit C to the Disclosure Statement which provides a distribution percentage of 18.5% for the DBSI Real Estate Liquidating Trust).  The Plan Distribution Projection for the creditors of the other pool (i.e., the

12

DBSI Consolidated Debtors) is 6.0% (see page 1 of Exhibit C to the Disclosure Statement which provides a distribution percentage of 6.0% for the DBSI Liquidating Trust). If the Creditors had not waged war against substantive consolidation, all creditors of Note/Fund Consolidated Debtors would have received a smaller return. Based on the amounts listed in Exhibit C to the Disclosure Statement, if all of the Debtors were substantively consolidated, the creditors of the Note/Fund Consolidated Debtors would have only received 13.3%[1] Since the Creditors' efforts prevented substantive consolidation of all of the Debtors, the efforts resulted in an actual and demonstrable benefit of increased returns from 13.3% to 18.5%. Thus, avoiding total substantive consolidation increased the return of all creditors of the Note/Fund Consolidated Debtors by approximately 39.1% or $19,973,824.00.[2]

36.    While the efforts of the Creditors did benefit the Creditors themselves, their efforts transcended self-protection. The Creditors make up only a fraction of similarly situated creditors of the estates. For example, (i) the 2007 Participants are only approximately one-half of the number of creditors that purchase Notes from the 2007 LIDF, (ii) the 2008 DOF Participants are only approximately one-half of the number of creditors that purchased Notes from the 2008 DOF, (iii) the 2008 Note Participants are only approximately 31% of the number of creditors that purchased Notes from the 2008 Notes Corp, (iv) the 2006 Note Participants are only approximately 42% of the number of creditors that purchased Notes from the 2006 Notes Corp, and (v) the 2005 Note Participants are only approximately 40% of the number of creditors

---

[1] The 13.3% return is calculated using amounts from Exhibit C to the Disclosure Statement and is calculated by combining amounts of the "Unsecured Claims Base" and the "Amount Distributed" for the DBSI Liquidating Trust with the amounts for the DBSI Real Estate Liquidating Trust. The calculation is as follows: ($5,822 + $10,530 + $12,500 + $12,683 + $12,874 + $32,846) / ($272,087 + $384,112) x 100% = 13.29703%.

[2] The 39.1% increase is calculated as follows: (18.5% - 13.3%) / 13.3% = 39.1%. The $19,973,824.00 amount is calculated using the "Unsecured Claims Base" from Exhibit C to the Disclosure Statement and is calculated as follows: ($384,112,000 x 18.5%) - ($384,112,000 x 13.3%) = $19,973,824.00.

that purchased Notes from the 2005 Notes Corp.   In addition to the other creditors of the 2007 LIDF, the 2008 DOF, the 2008 Notes Corp, the 2006 Notes Corp and the 2005 Notes Corp, the Creditors efforts improved the return of all creditors that purchased Notes from the Note/Fund Consolidated Debtors.   From day one, the Creditors knew that their efforts would aid all similarly situated creditors even though such other creditors were not contributing to pay the cost associated with their efforts.  The relief the Creditors sought at all stages still brought benefits to other creditors even though they did not contribute.  Accordingly, the actions of the Creditors were designed not only to benefit the Creditors themselves but also to benefit all similarly situated creditors.

37.    The efforts of the Creditors were not duplicative of services rendered by other parties involved in the bankruptcy.  Counsel for the Creditors collaborated and coordinated efforts so that duplicative work was avoided.  Counsel for the Creditors often submitted joinders to motions and objections filed by other counsel representing other Creditors.  No other parties were seeking the types of relief sought by the Creditors.

38.    Moreover, the Creditors' efforts in this case could not have been performed by the Chapter 11 Trustee or the Committee.  The Creditors' acted to promote the unique interests of Note/Bond/Fund Investors in these proceedings, at times at the expense of TIC Investors and other constituencies.  The Chapter 11 Trustee and the Committee owed fiduciary duties to all of the claimants and were not in a position to advocate for one group at the expense of another.  Thus, for example, the Committee took no position with respect to the Motion for Substantive Consolidation.  By acting in this role and forcing the compromise reflected in the Approved Plan, the Creditors conferred real benefits upon all similarly-situated creditors.

SL1 1039942v1/000000.00000

39.    Finally, the amount of reimbursement sought by the Creditors is significantly less than their total expenses incurred and is modest in comparison to the professional time and fees charged in these Chapter 11 Cases by counsel for the Committee and the Chapter 11 Trustee.

WHEREFORE, for the reasons stated above, the Creditors request that the Court grant this Motion, execute the proposed order attached hereto as Exhibit G and (i) allow and award to the Creditors an administrative expense in the amount of $800,000.00 for their fees incurred in making a substantial contribution to the Debtors' bankruptcy cases, (ii) allocate payment for such administrative expense to the DBSI Real Estate Liquidating Trust and/or the S/A/P Reserve as funded by the DBSI Real Estate Liquidating Trust, (iii) order that payment of such administrative expense shall be at the discretion of the DBSI Real Estate Liquidating Trustee provided that payment shall be made before or concurrently with the first distribution to beneficiaries of the DBSI Real Estate Liquidating Trust, (iv) order that payment of such administrative expense shall be disbursed to Nelson & Minert, PLLC, as agent for the Creditors, and (v) order that Nelson & Minert distribute the amounts received to the Creditors, net of any unpaid legal fees and Nelson Minert's administrative costs of making the payments, and allocated among the Creditors pro rata based upon their contributions to the 2007 Participants group, the 2008 DOF Participants group, the 2008 Notes Participants group, the 2006 Notes Participants group and the 2005 Participants group, which contributions were made to pay costs and expenses associated with the DBSI bankruptcy.

Dated: December 8, 2010                STEVENS & LEE, P.C.

                                       By   /s/ John D. Demmy
                                       John D. Demmy (DE Bar No. 2802)
                                       1105 North Market Street, 7th Floor
                                       Wilmington, DE 19801
                                       Tel: (302) 425-3308

SL1 1039942v1/000000.00000

Fax: (610) 371-8515
E-Mail: jdd@stevenslee.com

-and-

BEST & FLANAGAN LLP
Patrick B. Hennessy (#124412)
Bradley F. Williams (#027432X)
225 South Sixth Street, Suite 4000
Minneapolis, MN 55402-4690
Phone:  (612) 339-7121
Fax:      (612) 339-5897


CROSS & SIMON, LLC

By _____ /s/ *Joseph Grey* _____
Joseph Grey (No. 2358)
Michael J. Joyce (No. 4563)
913 N. Market Street, Suite 1001
P.O. Box 1380
Wilmington, Delaware 19899-1380
(302) 777-4200

CONNOLLY BOVE LODGE & HUTZ LLP

By _____ /s/ *Karen C. Bifferato* _____
Karen C. Bifferato (#3279)
Christina M. Thompson (#3976)
N. Christopher Griffiths (#5180)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207 (19899)
Wilmington, Delaware 19801
Telephone: (302)658-9141

ATTORNEYS FOR THE CREDITORS

SL1 1039942v1/000000.00000